GBGSLIQ1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
3    LIQUIDX,
4                    Plaintiff,
5              v.                        16 Civ. 5528 (WHP)
6    BROOKLAWN CAPITAL, LLC, et al.,
7                    Defendants.
8    ------------------------------x
                                        New York, N.Y.
9                                       November 16, 2016
                                        9:45 a.m.
10
     Before:
11
                    HON. WILLIAM H. PAULEY III,
12
                                        District Judge
13
                         APPEARANCES
14
     FOLEY HOAG, LLP
15        Attorneys for Plaintiff
     BY:  PETER SULLIVAN
16        MICHAEL LICKER
          KEVIN CONROY
17
     BLANK ROME, LLP
18        Attorneys for Defendants
     BY:  DANIEL E. RHYNHART
19        LOUIS ABRAMS
          COURTNEY GROCHOWSKI
20
     ALSO PRESENT:
21   Carla Nigro, Paralegal
     Jim Doyle, technician
22

23   Emile Van Denbol, Brooklawn CEO

24

25

GBGSLIQ1                        Kovacs - direct

1              (Hearing resumed; in open court)

2              THE COURT:  Are counsel ready to proceed?

3              MR. SULLIVAN:  We are, your Honor.

4              THE COURT:  Fine.

5              Mr. Sullivan, would you call your next witness.

6              MR. SULLIVAN:  LiquidX calls James Kovacs to the

7      stand.

8       JAMES D. KOVACS,

9           called as a witness by the Plaintiff,

10          having been duly sworn, testified as follows:

11             THE COURT:  You may inquire.

12             MR. SULLIVAN:  Thank you, your Honor.

13     DIRECT EXAMINATION

14     BY MR. SULLIVAN:

15     Q.  Mr. Kovacs, were you at one time an employee of a company

16     called Receivables Exchange?

17     A.  Yes.

18     Q.  Before we start talking about your time there, can you

19     briefly describe your educational background?

20     A.  Sure.  I attended Brown University, studied economics, and

21     I left in 2012.

22     Q.  For how long were you at Brown?

23     A.  Three and a half years.

24     Q.  What, if anything, did you do after Brown?

25     A.  I worked on a software project, and then I joined -- then I

1    joined the Receivables Exchange.

2    Q.  The software project, what was that about?

3    A.  We had a piece of software that played online -- it played

4    online poker automatically in a way that was positive ROI.

5    Q.  When you say ROI, what do you mean?

6    A.  Return on investment.

7    Q.  You created a poker program that made a profit, is that

8    what I understand you to say?

9    A.  That's correct.

10   Q.  Who did you sell it to?

11   A.  We sold it to a group -- a group of professional players

12   that were moving from New York to Canada.

13   Q.  Were you working while you were at school?

14   A.  Was I working on that project?

15   Q.  Yes.

16   A.  Yes.

17   Q.  And there came a time when you left school?

18   A.  That's correct.

19   Q.  Did you receive your degree?

20   A.  No.

21   Q.  What did you do after you left Brown and after you sold

22   your company?

23   A.  I started working -- I started working at TRE.

24   Q.  How did you find out about TRE?

25   A.  I was introduced through a gentleman named Jeff Schwartz,

GBGSLIQ1                    Kovacs - direct

1   who was the director for Bain Capital at the time.

2   Q.  When you were working at the Receivables Exchange, when is

3   the first year you started?

4   A.  What year did I start working?

5   Q.  Yes.

6   A.  2012.

7   Q.  And in what role did you have?

8   A.  I worked as a -- I worked as an associate in sales and

9   marketing.

10  Q.  Did there come a time where you had got different roles

11  within the company?

12  A.  Yes.

13  Q.  And what were those roles?

14  A.  So, in late 2013 or early 2014, I took on a role of head of

15  strategy and finance.

16  Q.  As head of strategy and finance, what were your daily --

17  just briefly, what were your tasks as far as being head of

18  strategy and finance?

19  A.  Sure.  I was in charge of financial planning and analysis,

20  I was budgeting and working on some of the financing rounds

21  that TRE did, also doing analysis on things like customer

22  lifetime value and cost of acquisition.

23  Q.  Are you generally familiar with the financial documents of

24  TRE?

25  A.  Yes.

GBGSLIQ1                          Kovacs - direct

1    Q.  Let me show you what we've marked previously as JX 87.  Let

2    me direct you to the binders.

3    A.  87?

4    Q.  Yes.

5    A.  Is it accessible on the monitor, also?

6    Q.  It is.  You can look at the monitor if that's enough for

7    you to identify a document.  I happen to know this is a

8    multi-page document.  You may want to look at the page.

9    A.  I'll turn there.  OK.

10   Q.  Do you recognize JX 87?

11   A.  Yes.

12   Q.  There is a reference to a PWC at the top.  Are you familiar

13   with who TRE's auditor was between 2012 and 2015?

14   A.  PWC is PricewaterhouseCoopers, which was TRE's auditor for

15   the entirety of that time.

16   Q.  Did you have any interaction with PricewaterhouseCoopers in

17   connection with them performing their role as auditor?

18   A.  Yes.

19   Q.  And have you seen this document before as part of the books

20   and records of TRE?

21   A.  Yes.

22            MR. SULLIVAN:  I move the admission of JX 87.

23            MR. RHYNHART:  No objection.

24            THE COURT:  JX 87's received in evidence.

25            (Joint Exhibit 87 received in evidence)

GBGSLIQ1                        Kovacs - direct

1    BY MR. SULLIVAN:

2    Q.  JX 87 refers to the consolidated financial statements from

3    December 31 -- I should say through December 31, 2012, starting

4    with the beginning of 2011?

5    A.  It's it -- it's the 2012 audit also reflecting the 2011

6    financials.

7    Q.  Let me show you what's been marked as JX 88.

8            Let me know if you have seen this document before.

9    A.  Yes.

10   Q.  What is this document?

11   A.  It's also -- also a PWC audit.

12   Q.  For which years?

13   A.  This is the 2014 audit.  It's the 2014 audit report, yes.

14   Q.  Let me show you what's been marked as JX 86.

15           MR. SULLIVAN:  I move JX 88 into evidence.

16           MR. RHYNHART:  No objection.

17           THE COURT:  JX 88 is received in evidence.

18           (Joint Exhibit 88 received in evidence)

19   BY MR. SULLIVAN:

20   Q.  Let's look at JX 86.

21   A.  OK.

22   Q.  Have you seen this document before?

23   A.  Yes.

24   Q.  What is this document?

25   A.  The 2010 audit report.

1   Q.  I move JX 86 into evidence.

2              MR. RHYNHART:  No objection.

3              THE COURT:  JX 86 is received in evidence.

4   BY MR. SULLIVAN:

5   Q.  Let me show you what's been marked as JX 54.

6              Are you familiar with JX 54?

7   A.  Yes.

8   Q.  What is JX 54?

9   A.  It's -- it's output from TRE's accounting software.  It's

10  just the native financials for the monthly financials for the

11  calender year 2013.

12  Q.  Who prepared the financials for TRE for 2013?

13  A.  These would have been prepared by the controller at the

14  time, which was a gentleman named Jason Rumford.

15  Q.  Would you have had any role in the preparation of this

16  document?

17  A.  Not in the preparation, no.

18  Q.  What would you have done, if anything, with respect to this

19  document?

20  A.  I have reviewed the document and seen these historical

21  financials.  I have seen them -- I have seen them in the

22  accounting software in this way.

23  Q.  Is this a printout of some part of a report from the

24  accounting software?

25  A.  It's a -- it's a consolidated report that's generated by

1  the software, yes.

2  Q.  What's the software called?

3  A.  NetSuite.

4  Q.  NetSuite.

5          MR. SULLIVAN:  I move the admission of JX 54.

6          MR. RHYNHART:  No objection.

7          THE COURT:  JX 54 is received in evidence.

8          (Joint Exhibit 54 received in evidence)

9  BY MR. SULLIVAN:

10  Q.  Let's take a look next at JX 24.

11          This is a larger document, Mr. Kovacs.  First, let me

12  know if you can identify it by skimming it first.

13  A.  It's a financial model for Receivables Exchange.

14  Q.  What, if any, role did you have with respect to the

15  creation of JX 24?

16  A.  I worked on this also with the same gentleman, Jason

17  Rumford.

18          MR. SULLIVAN:  I move the admission of JX 24.

19          MR. RHYNHART:  No objection.

20          THE COURT:  JX 24 is received in evidence.

21          (Joint Exhibit 24 received in evidence)

22  BY MR. SULLIVAN:

23  Q.  I just have a question for you on the second page of this

24  document.

25  A.  The second page, you mean --

1    Q.  There are no numbers.  I'm going to put it up on the screen

2    for you.

3          It says FY 2014A.  What does that nomenclature mean?

4    A.  What does --

5    Q.  What does FY 2014A mean?

6    A.  So it's the actual financials for the calender year of

7    2014.

8    Q.  So the A refers to actual?

9    A.  The A refers to actual.

10   Q.  And then the FY 2015E, what does that refer to?

11   A.  The E refers to expected or a projection.

12   Q.  Anything we see on this document with an E is a projection,

13   is that correct?

14   A.  That's correct.

15   Q.  Let's look at JX 48.

16          Let me know if you can identify this document.

17   A.  Yes.

18   Q.  What is this document?

19   A.  It's also native output from NetSuite for monthly financial

20   statements in 2015 through November.

21   Q.  Who at TRE is responsible for creating these reports?

22   A.  This would have been created by Sophia Gielewski, if it was

23   created in November.

24   Q.  During your time at TRE, would you be putting reports of

25   this type together?

GBGSLIQ1                      Kovacs - direct

1   A.   I would have seen this report.  I wouldn't have put it

2   together.

3   Q.   This one was as of November 15, 2015?

4   A.   I don't know if it's November 15.  It's just November of

5   2015.

6   Q.   OK.

7   A.   I can assume it's November, end of month.

8   Q.   The reason I ask you, I see there is a November 15 at the

9   top left corner.  What does that indicate?

10  A.   So it's just like all the other, it's -- January 15 is

11  January 2015, February 15 is February 2015, November 15 is

12  November 2015.

13  Q.   Does that capture the full month of November then?

14  A.   It does.

15  Q.   And when did you leave TRE?

16  A.   At the end of October.

17  Q.   We will save this for Ms. Gielewski.

18           Let me move to JX 61.

19  A.   61?

20  Q.   Yes, 6-1.

21  A.   OK.

22  Q.   Do you recognize the document and the statements contained

23  inside this document?

24  A.   These are also reports that are generated out of NetSuite.

25  I mean, these are various months and year-to-date financials.

1             MR. SULLIVAN:  I move the admission of JX 61.

2             MR. RHYNHART:  No objection.

3             THE COURT:  JX 61 is received in evidence.

4             (Joint Exhibit 61 received in evidence)

5   BY MR. SULLIVAN:

6   Q.  Let's take a look at JX 54.

7             Let me know if you can identify this document.

8   A.  OK.

9   Q.  You know what, I failed to recognize we have done this one

10  already.  Let's put this to the side.

11  A.  I was going to say.

12  Q.  Let me ask you about JX 58.

13            Do you recognize that document?

14  A.  Yes.  It's the same standard monthly financial and

15  year-to-date financial report that we generate out of NetSuite.

16            MR. SULLIVAN:  I move to admit JX 58.

17            MR. RHYNHART:  No objection.

18            THE COURT:  JX 58 is received in evidence.

19            (Joint Exhibit 58 received in evidence)

20            THE COURT:  But just to be clear, Mr. Kovacs, you had

21  left the firm, right?

22            THE WITNESS:  That's correct.

23            THE COURT:  By November of 2015?

24            THE WITNESS:  That's correct.

25            THE COURT:  OK.

1                MR. SULLIVAN:  We will continue to discuss -- we will

2      have Ms. Gielewski talk about this document then.

3                THE COURT:  Right.  I mean, this gentleman didn't

4      prepare it.

5                MR. SULLIVAN:  Right, no.  Understood, your Honor.

6                THE COURT:  He can't possibly tell me what it says, he

7      was gone from the company.

8                Come on.

9                MR. SULLIVAN:  Let's take a look at JX 13.

10               We will save this one for Ms. Gielewski as well.

11               THE COURT:  What's the point of showing him a trial

12     balance from December of 2015?

13               MR. SULLIVAN:  Your Honor, understood.  We want to get

14     these documents in for our expert.  We will have Ms. Gielewski

15     here for the remainder of them.

16               THE COURT:  I am paying attention to the testimony.

17     I hope everybody else is.

18     BY MR. SULLIVAN:

19     Q.  Did there come a time in 2015 where you, as part of your

20     role at TRE, became involved in helping them raise funds?

21     A.  Yes.

22     Q.  What did you do in your role at TRE to help raise funds?

23     A.  I worked on financial models, such as the one that we

24     looked at, and on presentations for potential equity investors

25     in TRE.

1   Q.  Did you go on any visits to visit with potential investors?

2   A.  Yes.

3   Q.  And let me show you what's been previously admitted as

4   JX 82.

5   A.  82?

6   Q.  82, please.

7          Have you seen JX 82 before?

8   A.  Yes.

9   Q.  OK.  What, if any, role did you have in helping to prepare

10  it?

11  A.  I think I prepared most of it with assistance of Jim

12  Toffey.

13  Q.  Why was it prepared?

14  A.  To -- it's an informal update for the board on the budget

15  and the equity financing process.

16  Q.  On page three of the document, there is a reference to

17  investor prospects and feedback.

18  A.  OK.

19  Q.  Can you identify which investor prospects you met with or

20  visited with or had a conversation with on the phone?

21  A.  Each one you want me to go through?

22  Q.  Yes.

23  A.  Spring Mountain, we met with in person.  Thrive Capital, we

24  met with in person.  Polaris, I don't remember.  North Hill,

25  met with in person.  RRE, met with in person.  Sageview, in

GBGSLIQ1                    Kovacs - direct

1   person at TRE's offices.  QED, over the phone.  Cannan

2   Partners, in person.  Canvas Venture Capital, in person.

3   Ribbit Capital, in person in California.  Foundation Capital,

4   in person in California.  Thomvest, over the phone.  Pivot

5   Investment Partners, in person at our offices.

6   Q.  Of the investors that you met, had any of them, after

7   meeting with them, expressed an interest in investing in TRE?

8   A.  Some of these expressed interest, but none of them

9   ultimately followed through formally.

10  Q.  Did you receive reasons for why those who chose not to

11  invest, did they share those reasons with you?

12  A.  Sometimes.

13  Q.  And what were those reasons?

14        MR. RHYNHART:  Objection, hearsay.

15        THE COURT:  Sustained.

16  Q.  What was your understanding of why investors were not

17  investing in TRE at this time?

18  A.  It was the business model that TRE had iterated to, didn't

19  have enough traction for some investors.  The space that TRE

20  was in wasn't an exact fit for a lot of venture capital

21  investors.  It wasn't a pure software business.

22        The company had a long history, so some of the

23  investors had seen the deal before.  It had -- it had a very

24  complicated capital structure.

25  Q.  Were there discussions within the board about how to remedy

GBGSLIQ1                       Kovacs - direct

1    some of these problems?

2    A.   I mean, some of those problems I don't think you can

3    remedy.   They were discussions about -- they were discussions

4    about how to remedy the capital structure and, you know,

5    different structures that might be more amenable to an

6    investor.

7    Q.   As part of your role at discussing potential investment

8    with investors, did you also have an opportunity to talk to

9    Gary Mueller about potentially investing in TRE?

10   A.   Yes.

11   Q.   OK.   What, if any, role did you have in assisting

12   Mr. Mueller in understanding TRE as a company?

13   A.   I had the same role initially with regards to putting

14   presentation materials with other people at TRE that

15   Mr. Mueller looked at to determine whether he had interest in

16   investing or not.

17        Later, he engaged in -- he had a more formal interest

18   than the other people on this list, and he engaged in a pretty

19   lengthy due diligence process.   So I was -- I was involved in

20   responding to his due diligence requests on TRE's behalf.

21   Q.   Let's put up JX 14.

22   A.   14?

23   Q.   Mr. Kovacs, take a look at JX 14.

24        I believe you just mentioned that you put together

25   materials for Mr. Mueller.   Was JX 14 part of the materials

1   that you provided to Mr. Mueller?

2   A.  Yes.

3   Q.  Does this document have a particular name within the

4   company?

5   A.  Did it have a particular name?

6   Q.  Isn't it called a pitch deck, or does it have a name?

7   A.  Investor presentation.

8   Q.  So who were you interacting with, with respect to Gary

9   Mueller's potential investment at TRE, from Mr. Mueller's side?

10  A.  Gary and Gary's attorneys.  I mean, first Gary, and then

11  later in the diligence process, he had attorneys involved.

12  Q.  And, generally, what were you providing to Gary and his

13  attorneys during due diligence.

14  A.  It's sort of a long -- long list of the normal terms you

15  would see on a due diligence list:  Contracts, financials, any

16  other agreements the company had, loan agreement, customer

17  agreements, incorporation documents, legal due diligence.

18  Q.  Did you provide Mr. Mueller information about the Solaia

19  arbitration award?

20  A.  I did.  I don't know if I was the first person to provide

21  that to him.

22  Q.  OK.  What information did you provide about the award?

23  A.  He asked for -- he asked for the complaint.  I don't

24  remember exactly when, and then when there was an arbitration

25  award, his attorneys asked for the award.  They may have asked

GBGSLIQ1                        Kovacs - direct

1   for the complaint on numerous occasions and then when there was

2   an award, he asked for the award.

3   Q.   Did there come a time where you were having conversations

4   with Comerica involving Gary Mueller's potential interest in

5   purchasing the loan?

6   A.   Yes.

7   Q.   Why were you involved with those discussions?

8   A.   We were -- we discussed with Comerica a number of options

9   and one of which was Gary had put an offer to buy their loan.

10  So I remember discussing that with Comerica on some of the

11  update calls we had.

12  Q.   You just mentioned update calls.  Who at TRE was involved

13  with interfacing with Comerica with respect to the status of

14  the company?

15  A.   When?

16  Q.   Just generally.  Let's take it back.

17          When did Comerica become a lender to TRE?

18  A.   In December of 2014.

19  Q.   And, thereafter, did Comerica have reporting requirements

20  that it required of TRE?

21  A.   They had -- I think the loan agreement required monthly

22  compliance certificate, which had some sort of standard

23  updates, and then we had informal updates within as well

24  throughout the CO search process in the beginning of 2015 and

25  then throughout the equity finance process in the summer of

1    2015.

2    Q.  Let me put up what's been -- let me have your exhibit list.

3           Let's look at JX 10, which has been admitted.

4    A.  OK.

5    Q.  Take a look.  There were three different documents appended

6    to JX 10.

7           What are these documents?

8    A.  These are the monthly compliance certificates.

9    Q.  What did you do with these monthly compliance certificates?

10   A.  What did I do with them?

11   Q.  Yes, if anything.

12   A.  The controller would prepare -- normally the controller

13   would prepare it, and then I would review it and sign it and

14   send it to Comerica.  Although on the last one, the last one

15   I had left the company, so Jim signed it.

16   Q.  Is that your signature on the first page of JX 10 and the

17   second page of JX 10?

18   A.  Yes.

19   Q.  In addition to the monthly compliance certificates, were

20   there any other interactions that you would have with Comerica

21   over the status of the loan?

22   A.  Just what -- you highlighted my printed name and just --

23   I mean, my signature is above that, just to clarify.

24   Q.  Yes.  Thank you.

25           Your signature is the sweeping?

1    A.  My signature is the one you cannot read.

2    Q.  OK.  In addition to these monthly certificates, were there

3    any other interactions that you had with Comerica over the

4    status of the loan?

5    A.  At what time?

6    Q.  Well, we will take it from the beginning of the loan, 2014,

7    until when you left the company in -- when did you leave the

8    company?

9    A.  At the end of October.

10   Q.  At the end of October.

11        From that time, from the beginning of the loan until

12   the time you left.

13   A.  OK.  At the beginning of the year, TRE was doing a CEO

14   search and Comerica was very interested in that process.  So in

15   addition to -- in addition to -- in addition to the compliance

16   certificate, we had informal updates with them about that.  The

17   board was on a lot of those.  I was on a lot of those.

18        After Jim was hired as CEO, they were very interested

19   in the equity financing process.  And we had, you know, regular

20   informal updates about that, in addition to communicating

21   monthly with the compliance certificate.  And then after Gary

22   decided not to invest, they were very concerned about the

23   liquidity position of the company, and we had very regular

24   updates with them about that.

25   Q.  Look at JX 53.

1    A.   OK.

2    Q.   Do you recognize JX 53?

3    A.   Yes.

4    Q.   And what is JX 53?

5    A.   This is an e-mail devon Bostock, who was the relationship

6    manager for the loan, sent me asking about the equity financing

7    process, because it's one of the kind of e-mails they send

8    during the process.

9    Q.   And you say the equity round.  Would this be the equity

10   round in which Gary Mueller was planning to participate?

11   A.   Yeah, because this refers specifically, I guess, to the

12   potential equity close with Gary Mueller.

13           MR. SULLIVAN:  I move the admission of JX 53.

14           MR. RHYNHART:  No objection.

15           THE COURT:  JX 53 is received in evidence.

16           (Joint Exhibit 53 received in evidence)

17   BY MR. SULLIVAN:

18   Q.   Let me show you next what's been marked as JX 49.

19           Can you identify JX 49?

20   A.   Yes.

21   Q.   What is JX 49?

22   A.   The first page is from the accounting software.  The other

23   ones are printouts from the Comerica Bank account.  I guess

24   this would be the money market account.

25   Q.   What is the Comerica money market account?

1   A.  It was TRE's primary bank account.  Per the loan agreement,

2   TRE was required to use this money market account and another

3   Comerica operating account as its primary banking account.

4   Q.  Was there any obligations with respect to how much money

5   should be in that accounts, per the loan agreement?

6   A.  The one agreement had an affirmative financial covenant

7   that these accounts should be kept above $2 million in cash.

8   Q.  Does this reflect the bank account of TRE as of

9   September 31, 2015?

10  A.  As of --

11  Q.  Is that what this document represents?

12  A.  Did you say September?

13  Q.  No.  I meant to say July 31, 2015.

14  A.  Yeah.

15          MR. SULLIVAN:  I move the admission of JX 49.

16          MR. RHYNHART:  No objection.

17          THE COURT:  JX 49 is received in evidence.

18          (Joint Exhibit 49 received in evidence)

19  BY MR. SULLIVAN:

20  Q.  Let's look at JX 50.

21          Is this another document, such as JX 49, wherein there

22  is information about the TRE account balance?

23  A.  Yes.  It's the same -- it's the exact same -- it's the

24  exact same documents for August.

25  Q.  Just for August, it's one month later?

1    A.  Yes.

2              MR. SULLIVAN:  I move the admission of JX 50.

3              MR. RHYNHART:  No objection.

4              THE COURT:  JX 50 is received in evidence.

5              (Joint Exhibit 50 received in evidence)

6    BY MR. SULLIVAN:

7    Q.  Let's look at JX 51.

8              Is JX 51 similar to JX 50 and 49, insofar it is

9    showing the account balance as of September 30, 2015?

10   A.  Yes.

11             MR. SULLIVAN:  I move the admission of JX 51.

12             MR. RHYNHART:  No objection.

13             THE COURT:  JX 51 is received in evidence.

14             (Joint Exhibit 51 received in evidence)

15   BY MR. SULLIVAN:

16   Q.  I believe you testified that, after the Solaia arbitration,

17   there was increased reporting to Comerica.  Do I have that

18   correct?

19   A.  Yes.

20   Q.  And can you describe what that increased reporting was?

21   A.  Mostly, it was Comerica requesting cash summaries, a

22   summary of TRE's cash position.

23   Q.  Let me show you what's been marked as JX 52.

24             Do you recognize that document?

25   A.  Yes.

GBGSLIQ1                         Kovacs - direct

1    Q.  What is that document?

2    A.  This is my response to one of their -- to one of their cash

3    summary requests.

4    Q.  The cash summary request as of what time in October do you

5    pull the balances to show the cash summary request for your

6    e-mail?

7              MR. RHYNHART:  Objection, ambiguous.

8              THE COURT:  Say it again.

9              MR. RHYNHART:  It's vague.  I don't understand.

10             MR. SULLIVAN:  I'll try it again.

11             THE COURT:  All right.

12   BY MR. SULLIVAN:

13   Q.  The cash summary, as of what date was this the cash summary

14   for this account?

15   A.  It would have -- the habit was pulling it and sending it on

16   the same day.  It certainly could have been the day before.

17   Q.  If we see a cash summary that is with an e-mail that is

18   dated October 13, will it have been a pull from October 13 or

19   October 12?

20   A.  I would assume this is from the 13th because it's at

21   seven p.m., so I doubt it was pulled the day before.

22   Q.  OK.  Let's look at JX 35.

23             MR. SULLIVAN:  Can I move the admission of JX 52.

24             MR. RHYNHART:  No objection.

25             THE COURT:  JX 52 is received in evidence.

GBGSLIQ1                         Kovacs - direct

1                (Joint Exhibit 52 received in evidence)

2       A.  35?

3       Q.  35, please.  Thanks.

4                Do you recognize JX 35?

5       A.  Yes.

6       Q.  At the bottom of 35, there is an e-mail that is identified

7       from being from you sent on October 26 at five o'clock in the

8       morning.

9                Do you see that?

10      A.  Yes.

11      Q.  OK.  Does this exhibit reflect another response to a cash

12      summary?

13      A.  Yeah.  This includes, I guess, in addition to Devon

14      Bostock, they had their workout team, which was two gentlemen,

15      Jim Petroff and Gary also.  Kevin Urban is another relationship

16      manager at Comerica.

17      Q.  When did you pull the information to supply to the Comerica

18      people as of on Monday, October 26, at five o'clock?

19      A.  This, quite possibly, could have been pulled the day

20      before.

21      Q.  OK.  Would it have been two days before or three days

22      before?

23      A.  It is highly unlikely it would have been more than two

24      days.

25                MR. SULLIVAN:  I move the admission of JX 35.

1          MR. RHYNHART:  No objection.

2          THE COURT:  JX 35 is received in evidence.

3          (Joint Exhibit 35 received in evidence)

4   BY MR. SULLIVAN:

5   Q.  Did you have a role in an evaluation that took place on

6   behalf of TRE by a company called Alvarez & Marsal?

7   A.  Yes.

8   Q.  What was that role?

9   A.  I responded to information requests from Alvarez & Marsal.

10  Q.  Who at Alvarez & Marsal were you responding to?

11  A.  A woman named Kim Russell, and then there were two

12  gentlemen who I do not remember their names.  They worked with

13  her.  They were junior to her.

14  Q.  OK.  And what type of information did you provide?

15  A.  Do you want me to try to go through everything?

16  Q.  What did they ask you for, generally?

17  A.  Pretty long info request lists, and then they had

18  subsequent information requests, as they did their work.

19  Q.  What form did the information supply take on your end?

20  A.  What form?

21  Q.  Yeah.  Did you provide people?  Did you provide documents?

22  What did you provide back to them?

23  A.  We provided documents, mostly historical documents,

24  historical financials, historical information about the

25  technology software.  We coordinated calls with other -- other

529

GBGSLIQ1                      Kovacs - direct

1    employees at TRE, also.

2    Q.  Who at TRE did you coordinate calls with the Alvarez &

3    Marsal people?

4    A.  They spoke to Mike Walker about technology.  They spoke to

5    the board.  I think they spoke to every board member.  They

6    spoke to Jim Toffey.  They may have spoken to some of the

7    salespeople, as well.

8    Q.  Was there anything that they requested of TRE that you were

9    not able to provide them?

10   A.  I think there were minor things on their initial info

11   request list that we just didn't have.  I don't remember

12   exactly what they were.

13   Q.  Do you remember them asking for something in specific that

14   you couldn't provide to them?

15   A.  Not specifically.

16   Q.  Did you have any role in reviewing the evaluation report

17   after it was created?

18   A.  I saw it.  I didn't really review it.

19   Q.  Let me ask you about insurance.

20          What role, if any, did you have with respect to

21   interacting with the insurance companies over the litigations

22   that were outstanding against TRE while you were an employee?

23   A.  While I was an employee?  We had -- there was a litigation

24   matter with Cargill and ICICI Bank, which I think -- I think

25   the complaint was filed in June and we noticed the insurer in

GBGSLIQ1                    Kovacs - direct

1    July.  I worked on that, and then there was -- there was an

2    arbitration matter with Brooklawn, which I noticed the insurer.

3    I don't remember whether I noticed them when I was an employee

4    or later in my capacity as -- when I had a consulting

5    relationship with the company after I left.

6    Q.  Did there come a time where you became a consultant to TRE?

7    A.  Yes.

8    Q.  When was that?

9    A.  In November of 2015.

10   Q.  And since November 15, for how long have you been a

11   consultant of TRE?

12   A.  Since November of 2015.

13   Q.  Are you currently a consultant at TRE?

14   A.  Yes.

15   Q.  Now, going back to the ICICI case, what was your

16   understanding of the complaints made against TRE?

17   A.  By ICI -- so the ICI -- do you want me to --

18   Q.  There are two parties, is that right, Cargill and ICICI?

19   A.  Yes.

20   Q.  Did Cargill make complaints against TRE?

21   A.  So Cargill filed a complaint against TRE -- well, ICICI

22   sued Cargill.  Cargill named TRE as a third-party defendant.

23   And then ICICI sort of piggybacked onto Cargill's claims naming

24   TRE directly.

25   Q.  Do you have an understanding of what those claims were as

GBGSLIQ1                          Kovacs - direct

1    posed against TRE by Cargill?

2    A.  I think both -- I think both -- both had similar claims.

3    It was breach of contract, fraud, breach of covenant of good

4    faith.  There may have been one more claim.

5    Q.  OK.  This ICICI case, did you continue doing work in your

6    capacity as a consultant to TRE starting in November?

7    A.  I continued to assist TRE's restructuring officer and the

8    counsel for TRE at times on the case, yes.

9    Q.  So the Cargill case, was that noticed to AIG?

10            Was AIG the insurance company?

11   A.  The Cargill and ICICI case was noticed.

12   Q.  Did AIG pay defense costs in that case?

13   A.  Yes.

14   Q.  Was there a resolution of that case through settlement?

15   A.  Yes.

16   Q.  Did AIG pay a settlement in that case?

17   A.  Yes.

18   Q.  You mentioned the Brooklawn matter.  Was that noticed to

19   AIG?

20   A.  Yes.

21   Q.  Did AIG pay defense costs on the Brooklawn matter?

22   A.  If --

23   Q.  Or does it?

24   A.  Are they paying?

25   Q.  Does it?

1    A.   Yes.

2    Q.   Has AIG authorized the making of a settlement offer to

3    Brooklawn?

4    A.   Yes.

5    Q.   All right.  You didn't mention the Solaia matter.  Was the

6    Solaia matter noticed to insurance?

7    A.   No.

8    Q.   Why not?

9    A.   It was -- the policy has -- the policy has 100 or $150,000

10   retention, and I don't remember the size of the Solaia matter,

11   but it wasn't -- it wasn't a large case.  I think the board

12   thought it would be more likely to affect the policy renewal

13   than have any -- than there was any meaningful reason to notice

14   it.

15   Q.   Did the board decide not to notice the insurance company

16   for the Solaia matter?

17   A.   Yes.

18   Q.   I want to go back to your role as consultant to TRE.

19              What activities since November have you undertaken as

20   a consultant to TRE?

21   A.   Since November of 2015?

22   Q.   Yes.

23   A.   I worked with TRE at the end of 2015 helping them terminate

24   contracts with vendors or agreements with customer agreements.

25   TRE engaged a restructuring officer.  I worked on helping him

1    get up to speed with issues to try to make sure he was able to

2    wind the company down in an orderly fashion.  I continued to --

3    I guess then, after that, I continued to spend some time

4    continuing to help him with keeping track of expenses and legal

5    cases.

6    Q.  Are there any other tasks that come to mind?

7    A.  No .

8    Q.  Did there come a time where you became a consultant to

9    LiquidX?

10   A.  Yes.

11   Q.  When was that?

12   A.  In November of 2015.

13   Q.  All right.  Was there any time in which you were both a

14   consultant to LiquidX and an employee of TRE?

15   A.  No.

16   Q.  In your role as a consultant to LiquidX, what did you do?

17        I want to focus more on the November and December of

18   2015 time period, if you have a recollection of what you were

19   doing for LiquidX during that time.

20   A.  In November and December of 2015?  I helped LiquidX start

21   to put bank accounts in place, maybe started to help LiquidX

22   establish contracts with vendors.  I helped in the formation of

23   LiquidX itself.

24   Q.  Let's talk now about the 2016 time period.

25        Are you still a consultant for LiquidX?

1    A.  No.

2    Q.  When did that relationship end?

3    A.  Six to eight weeks ago.

4    Q.  So, during the time, let's say, January 1st, 2016, until

5    the point where your relationship ended as a consultant, what

6    kinds of tasks were you performing for LiquidX?

7    A.  For what time period?

8    Q.  January 1st, 2016, until the point in which you ended your

9    relationship, the relationship ended.

10   A.  I did a bunch of discrete tasks for LiquidX.  In the first

11   half of the year, I helped -- I helped them -- I helped with

12   some technical administrative aspects of working on the

13   financing presentation materials.  I helped them put insurance

14   policies in place.  I helped -- I helped establish

15   relationships with vendors.  I worked a little bit on drafting

16   customer contracts and, I mean, that's all that comes to mind.

17   Q.  All right.  I don't know, did you mention assisting with

18   potential fund-raising?  Did you assist with that?

19   A.  Not potential.  LiquidX raised money in the first half of

20   2016, and I assisted with that, yes.

21   Q.  In what ways did you assist?

22   A.  I helped -- I helped them put presentation materials

23   together to talk to some investors, I helped organize due

24   diligence materials for those investors.

25   Q.  Did there come a time when you made an investment in

GBGSLIQ1                         Kovacs - direct

1   LiquidX?

2   A.  Yes.

3   Q.  What was the nature of that investment?

4   A.  I bought $100 of restricted stock.

5   Q.  What time period was that?

6   A.  In, I think, mid November, after I left TRE in mid

7   November.

8   Q.  When you say restricted stock, are you referring to

9   unvested stock?

10  A.  Stock with a vesting schedule, yes.

11  Q.  Did any of the stock vest?

12  A.  No.

13  Q.  As part of your role at TRE, did you have interactions with

14  the board?

15  A.  As part of my role at TRE?

16  Q.  Yes.  Did you have interactions with the TRE board?

17  A.  When?

18  Q.  Just generally.  Was it part of your job from time to time

19  to interact with the board?

20  A.  Yes.

21  Q.  OK.  What types of interactions would you have generally

22  with the board?

23  A.  Mostly -- mostly budget and financial updates.  I had some

24  interactions with regard to, I guess, some of the other things

25  we talked about, noticing the insurer.  I worked on -- I worked

 1   on one financing where the owners of TRE, Bain, Redpoint, Prism

 2   and StarVest, all the venture funds put money in, which is sort

 3   of like an inside equity financing.  And then I worked on

 4   the -- I worked on TRE, refinancing its loan with Comerica

 5   Bank.

 6   Q.  Did you have any interactions with the board in the period

 7   after the Solaia arbitration matter?

 8   A.  Yes.

 9   Q.  And, generally, what types of interactions did you have?

10   A.  I discussed some of the legal matters with the board after

11   that.  We also -- I also spent some time in October helping the

12   board evaluate whether they could put a bridge financing in

13   place.  I think I wrote them sort of an outline of how it might

14   work so that they could explore that with their partnerships.

15   Q.  Do you have an awareness, an understanding of what was the

16   result of that proposal?

17   A.  It was not viable.

18   Q.  Did you have any interactions with the board concerning the

19   potential purchase of the Comerica loan by Gary Mueller?

20   A.  Not really.

21   Q.  Did you spend any time with the board with respect to --

22   withdrawn.

23            Did you attend board meetings during that time?

24   A.  Yes.

25   Q.  Those board meetings, were they by conference call or were

1    they in person?

2    A.   When?

3    Q.   During October.

4    A.   I think almost all by conference call.  There may have been

5    one in person.

6    Q.   Were you on calls in which the proposal to purchase the

7    Comerica loan was discussed?

8    A.   Yes.

9    Q.   During those discussions, did they discuss the

10   participation of anyone else at TRE in an investment with

11   Mr. Mueller?

12   A.   To purchase the loan?

13   Q.   Yes.

14   A.   Yes.

15   Q.   Who was that?

16   A.   Jim -- Jim and John.  Jim Toffey and John Connolly.

17   Q.   Was there any interest by other members of the board in

18   participating in an investment with Mr. Mueller during October

19   2015?

20   A.   Yes.

21   Q.   And you left when in October of 2015?

22   A.   At the end of the month, on the 30th.

23              MR. SULLIVAN:  Nothing further.

24              THE COURT:  Cross-examination?

25              MR. RHYNHART:  Thank you, your Honor.

1    CROSS-EXAMINATION

2    BY MR. RHYNHART:

3    Q.  Good morning, Mr. Kovacs.

4    A.  Is it possible to get one more bottle of water?  If it's a

5    big deal, it doesn't matter.

6              MR. RHYNHART:  I'm not sure where the water is.

7              THE COURT:  Scott, could you fill the pitcher?

8              THE WITNESS:  Can I get a cup?

9              Thank you.

10             MR. RHYNHART:  Do you want me to wait, your Honor?

11             THE COURT:  No.

12             THE WITNESS:  I'm fine.

13   BY MR. RHYNHART:

14   Q.  Mr. Kovacs, did you sometimes refer to yourselves the chief

15   financial officer of TRE during the time that you were working

16   there?

17   A.  No.

18   Q.  Did others call you the chief financial officer of TRE?

19   A.  Yes.

20   Q.  All right.  And there were two people then referred to as

21   a chief officer at TRE.  That would be Mr. Toffey as the CEO

22   and yourself, who people sometimes called the CFO, is that

23   true?

24   A.  OK.

25   Q.  Yes?

GBGSLIQ1                          Kovacs - cross

```
1   A.  Yes.
2   Q.  All right.  And you were in charge of finance at TRE, is
3   that right?
4   A.  Yes.
5   Q.  You have no financial training before TRE, right?
6   A.  Yes.
7   Q.  You didn't graduate college, right?
8   A.  Yes.
9   Q.  And you developed a software program to play poker online?
10  A.  Yes.
11  Q.  And then went to work for TRE?
12  A.  Yes.
13  Q.  And even with that software program, you didn't have a
14  company that sold the software program, right?
15  A.  Correct.
16  Q.  There was a reference to you selling that company.  There
17  was no company and you didn't sell a company, right?
18  A.  There was a reference to me selling what?
19  Q.  On direct, to your selling your company with the poker
20  software, there was no company, right?
21  A.  I don't remember a reference.  There wasn't a company, yes.
22  Q.  There was?
23  A.  There was no company.
24  Q.  There was no company?
25  A.  Yeah.
```

GBGSLIQ1                         Kovacs - cross

1   Q.  You just developed a software program and actually used it

2   to play poker and make money on online poker websites?

3   A.  That's correct.

4   Q.  You've reviewed the board minutes of TRE spanning from

5   October through December 2015?

6   A.  From October to December 2015?

7   Q.  Yes.

8   A.  I saw them in my deposition, not -- I haven't reviewed them

9   in detail.

10  Q.  You saw that in every meeting, you are listed as attending

11  as the chief financial officer of TRE?

12  A.  I don't remember whether it says that in every meeting.

13  Q.  Let's look at Exhibit 63.

14          On October 4, you were listed as attending as the

15  chief financial officer of the company, right?

16  A.  Yes.

17  Q.  And on October 11, you are listed as attending as the chief

18  financial officer of the company, right?

19  A.  Yes.

20  Q.  And on October 30, you are listed as attending as the chief

21  financial officer of the company, right?

22  A.  Yes.

23  Q.  And on November 11, you are listed as attending as the

24  chief financial officer of the company, right?

25  A.  Yes.

GBGSLIQ1                        Kovacs - cross

1    Q.   Is it your testimony that by this point in time,

2    November 11, you were no longer employed by TRE?

3    A.   That's correct.

4    Q.   On November 23, you were listed as attending the board

5    meeting as chief financial officer of the company, right?

6    A.   Right.  My last day was the 30th, which was why I didn't

7    sign the compliance certificate that we saw.  And I also signed

8    a separation agreement with TRE before this meeting.

9    Q.   This November 23rd meeting?

10   A.   That's correct.

11   Q.   When you say the 30th, you meant October 30th?

12   A.   That's correct.

13   Q.   Just let me finish these documents here.

14        On December 3, 2015, you are listed as attending as

15   the chief financial officer of the company?

16   A.   Yes.

17   Q.   And on December 21st, you are listed as attending as the

18   chief financial officer of the company, right?

19   A.   Yes.

20   Q.   Did you actually attend all of those board meetings?

21   A.   I don't know whether I attended all of them.

22   Q.   Did you receive copies of the minutes of the board

23   meetings?

24   A.   No.

25   Q.   No?

1   A.  Not these minutes.

2   Q.  So when you attended board meetings, you would not receive

3   a copy of the minutes afterwards?

4   A.  I didn't generally review minutes.

5   Q.  But you received them, you just didn't review them?

6   A.  I didn't generally receive them.

7   Q.  There would not be a copy given out to board members to

8   approve at the beginning of each board meeting, in other words,

9   the minutes of the previous meetings, all in favor, the minutes

10  are correct, anything like that?

11  A.  To the board members, not to me.

12  Q.  But were you present when that happened?

13  A.  Not always, no.

14  Q.  Well, how about at the six board meetings I just pointed

15  out to you, were you present at those board meetings where

16  these minutes were approved?

17  A.  I don't remember these minutes being approved.

18  Q.  But it's your testimony that, at least from November 11,

19  November 23, and December 3, and December 21, all four of those

20  meeting minutes incorrectly stated that you were the chief

21  financial officer of TRE?

22  A.  That's correct.

23  Q.  And that you never reviewed those minutes and never saw

24  that?

25  A.  That's correct.

1  Q.  Do you believe you were still attending board meetings

2  after your, quote, separation from TRE on October 30?

3  A.  After -- after I was separated from TRE, did I still attend

4  board meetings?

5  Q.  Yes.

6  A.  I attended some.  There were a lot of board calls.

7  Q.  For the four meetings after November 11 that we just looked

8  at in the minutes, do you believe you attended those meetings,

9  you're just incorrectly listed as CFO of the company?

10 A.  I don't remember the specific meetings, but it's after --

11 this is after I was separated, and the separation was

12 memorialized in writing in a separation agreement.

13 Q.  I understand.  My only question is whether you kept

14 attending board meetings after that?

15 A.  I -- I was present for parts of some of the board meetings

16 and on some calls with the board.

17 Q.  Do you know who took the board minutes at those meetings?

18 A.  I think that Glenn Burlingame.

19 Q.  That's the attorney from ZEK who represented TRE?

20 A.  He was -- he was outside corporate counsel.

21 Q.  The ZEK law firm?

22 A.  Zeichner Ellman & Krause, yes.

23 Q.  You mentioned that you left the company on October 30.

24          Let's look at Exhibit JX 115.

25 A.  115?

544
Kovacs - cross

1   Q.   Yes.   Is this your separation agreement from TRE?

2              (Continued on next page)

1    A.   Yes.

2    Q.   Okay.  So is it actually November 13th, not October 30th?

3    A.   We -- I was verbally separated on the 30th.  That's why I

4    didn't continue to sign the compliance certificates as soon as

5    the 31st, which we saw a minute ago, and then it was

6    memorialized on the 13th of November.

7    Q.   So when it says separation date, here in paragraph one, it

8    says your separation is effective November 13th.  That was a

9    mistake?

10   A.   That's when it was memorialized.

11   Q.   That's not the date you left the company, November 13th?

12   A.   No.

13   Q.   Okay.  And, in fact, you kept going to board meetings after

14   this, right?

15   A.   Some of them, yes.

16   Q.   And the reason you're saying October 30th as your

17   separation, instead of November 13th, is because you invested

18   in LiquidX on November 6th, right?

19   A.   No, I invested in LiquidX on November 13th.

20   Q.   November 13th?

21   A.   Yeah.  The 6th is incorrect.

22   Q.   So when LiquidX was formed or incorporated on November 6th,

23   you were not one of the founding shareholders on that date?

24   A.   No.  I think I have -- also, my restricted stock purchase

25   agreement has the date November 13th on it.

1   Q.  Okay.

2   A.  But -- I think.

3   Q.  When you, quote, separated from TRE, whether it was

4   October 30th or November 13th, 2015, after that, you began

5   working for both TRE and LiquidX, right?

6   A.  I -- in November 2015, I started consulting with both TRE

7   and LiquidX, yes.

8   Q.  And, in effect, you started splitting your duties between

9   the two companies, right?

10  A.  I don't understand the question.

11  Q.  Okay.  So for LiquidX, you began working on transition of

12  vendors and customers, transition of employees, getting

13  investors for the new company, right?

14  A.  Could you repeat that?

15  Q.  For LiquidX, for the new company, you began transitioning

16  buyers, sellers, vendors, and employees to the new company,

17  right?

18  A.  I didn't -- I didn't work with buyers and sellers.  I

19  worked on -- I worked with LiquidX on establishing contracts

20  and relationships with vendors.

21  Q.  And you began working on the plan to transition over the

22  TRE employees to the new company, right?

23  A.  I worked -- I worked with TRE on terminating the employees.

24  I didn't really -- I didn't really work on the hiring process

25  with LiquidX.

1   Q.  You began working with investors who might invest in the

2   new company, right?

3   A.  In -- When?

4   Q.  After you left TRE, whether it was October 30th or

5   November 13th.

6   A.  I worked on -- I worked on a funding round with LiquidX in

7   February of 2016, yes.

8   Q.  Was that the first time you began speaking with potential

9   investors in the new company, February of 2016?

10   A.  I mean, I spoke with the initial investors in LiquidX.

11   Q.  And you began speaking to prospective investors in LiquidX

12   before February 2016, right?

13   A.  Yeah, I think in December -- in December we started

14   speaking with -- not in -- well, in December we started talking

15   to prospective investors for LiquidX.

16   Q.  And you worked on LiquidX's finances, right?

17   A.  I -- yes.

18   Q.  So some of your responsibilities that you had previously

19   handled for TRE, such as finances, working with prospective

20   investors, putting together investment rounds, you did that

21   work then with LiquidX afterwards, right?

22   A.  I -- I consulted for LiquidX in some of those areas until

23   they were able to hire -- until they were able to hire

24   full-time employees to do those tasks, yes.

25   Q.  And for TRE, you began working after you, quote, separated

1   from TRE, on winding down the TRE business?

2   A.  Yes.

3   Q.  Okay.  And that work that you were doing is now split

4   between TRE and LiquidX.  You were paid, in total,

5   approximately the same amount you were paid previously at TRE,

6   when people called you the chief financial officer, right?

7   A.  Can you clarify?

8   Q.  Sure.  Were you not paid approximately $10,000 a month by

9   LiquidX and approximately $1,000 a month by TRE, for a total of

10  approximately $11,000 a month, when you were consulting for

11  both?

12  A.  Yes, but it's less than -- it's less than what I was paid

13  as the head of strategy and finance for TRE.

14  Q.  What were you paid by TRE before you, quote, separated?

15  A.  I mean, for a full year 2014?  150,000 base, plus a bonus

16  of 30 or 25.

17  Q.  Okay.  All right.  When you were both investing in LiquidX

18  in November 2015 and working with TRE on the wind down of its

19  affairs and the transition of employees from TRE to LiquidX,

20  you recognized that you had a potential conflict, right?

21  A.  Could you repeat that?

22  Q.  When you were working with -- investing in LiquidX and

23  working with TRE to transition -- to wind down that company and

24  transition over employees, vendors and investors to LiquidX,

25  you recognized that you had a potential conflict there, right?

1    A.  I don't think there's a conflict in consulting for both

2    companies, no.

3    Q.  Were you not concerned about conflict with the fact that

4    you were winding down one company, while investing in the other

5    company and consulting for both?

6    A.  No.  I only invested a hundred dollars in one company, and

7    I didn't see a conflict in consulting for both companies.

8    Q.  Just to get our time line straight, from November 2015 to

9    the present, you've been consulting for TRE; so a full year,

10   right?

11   A.  Correct.

12   Q.  And you don't have a consulting agreement with TRE, nothing

13   in writing, correct?

14   A.  Correct.

15   Q.  It's a handshake deal?

16   A.  I don't know if we shook hands.  It's a verbal agreement,

17   yes.

18   Q.  Who's the verbal agreement with, what person?

19   A.  Peter Sullivan.

20   Q.  The person who works for Argus Management, who's contracted

21   to wind down TRE?

22   A.  He's the chief restructuring officer of TRE.

23   Q.  So the two of you have a verbal agreement that you will be

24   a consultant for TRE for the last year?

25   A.  He pays -- we have a verbal agreement that he pays me

1   monthly if he needs my services, and when he doesn't, we'll

2   stop.

3   Q.  Okay.  And from November 2015 until, I think you said,

4   September of 2016, for ten months, you were consulting for

5   LiquidX?

6   A.  Yes.

7   Q.  And, again, no consulting agreement in writing?

8   A.  Correct.

9   Q.  You had a handshake deal or a verbal agreement with LiquidX

10  as well?

11  A.  We had an agreement that as long as they needed my

12  services, then I would provide them as I transitioned into

13  whatever I was going to do next.

14  Q.  Who's "we"?  Who did you have an agreement with, with

15  LiquidX, to consult?

16  A.  With the principals of LiquidX.

17  Q.  Who's that?

18  A.  Gary Mueller, Jim Toffey, John Connolly.

19  Q.  So they gave you a verbal agreement to pay you to be a

20  consultant for LiquidX for ten months?

21  A.  Not for ten months, just month to month.

22  Q.  Month to month?

23  A.  Yes.

24  Q.  And you say you left in September 2016, but there's nothing

25  in writing evidencing that either, right?

1   A.  I left what?

2   Q.  I think you said you stopped consulting for LiquidX in

3   September of 2016?

4   A.  Right.  Yes.

5   Q.  There's nothing in writing evidencing that, correct?

6   A.  There's -- I mean, there's the end of invoicing.

7   Q.  You didn't send an invoice after September?

8   A.  That's correct.

9   Q.  Okay.  You didn't send an e-mail or a letter or anything

10  saying I'm done consulting for LiquidX?

11  A.  I think I did send an e-mail.

12  Q.  You did?  Who did you send that to?

13  A.  To Jim and the LiquidX's general counsel.

14  Q.  Okay.  When did you send that?

15  A.  In August of -- in August or September.

16  Q.  Okay.  All right.  We haven't seen that one.  Was it sent

17  by Gmail to the Gmail addresses or to the LQX.com, LiquidX

18  e-mail?

19  A.  LQX.com.

20  Q.  Okay.  When you were consulting for both TRE and LiquidX,

21  you did not have any set days of the week or set hours of the

22  day where you would work for one or the other, right?

23  A.  No.

24  Q.  And you didn't even track your time working for one or the

25  other, right?

1    A.  No.

2    Q.  You would just send bills for a flat rate for your work as

3    a consultant?

4    A.  I would send bills to Peter Sullivan for work with TRE and

5    bills to LiquidX's CFO, Mark Brazier, for work with LiquidX,

6    yes.

7    Q.  In fact, do you know if both of your sets of invoices, for

8    both TRE and LiquidX, actually went to LiquidX's finance

9    department, Sophia Gielewski and Beth Carcich, who would pay

10   you in both cases from the TRE bank accounts?

11   A.  No, I sent the -- no, I would send invoices for Receivables

12   Exchange to Peter Sullivan.

13   Q.  Do you know if he would then forward it to Gielewski and

14   Carcich, and they would pay you from the TRE bank accounts?

15   A.  I think he forwards them, any invoices that he wants to

16   approve on behalf of TRE.

17   Q.  Right.  And then LiquidX's finance department actually

18   wires you the money, right?

19   A.  LiquidX's finance department, I think, wires the money from

20   TRE's bank accounts, yes.

21   Q.  Right.  And so that's how you're paid as a consultant for

22   TRE.  When you're a consultant for LiquidX, the same two people

23   in finance at LiquidX wire you money from LiquidX, right?

24   A.  To my knowledge, yes.

25   Q.  Okay.  When you have an e-mail problem with your TRE

1    work -- You have a TRE e-mail address, right?

2    A.  Correct.

3    Q.  When you have an e-mail problem with your TRE e-mail

4    address, you reach out to Mike Walker, the IT guy at LiquidX?

5    A.  Correct.

6    Q.  Okay.  So the LiquidX IT group helps you with your TRE

7    e-mail in 2016, right?

8    A.  Yes, they've done that.

9    Q.  When you were referred to by others as the chief financial

10   officer of TRE, you reported to work at an office, right?

11   A.  When I worked for TRE?

12   Q.  Yes.

13   A.  Yes.

14   Q.  Okay.  And I'm now talking about the time period before

15   either October 30th or November 13th, when you, quote,

16   separated from TRE.  Before that time, did you have an office?

17   A.  Before which time, I'm sorry?

18   Q.  Either October 30th or November 13th, whatever is the

19   correct date of your separation.  Before then, did you have an

20   office?

21   A.  Yes.  I had an office until I was separated.

22   Q.  Okay.  And that office was the TRE office in New York?

23   A.  That was TRE's former offices at 100 Park Avenue, yes.

24   Q.  Okay.  You would go to 100 Park Avenue, the TRE office, and

25   you would walk into a door to an office within an office, where

GBGPLIQ2                         Kovacs - Cross

1    you had a desk and a chair and a computer, and you could close

2    your door, if you wanted?

3    A.  Yes.

4    Q.  All right.  And when you, quote, separated from TRE, even

5    after that, as a, quote, consultant for TRE, you still had that

6    office at 100 Park Avenue, correct?

7    A.  I had -- I used the office for a little while as a

8    consultant, but then I gave it up.

9    Q.  Okay.  As a consultant for TRE and for LiquidX, you have

10   continued to go to the office at 100 Park Avenue in 2016,

11   right?

12   A.  I've gone to the office at times, yes.

13   Q.  Okay.  As part of your work as a TRE consultant, you have

14   been involved in helping with the defense of the Brooklawn

15   arbitration?

16   A.  Yeah, I've worked with -- I've consulted for TRE with both

17   legal matters in 2016, yes.

18   Q.  And as part of that, you conferred with TRE's lawyer

19   handling the Brooklawn arbitration, right?

20   A.  Yes.

21   Q.  Worked with him on strategy for the case?

22   A.  Sometimes.

23   Q.  You have assisted with finding documents, correct?

24   A.  Yes.

25   Q.  All right.  And when you go to find documents to help

1   defend the Brooklawn arbitration, you go to the people at

2   LiquidX who have the TRE documents, right?

3   A.  Yes.

4   Q.  And those people are, for instance, Mike Walker, right?

5   A.  Yes.

6   Q.  He has control of the servers that have the TRE documents,

7   even though he's working at LiquidX?

8   A.  Yes.  So they have a -- there's an agreement between TRE

9   and LiquidX for -- where LiquidX is to provide assistance with

10  discovery matters to TRE.

11  Q.  Let me take a step back.  Before you, quote, separated from

12  TRE, you were, obviously, involved with putting together the

13  financing round that was scheduled for September 2015, right?

14  A.  I was involved with the round, yes.

15  Q.  And you circulated wire instructions on September 28th; it

16  was very close to closing?

17  A.  I don't remember whether I circulated wire instructions.

18  Q.  Okay.  Do you remember being very close to closing?

19  A.  Yes.

20  Q.  Why did the funding collapse, the September 2015 funding?

21  A.  We were close to closing at the end of September, and then

22  the Gary Mueller was going to lead the financing.  He delayed

23  it to review some of the legal matters, and then after the

24  Solaia decision was awarded, he decided that he was not going

25  to invest.

GBGPLIQ2                          Kovacs - Cross

1   Q.  Did you have an understanding that was because there was an

2   increased perception of risk from the outstanding Brooklawn

3   arbitration?

4   A.  I think there was an increased perception of legal risk to

5   the company.

6   Q.  And you knew there were only two other cases outstanding

7   against the company, Cargill and Brooklawn, right?

8   A.  Cargill had a case against TRE, ICSCI had a case against

9   TRE, and Brooklawn had a case in arbitration.

10  Q.  Cargill and ICICI were one case in the Southern District of

11  Illinois, right?

12  A.  Yes.

13  Q.  Okay.  The other one was the Brooklawn arbitration, right?

14  A.  Yes.

15  Q.  I think you said earlier that Cargill has settled and been

16  paid?

17  A.  The Cargill ICICI case settled a few months ago, yes.

18  Q.  Okay.  And so Brooklawn was the arbitration that was

19  outstanding for over $8 million, where there was an increased

20  perception of risk in late September 2015?

21  A.  Well, Cargill wasn't settled in September 2015; so --

22  Q.  It settled later?

23  A.  It settled a few months ago, yes.

24  Q.  Was Brooklawn one of the two matters that there was an

25  increased perception of risk at TRE that led to the financing

1   falling through in late September 2015?

2   A.  That's my understanding.

3   Q.  Okay.  And after that, did you then become the point person

4   on communicating to Comerica what had happened and coming up

5   with a plan to move forward?

6   A.  I handled a lot of the communications.  I wouldn't call

7   myself the point person on coming up with a plan to move

8   forward.

9   Q.  Did you tell Comerica what had happened with the Solaia

10  award, and the Brooklawn arbitration was still out there?

11  A.  Yes.  I don't remember whether I was the first person to

12  tell them.

13  Q.  We've seen a number of communications where you were

14  telling Comerica how much cash was in the TRE accounts?

15  A.  Yes.

16  Q.  And did you also make a number of calls and meetings and

17  e-mails to Comerica to see if they would sell their loan to a

18  new company?

19  A.  I don't remember asking them whether they would sell their

20  loan.

21  Q.  Do you remember being part of calls with Mr. Toffey where

22  he was asking them that?

23  A.  I remember discussions with Comerica about Gary Mueller,

24  John and Jim forming a company to buy the loan, yes.

25  Q.  Okay.  And, in fact, you and Mr. Toffey and Mr. Connolly

1   all were persistent in your efforts to Comerica to convince

2   them they should sell the loan to that new company, right?

3   A.  It's a hundred billion dollar bank, I don't -- I wasn't

4   trying to convince them to sell the loan.  We were trying to

5   convince them not to foreclose on the company.

6   Q.  Were you "pounding them every day" to get them to settle

7   that loan to Mueller?

8   A.  No.

9   Q.  Let's look at Exhibit 267.

10  A.  267?

11  Q.  267.  This is an October 15th, 2015, e-mail from you to Jim

12  Counihan on the TRE board, right?

13  A.  The first one?  Yes.

14  Q.  Do you recognize it?

15  A.  It's -- yes, it's an e-mail from me to Jim Counihan, yes.

16          MR. RHYNHART:  Move to admit Exhibit 267 into

17  evidence.

18          MR. SULLIVAN:  No objection.

19          THE COURT:  JX267 is received in evidence.

20          (Joint Exhibit 267 received in evidence)

21  BY MR. RHYNHART:

22  Q.  If we look at the bottom e-mail, Toffey writes to Comerica,

23  copying you, right?  And he's following up with them about a

24  quick call this a.m., getting an update on their current

25  thoughts.  He wants them to talk to Gary before tomorrow's

GBGPLIQ2                          Kovacs - Cross

1   board meeting, right?

2              Was this one of those communications, one of those

3   efforts to get Comerica to sell the loan to a new company led

4   by Mr. Mueller?

5   A.  I'm sorry.  You asked your question and I was about to

6   answer it and you said "right" and then you just started

7   talking again.

8   Q.  Do you want to --

9              THE COURT:  Why don't you rephrase the question.

10             MR. RHYNHART:  I'll try again.  Thank you, your Honor.

11  Q.  Was this October 15th e-mail from Mr. Toffey one of the

12  communications to Comerica about getting them to sell the loan

13  to the new company?

14  A.  Yes.

15  Q.  Okay.  And you forwarded it to Mr. Counihan, letting him

16  know, we're pounding them every day, right?

17  A.  So I forwarded it to Jim Counihan, who had no involvement

18  in buying the loan because we were trying to prevent Comerica

19  from foreclosing on TRE.

20  Q.  But when you say "pounding them every day," you're talking

21  about Comerica, right?

22  A.  I think so, yes.

23  Q.  All right.  And what you're writing there is, we are

24  pounding Comerica every day, right?

25  A.  Yes.

1   Q.   Okay.  Not they are pounding us; we are pounding them,

2   right?

3   A.   No, we were trying to prevent them from foreclosing in a

4   messy foreclosure on TRE, but it's a hundred billion dollar

5   bank, I don't know how much convincing one can even do.

6   Q.   Okay.  But you weren't even -- TRE was not even in default

7   at that point, right?

8   A.   On October 15th?

9   Q.   Right.

10  A.   It wasn't in default, but they had sent a letter in early

11  October saying that they were concerned about TRE's ability to

12  repay the loan and that they might need to exercise their

13  rights under the loan agreement.  So we were concerned about --

14  we were concerned about their potentially foreclosing on the

15  company.

16  Q.   All right.

17  A.   I don't think it went into default until later in October.

18  Q.   Let's look at Exhibit 117.  When LiquidX was formed, were

19  you --

20  A.   Sorry, I've just got to switch binders.  Okay.

21  Q.   When LiquidX was formed, were you, at least initially, the

22  treasurer of LiquidX?

23  A.   No.

24  Q.   So this initial consent of sole director is incorrect?

25  A.   I was offered to join LiquidX as an officer.  I never -- I

1    didn't accept the offer, but this isn't even -- it's not even a

2    signed consent.

3    Q.  Have you seen a signed consent form of this?

4    A.  No.

5    Q.  Okay.  So this is the only one we have, and it has you

6    listed as treasurer.  Were you treasurer for even a brief

7    period of time of LiquidX?

8    A.  No.

9    Q.  Were you an officer of LiquidX for even a brief period of

10   time?

11   A.  No.

12   Q.  No?

13   A.  No, I was a consultant.

14   Q.  Looking at the stock, initial stock distribution, this is

15   accurate, right?  You purchased 122,449 shares of common stock

16   when LiquidX was formed?

17   A.  I recognize the $122 is accurate.  I don't know if the

18   share count -- I don't remember what the share count was.

19   Q.  You don't know if you paid one one-hundredth of a cent per

20   share; so that you got 122,000 shares?

21   A.  I remember buying $122 of restricted stock.

22   Q.  Were you aware that you were, at least at the outset, an

23   owner of more than ten percent of the company?

24   A.  More than ten percent?  No.

25   Q.  Yes.

1   A.  I wasn't aware of that.

2   Q.  Do you think this number looks inaccurate, the number of

3   shares?

4   A.  I don't recall the number of shares.  My understanding was

5   that I would own, if the shares -- if I joined LiquidX and the

6   shares vested over the four-year vesting schedule in the

7   restricted stock purchase agreement, then I would own two or

8   three percent of the company.

9   Q.  Two or three percent.  Okay.  Let's look at Exhibit 236.

10  This is two months -- sorry, one month later, December 14th.

11  You're writing to Gielewski, and you're going through with her

12  who are the owners of LiquidX on that date, right?  Is that

13  right?

14  A.  I just -- I don't remember this.  Let me just look at the

15  e-mail.

16          (Pause)

17          Okay.

18          MR. RHYNHART:  Move to admit Exhibit JX236 into

19  evidence.

20          MR. SULLIVAN:  No objection.

21          THE COURT:  JX236 is received in evidence.

22          (Joint Exhibit 236 received in evidence)

23  BY MR. RHYNHART:

24  Q.  Now, this is after a subsequent financing round later in

25  November that you were not a part of, correct?  Do you know

1    about that?

2    A.  I know that -- I know that the LiquidX principals invested,

3    bought several million dollars of preferred stock, yes.

4    Q.  Okay.  So at this point, after that preferred round, you

5    are still a stockholder with 122,449 shares but totaling only

6    3.35 percent after that preferred round, correct?

7    A.  It's unvested stock; so on a fully diluted basis, I guess,

8    but I would have had to have joined the company or maintain my

9    relationship with the company for four years for the stock to

10   vest.

11   Q.  Okay.  And so as of this date, December 14th, when you're

12   writing the owners of the company, the stockholders, and you're

13   referring to yourself as a 3.35 percent owner, you're saying

14   that was only a possibility if there was vesting?

15   A.  An impossibility or a possibility?

16   Q.  A possibility.

17   A.  It was a possibility if the stock vested over four years,

18   yes.

19   Q.  Do you know if you were giving this information to

20   Gielewski so that she could set up bank accounts for LiquidX?

21   A.  I think it's for -- I think it's for KYC for a bank.

22   Q.  Right.  KYC is know your customer, right?

23   A.  That's correct, yes.

24   Q.  And so you're helping a bank know its customer for LiquidX

25   by telling the bank, through Gielewski, who are the owners of

GBGPLIQ2                          Kovacs - Cross

1   LiquidX, right?

2   A.  I'm sending her this information.

3   Q.  You understood it was a know-your-customer analysis for JP

4   Morgan Chase, to set up LiquidX accounts, right?

5   A.  I think that's what this refers to.

6            MR. RHYNHART:  Your Honor, I don't know where you want

7   to take a mid-morning break.  I'm pushing on or should I just

8   keep --

9            THE COURT:  A few more minutes because I need to take

10  a call with another judge --

11           MR. RHYNHART:  Thank you.

12           THE COURT:  -- right around 11:30.

13  BY MR. RHYNHART:

14  Q.  Let's look at Exhibit 144 and 189.

15  A.  At the same time or?

16  Q.  Well, let's start with 144.  189 is going to be a clearer

17  copy that I found; so I'll go to that, but we'll only go to

18  144.

19  A.  It's hard to look at them at the same time.

20  Q.  I appreciate that.  So we'll start with 144.  This is a

21  document that's already in evidence.  You sent it on

22  November 12th to Mueller and Toffey.  And by the way, you're

23  using a Gmail address here; do you see that?

24  A.  Yes.

25  Q.  And so is Toffey, right?

GBGPLIQ2                          Kovacs - Cross

1              Did you all agree to use Gmail addresses when you were

2     writing to each other about LiquidX?

3     A.   Did we agree to use Gmail addresses?

4     Q.   Yes.

5     A.   I don't think so.

6     Q.   Did Mueller or Toffey tell you, hey, use Gmail when you're

7     writing about LiquidX so that this is not on TRE's e-mail

8     server?

9     A.   I don't think they told me to use Gmail, no.

10    Q.   So that's a coincidence that you're using Gmail and so is

11    Toffey; is that right?

12    A.   I think people were using Gmail to separate TRE business

13    from LiquidX business.

14    Q.   And no one talked to you about that; that's just how you

15    were doing it?

16    A.   It seems like everyone is doing it, but I don't remember

17    anyone instructing me to do that, no.

18    Q.   Okay.  You were attaching something called project Caerus,

19    next steps.  Is that what you called this project forming the

20    new company?

21    A.   I don't remember the name.

22    Q.   All right.  You're attaching the latest next steps doc,

23    right?

24    A.   I recognize the -- I recognize the document, yes.

25    Q.   And then you write:  John Connolly had also asked for this

GBGPLIQ2                              Kovacs - Cross

1    doc.  I only have his Bain e-mail; so could one of you please

2    forward to him at the proper address?

3             Are you writing there that you don't want to send it

4    to his work address, you want to send it to his Gmail, but you

5    don't remember his Gmail address?

6    A.  I don't remember what the other address was.  Maybe...

7    Q.  Well, previously when you were writing to Connolly, when he

8    was a TRE board member, you would send things to his Bain

9    Capital e-mail address, right?

10   A.  Yes.

11   Q.  Was there some reason you wouldn't send something relating

12   to the formation of LiquidX to his Bain Capital e-mail address?

13   A.  Bain wasn't involved in LiquidX, only TRE.

14   Q.  Okay.  Let's look at the second page.  There is this

15   project Caerus next steps.  Now, I have found a clearer copy of

16   this, which is Exhibit 189.  Slightly clearer, not too much.

17   A.  189 is the same document only clearer.

18   Q.  It's the attachment, only slightly clearer.

19   A.  So we can look at 189, right?

20   Q.  Exactly.  I'll put it up on the screen.

21   A.  Good.

22   Q.  Slightly better.  So just looking at this project Caerus

23   here, next steps, your first section is legal and structural,

24   right?  This has to do with the loan purchase and the

25   foreclosure, right?

GBGPLIQ2                        Kovacs - Cross

1    A.   That's the first section, yes.

2    Q.   All right.  And you wrote this document, right?

3    A.   I wrote some of it.  I don't know if I wrote the entire

4    document.  I don't think I wrote the entire document.

5    Q.   Did you write most of it?

6    A.   I don't know.

7    Q.   Is it your form?

8    A.   I think I formatted it, yes.

9    Q.   All right.  You're circulating it to Mueller, Toffey and a

10   lawyer, right, John Patterson at Foley Hoag?

11   A.   I turned away from the e-mail, but I assume so, yes.

12   Q.   Do you see that?

13   A.   Yes.

14   Q.   Are any of the three of them the other co-author of this

15   document?  Let me try it another way.

16   A.   Yeah.

17   Q.   Who else, aside from you, might have been the author of

18   this document?

19   A.   Mike Walker may have contributed to it.  Sophia Gielewski

20   may have contributed.  Jim may have contributed.

21   Q.   Jim Toffey contributed?

22   A.   Gary may have contributed.

23   Q.   Okay.  If we look under legal and structural and look at

24   customer agreement transition, recreation of customer

25   agreements for new co entity, right?

1            And if we go down to the next page, customers

2     pipelines and relationships, seller notification and

3     transition, communication to and transition of existing

4     sellers, was that part of what you were working on here,

5     transitioning the sellers on the TRE exchange over to the new

6     LiquidX company?

7     A.   So I worked on -- I didn't really work with the

8     communication with the sellers, but I worked on -- TRE sellers

9     were terminated their agreements with TRE, and some of them --

10    some of them signed new agreements with LiquidX.

11    Q.   At least your plan here, as part of this project, was to

12    move the sellers who were on the TRE exchange over to the new

13    company LiquidX exchange, right?

14    A.   I don't think any -- I don't think any sellers joined

15    LiquidX until May or April of 2016, but --

16    Q.   They stayed with TRE on the same exchange, though, right?

17    A.   I'm not sure.

18    Q.   You don't know?  Okay.

19            THE COURT:  Is this an appropriate place?

20            MR. RHYNHART:  Sure.

21            THE COURT:  We're going to take a short recess.  You

22    can step down, Mr. Kovacs.  We'll resume shortly.

23            (Witness temporarily excused)

24            (Recess)

25            THE COURT:  Please be seated.  All right.

1          MR. RHYNHART:  Thank you, your Honor.

2          THE COURT:  You can proceed.

3   BY MR. RHYNHART:

4   Q.  Mr. Kovacs, beneath the communication and transition of

5   existing sellers' line --

6   A.  Can you tell me what number it is, again, please?  I'm

7   sorry.

8   Q.  It's Exhibit 189.

9          MR. RHYNHART:  And, your Honor, I don't know if I

10  absolutely formally admitted it.  I move to admit

11  Exhibit JX189.

12         MR. SULLIVAN:  No objection.

13         THE COURT:  JX189 is received in evidence.

14         (Joint Exhibit 189 received in evidence)

15  BY MR. RHYNHART:

16  Q.  Are you there?

17  A.  Yes.

18  Q.  Okay.  The next line down is:  Buyer notification and

19  transition; do you see that?

20  A.  Yes.

21  Q.  All right.  And over here it says:  Develop communication

22  plan and talking points for each individual buyer, right?

23         Was this also part of the plan to transition TRE's

24  buyers on the exchange over to LiquidX?

25  A.  I don't -- I don't think I spoke to any buyers.  My name's

GBGPLIQ2                          Kovacs - Cross

1   not there, but TRE -- buyers left TRE and some buyers signed

2   new agreements with LiquidX.

3   Q.   Okay.  And I am not asking if you personally spoke to

4   buyers.  I'm asking if this is part of the plan that you are

5   circulating for the transition from TRE to LiquidX?

6   A.   I'm not sure exactly what the plan is with respect to

7   buyers.

8   Q.   You circulated this plan to the management team, right?

9   A.   To --

10  Q.   To TRE's management team?

11  A.   I don't think it was to TRE's management team.

12  Q.   Okay.  If we think of Mr. Toffey then as LiquidX, is this

13  the LiquidX management team?  I'm showing you Exhibit 144

14  again.

15  A.   Okay.  I sent it to Gary Mueller and Jim Toffey.

16  Q.   Are they the LiquidX management team?

17  A.   They're investors in LiquidX.

18  Q.   Okay.  Were you in charge of doing the -- of overseeing the

19  transition from TRE to LiquidX?

20  A.   Not -- not every aspect of -- I wasn't in charge of buyers

21  leaving TRE, and I wasn't in charge of getting buyers to join

22  LiquidX.

23  Q.   Were you in charge of putting together the plan for doing

24  that transition from TRE to LiquidX?

25  A.   I put this document together.

1   Q.  Aside from this document specifically, high level, were you

2   involved in putting together the plan -- were you in charge of

3   putting together the plan?

4   A.  Involved or in charge?

5   Q.  In charge of transitioning from TRE TO LiquidX.

6   A.  No.

7   Q.  No?  Okay.  So this plan, where it says:  Transition

8   sellers, transition buyers, you did not write those items, you

9   are not familiar with that part of the plan?

10  A.  I'm familiar with the document, and I'm familiar with --

11  I'm familiar with the fact that buyers left TRE and signed the

12  agreements with LiquidX.  I didn't write the entire document.

13  Q.  Okay.  I'm asking you a simpler question.  Are you familiar

14  with the fact that this transition plan involved a transition

15  of TRE's buyers and sellers over to LiquidX?

16  A.  Yes, the plan involved some -- some of TRE's buyers joining

17  LiquidX.

18  Q.  Well, this doesn't say some, though, right?  It says

19  existing sellers and existing buyers, right?  Right?

20  A.  Where are you referencing existing?

21  Q.  4A and B, existing sellers, and here I think there's a

22  typo.  It says existing sellers again, but it's under the buyer

23  notification and transition head.  Wasn't this for all existing

24  buyers and sellers of TRE?

25  A.  I think that was the plan, yes.

1   Q.  Okay.  The next line says, prospect notification,

2   communicate to existing prospects for the TRE exchange that

3   they will be transitioned to LiquidX, right?

4   A.  Okay.

5   Q.  Yes?

6   A.  Yes.

7   Q.  Then technology and operations.  Was it also part of the

8   plan to transition ten-plus operations vendors over from TRE to

9   LiquidX?

10  A.  So there was a plan to -- TRE would terminate contracts

11  with some of its vendors or with all of its vendors, and some

12  of those vendors established contracts and relationships with

13  LiquidX, yes.

14  Q.  Was it, in fact, the plan to get every operations vendor

15  that was working with TRE to work with LiquidX?

16  A.  Not every vendor, no.

17  Q.  Okay.  But over ten?

18  A.  According to the document, yes.

19  Q.  And then technology vendors, same question.  Ten-plus

20  technology vendors working for TRE would work for LiquidX under

21  this plan?

22  A.  Again, I think -- I think Mike Walker wrote sections on

23  technology in the document; so I'm not completely familiar with

24  what the plan was or how many exact vendors.  But TRE canceled

25  relationships with technology vendors, and LiquidX established

1  relationships with some of those technology vendors.

2  Q.  But at the highest level, it was the plan that TRE's

3  vendors for operations and technology, TRE's buyers and TRE's

4  sellers and TRE's prospects, would all go over to LiquidX,

5  right?  At the highest level.  I know you're not aware in every

6  detail, but you understood that at a high level, right?

7  A.  Yeah, I understood, at a high level, that a lot of these --

8  a lot of these relationships would establish relationships with

9  LiquidX, yes.

10  Q.  If we look down a bit towards the bottom here, SMB workout

11  resignation; do you see that?

12  A.  Yes.

13  Q.  Having TRE resign as collateral agent on small and medium

14  business workouts, was this an item you were familiar with?

15  A.  Yes.

16  Q.  All right.  And did you write this row?

17  A.  I don't remember.

18  Q.  If we look over at the side, that row continues, does old

19  co resign if it remains as a shell co; do you see that?

20  A.  Yes.

21  Q.  Was that your question there?

22  A.  I don't remember.

23  Q.  All right.  Does that question, to your understanding, mean

24  does TRE resign if it is just a shell company after this?

25  A.  Yes, to my understanding.

GBGPLIQ2                      Kovacs - Cross

1    Q.  All right.  And was that a question that you had at or

2    around this time?

3    A.  I'm not sure if it was my question or someone else's

4    question.

5    Q.  Was TRE going to be a shell company post-transition to

6    LiquidX?  Was that part of the plan?

7    A.  After the foreclosure?

8    Q.  Yes.

9    A.  Yes.

10   Q.  Well, let's look at the next row, too.  Insurance coverage;

11   do you see that?  A little hard to read.

12   A.  I see it.

13   Q.  Leave old co in place to defend legal claims, given AIG

14   coverage; do you know anything about that?

15   A.  Yes.

16   Q.  Was that the plan, to leave TRE in place to defend the

17   legal claims with AIG coverage?

18   A.  The plan was to create -- to leave TRE with the ability to

19   wind down orderly with respects to all aspects of the

20   business -- with respect to all aspects of the business so --

21   including resolving the legal claims.

22   Q.  All right.  And you were asked some questions on direct

23   about the AIG coverage.  In fact, did AIG write you a letter

24   reserving rights to disclaim coverage for the Brooklawn

25   arbitration?

1    A.  They -- they sent a reservation of rights letter, yes.

2    Q.  Let's mark at Exhibit 224 or, sorry, get out Exhibit 224.

3    Sorry.  I jumped ahead.  273.  Showing you Exhibit 273 --

4    A.  Let me just pull it up here.  Okay.

5    Q.  Do you recognize Exhibit 273?

6    A.  Yes.

7    Q.  This is an October 19, 2015, letter that AIG wrote to you

8    at TRE?

9    A.  Yes.

10   Q.  And it's regarding the Brooklawn Capital claims?

11   A.  Yes.

12           MR. RHYNHART:  Move to admit JX273 into evidence.

13           MR. SULLIVAN:  No objection.

14           THE COURT:  JX273 is received in evidence.

15           (Joint Exhibit 273 received in evidence)

16   BY MR. RHYNHART:

17   Q.  And in this letter, AIG notes that Brooklawn is seeking

18   $8.4 million in damages, right?  And they say there's an

19   allegation of gross negligence, breach of contract --

20   A.  Wait, which page are you on?

21   Q.  Page 1.

22           THE COURT:  And one question at a time.

23   A.  Yes.

24   Q.  I'm sorry.  Thank you.

25           THE COURT:  Okay.

1   Q.  I'm sorry.  Let me slow it down.  Fourth paragraph on the

2   first page.

3   A.  Okay.

4   Q.  AIG acknowledges receipt of this arbitration demand, where

5   they say the claims are gross negligence, breach of contract

6   and unfair and deceptive trade practices, right?

7   A.  Yes.

8   Q.  And after that, this letter proceeds to state that the

9   policy excludes claims for intentional conduct.  If you look at

10  Page 3, do you see that?

11  A.  Which paragraph?

12  Q.  It's the end of the second full paragraph on Page 3.

13  A.  Okay.

14  Q.  Yes?

15  A.  I see it, yes.

16  Q.  Okay.  And they reserved all rights with respect to the

17  Louisiana Deceptive Trade Practices Act claim as a result of

18  that; is that your understanding?

19  A.  Of whether this relates to the unfair trade practices

20  claim?

21  Q.  Did you have an understanding?

22  A.  I'm not sure what it references specifically.

23  Q.  All right.

24  A.  I see your reference to intentional conduct.

25  Q.  Okay.  And then in the next paragraph, they note that the

1    policy does not cover loss in connection with claims made

2    against an insured alleging, among other things, unfair and

3    deceptive business practices; you saw that?

4    A.  I see that, yes.

5    Q.  And they say because the demand alleges unfair and

6    deceptive trade practices, they're reserving rights at least on

7    that claim, right?

8    A.  Yes.

9    Q.  And then in the next paragraph, they state that there's no

10   coverage for loss for claims relating to return of an insured's

11   fees or compensation.  And on the next page, they say the

12   policy does not cover losses in connection with claims made

13   based upon or attributable to an obligation under a contract.

14   Did you see that?

15   A.  Do I see the highlight?

16   Q.  Did you see it when you got the letter from AIG back in

17   October?

18   A.  I'm sure I read the letter.  I don't remember.

19   Q.  Okay.  Did you have an understanding that this AIG

20   insurance policy might not actually cover the Brooklawn claims?

21   A.  I mean, I'm not sure -- they reserved all their rights

22   under the policy.  I think you need a lawyer to look at the

23   reservation of rights letter and the policy to analyze

24   coverage.

25   Q.  AIG never rescinded or withdrew this reservation of rights

1    letter, to your understanding?

2    A.  Not to my knowledge.

3    Q.  And you had conversations with AIG on the phone?

4    A.  When?  Just generally?

5    Q.  Well, let's look at Exhibit 224.  Do you see Exhibit 224?

6    A.  Yes.

7    Q.  And is this a April 7, 2016, e-mail chain between yourself

8    and Mr. Sullivan?

9    A.  Yes.

10            MR. RHYNHART:  I move to admit Exhibit JX224, your

11   Honor.

12            MR. SULLIVAN:  No objection.

13            THE COURT:  JX224 is received in evidence.

14            (Joint Exhibit 224 received in evidence)

15   BY MR. RHYNHART:

16   Q.  If you look at the second page, towards the top, Sullivan

17   is writing to you:  Should we go into the reservation -- I'm

18   sorry, strike that.

19            At the very bottom, you started the e-mail chain.  You

20   wrote to him just a subject line:  Should we go into the

21   reservations?  Do you remember this?

22   A.  Not specifically, no.

23   Q.  Were you on a call with AIG and e-mailing with Mr. Sullivan

24   at the same time?

25   A.  On April 7th?

1    Q.   Yes.

2    A.   I don't remember.

3    Q.   Okay.  The reservations that you were writing about here

4    was the reservations of rights under the policy?

5    A.   I assume so.

6    Q.   And at the bottom, you write, on the first page:  I think I

7    called it right, to just tell her we expect to understand the

8    coverage issues at some point.  Right?  Is that what you wrote?

9    A.   Yes.

10   Q.   So did you tell AIG, we expect to understand the coverage

11   issues at some point, back in April?

12   A.   We had a frustration with AIG that they -- they were --

13   they wouldn't go into coverage.  They wouldn't have a

14   conversation about it.

15   Q.   Okay.

16   A.   So I don't remember what exactly I --

17   Q.   And you, obviously, were unhappy with AIG by your comment

18   about halfway down the middle of the first page?

19   A.   Was I unhappy with them?

20   Q.   You're talking about AIG there in that comment?

21   A.   Yes, for the reasons I just mentioned.

22   Q.   Let's look at Exhibit JX274.

23   A.   274?

24   Q.   274, yes.  Are you there?

25   A.   Yes.

 1   Q.   Looking at the second e-mail down, third e-mail down, you

 2   wrote on November 22nd to Mr. Patterson and Mr. Leonetti at the

 3   Foley Hoag firm, and to Gary Mueller, about LiquidX paperwork,

 4   privileged and confidential; do you see that?

 5   A.   Yes.

 6   Q.   And earlier today, I asked you if you were concerned about

 7   a conflict between both working for TRE and LiquidX at the same

 8   time and you said no, right?

 9   A.   I don't think -- I wasn't concerned about a conflict with

10   consulting for both companies, no.

11   Q.   All right.  In this e-mail, in the second paragraph, you

12   wrote:  I am no longer an officer of RecX.

13         Stopping there for a moment.  This is shortly after

14   you had resigned as chief financial officer of TRE?

15   A.   It's after I was separated as head of strategy and finance.

16   Q.   You're calling yourself an officer, capital O, right?

17   A.   Yes, I was an officer.

18   Q.   Okay.  And you say:  and, thus, have no fiduciary duty,

19   et cetera.  While this is a much more comfortable position than

20   remaining in my previous role, it still seems awkward to be an

21   officer of the new co -- stop there for a second.  Were you an

22   officer of LiquidX on November 22nd?

23   A.   No.

24   Q.   No?

25   A.   No.  They made me an offer, but I never accepted it or

1   joined as an officer of LiquidX.

2   Q.  Are you sure you weren't treasurer of LiquidX on this date?

3   A.  Yes.

4   Q.  You say:  it still seems awkward to be an officer of the

5   new co and be investing in it while acting as the main point

6   person on both the valuation and the wind down for the old co,

7   even if purely from a consulting standpoint, with no

8   decision-making authority.

9           Were you concerned about a conflict there?

10  A.  A conflict with what?

11  Q.  With both being an investor in LiquidX while simultaneously

12  being the main point person on the valuation with Alvarez and

13  Marsal and the wind down of TRE?

14  A.  No, I was explaining that the -- I realized over the past

15  week that there is more work that needs to be done to ensure

16  the transition and wind down go well.  So I was -- I had worked

17  with TRE and the board of TRE, and I was -- wanted to focus on

18  working with TRE and the restructuring officer at TRE to ensure

19  an orderly wind down, not be in the awkward position of

20  accepting LiquidX's offer to join as an officer and also -- and

21  spending 70 percent of my time on TRE consulting help for TRE.

22  Q.  Did you, quote, separate from TRE and become a consultant

23  in order to minimize your personal involvement in conflicts?

24  A.  No, I separated from TRE because I -- the board and I

25  decided that once the company was no longer a going concern,

1    TRE needed a restructuring officer, not me.

2    Q.  So they no longer needed a finance officer or a strategy

3    officer?

4    A.  Well, they didn't need a strategy officer, and the finance

5    role was taken by the restructuring officer.

6    Q.  And you say that's as of October 30th, right, that date

7    when that separation happened?

8    A.  That's correct.

9    Q.  So as of October 30th, TRE no longer had any need for

10   either strategy or finance because it was already in full

11   wind-down mode?

12   A.  It was -- I spent -- the end of October, I wrote a memo to

13   the board exploring a bridge financing option from the owners

14   of TRE, the existing investors, and they talked to their

15   partnerships and it wasn't viable.  The partnerships didn't

16   want to invest.  The board members didn't want to invest, and

17   it was -- it was in -- it was -- yeah, it was in wind-down

18   mode.

19   Q.  Okay.  You write here:  Make manifest the opportunity for

20   new co.  You knew, as an investor in LiquidX --

21   A.  Can you zoom that out just a little bit?

22   Q.  Oh, I'm sorry.  Do you see that?

23   A.  I do.

24   Q.  The opportunity for new co, obviously, is to form LiquidX,

25   buy the Comerica loan and foreclose on the TRE assets?

GBGPLIQ2                            Kovacs - Cross

1    A.  Correct.

2    Q.  Okay.  And you were simultaneously an investor in new co

3    and the main point person on the valuation with Alvarez, right?

4    A.  Yes.

5    Q.  And when you're working with Alvarez, you're working with

6    them on behalf of TRE, right?

7    A.  Yes.

8    Q.  And you're not telling them I'm also an investor in the

9    buyer, are you?

10   A.  Did I tell them I was an investor in the buyer?

11   Q.  Yes.

12   A.  I think so, yes.

13   Q.  You did?

14   A.  Yes.

15   Q.  Okay.  And did you tell them that LiquidX wants the lowest

16   possible valuation on these TRE assets so that LiquidX can

17   foreclose on all of TRE's assets and leave all other unsecured

18   creditors behind?

19   A.  No.  I told Alvarez very explicitly that we needed to make

20   sure that they did the fairest valuation possible.  I think

21   Alvarez would tell you that, and it may be in writing.

22   Q.  Were you present when Mr. Toffey said something like that

23   to Alvarez?

24   A.  When he said what?

25   Q.  That it would be good if the valuation came in low, less

1    than the loan price?

2    A.  I don't remember anyone saying that to Alvarez, and I

3    definitely did not say that to Alvarez.

4    Q.  Let's look at Exhibit 290.

5    A.  Two, nine?

6    Q.  Two, nine, zero.  This is an e-mail dated December 28th

7    from Toffey to Connolly, copying you and Mueller, regarding

8    Broadridge.  Do you recognize it?

9    A.  Not specifically.

10   Q.  Do you believe you received it?

11   A.  Yes.

12           MR. RHYNHART:  Move to admit Exhibit JX290.

13           MR. SULLIVAN:  No objection.

14           THE COURT:  JX290 is received in evidence.

15           (Joint Exhibit 290 received in evidence)

16   BY MR. RHYNHART:

17   Q.  And you're all using your Gmails, right?  Does that mean

18   this is LiquidX business?

19   A.  I assume so because Gary Mueller is on there too.

20   Q.  If we look down, sorry, December 24th at 3:30, and you're

21   writing an e-mail; do you see that?

22   A.  Yes.

23   Q.  You say:  I agree that the meeting was very constructive.

24   Jim clearly has a great relationship with BR.  And BR is

25   Broadridge?

 1   A.  I assume so.

 2   Q.  Then you say:  It's not clear to me that they understand

 3   the structure of the series A.

 4          You're talking about a series A investment round in

 5   LiquidX, right?

 6   A.  I think so.  I'm not sure.

 7   Q.  So in this e-mail you are consulting for LiquidX?

 8   A.  Yes.

 9   Q.  And you are trying to get Broadridge to invest in LiquidX,

10   right?

11   A.  I was working with LiquidX on -- in conversations with

12   Broadridge to invest, yes.

13   Q.  Broadridge was a company you had previously been talking to

14   back in September about investing in TRE, right?

15   A.  I think TRE talked to Broadridge.  I don't remember -- I

16   don't remember what parts of those conversations I was in.

17   Q.  Didn't you send Broadridge due diligence information for

18   their analysis of TRE for a potential investment back in

19   September?

20   A.  I may have.  I don't remember specifically.

21   Q.  Let's look at Exhibit 157.  Showing you a LiquidX

22   foreclosure on TRE contract, vendor transition checklist,

23   updated on December 29th, 2015.  Do you recognize this

24   document?

25   A.  Yes.

GBGPLIQ2                          Kovacs - Cross

1              MR. RHYNHART:  Move to admit Exhibit JX157.

2              MR. SULLIVAN:  No objection.

3              THE COURT:  JX157 is received in evidence.

4              (Joint Exhibit 157 received in evidence)

5     BY MR. RHYNHART:

6     Q.   And, Mr. Kovacs, were you involved in preparing this

7     document?

8     A.   Yes.

9     Q.   And this is an update on how the transition is going for

10    the contracts and vendors of TRE to go to LiquidX, right?

11    A.   I don't think any contracts were moved from TRE to LiquidX;

12    so not really, no.

13    Q.   Okay.  Well, let's just go through it, then.  The first

14    part here, technology vendors and contracts, you are working

15    through various technology vendors who were working for TRE,

16    right?

17    A.   What do you mean by "working through"?

18    Q.   Well, these were technology vendors who were working for

19    TRE under contract?

20    A.   I think so.

21    Q.   And you are going through each of those vendors and

22    arranging for them to have contracts with LiquidX?

23    A.   Yeah, LiquidX established new contracts with some of these

24    vendors.  I wasn't -- Mike Walker did -- Mike Walker did more

25    of the vendor communication.

GBGPLIQ2                          Kovacs - Cross

1    Q.  Okay.  And for some of these contracts, like venue, that's

2    a technology vendor, right?

3    A.  Yes.

4    Q.  A question is being raised whether there's even a need to

5    repaper; do you see that?

6    A.  Yes.

7    Q.  In other words, could they just start working for LiquidX

8    without even needing a new contract, right?

9    A.  No, I don't think Venyu -- Venyu never started working for

10   LiquidX; so that's not correct.

11   Q.  You don't think Venyu worked for LiquidX?

12   A.  No.

13   Q.  Okay.  Let's look at operations vendors and contracts.

14   A.  Okay.

15   Q.  Were you also going through each of the different

16   operations vendors, of which there are five listed on this page

17   and the next, arranging for them to go from being contracted

18   with TRE to being contracted with LiquidX?

19   A.  Are you asking if I was or if TRE would be because most of

20   these -- like, these don't even have my name by them, and I

21   don't think I was going through these vendors, no.

22   Q.  Well, are you putting together this report?

23   A.  I put the report together.  Other people may have filled

24   in -- other people may have filled in fields on the report.

25   Q.  I understand.  So were you, though, listing out all the

1    different vendors and contracts, and then overseeing at a high

2    level this transition?

3    A.   No.

4    Q.   No.  Are you simply the keeper of the form?

5    A.   I was the -- sometimes I was the keeper of the form, but

6    with some of the vendors, I spoke to in the context of working

7    for TRE to terminate relationships with them or working for

8    LiquidX to establish a new relationship, but not these specific

9    vendors that you were just asking about.

10   Q.   Are you aware, as both a consultant to TRE and a consultant

11   to LiquidX, on December 29th, whether an effort was underway to

12   take each of these listed technology vendors and operations

13   vendors, who were contracted with TRE, and get them contracted

14   with LiquidX?

15   A.   Yes.

16   Q.   Okay.  And for items that have your initials, for instance,

17   is this you, JK?

18   A.   Yes.

19   Q.   Under the Owner column?

20   A.   Yes.

21   Q.   So when you're in each one of these rows, you're the owner

22   of responsibility for transitioning those technology vendors?

23   A.   No, I don't think I would be.  I think Mike Walker would be

24   the owners for these, that's why his name is first.

25   Q.   Okay.  You're both there, right?

1    A.  We are both there, yes.

2    Q.  Were you involved in that transition of the technology

3    vendors?

4    A.  Not -- not at a detailed level.

5    Q.  On the next page, then there's a list of major corporate

6    vendors, right?

7    A.  Yes.

8    Q.  And again, your initials are in some of these rows as the

9    owner, right?

10   A.  Yes.

11   Q.  And was an effort underway at TRE to take these major

12   corporate vendors, who had contracts with TRE, and get them

13   contracts with LiquidX?

14   A.  Yes, there was an effort to -- TRE was terminating

15   relationships with the vendors, and there was an effort to --

16   for LiquidX to establish new contracts with some of those

17   vendors.

18   Q.  And this was supposed to be a seamless transition, right?

19   So they would terminate with TRE and sign with LiquidX without

20   any break in service, right?

21   A.  I don't know if it was seamless in all cases.

22   Q.  Was the intention for it to be seamless?

23   A.  I think so.

24   Q.  Okay.  After those eight corporate vendors, then there are

25   ancillary corporate vendors at the bottom of the second page,

1   which continues onto the third page, where there are ten more

2   corporate vendors listed, right?

3   A.  Yes.

4   Q.  And is the same true for these ten ancillary corporate

5   vendors, that an effort was underway to take these ten

6   ancillary corporate vendors, who were contracted with TRE, and

7   get them contracted with LiquidX?

8   A.  Wait, I don't know if all of these were intended to sign

9   contracts with LiquidX, or whether all of them even signed

10  contracts with LiquidX.  I mean, I'm not the owner on any of

11  these, but generally, there was an effort to terminate vendors

12  with TRE and LiquidX establish relationships and new contracts

13  with some of those vendors.

14  Q.  Let's go to Exhibit 284.  Do you see this e-mail from

15  yourself to Ms. Gielewski on March 7th, 2016?

16  A.  Yes.

17  Q.  And you are actually forwarding an e-mail below that you

18  had sent to Broadridge on January 25th?

19  A.  Yes.

20          (Continued on next page)

21

22

23

24

25

1          MR. RHYNHART:  Move to admit Exhibit JX 284.

2          MR. SULLIVAN:  No objection.

3          THE COURT:  Exhibit JX 284 is received in evidence.

4          (Joint Exhibit 284 received in evidence)

5    BY MR. RHYNHART:

6    Q.  On January 25, you are writing to someone named Raghav at

7    Broadridge and Christian Palomino at Broadridge?

8    A.  OK.

9    Q.  And you are copying Mr. Toffey, right?

10   A.  I don't remember the e-mail specifically, but yes.

11   Q.  Do you remember Toffey asking you to send along an updated

12   financial model for LiquidX to Broadridge in January of 2016?

13   A.  I remember -- I remember exchanging -- I remember working

14   with LiquidX on the -- what became Broadridge's equity

15   investment in LiquidX.  I don't remember whether Jim asked me

16   to do this on January 25.

17   Q.  Well, you give them some details about how this financial

18   model was put together.

19          Were you involved in that?

20   A.  Yes, I was involved in putting the model together.

21   Q.  OK.  If we look at the attachment, it says, LiquidX

22   preliminary financial model.

23          By the way, I think the date here on the draft wound

24   up getting changed when it was printed.  Do you know if that

25   was a --

1    A.  Well, I think we can be pretty certain it wasn't created on

2    November 8, 2016.  But other than that, I don't know anything.

3    Q.  OK.  But this was appended to an e-mail that you sent on

4    January 25, 2016, right?

5    A.  OK.

6    Q.  All right.  So if we then look at the financial model --

7    and I'm now on page --

8    A.  Yeah.  I'm with you.

9    Q.  You're with me.  It's the second page of the attachment,

10   which is the third page overall of the exhibit.  It's entitled

11   LiquidX financial statements and model output.

12   A.  Correct.

13   Q.  At this point in time, January 25, 2016, was there anything

14   different about the LiquidX operating business --

15   A.  I just have to -- I'm not sure that -- it's not clear to me

16   what the date of the model is, and I don't remember it.

17   Q.  OK.

18   A.  It has a -- it has a date in the future on it and it's

19   attached in a forwarded e-mail.  So it's hard for me to -- it's

20   hard for me to answer questions that it is assumed that it is

21   contemporaneous with the e-mail I would be getting.

22   Q.  Well, you said it was a forwarded e-mail.

23       You forwarded it on March 7, correct?

24   A.  Yes.

25   Q.  And the attachment is actually called 012516.  Is that

1   January 25, 2016?

2   A.  That is probably the date then.

3   Q.  OK.  Before we get into this attachment, on January 25,

4   2016, there was nothing different about the LiquidX operating

5   business from the way the TRE operating business had been

6   running less than a month before, correct?

7   A.  I don't think LiquidX had any -- had a business or any

8   customers in January, so...

9   Q.  Well, as of January 1, wasn't LiquidX running the TRE large

10  corporate Receivables Exchange?

11  A.  Was LiquidX running TRE's business on January --

12  Q.  Yes.

13  A.  No.

14  Q.  OK.  When do you believe LiquidX started running the TRE

15  large corporate receivables exchange?

16  A.  TRE wound down.  TRE wound its business down, so LiquidX --

17  I don't understand the question.

18  Q.  TRE had an exchange for large corporate receivables, is

19  that right?

20  A.  Yes.

21  Q.  And it had buyers and sellers that would go on this

22  exchange and buy and sell invoices, right?

23  A.  Yes.

24  Q.  OK.  That business continued from December 31, 2015 to

25  January 1, 2016, without interruption, correct?

1    A.   TRE's business?

2    Q.   The --

3    A.   Yes.

4    Q.   That exchange continued operating without any interruption,

5    right?

6    A.   It -- it continued operating beyond January 1st.

7    Q.   That's right?

8    A.   Did it continue to January 1st?  Yes.

9    Q.   I'm sorry, I didn't hear what you just said.

10   A.   Yes.  TRE's business continued -- I'm sorry.  If you could

11   just restate it?  My apologies.

12   Q.   Sure.

13        On January 25, 2016, that large corporate Receivables

14   Exchange was operating under the LiquidX banner, right?

15   A.   What -- TRE's -- LiquidX never ran TRE's business, so I

16   don't know how else to answer the question.

17   Q.   Let's break it down even smaller then.

18   A.   Sure.

19   Q.   On December 31, 2015, do you know if TRE was running an

20   exchange for the buying and selling of large corporate

21   receivables?

22   A.   Yes.

23   Q.   On January 1, 2016, do you know if LiquidX was running an

24   exchange for the buying and selling of large corporate

25   receivables?

A.   No, because I don't think LiquidX had any customers on

January 1st.

Q.   So you believe there was actually a period of of time when

the exchange was not operational?

A.   There was -- there was a period of time when -- there was a

period of time when LiquidX wasn't running an exchange, yes.  I

mean, it wasn't -- I don't know -- I don't know when LiquidX

signed its first customer, but I think it was well after --

well after January.

Q.   OK.  Let me try it a different way.

A.   OK.

Q.   Do you believe on January 1, 2016, that there was no

exchange for the buying and selling of large corporate

receivables; it was shut down?

A.   That there was no exchange anywhere or --

Q.   Whether you call it TRE or LiquidX, there was no exchange

running on January 1st?

A.   TRE was running an exchange on January 1st.

Q.   Oh, OK.  All right.  I was missing you on it.

          So TRE kept running the exchange into January of 2016?

A.   TRE had -- after -- after LiquidX foreclosed, TRE had

the -- the receivables create a tail when there is a

transaction.  So that TRE continued to have customers under TRE

contracts and it had a technology -- it had a technology

services agreement with LiquidX whereby LiquidX would provide

1   services to help TRE run its business, but I'm not sure when

2   LiquidX actually signed its first customer.

3   Q.  So do you believe there was a period of time in early

4   January 2016 where new buyers or sellers could not get on to an

5   exchange and sell or buy invoices, whether you call it TRE or

6   LiquidX?

7   A.  Maybe in early January, I'm not sure.

8   Q.  But you do believe there was a period of time when there

9   was no new buyers or sellers on an exchange, whether it's TRE

10  or LiquidX?

11  A.  What do you mean by new buyers or sellers?

12  Q.  Well, you were talking about a tail and old TRE invoices,

13  right?

14          You said TRE was winding down the open invoices that

15  had been purchased on its exchange before December 31, right?

16  A.  You're using -- you just used the term open invoice, and I

17  did not use that term, so it's very hard for me to follow you.

18  If you put -- like you're restating what I am saying but adding

19  new terms, so...

20  Q.  I am just trying to understand something very simple.

21          Did the exchange for buying and selling large

22  corporate receivables continue operating from December 31 to

23  January 1st and onward seamlessly so that people could continue

24  buying and selling on it?

25  A.  TRE kept up -- TRE's customers kept transacting under their

1    contracts with TRE, I think, well after January 1st.

2    Q.  Could a new buyer sign up on the TRE exchange after

3    January 1st, 2016?

4    A.  I don't think any new buyers signed up.  I don't -- I

5    don't -- could they have?  If --

6    Q.  If you don't know, you don't know.

7    A.  OK.  I don't know.

8    Q.  You don't know if LiquidX was running and operating an

9    exchange for buying and selling large corporate receivables in

10   January of 2016?

11   A.  I don't think LiquidX had any customers in January of 2016.

12   Q.  OK.  TRE's salespeople went over to LiquidX and became its

13   employees in January of 2016, right?

14   A.  Some of them, yes.

15   Q.  OK.  Do you recall them bringing in any significant new

16   buyers or sellers in January 2016?

17   A.  No.

18   Q.  OK.  So now let's go back to this Exhibit JX 284, where you

19   have a projection for LiquidX.

20          I want to start with the gross revenue line.  Do you

21   see that here?

22   A.  I do.

23   Q.  Then I want to go to gross profit and then to EBITDA, which

24   is net profit, right?

25          It's Earnings Before Interest, Taxes, Depreciation,

1  and Amortization, is that right?

2  A.  @That's what it stands for, yes.

3  Q.  OK.  Well, if you want to be literal, that's what it is,

4  right?

5  A.  Just to be literal, I was just saying I am not sure net

6  profit is the literal equivalent.

7  Q.  So, fiscal year 2016, following this column down, you're

8  projecting $7.4 million in revenues, gross revenues, right?

9  Yes?

10  A.  That's what's in the model, yes.

11  Q.  OK.  And then for gross profit, $6.8 million, right?  Yes?

12  A.  That's what it says, yes.

13  Q.  And then per EBITDA, $356,000, right?

14  A.  Yes.

15  Q.  Then let's go over to fiscal year 2017.

16      Gross revenues are projected at 12.4 million; yes?

17  A.  Yes.

18  Q.  Gross profits are projected at 11 million, right?

19  A.  Yes.

20  Q.  And EBITDA is projected at $3.5 million?

21  A.  OK.

22  Q.  And then if we go over to fiscal year 2018, gross revenues

23  are predicted at $24 million?

24  A.  OK.

25  Q.  Projected gross profit at 24 million, 24.0, is that right?

1   A.  OK.

2   Q.  And EBITDA of $14.1 million?

3   A.  OK.

4   Q.  So that projection that you just gave to Broadridge on

5   January 25, 2016, predicts that the company will be earning

6   $14.1 million in EBITDA within two years?

7   A.  That's what the model says, yes.

8   Q.  And there is nothing different about this business on

9   January 25 than the TRE business that had existed on

10  December 31, right?

11  A.  Well, there is this business has no customers on

12  January 25.

13  Q.  LiquidX is in even worse shape, right?

14  A.  What?

15  Q.  If you're saying LiquidX had no customers on January 25,

16  then it would be in even worse shape than TRE was in at the end

17  of December, right?

18  A.  LiquidX would be in worse shape?

19  Q.  I thought you just said they had no customers?

20  A.  I am not sure the shape of the customers is -- I'm not sure

21  number of customers is the only way that you would judge the

22  shape of the customers, but...

23  Q.  To put it more simply, you don't know of anything on

24  January 25th that was different about the LiquidX business from

25  the way the TRE business was being run towards the end of 2015,

GBGsLIQ3                         Kovacs - cross

1    right?

2    A.  No.  The difference would be that the LiquidX business had

3    no customers, whereas, the TRE business did have customers in

4    2015.

5              THE COURT:  How does that result in such an optimistic

6    projection about EBITDA?

7              THE WITNESS:  Was that a question?

8              THE COURT:  Yes.  I'm asking you.

9              THE WITNESS:  It's the -- it's a financial model

10   driven by salespeople's projections.  I -- it's --

11             THE COURT:  But it had no customers.  If it had no

12   customers, how could a projection for that kind of EBITDA be

13   meaningful?

14             What's it tied to?

15             THE WITNESS:  It's tied to projections for

16   salespeople.  All the spreadsheet is doing is -- all the

17   spreadsheet is doing is turning the salesperson's projections

18   into numbers.  I didn't hard put the numbers.

19             THE COURT:  OK.  When you say hard put, you mean you

20   didn't look behind them to ask the salespeople like, how could

21   you possibly come up with this; is that it?

22             THE WITNESS:  That wasn't my job.  My job was to --

23             THE COURT:  Whose job was it to look at what lay

24   behind the numbers that somebody through down on a piece of

25   paper?

GBGsLIQ3                              Kovacs - cross

1          THE WITNESS:  I think that the potential investor

2     would -- would -- would want to look at that.

3          THE COURT:  Would be acting at his peril, right?

4          THE WITNESS:  I don't know that these are -- this is

5     just a spreadsheet.  I don't know that this is what the

6     potential investor thought of as realistic or reality.  I have

7     no idea.

8          THE COURT:  But it was shown to investors, right?

9          THE WITNESS:  I -- I think it was shown to Broadridge,

10    who ultimately invested in LiquidX, right.

11         THE COURT:  Right.  It was offered to them to induce

12    them, right?

13         THE WITNESS:  It --

14         THE COURT:  Right?

15         THE WITNESS:  It was sent to Broadridge, yes.

16         THE COURT:  To induce them, right?

17         You didn't send it to them by accident, did you, like

18    so many other documents in this case that are signed by

19    accident on different dates?

20         THE WITNESS:  I mean, I was asked to send them an

21    e-mail.

22         THE COURT:  All right.

23         THE WITNESS:  I don't know.

24         THE COURT:  Please continue.

25         MR. RHYNHART:  Thank you, your Honor.

1  BY MR. RHYNHART:

2  Q.  These salespeople that gave you these projections were the

3  same salespeople that were working at TRE in the fall of 2015,

4  right?

5  A.  I'm not sure.  LiquidX hired some new salespeople.  I don't

6  remember exactly when they were hired.

7  Q.  You never attempted to do a projection like this through

8  your salespeople's expectations of future profits in the fall

9  of 2015 for purposes of finding new investors, right?

10  A.  Did I?

11  Q.  Yes.

12  A.  Yes.  We did similar -- we did similar -- we did similar --

13  I think we have even seen a similar model from the summer of

14  2015, when TRE was soliciting equity.

15  Q.  So nothing changed --

16  A.  Perhaps the lack of interest is due to Judge Pauley's

17  concerns.

18  Q.  Let's look at Exhibit JX 287.

19  A.  Which number?  I'm sorry.

20  Q.  This is an e-mail that you wrote on January 7 --

21  A.  What was the number?

22  Q.  I'm sorry.  278.

23  A.  Sure.  OK.

24  Q.  And you're writing to Mr. Toffey and the lawyers at Foley

25  Hoag and Mr. Mueller, this time you are also copying Adam

1    McNeil at McGlinchey.  Who does he represent?

2    A.   TRE.

3    Q.   So he's TRE's lawyer in the Brooklawn arbitration, right?

4    A.   One of them, yes.

5    Q.   Mr. Sims at ZEK is the other one?

6    A.   Stu Krause.  I mean, there is a list of lawyers that have

7    worked on that matter.

8    Q.   At the ZEK law firm?

9    A.   And at McGlinchey, yes.

10   Q.   I'm sorry.  You have got Adam McNeil at McGlinchey

11   representing TRE.  You also have the ZEK law firm, which is

12   Mr. Sims or Mr. Krause or someone else at ZEK, right?

13   A.   ZEK,  Zeichner Ellman & Krause, was TRE's -- is TRE's

14   corporate counsel and also -- also represented TRE in the

15   Brooklawn arbitration matter, yes.

16   Q.   In fact, are they representing you for purposes of your

17   testimony today in court?

18   A.   Is who, is ZEK?

19   Q.   Do you know if ZEK required us to serve a subpoena on you

20   and require us to pay you a witness fee to be here today?

21   A.   I don't know -- I don't know if I'm getting a fee, but they

22   are -- they are representing me.

23   Q.   OK.

24            THE COURT:  You're entitled to a fee.  OK?

25            Apparently it was paid.

1    Q.  You're writing to the lawyers for LiquidX and the lawyers

2    for TRE, and you're saying LiquidX would like to discuss legal

3    issues with debtor TRE, right?

4    A.  OK.

5    Q.  And you're writing this from a LiquidX e-mail address in

6    January?

7    A.  Yes.

8    Q.  OK.  So I take it for this e-mail, you are a LiquidX

9    consultant?

10   A.  I had e-mails at both companies.  I think -- actually, I

11   think this is a mistake.

12   Q.  Who were you working for in this e-mail?

13   A.  I think the e-mail is relating to part of -- part of the

14   transition services agreement between TRE and LiquidX was for

15   LiquidX to assist with discovery matters.  So I think I was

16   setting up a discussion to talk to LiquidX about assisting with

17   some discovery.

18   Q.  There was an agreement to cooperate with each other under

19   the transition services agreement for purposes of litigation;

20   is that right?

21   A.  To cooperate in litigation?

22   Q.  Yes.

23   A.  No, the agreement was -- I mean, there's a number -- I

24   mean, I think there is -- I'm not intimately familiar with the

25   TSA, but I don't think it includes cooperating in litigation.

1    Q.  Do you believe that anyone was being paid under the

2    transition services agreement to provide services in connection

3    with the Brooklawn arbitration?

4    A.  No.

5    Q.  OK.  So who you were representing here, LiquidX or TRE?

6    A.  TRE.

7    Q.  All right.  And you're accidentally writing it from a

8    LiquidX e-mail?

9    A.  I think so.

10   Q.  And you're writing, LiquidX would like to discuss legal

11   issues with its debtor TRE?

12   A.  That's what I'm writing, yeah.

13   Q.  And you're writing it that way because you're actually TRE

14   requesting a conference with LiquidX?

15   A.  Adam is beginning discovery on the matter.  I think it's an

16   e-mail to talk about cooperation under the TSA on discovery.

17   Q.  OK.  So you're getting the counsel for both parties

18   together to start working on helping Mr. McNeil defend the

19   Brooklawn arbitration?

20   A.  No.

21   Q.  No?

22   A.  No.

23   Q.  Aren't you copying in Mr. Toffey, who is the CEO of LiquidX

24   and an owner of LiquidX, and the lawyers for LiquidX,

25   Mr. Leonetti --

1    A.  You're misunderstanding me.

2            When LiquidX foreclosed on TRE, it foreclosed on

3    servers and other -- other things that held documents and this

4    was -- I don't know if it was important with regard to

5    Brooklawn, but I think it was very important with regard to the

6    Cargill ICICI case, because there was a federal hold on these

7    documents.  So they had to -- they had to stay pristine, but

8    LiquidX foreclosed on the servers.  So it was -- there was an

9    agreement under the TSA that LiquidX would provide TRE the

10   ability to comply with discovery in the legal matters.

11   Q.  OK.  In this e-mail, you're obviously not writing about

12   Cargill or ICICI, right?

13   A.  Not -- not -- I don't know if -- I don't know if this was a

14   broader discussion about discovery or whether it was only a

15   discussion about Brooklawn.  I don't remember whether there was

16   a call or what -- what sort of discussion took place.

17   Q.  I mean, you specifically referenced the Brooklawn matter

18   and you say Adam is beginning discovery on the matter set to go

19   to arbitration in April.  That's Brooklawn, right?

20   A.  Yes.

21   Q.  OK.  Then you proceeded to get some documents from LiquidX

22   for the Brooklawn arbitration which you reviewed, right?

23   A.  I don't think I reviewed the documents.  Counsel reviewed

24   it.

25   Q.  You didn't?  You didn't review all of the verifications for

1   the underlying matters at issue in the Brooklawn arbitration?

2   A.  I reviewed verifications for Brooklawn in October of 2015,

3   when the complaint was filed.

4   Q.  OK.  Who were you working for then?

5   A.  TRE.

6   Q.  OK.  Did you put together a memo, by the way, about that?

7   A.  I don't remember.

8   Q.  Showing you Exhibit JX 193.

9            MR. RHYNHART:  By the way, I may have missed the last

10  one.  Move to admit JX Exhibit 278 into evidence.

11           MR. SULLIVAN:  No objection.

12           THE COURT:  JX 278 is received in evidence.

13           MR. RHYNHART:  Thank you.

14           (Joint Exhibit 278 received in evidence)

15           MR. RHYNHART:  This one is JX 193.

16           THE COURT:  Any objection?

17           MR. SULLIVAN:  I need to get it first.  193?

18           THE WITNESS:  OK.

19           THE COURT:  Hold on.

20           MR. RHYNHART:  I'm sorry.

21           MR. SULLIVAN:  No objection.

22           THE COURT:  JX 193 is received.

23           MR. RHYNHART:  Thank you, your Honor.

24           (Joint Exhibit 193 received in evidence)

25  BY MR. RHYNHART:

GBGsLIQ3                      Kovacs - cross

1    Q.  In this e-mail dated January 25, you're writing to

2    Mr. Walker at LiquidX copying Mr. McNeil, the lawyer for TRE,

3    right?

4    A.  Yes.

5    Q.  And if we go to the back, the second page, Mr. Walker at

6    LiquidX is requesting from RecX-Support and copying you and

7    TRE's lawyer on January 22 seeking information about

8    Brooklawn's underlying auction bids, right?

9    A.  OK.

10   Q.  Was he doing this at your and Mr. McNeil's request to

11   assist TRE in the Brooklawn arbitration?

12   A.  This is -- this is a similar -- TRE is requesting -- or

13   maybe I'm requesting on TRE's behalf -- for LiquidX to provide

14   TRE with some discovery materials in the Brooklawn arbitration.

15   Q.  All right.  Was Mr. Walker coming up with this list himself

16   for what would be helpful to TRE in the arbitration?

17   A.  I don't -- I don't know if this is a list of what would be

18   helpful or whether it's just discovery or inquiry.  I -- I

19   don't know.  I'm not sure.

20   Q.  He writes at the bottom, in other words, we are not just

21   looking for the last and final bid by the buyer, we are looking

22   for all bids and so on.  You received that.

23        Did you understand he was understanding "we" meaning

24   you and he and Mr. McNeil?

25   A.  I think he's writing "we" as in him requesting whatever --

1   whatever technology apparatus he is e-mailing.

2   Q.  Did you work closely with Mr. Walker in defending the TRE

3   Brooklawn arbitration?

4   A.  He had nothing to do with defending the arbitration.

5   Q.  You didn't e-mail with him many times for different kinds

6   of documents and help in that arbitration?

7   A.  He -- he assisted TRE with getting discovery off of servers

8   that LiquidX had possessed.

9   Q.  And this RecX-Support, is this an e-mail group at LiquidX?

10  A.  I don't know what that is.

11  Q.  OK.  You were a consultant to LiquidX being paid $2,500 a

12  week at this time, right?

13  A.  I think so, yes.

14  Q.  You never saw this e-mail address before, RecX-Support?

15  A.  No.

16  Q.  You don't know if LiquidX had an e-mail group devoted

17  solely to supporting TRE?

18  A.  That, I know they did not.

19  Q.  OK.  Then you get the information from Walker, right?  Here

20  is the bid query.

21          And you write to Mr. McNeil, I will clean this up and

22  walk you through it; yes?

23  A.  Yes.

24          THE WITNESS:  Can we take a very quick restroom break?

25          THE COURT:  Sure.  Do you need one?

1               THE WITNESS:  Very quick, but yes.

2               THE COURT:  We will take two minutes.

3               How much more do you have with this witness?

4               MR. RHYNHART:  About ten minutes, your Honor.

5               THE COURT:  OK.

6               THE WITNESS:  Where is the closest restroom?

7               THE COURT:  There is one out in the hall.

8               MR. SULLIVAN:  I'll show him.

9               THE COURT:  I'm sure that Mr. Sullivan has been there.

10   Show him the way.

11              THE WITNESS:  Thank you.  Apologies.  Thank you.

12              MR. SULLIVAN:  Thank you.

13              (Pause)

14              THE COURT:  Ready to proceed?

15              THE WITNESS:  Yes, sir.

16              THE COURT:  All right, Mr. Rhynhart.

17              MR. RHYNHART:  Thank you, your Honor.

18   BY MR. RHYNHART:

19   Q.  Exhibit JX 282.

20              This is a March 7, 2016 e-mail from yourself to Beth

21   Carcich at LiquidX, copying Adam McNeil, attorney for TRE,

22   regarding Brooklawn rebates.

23              Do you see this document?

24   A.  I see it, yes.

25              MR. RHYNHART:  Move to admit Exhibit 282.

1             MR. SULLIVAN:  No objection.

2             THE COURT:  Exhibit 282 is received in evidence.

3             (Joint Exhibit 282 received in evidence)

4   BY MR. RHYNHART:

5   Q.  If we go down to right here, you're writing to Ms. Carcich

6   at 9:36 a.m. -- 9:55 a.m., please keep Adam copied on

7   everything.  Need the info going back to when they first

8   started buying.

9             You're asking Ms. Carcich, an individual in the

10  LiquidX accounting department, to get you information about

11  Brooklawn when they made purchases at TRE?

12  A.  This is another information or discovery request to

13  LiquidX, yes.

14  Q.  You write back at the very top, after reviewing those

15  document, so we only rebated them starting in January 2013,

16  with three question marks, even though they were buying since

17  like 2010.

18            You wrote that, right?

19  A.  I assume so, yes.

20  Q.  Is it fair to say you were deeply involved in the strategy

21  for defending this TRE arbitration?

22  A.  I was somewhat involved in the strategy, but this is

23  just -- this is just asking for data when Brooklawn was buying.

24  Q.  But then you're reviewing the data, commenting on it and

25  involving LiquidX's personnel in the strategy, right?

1   A.  In what strategy?

2   Q.  For instance, questioning how we could have only been

3   paying rebates to Brooklawn since 2013.  You are posing those

4   questions to LiquidX's finance people, right?

5   A.  I was posing the question about whether -- about what the

6   data said, but I don't recall discussing anything about

7   litigation strategy with LiquidX's finance department.

8   Q.  Let's look at Exhibit 306.

9              This is an e-mail from you on February 22, 2016.

10  A.  Which is this?

11  Q.  I'm sorry, 306.

12  A.  OK.  Sure.

13  Q.  You're writing to Mr. Toffey, copying Ms. Gielewski, and

14  you're writing about items for an afternoon discussion?

15  A.  Sure.

16             MR. RHYNHART:  Move to admit Exhibit JX 306?

17             MR. SULLIVAN:  No objection.

18             THE COURT:  Exhibit JX 306 is received in evidence.

19             (Joint Exhibit 306 received in evidence)

20  BY MR. RHYNHART:

21  Q.  You're using a LiquidX e-mail here.  Is this LiquidX

22  business?

23  A.  Yes.

24  Q.  All right.  The first item here, I have to spend an hour at

25  ZEK.  ZEK, that would be an hour of TRE business?

1    A.  That's right.

2    Q.  OK.  So, first, you're spending an hour at ZEK on the

3    Brooklawn arbitration, is that right?

4    A.  I don't remember.  There were -- there were two cases at

5    this time, so I'm not sure which.

6    Q.  And then in the same e-mail you're writing about setting up

7    bank accounts for LiquidX, getting Broadridge information on

8    investing in LiquidX, setting up subleases for LiquidX, setting

9    up insurance for LiquidX, and doing cash projections for

10   LiquidX, right?

11   A.  Sure.

12   Q.  You're doing all of that for LiquidX while simultaneously

13   working on defending TRE in the Brooklawn arbitration?

14   A.  I'm not simultaneously.  I think I spent the hour at ZEK

15   first, and then after that, I worked on some things on this

16   list -- I don't remember exactly what -- with LiquidX.

17   Q.  Let's look at JX 220.  This is on March 14.

18          You're receiving an e-mail from Alex Regitsky at

19   LiquidX to you at TRE, copying McNeil regarding Brooklawn's

20   calculation of damages.

21          Do you recognize this document?

22   A.  Generally, yes.

23          MR. RHYNHART:  Move to admit Exhibit JX 220.

24          MR. SULLIVAN:  No objection.

25          THE COURT:  JX 220 is received in evidence.

1              (Joint Exhibit 220 received in evidence)

2    BY MR. RHYNHART:

3    Q.  If we look at the bottom here, it starts with McNeil

4    sending you Brooklawn's calculation of damages in the

5    arbitration, right?

6    A.  OK.

7    Q.  You send this along to Alex Regitsky at LiquidX, right?

8    A.  OK.

9    Q.  If you look up just a tiny bit, he is a senior associate in

10   clearing and settlement operations at LiquidX?

11   A.  Yes.

12   Q.  So you ask him to look over Brooklawn's damages and see if

13   his auctions match up to our data, right?

14   A.  Right.  So, again, LiquidX had all of the legacy TRE data,

15   so any information or discovery request in any legal case would

16   have had to have been served by LiquidX.

17   Q.  But you're doing more than just asking them to send you

18   documents, you're actually asking them to do an analysis,

19   right?

20   A.  I'm asking him to, I guess, compare -- I can't quite read

21   it.  Let me see.

22              I asked him to compare, I guess, the list of auctions

23   on -- on the Brooklawn damages exhibit to whatever the actual

24   list of auctions was on the LiquidX servers.

25   Q.  Right.  You're asking a LiquidX employee to do an analysis

1    of the data.  And he writes you back that the advances match

2    up, but he is not including payments received, advance discount

3    or late fees in his calculation.

4              Were you using the LiquidX personnel as part of your

5    team for defending the TRE arbitration?

6    A.   I was -- we -- TRE made discovery requests that had to be

7    served by LiquidX.  It made information requests about

8    information that it no longer had since LiquidX had foreclosed

9    on TRE's servers.  I think LiquidX and TRE had an agreement to

10   cooperate on those items under the transition services

11   agreement.

12   Q.   Are the LiquidX financial personnel reporting to you

13   without question because you had been their supervisor as chief

14   financial officer only a few months before?

15   A.   You're talking about Alex Regitsky?

16   Q.   Yes.

17   A.   Alex Regitsky never reported to me.

18   Q.   Were you the chief financial officer above him at TRE?

19   A.   He didn't report to me, though he reported to Mike Walker,

20   and then Mike Walker reported in to Jim.

21   Q.   OK.  That last e-mail we looked at was March 14 at

22   12:44 p.m.  This is the same day.  This is Exhibit JX 285.

23             Do you recognize this document?

24   A.   I have to pull it up real quick.  OK.

25             MR. RHYNHART:  Move to admit Exhibit JX 285.

1              MR. SULLIVAN:  No objection.

2              THE COURT:  JX 285 is received in evidence.

3              (Joint Exhibit 285 received in evidence)

4    BY MR. RHYNHART:

5    Q.  On the same day you had just been writing to the LiquidX

6    financial personnel about helping with the Brooklawn

7    arbitration damages assessment, you write to someone in finance

8    at LiquidX regarding Broadridge's investment in LiquidX, right?

9    A.  Ryan -- Ryan is not in finance.  He's a salesperson.

10   Q.  Oh, he's a sale person.  OK.

11             But now, on the same day you are writing to LiquidX,

12   but now you are a LiquidX person?

13   A.  So am I doing LiquidX business?

14   Q.  Yes.

15   A.  Yes.  Some days I did business for both TRE and LiquidX.  I

16   consulted for both companies.

17   Q.  OK.  Let's look at another e-mail on the same day.

18             This is two hours later, exhibit 286.

19   A.  It's two hours or five hours?

20   Q.  Two hours after Exhibit 220, seven hours before Exhibit

21   285, all on the same day.

22             Do you see Exhibit 286?

23   A.  We are five hours after 286 or I'm not following.

24   Q.  Let's just start over.

25             Do you see Exhibit JX 286?

GBGsLIQ3                         Kovacs - cross

1    A.  I do.

2    Q.  Do you recognize it?

3    A.  It's very hard to read.

4    Q.  Do you see it on the screen?

5    A.  It's just that the numbers are all scattered across like

6    12 pages.  No, I don't recognize it.

7    Q.  Do you remember sending Mr. Regitsky at LiquidX a Brooklawn

8    auction summary that you actually put together?

9    A.  I remember sending him it -- I remember sending him the

10   list of auctions so that he could compare it to the data on

11   LiquidX's servers in the last e-mail.  I don't remember this

12   one.

13   Q.  What is it you don't remember about this in particular,

14   that parts of it are redacted?

15   A.  That's -- it looks like it's printed in a way that it's

16   unrecognizable.

17   Q.  Do you recognize the e-mail on the first page?

18   A.  I don't.  It doesn't even have text.

19   Q.  Do you believe you sent this e-mail?

20   A.  I believe that I sent it, yes.

21           MR. RHYNHART:  Move to admit Exhibit JX 286.

22           MR. SULLIVAN:  No objection.

23           THE COURT:  JX 286 is received.

24           (Joint Exhibit 286 received in evidence)

25   BY MR. RHYNHART:

1   Q.  So, on the same day you wrote to LiquidX three times, two

2   of those times you were writing as a TRE consultant, one of

3   those times you were writing as a LiquidX consultant?

4   A.  I don't have -- I don't know how many times I wrote to who

5   on March 14.

6   Q.  Well, we just looked at the three exhibits, right?

7   A.  Can you just re-summarize them?

8   Q.  We'll move on.

9   A.  Sure.

10  Q.  Let's look At exhibit JX 283.

11          MR. RHYNHART:  Your Honor, I apologize.  I have about

12  two minutes left.

13  A.  283?

14  Q.  283.

15  A.  Sure.

16  Q.  Do you recognize this document?

17  A.  Yes.

18  Q.  It's a March 7 e-mail chain between yourself and

19  Mr. Counihan?

20  A.  Yes.

21          MR. RHYNHART:  Move to admit Exhibit JX 283.

22          MR. SULLIVAN:  No objection.

23          THE COURT:  JX 283 is received.

24          (Joint Exhibit 283 received in evidence)

25  BY MR. RHYNHART:

1  Q.  If we look at the second page, this begins with an e-mail

2  from someone named Jeffrey Yellin to Beth Carcich regarding

3  TRE.

4          Do you see that?

5  A.  I do.

6  Q.  Do you know who Mr. Yellin is?

7  A.  He is a former employee of TRE.

8  Q.  He had stock options in TRE?

9  A.  At one point, I'm sure he had stock options, yes.

10 Q.  He is writing to Beth Carcich, who had been the controller

11 at TRE in 2015?

12 A.  No.  She was never the controller.

13 Q.  Assisting controller?

14          What was her title?

15 A.  Accounting associate.

16 Q.  She was in finance at TRE?

17 A.  Yes.

18 Q.  He's writing to her saying, I learned that LiquidX acquired

19 TRE.  If that is the case, are my shares now officially worth

20 zero, right?

21          She forwarded that to Mr. Sullivan, who is the

22 wind-down consultant for TRE, right?

23 A.  Yes.

24 Q.  He writes back to Mr. Yellin on March 7 at 9:41 a.m.

25 telling him about the foreclosure that took place and that any

1   shareholder investment is worthless as of 12/31/15, right?

2   A.  OK.

3   Q.  He bcc'd you on that; do you know?

4   A.  Do I know whether he bcc'd me?

5   Q.  Yes.

6   A.  I'm not sure.

7   Q.  Somehow you got that e-mail, right, because here you are

8   forwarding it to Counihan saying, was Jeff entitled to this

9   level of info, right?

10  A.  Yes.

11  Q.  And Counihan writes back to you, probably not, but we will

12  have to tell shareholders what is going on at some point, so

13  I'm not sure it hurts, right?

14  A.  OK.

15  Q.  Stopping there for a moment, it's March of 2016.  Had

16  no one at TRE or LiquidX told TRE's common stock shareholders

17  and former employees who held stock through the options plan

18  that there had been a foreclosure by LiquidX?

19  A.  I think -- I think the shareholders that owned 98 percent

20  of the company signed a shareholder's consent for the

21  foreclosure.  I don't know whether -- I don't know which

22  common -- I don't know which tiny amounts of common stock were

23  or were not informed.  These people don't have information

24  rights, so there would be no reason to inform them.

25  Q.  When you talk about 98 percent, you're talking about the

1   preferred shareholders who sat on the board?

2   A.  Yes, and the other preferred shareholders who were

3   notified.

4   Q.  Obviously, in your work as the chief financial officer at

5   TRE, you saw many times the cap table of TRE showing all the

6   common stock shareholders beneath the preferred shareholders,

7   right?

8   A.  You mean -- my title wasn't chief financial officer.

9   People referred to me that way.  Is that --

10  Q.  OK.  Whatever your title was, you saw the cap table many

11  times at TRE, right?

12  A.  Yes.

13  Q.  And you saw many times the long list of common stockholders

14  in TRE?

15  A.  There was, I think, common stock that owned collectively

16  one percent of TRE.

17  Q.  No one told them about this foreclosure by LiquidX?

18  A.  I don't know which of those one percent collective owners

19  were or were not told about the foreclosure.

20  Q.  Well, it was intentional, was it not, that you were trying

21  not to get the word out about this?  You didn't want people to

22  know, right?

23  A.  I -- we were trying to wind -- we are trying to wind TRE

24  down orderly, so I -- I didn't see -- I didn't see a need to

25  inform every single shareholder that owned .0001 percent of TRE

1    and didn't have information rights about the foreclosure.  But

2    Peter and Jim did inform them, so I don't know if they informed

3    others or not.

4    Q.  Well, you write, we have to tell them at this level of

5    detail, and using the word foreclosure.  I assume Jeff will

6    forward to Nic, Nic to news outlets, etc.

7         Nic is Nic Perkin, the founder of TRE?

8    A.  I think he was one of the founders, yes.

9    Q.  Were you all trying to keep the word from getting out about

10   this foreclosure deal with LiquidX?

11   A.  I think it's easier to wind the company down if you don't

12   go out and inform every single individual that owns .01 percent

13   of the company, like Jeff Yellin, and then you end up with, you

14   know, whatever news media, PR.  But I guess Jim and Peter

15   decided to inform him, so they must not have shared that view.

16   Q.  OK.  Are you sure it wasn't the wind down that you were

17   trying to keep from the old shareholders, but rather the news

18   that the company was now LiquidX and continuing to operate?

19   A.  That TRE was now LiquidX?

20   Q.  Yes.

21   A.  TRE and LiquidX don't even share a common owner, much less

22   are they the same company.  I don't think they have a single

23   common shareholder.

24        MR. RHYNHART:  Your Honor, one clean-up item.  I think

25   Exhibit 273, the reservation of rights letter, we may have

1   forgotten to move it into evidence.  So just as a clean-up

2   matter, move to admit JX 273.

3            MR. SULLIVAN:  No objection.

4            THE COURT:  JX 273 is received.

5            (Joint Exhibit 273 received in evidence)

6            MR. RHYNHART:  Thank you.

7            THE COURT:  I assume there is going to be some

8   redirect?

9            MR. SULLIVAN:  You're assuming incorrectly, your

10  Honor.  I have no redirect.

11           THE COURT:  I just have one question for you.

12           THE WITNESS:  Sure.

13           THE COURT:  Earlier you mentioned the fact that you

14  verbally agreed to separate on October 30 of 2015?

15           THE WITNESS:  Correct.

16           THE COURT:  Now, if I've got it correct, that's the

17  day before the certification needed to be signed to Comerica?

18           THE WITNESS:  I did notice that that one was signed

19  by -- that one was the day after I -- well, I -- I verbally

20  agreed this with the board.  I sent the board an e-mail on

21  October 30, which I remember, thanking them for the time that

22  we had worked together.  And then on October 31, it was well

23  understood that I was not employed by the company.  So Jim

24  signed the compliance certificate, yes.

25           THE COURT:  OK.  Did your decision or election to

1   separate on October 30 have anything to do with any reluctance

2   on your part to sign the compliance certificate on October 31?

3            THE WITNESS:  No, not the compliance certificate, but

4   we had two things had happened in late October, which one, the

5   company went into default, formally went into default on the

6   loan, and number two, I had written a memo to the board and

7   discussed the concept of the board or the existing investors

8   who own 99 percent of the company putting a bridge round of

9   equity in.

10           And once -- once it -- once it became apparent that

11  they would not be able to do that, I -- there was a mutual

12  understanding between me and the board that the right person to

13  serve as an officer with respect to TRE's wind down in this

14  post-default world, where it wasn't going be to a going

15  concern, was a restructuring officer, which they went out and

16  engaged.

17           THE COURT:  All right.  I guess, lastly, perhaps more

18  out of curiosity than anything else, when you were at Brown --

19           THE WITNESS:  Yes.

20           THE COURT:  -- did you take any accounting courses?

21           THE WITNESS:  I did, yes.

22           THE COURT:  All right.

23           Anything further?

24           MR. SULLIVAN:  I do.  One thing, your Honor.  He

25  mentioned an e-mail from him to the board.

GBGsLIQ3                          Kovacs - redirect

1    REDIRECT EXAMINATION

2    BY MR. SULLIVAN:

3    Q.  Can I show you JX 110.

4    A.  If it comes up here, if it's just one e-mail, then I can

5    read it here.  Well, no, I can't.

6              THE COURT:  No, he's going to blow it up.

7              THE WITNESS:  All right.

8    Q.  Mr. Kovacs, you mentioned an e-mail that you sent to the

9    board around October 30.

10             Is JX 110, at the bottom, the e-mail that you're

11   referring to?

12   A.  It's just so much easier to read it on here.  My apologies.

13             Yes.  Yes.  I've had the pleasure to work with each of

14   you, blah, blah, blah, blah, blah, 2.5 years trying to --

15   2.5 years trying to realize something out of the company, etc.

16             So that's the end.

17             MR. SULLIVAN:  I move the admission of JX 110.

18             THE COURT:  Any objection?

19             MR. RHYNHART:  No objection.

20             THE COURT:  JX 110 is received in evidence.

21             (Joint Exhibit 110 received in evidence)

22             MR. SULLIVAN:  No other questions.

23             THE COURT:  Anything further?

24             All right.  Mr. Kovacs, you're excused.

25             THE WITNESS:  Thank you.

1              (Witness excused)

2              THE COURT:  Have a good afternoon.  I'll see you all

3    at two o'clock.

4              (Luncheon recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    A F T E R N O O N   S E S S I O N

2                            2:09 P.M.

3            (Hearing resumed in open court)

4            THE COURT:  Please be seated.  All right.

5    Mr. Sullivan, would the plaintiff call their next witness?  Or

6    Mr. Licker.

7            MR. LICKER:  Yes, your Honor.  The plaintiff calls

8    Sophia Gielewski.

9     SOPHIA GIELEWSKI,

10         called as a witness by the Plaintiffs,

11         having been duly sworn, testified as follows:

12           THE COURT:  Please take a seat.  State your full name

13   and spell your last name slowly for the court reporter.

14           THE WITNESS:  Sophia Gielewski, G-i-e-l-e-w-s-k-i.

15           THE COURT:  All right.  You may inquire, Mr. Licker.

16           MR. LICKER:  Thank you.

17   DIRECT EXAMINATION

18   BY MR. LICKER:

19   Q.  Good afternoon, Ms. Gielewski.

20   A.  Hi.

21   Q.  Can you just describe your education?

22   A.  I have a Bachelor of Commerce degree from --

23           THE COURT:  You're very soft-spoken.  Okay?  Try to

24   speak a little more slowly and into the microphone because --

25   A.  Melbourne University in Australia, and I have my Chartered

1   Accountancy from the Institute of Chartered Accountants in

2   Australia, which is the equivalent of the CPA.

3   BY MR. LICKER:

4   Q.  Okay.  Were you born in Australia?

5   A.  No, I was born in Germany.

6   Q.  You moved to Australia at some point?

7   A.  Yes, I spent my childhood in Australia.

8   Q.  What did you do after you graduated from Melbourne

9   University?

10  A.  I went to Ernst & Young in Melbourne, Australia, for

11  three-and-a-half years in the audit department.

12  Q.  What did you do after that, after leaving Ernst & Young?

13  A.  I moved to London and worked for Sony Music or Sony

14  Corporation of America in their corporate audit department for

15  three-and-a-half years.

16  Q.  And then what did you do for work after that?

17  A.  I moved to a start-up media and entertainment company in

18  London called 19 Entertainment, as the controller -- as the

19  finance manager and then the controller.

20  Q.  You say it was a media and entertainment company?  I just

21  didn't hear you.

22  A.  Yes, I did.  Sorry.

23  Q.  And then how long were you there?

24  A.  18 months.  And then I moved to New York and took a

25  position as controller and then finance director at a fin-tech

1   startup company.

2   Q.   A tech startup company?

3   A.   Fin-tech, yes.

4   Q.   What year was that?

5   A.   I moved to New York at the end of 2012.

6   Q.   How long were you at that company?

7   A.   Three years.

8   Q.   Okay.  So until about 2015?

9   A.   Yes.

10  Q.   What did you do after leaving that company?

11  A.   I took a position as the finance director at the

12  Receivables Exchange.

13  Q.   That was in 2015?

14  A.   Yes.

15  Q.   When in 2015?

16  A.   October 2015.

17  Q.   Okay.  As the finance director at the Receivables Exchange,

18  what were your responsibilities on a day-to-day basis?

19  A.   Making sure that the financials were up to date, overseeing

20  one report, who did a lot of the bookkeeping, AP runs, payroll,

21  financial statement preparation, looking at accounting issues,

22  forecasting, budgeting; so day-to-day stuff.

23  Q.   You mentioned that you oversaw one report.  Who is that?

24  A.   Beth Carcich.

25  Q.   Who did you report to?

1    A.   In the beginning, I reported to James Kovacs and Jim

2    Toffey.

3    Q.   What do you mean "in the beginning"?  Did that change?

4    A.   James ceased to be an employee of the Receivables Exchange;

5    so once that happened, while I still communicated with him, I

6    mostly reported to Jim Toffey after that.

7    Q.   If he ceased being an employee at the Receivables Exchange,

8    why were you communicating with him?

9    A.   He was still -- I was just used to discussing financial

10   issues with him; so it was good to have him as a sounding board

11   to discuss those issues with.

12   Q.   Was he still involved with the Receivables Exchange at that

13   point in some capacity?

14   A.   He became a consultant, yes.

15   Q.   In your role as finance director, were you familiar with

16   TRE's books and records, financial books and records?

17   A.   Yes.

18   Q.   Can you turn -- there should be an exhibit book next to

19   you -- to Tab 47, the one that's labeled zero through a

20   hundred, or some number?

21   A.   Yes.

22   Q.   Some range like that.  I'll also put it up for you on the

23   screen.  Do you recognize that?

24   A.   Yes.

25   Q.   What is it?

1    A.   The cash projections for the Receivables Exchange for the

2    rest of 2015, and then for a wind-down period in 2016.

3    Q.   Did you have anything to do with preparing this document?

4    A.   Yes, I prepared it.

5    Q.   Why did you prepare it?

6    A.   To show -- like, to accurately represent all of the cash

7    in-flows and outflows for the Receivables Exchange for the

8    not-too-distant future.

9              MR. LICKER:  Move admission of JX47.

10             MR. ABRAMS:  No objection.

11             THE COURT:  JX47 is received in evidence.

12             (Joint Exhibit 47 received in evidence)

13   BY MR. LICKER:

14   Q.   Can you now turn to Exhibit 48, please.  Do you recognize

15   this document?

16   A.   Yes, these are the financial statements for the Receivables

17   Exchange up to the end of November 2015.  They have -- this is

18   what I used to review the financials to make sure that

19   everything was captured correctly, like expenses, revenue, that

20   type of thing.  And like, I have my notes and my review

21   comments, which I would have sent to my report, just to make

22   sure that everything was accurate.

23             MR. LICKER:  Okay.  Move admission of JX48.

24             MR. ABRAMS:  No objection.

25             THE COURT:  JX48 is received in evidence.

1        (Joint Exhibit 48 received in evidence)

2   BY MR. LICKER:

3   Q.  Can you now turn to Exhibit 58, please?

4   A.  Sorry, 58?

5   Q.  Yes, please.  Do you recognize this document?

6   A.  Yes, these are the financial statements or the financial

7   dec for the Receivables Exchange for November 2015.

8   Q.  Okay.  Were you involved in preparing the financials in

9   November 2015?

10  A.  Yes.

11       MR. LICKER:  Your Honor, I think Exhibit 58 was

12  already moved in evidence.  Although, there was an issue

13  earlier with whether the witness was there; so I just want to

14  make the record clear that we have a witness to identify the

15  document.

16       THE COURT:  Are you offering it?

17       MR. LICKER:  Yes, I offer JX58 again.

18       MR. ABRAMS:  No objection.

19       THE COURT:  All right.  JX58 is received.

20       (Joint Exhibit 58 received in evidence)

21  BY MR. LICKER:

22  Q.  Can you turn to Exhibit 91, please.  Do you recognize it?

23  A.  Yes, these are the financial reporting dec for the

24  Receivables Exchange for December 2015.

25  Q.  Did you have any role in preparing this document?

1    A.  Yes, I prepared this.

2              MR. LICKER:  Move Exhibit JX91 into evidence.

3              MR. ABRAMS:  No objection.

4              THE COURT:  JX91 is received in evidence.

5              (Joint Exhibit 91 received in evidence)

6    BY MR. LICKER:

7    Q.  Okay.  Ms. Gielewski, based on your review of these records

8    we've looked at, and other financial records of TRE in the

9    November, December 2015 time period, did you have an

10   understanding of TRE's financial condition at the time?

11   A.  Yes.  TRE was losing money.  It wasn't making enough

12   revenue to cover its operating expenses, and if it didn't

13   receive some sort of cash injection, then it would fail to be

14   able to continue to run.

15   Q.  Okay.  It if it's easier, you can put that binder aside for

16   a few minutes, and we can come back to it.  Are you familiar

17   with a company LiquidX?

18   A.  Yes.

19   Q.  When was the first time you heard, in concept, of a new

20   company that would become LiquidX?

21   A.  In November, mid-November 2015.

22   Q.  How did you learn of that?

23   A.  Jim and James had a meeting with me and explained that

24   LiquidX, or a company that was later called LiquidX, was going

25   to be created.  It would purchase a loan from Comerica, and

1    then -- that was with the Receivables Exchange, and then it

2    would foreclose upon the assets of the Receivables Exchange.

3    Q.  Okay.  Where did this meeting take place?

4    A.  In Jim's office.

5    Q.  Okay.  During the meeting, did you ask any questions?

6    A.  I asked about my visa situation.  At this point, they had

7    already told me that they were going to offer me a job at

8    LiquidX, and so because it was a completely new company, I

9    asked about my visa situation because it is tied to the job and

10   the company that I work for.  And working for a new company

11   would mean that I need to get a new visa.

12   Q.  Let's just break that down a little bit.  Are you a United

13   States citizen?

14   A.  No.

15   Q.  So do you need some type of visa to work here?

16   A.  Yes.

17   Q.  Okay.  And does that visa need to have the name of the

18   company you're working for?

19   A.  Yes.

20   Q.  What company was listed on your visa prior to

21   December 31st, 2015?

22   A.  The Receivables Exchange.

23   Q.  Did you have an understanding that you needed to get a

24   different visa; is that what you were asking about?

25   A.  Yes.

1    Q.  And did you go ahead and obtain a new work visa?

2    A.  Yes.

3    Q.  When did you do that?

4    A.  Over the Christmas period, I was visiting my family in

5    Singapore, and they have an American embassy there; so I had

6    got a new visa there.

7    Q.  And that new visa, which company did that reflect as your

8    employer?

9    A.  LiquidX.

10   Q.  Do you still have that visa today?

11   A.  Yes.

12   Q.  When was the first time that you actually heard the name

13   LiquidX?

14   A.  It was probably sometime mid-November, around the time that

15   I found out about the new company.

16   Q.  How did that happen?

17   A.  Jim came out of his office onto -- into the main sort of

18   office area -- we all sit on trading desks -- and was

19   brainstorming name ideas.  So he asked what the people there

20   thought of the name LiquidX.

21   Q.  Can you describe how the LiquidX office is set up, the size

22   of it and how people sit in the office?

23   A.  Sure.  It's quite a small office.  There's one main --

24   there are three offices along the side, and then there's the

25   main area where the salespeople sit, I sit, and then we have

GBGPLIQ4                       Gielewski - Direct

1    sort of an entryway where the office manager sits, and we have

2    a conference room there.

3    Q.   Okay.  And is that roughly the same configuration at the

4    time you worked for the Receivables Exchange?

5    A.   The desks are moved slightly around, but it's the same

6    configuration.

7    Q.   So when Mr. Toffey came out to talk to you and ask about

8    the name, were other people present?

9    A.   Yes.

10   Q.   Who else was there?

11   A.   I couldn't be sure because the salespeople travel a lot,

12   but probably Jesse Bornstein, the head of client services,

13   because he's mainly based in the office, but there were some

14   salespeople there.

15   Q.   There were a few people?

16   A.   Yeah, like a handful of people.

17   Q.   Was Mr. Toffey asking everyone that was there?

18   A.   Yes.

19   Q.   Did anyone give him any suggestions?

20   A.   I can't remember, but the suggestions were around sort of

21   liquidity and being an exchange and like those types of ideas.

22   Q.   Around this time, based on your understanding what you

23   observed, did other employees understand that there's going to

24   be a new company?

25   A.   I don't know.  It seemed to me like that because Jim was

1    talking about this new company name.  I don't know how much he

2    told them.  I understood that I probably knew more than most

3    people just because of my role in the company and because I

4    was -- like, I was helping set up new vendors for LiquidX.

5    Q.  Did you perform any work related to LiquidX in the

6    November, December 2015 time period?

7    A.  Yes.  I set up like vendors for LiquidX.

8    Q.  What do you mean by that?  Can you describe that?

9    A.  Sure.  When I needed to set up -- the most important vendor

10   that I needed to set up was Insperity, which is LiquidX's

11   co-employer, payroll provider.  So that when LiquidX had

12   employees on the 1st of January, that employees would receive

13   health benefits and would be set up for salaries and that type

14   of thing.  Other vendors included like rate feeds, internet,

15   cable, phone lines, all of -- like all of the typical vendors

16   that an office would have.

17   Q.  Did you have an understanding of why you were setting up

18   these vendors for LiquidX?

19   A.  LiquidX needed them to run as a company, and so that's why

20   I was setting them up.

21   Q.  Did the work -- that work that you were doing, did that

22   affect TRE in any way?

23             MR. ABRAMS:  Objection.

24             THE COURT:  Overruled.

25   A.  It benefited them because, at the same time that I was

1    setting up new vendors for LiquidX, I was also canceling the

2    vendors for the Receivables Exchange, and so some of the

3    vendors had sort of cancellation policies where I might have to

4    give them like 90-days' notice, and we were already maybe, at

5    the earliest, like mid-November.  So they waived that sort of

6    cancellation period so that -- because LiquidX was being set up

7    as a new vendor, or they were -- oh, yeah, we were setting them

8    up as a new vendor for LiquidX; so it probably saved

9    Receivables Exchange some money.

10   Q.  Can you look at Exhibit 227, please.  It's going to be in a

11   different binder than the one you had before.  Do you recognize

12   this document?

13   A.  Yes.

14   Q.  What is it?

15   A.  It's an e-mail from me to a graphic designer asking him to

16   create a logo for LiquidX.

17   Q.  Okay.  Why were you contacting him?

18   A.  In the same method that Jim came out and asked for feedback

19   about the name, he also wanted to get out input into logo

20   designs.  So he had asked us if we knew any graphic designers

21   that we could reach out to to suggest ideas for the logo.

22   Q.  Who is Elliott Hutchinson at Gmail.com?

23   A.  He's a friend of a friend, and he's a graphic designer.

24   Q.  So this is somebody you knew?

25   A.  Peripherally.  I had never met him before, but he had

1   worked with a friend of mine; so he came recommended.

2            MR. LICKER:  Okay.  Move JX227 into evidence.

3            MR. ABRAMS:  No objection.

4            THE COURT:  JX227 is received in evidence.

5            (Joint Exhibit 227 received in evidence)

6   BY MR. LICKER:

7   Q.  Okay.  Do you see on the first sentence of the e-mail,

8   right under Great to meet you, you write:  I work for a fin

9   tech startup company.  We are about to change our name from

10  Receivables Exchange to LiquidX.

11           Do you see that there?

12  A.  Yes.

13  Q.  What did you mean by that?

14  A.  I just simplified the situation because he was a graphic

15  designer, and I thought he might get confused with all the

16  details.  But I felt I needed to explain why I was sending him

17  an e-mail about a new company called LiquidX from another

18  company's e-mail address.

19  Q.  So did you understand what was happening as a name change

20  at the time?

21  A.  I did not think it was a name change.

22  Q.  Around this time, around November 18th, did you understand

23  at that time -- I think you -- let me strike that.

24           I think you testified earlier that you had an

25  understanding that there's going to be a transaction between

1    LiquidX and TRE, right?

2    A.  Yes.

3    Q.  Okay.  I think you also said you knew at that time that you

4    were going to go work for LiquidX?

5    A.  Yes.

6    Q.  Were other employees beginning to understand that they

7    might also get offers to work for LiquidX?

8              MR. ABRAMS:  Objection.

9              THE COURT:  Sustained.

10             MR. LICKER:  I'll move on.

11   Q.  Can you turn to Exhibit 235.  Do you recognize this

12   document?

13   A.  Yes.  Yes, I do.

14   Q.  Okay.  What is it?

15   A.  It's an e-mail change between myself and a client account

16   representative at Insperity, just setting up LiquidX as the

17   co-employer.

18   Q.  Okay.  And are there attachments to this e-mail as well?

19   A.  Yes, there is one attachment that I was asked to fill out

20   in order to be able to set up LiquidX as a co-employer.

21   Q.  As a what?

22   A.  As a co-employer.

23             MR. LICKER:  Move Exhibit 235 into evidence.

24             MR. ABRAMS:  No objection.

25             THE COURT:  JX235 is received in evidence.

1              (Joint Exhibit 235 received in evidence)

2    BY MR. LICKER:

3    Q.   When you say that you were trying to set up LiquidX as a

4    co-employer with Insperity, what does that mean?

5    A.   So Insperity is a payroll provider, but they co-employ all

6    of their clients' employees so the employees fall under -- so

7    that way, Insperity, as a larger company, can get better like

8    deals on benefits and other items.

9              So but LiquidX, or like any co-employer, would have

10   like has the control to make all the decisions around hiring

11   and terminating people, but everything else falls under

12   Insperity.

13   Q.   Essentially, benefits flow through Insperity?

14   A.   Yes.

15   Q.   You said you needed to set up a new account for LiquidX

16   with Insperity?

17   A.   Yes.

18   Q.   That's what you were trying to do here?

19   A.   Yes.

20   Q.   When did you actually send this e-mail and fill out the

21   forms that were attached to this document?

22   A.   Mid-December.

23   Q.   Was LiquidX operating or conducting business at that point?

24   A.   LiquidX existed, but it was not operating --

25   Q.   Okay.

GBGPLIQ4                          Gielewski - Direct

1   A.   -- any business.

2   Q.   If you turn to Page 1231, do you see under question 7?

3   A.   Yes.

4   Q.   Do you see it asks -- what does question 7 ask you to do?

5   A.   It's asking me to identify any officers of LiquidX.

6   Q.   Who did you identify here?

7   A.   On this page, Mike Walker and James Kovacs, and then I

8   added in Jim Toffey at the back.

9   Q.   Okay.  Was that on Page 1239?

10  A.   Correct.

11  Q.   Why did you list them there?

12  A.   I assumed that they would be taking those roles on when

13  they were employees of LiquidX.

14  Q.   Were they actually employees of LiquidX at the time?

15  A.   No.

16  Q.   Were they officers of LiquidX at the time?

17  A.   No.

18  Q.   Did you have any discussions with Insperity about filling

19  out this document?

20  A.   I did.  Originally they had told me to fill it out as the

21  current year being 2015, but when I explained to them that

22  there were no employees, like, the business wasn't in operation

23  and I thought it would be better if I filled it out as if it

24  was 2016, like, they let me do that instead.

25  Q.   So you communicated to them that you were filling this out

1    as 2016?

2    A.  Yes.

3    Q.  Did they ever complain about that?

4    A.  No.

5    Q.  Okay.  I'm going to have you switch binders again and turn

6    to JX13, please, Tab 13.  After you've had a chance to look at

7    this, can you let me know if you recognize it?

8    A.  Yes.  This is a trial balance for Receivables Exchange at

9    the end of December 2015.  I sent this to Peter Sullivan, the

10   chief restructuring officer, just to ask -- just to discuss

11   with him the foreclosure accounting treatment and any other

12   balances that I believed should be written off at the end of

13   2015.

14              MR. LICKER:  Move JX13 into evidence.

15              MR. ABRAMS:  No objection.

16              THE COURT:  JX13 is received in evidence.

17              (Joint Exhibit 13 received in evidence)

18   BY MR. LICKER:

19   Q.  And if it's easier for you, Ms. Gielewski, you can look at

20   the screen, if it's easier to read.  The numbers are small.  Do

21   you see a line down the left column, about a half dozen lines

22   down, it says:  Total 1001 cash operating?

23              MR. LICKER:  Sorry.  Jim, just a couple of lines up.

24   The cash operating line.  It starts:  Total.

25   Q.  Do you see it, Ms. Gielewski?

1   A.  I see it.

2   Q.  What does the number there that's next to that line

3   represent under the debit line?

4   A.  It represents the cash that Receivables Exchange had as of

5   December 31st, 2015.

6   Q.  Okay.  Does this represent the cash that was -- does this

7   represent the cash that was there before the foreclosure or

8   after the foreclosure?

9   A.  Technically, before the foreclosure because this is -- this

10  is before I did the journal entry to account for the

11  foreclosure.  But even after the foreclosure -- after I did

12  this journal, the money was still left in -- on the trial

13  balance because it was decided that, though that's -- the cash

14  would not be foreclosed upon at that time.

15  Q.  Okay.  So if we were to view this document as of

16  January 1st, 2016, that one line, cash operating, would that

17  look the same?

18  A.  Yes.

19  Q.  Okay.  If you go to the next page of this document -- let

20  me get that up on the screen.  Sort of the top quarter of the

21  page, there's a line, computer software?

22  A.  Yes.

23  Q.  1526; do you see that?

24  A.  Yes.

25  Q.  What does the number next to that represent?

1   A.   That represents the book value of the capitalized software

2   costs; so basically the platform.

3   Q.   And then, if you go slightly to the right of that, there's

4   a number 5,289,205.96 what does that number represent?

5   A.   That's the accumulated amortization.  So with any sort of

6   asset, like property or intangible asset, the assets get

7   devalued over time, and so that represents the devaluation of

8   that asset.  So netted off together, that would be sort of the

9   net value of the capitalized software.

10  Q.   Okay.  The fact that that number -- those numbers are

11  highlighted in blue, does that have any significance?

12  A.   Yes.  I believe that that should be written down to zero

13  because those assets were part of the foreclosure.

14  Q.   So they were subject to the foreclosure?

15  A.   Yes.

16  Q.   Okay.  Can you turn to JX21, which I believe is already in

17  evidence.

18  A.   Yes.

19  Q.   Do you recognize this document?

20  A.   Yes, it looks like the transitions services agreement.

21  Q.   Were you involved in negotiating this document at all?

22  A.   No.

23  Q.   Have you seen it before?

24  A.   Yes, just in relation to what it meant for the finance

25  department.

1   Q.  So in regard to what it means for the finance department,

2   do you have a general understanding of what it provides for?

3   A.  Yes.

4   Q.  What is that understanding?

5   A.  That the finance department would provide back-office

6   services to TRE for the transition period, and that LiquidX

7   would invoice TRE 80 percent of TRE's transaction income for

8   all new trades, and then $5,000 for any old trades as part of

9   like the servicing charge.

10  Q.  So LiquidX was going to provide back-office services to

11  TRE?

12  A.  Yes.

13  Q.  What do you mean by back-office services?

14  A.  Bookkeeping, AP payment, payroll, financial statement

15  preparation, that's it.

16  Q.  And did you have a direct role in regard to those services?

17  A.  I oversaw my report, and I prepared the financial

18  statements, and I communicated with Peter Sullivan.

19  Q.  When you say report, are you referring again to Beth

20  Carcich?

21  A.  Yes.

22  Q.  What are some specific examples of things that you would

23  work on under the transition services agreement?

24  A.  So we -- we would do the bookkeeping; so any invoices that

25  TRE received, we would put them into the -- their general

1   ledger system.  Then, every week Beth would run an AP summary,

2   which would have all of the payments that she thought should be

3   paid that week based on due dates, and then we would send that

4   to Peter Sullivan for approval.  Once we had approval from him,

5   we would then set up the payment in the online banking system,

6   and we would process them.

7   Q.  Okay.  Just to break that down a little bit, you mentioned

8   sending Peter Sullivan, something for his approval?

9   A.  Yes.

10  Q.  Could you make any of these payments without getting his

11  approval?

12  A.  Technically, we could, but we never did.  We always

13  obtained his approval.

14  Q.  So you don't recall any payments made without his approval?

15  A.  No.

16  Q.  And you said that either you or Beth would -- Beth was

17  responsible for actually processing the payment?

18  A.  In the online banking system, you need two people.  It's a

19  control.  So she would set them up, and then I would click the

20  button to approve.

21  Q.  Okay.  Do you have an understanding of why Mr. Sullivan

22  just didn't do all of this by himself?

23  A.  Well, one, he couldn't create a payment and then approve it

24  by himself; and, two, it wasn't very user friendly.  Beth and I

25  had worked with it before; so it just made sense.  And it was

1    more efficient if we just continued to do that for him.

2    Q.  Okay.  I think you may have said this, but just to make

3    sure we're clear, what was Mr. Sullivan's role?

4    A.  The TRE chief restructuring officer.

5    Q.  For what company?

6    A.  TRE.

7    Q.  Can you turn to Exhibit 27, please.  Do you recognize this

8    document?

9    A.  Yes.  This is an e-mail chain between Peter, Beth and

10   myself, basically listing out all of the payments that we

11   thought needed to be paid that week and asking for his

12   approval.  Peter came back with questions.  I answered the

13   questions, and then there would have been an approval from him,

14   and then we paid everything.

15   Q.  Did he sometimes ask questions about the payables?

16   A.  Yes.

17   Q.  And does this -- this e-mail, is this fairly representative

18   of the process that you went through to pay bills for TRE?

19   A.  Yes.

20            MR. LICKER:  Move admission of JX27.

21            MR. ABRAMS:  No objection.

22            THE COURT:  JX27 is received in evidence.

23            (Joint Exhibit 27 received in evidence)

24   BY MR. LICKER:

25   Q.  Turn now to Exhibit 28, please.  Do you recognize this

1    document?

2    A.  Yes.  This looks like a payroll report that -- from Beth to

3    Peter for TRE's payroll for approval.

4    Q.  Okay.  And you're copied on this e-mail, right?

5    A.  Yes, I was.

6    Q.  Can you explain what's going on here, what this process is?

7    A.  Beth sends this report so that Peter can review how much

8    the employees are getting paid, and once he -- once he agrees

9    with the amounts, then he will approve it, respond approved,

10   the e-mail in the payment, so that we can then process the

11   payment.

12   Q.  Are you aware of payroll ever being run without his

13   approval?

14   A.  No.

15   Q.  Do you know who the employees of TRE were at this point?

16   A.  Michael Gonik and William Roche.

17          MR. LICKER:  Move admission of JX28.

18          THE COURT:  Any objection?

19          MR. ABRAMS:  No objection.

20          THE COURT:  JX28 is received in evidence.

21          (Joint Exhibit 28 received in evidence)

22   BY MR. LICKER:

23   Q.  Can you turn to JX26, please.  Do you recognize this

24   document?

25   A.  Yes.  This is an e-mail with the financial dec for

1   December 2015 for TRE that I sent to Peter.

2   Q.  Okay.  Could you just look at the -- start with the e-mail

3   toward the bottom of the page, the first e-mail to

4   Mr. Sullivan.  Do you see the last paragraph from the bottom?

5   First of all, what's this specific e-mail about?

6   A.  A couple of things.  I'm asking about payments.  Some

7   invoices haven't been paid, and I just wanted to let -- make

8   him aware of the fact that he might need to have conversations

9   with these people to let them know whether he had decided that

10  he would pay them or not.  I attached the financials, a cash

11  forecast, and then a trial balance, which has my suggestions

12  for what balances need to be written down as part of the

13  foreclosure.

14  Q.  You mentioned that he would decide whether to pay these

15  bills or not.  Do you recall any situations where you were

16  about to send him a list of payables and he would decide not to

17  pay a bill?

18  A.  Yes.  So TRE had invoices from PWC at the end of 2015 that

19  related to the audit that was supposed to take place for 2015.

20  The audit didn't take place, and Peter decided not to pay them

21  because they would not be performing the work.

22  Q.  Did you have anything to do with that decision?

23  A.  I relayed the situation to him, but ultimately the decision

24  was up to him.

25  Q.  Okay.  During this general time period, this e-mail we're

1   looking at now is dated February 5th; so during January and

2   February 2016, were any of TRE's creditors being paid?

3   A.   Yes.

4   Q.   Okay.  Do you know where the funds were coming from that

5   were being used to pay them?

6   A.   The TRE bank account.

7   Q.   Okay.  If you turn now to the attachments to this document,

8   if you turn specifically to Page 923?

9   A.   Yes.

10  Q.   Do you see the cash operating line?

11  A.   Yes.

12  Q.   December 31st, 2015?

13  A.   Yes.

14  Q.   What's that number?

15  A.   838,152.

16  Q.   Does that roughly match up with the cash operating number

17  that we looked at previously on JX13?

18  A.   Yes, rounded to the nearest dollar, yes.

19  Q.   That cash balance, was that being used to pay TRE

20  creditors?

21  A.   Yes.

22  Q.   If you look down to the next line, cash held in custody, do

23  you see it's just over $3 million as of December 31st, 2015?

24  A.   Yes.

25  Q.   What does that mean, cash held in custody?

1   A.  Cash held on behalf of TRE customers.

2   Q.  Was that TRE's money?

3   A.  No.

4   Q.  So whose money was it?

5   A.  The customers' money.

6   Q.  Could TRE use that money?

7   A.  No.

8   Q.  Turn now to Exhibit 77, please.  Do you recognize these

9   documents?

10  A.  These are bank statements for LiquidX bank accounts.

11  Q.  Okay.  Do they -- is it one bank account or multiple bank

12  accounts?

13  A.  Several bank accounts, several, yes.

14            MR. LICKER:  Move admission of JX77.

15            MR. ABRAMS:  No objection.

16            THE COURT:  JX77 is received in evidence.

17            (Joint Exhibit 77 received in evidence)

18  BY MR. LICKER:

19  Q.  Are these the same bank accounts that TRE had?

20  A.  No.

21  Q.  Is there any TRE money in these bank accounts?

22  A.  No.

23            MR. LICKER:  I apologize, your Honor.  I forgot to

24  move JX26 in evidence; so I'll do that now.

25            MR. ABRAMS:  No objection.

1          THE COURT:  JX26 is received.

2          (Joint Exhibit 26 received in evidence)

3   BY MR. LICKER:

4   Q.  Who has authority to make decisions with respect to

5   LiquidX's bank accounts?

6   A.  I would say Jim and then the CFO Mark Brazier for TRE

7   LiquidX accounts.

8   Q.  Who is Jim Brazier?

9   A.  The CFO.

10  Q.  Do you have any authorities with regard to the LiquidX bank

11  accounts?

12  A.  I can approve payments in the bank -- banking system, but

13  that's about it.

14  Q.  Okay.  Do transactions of a certain size go to Jim Toffey

15  or Mark Brazier?

16  A.  They -- Mark sees any transaction that we pay out of the

17  bank account; so he approves it before -- before I approve it

18  in the bank account.

19  Q.  Mark Brazier, did he ever work for TRE?

20  A.  No.

21  Q.  Do you know who has authority with respect to TRE's bank

22  accounts?

23  A.  I believe it's Peter Sullivan.

24  Q.  Does anyone else have signature authority with respect to

25  TRE's bank accounts?

1   A.  I don't know at this point.

2   Q.  Okay.  Have you ever had authority with respect to TRE's

3   bank accounts?

4   A.  Just to approve payments.

5   Q.  Okay.  Has anyone else had authority in 2016 to approve

6   payments?

7   A.  Peter Sullivan can approve payments.

8   Q.  So you and Peter Sullivan are the two people?

9   A.  Yes.

10  Q.  Do you know why you have authority to approve payments?

11  A.  I'm the finance director.  It's typically part of like my

12  role and, also, it's easier for me to do it than for Peter to

13  do it.

14  Q.  Okay.  Why is it easier for you to do it?

15  A.  Like, I'm familiar with the system.  I know how to do it.

16  You need a special toggle to log in.  Like, one can lose that

17  quite easily; so it's right there at my desk all the time.  So

18  like, I have it.  I can make payments whenever.

19  Q.  Does this fall under your responsibilities under the TSA

20  that you were talking about?

21  A.  Yes.

22  Q.  When it comes time for any kind of money to leave the TRE

23  bank account to make payments, who makes that actual decision?

24  A.  Peter Sullivan.

25  Q.  Do you make that -- Do you ever make that decision?

1    A.  No.

2    Q.  Can you turn now to Exhibit 32, please.  Before I ask you

3    about this document, has -- in 2016, has LiquidX made any

4    payments to TRE?

5    A.  LiquidX payments to TRE, yes.

6    Q.  Okay.  Why does LiquidX make payments -- or why has LiquidX

7    made payments to TRE?

8    A.  The vendor creation process took longer than expected; so

9    some vendors were still being paid by -- were still set up with

10   TRE and hadn't been canceled, but they were essentially LiquidX

11   expenses.  So LiquidX had to pay TRE back for those expenses

12   that they incurred on LiquidX's behalf.  There was also an IP

13   payment that was made; so they're the only payments.

14   Q.  So the IP payment, was that a one-time payment?

15   A.  Yes.

16   Q.  These other payments that you've described, did they happen

17   multiple times?

18   A.  Yes.

19   Q.  Okay.  And why is it that these -- why doesn't LiquidX just

20   have the contracts in its own name so that it can do this

21   itself?

22   A.  That was the goal.  It just look a lot longer than

23   anticipated.  Sometimes it was because LiquidX was such a new

24   company that vendors -- we couldn't meet like the vendor's

25   requirements for their due diligence for new customers.

1   Sometimes just like the legal paperwork took a while, and then

2   sometimes it was hard to set up new agreements because they --

3   like, those vendors related to like fee internet, which

4   couldn't -- like there might be an issue with service for a

5   couple of days.  There might be an outage; so instead of just

6   setting up a new agreement, it was decided that the TRE

7   agreement would just get assigned to LiquidX instead.  So a

8   number of reasons.

9   Q.  And you mentioned that some vendors have requirements with

10  regard to diligence, what do you mean by that?

11  A.  They wanted to see six months of bank statements or

12  financial statements, corporate documents, proof of address,

13  that type of thing.

14  Q.  So six months of bank statements.  Would LiquidX have had

15  that in January or February of 2016?

16  A.  No.

17  Q.  And in 2016, did you do any work with respect to getting

18  vendor agreements in LiquidX's name?

19  A.  Yes.

20  Q.  What did you do?

21  A.  I would just call up the vendors.  I was a facilitator.  So

22  if it was just signing an agreement from TRE to LiquidX, I

23  would ask Peter Sullivan to sign on TRE letterhead the request

24  to assign the contract, and then I would have Jim Toffey, as

25  the CEO of LiquidX, also sign that document to say that LiquidX

1   accepted the liability of that agreement.

2            For new vendors, it was more just calling them up and

3   going through the process of setting up like a new contract,

4   basically, and then having that signed.

5   Q.  Now, you mentioned that Peter Sullivan would sign for TRE

6   when an agreement needed to be signed?

7   A.  Yes.

8   Q.  Did anyone else do that on behalf of TRE in 2016?

9   A.  No.

10  Q.  If you turn to -- I think you've already turned to

11  Exhibit 32.  Do you have that in front of you?

12  A.  Yes.

13  Q.  What is this document?

14  A.  This is an e-mail with an attachment.  I sent this e-mail

15  to Peter and James.  It's just to confirm the amount TRE was to

16  pay LiquidX.  So it was the service charge, which was

17  80 percent of transaction, fees plus $5,000, less expenses that

18  LiquidX either owed to TRE; so rent, because TRE was subleasing

19  to LiquidX, or it was expenses that -- from vendors that I had

20  not been able to set up for LiquidX yet.

21  Q.  And you may already be looking at this, as we're talking,

22  but if you look at the attachment --

23  A.  Yes.

24  Q.  -- do you have that?  The amount overpaid for January at

25  the bottom 6,352.97?

1    A.   Yes.

2    Q.   What does that show?

3    A.   So there were some amounts that were, I think, either

4    double counted or related to December that were mistakenly

5    applied in January, and so they -- like, they weren't supposed

6    to be included in there.  So the amount was -- the amount was

7    overpaid, and then in the next month, we sort of we balanced it

8    out.

9    Q.   So is this e-mail attachment representative of the process

10   you described between LiquidX and TRE for LiquidX reimbursing

11   TRE?

12   A.   Yes.

13            MR. LICKER:  Move admission of JX32.

14            MR. ABRAMS:  No objection.

15            THE COURT:  JX32 is received in evidence.

16            (Joint Exhibit 32 received in evidence)

17   BY MR. LICKER:

18   Q.   Can you now turn to JX244.  Also, we've got it on the

19   screen, if that's easier for you.  It's just a one-pager?

20   A.   Okay.

21   Q.   Do you recognize this document?

22   A.   Yes.  This is an e-mail from me to James and Peter just

23   identifying expenses that Receivables Exchange had paid on

24   behalf of LiquidX, and then my comments about how either the

25   assignment process was going or the new -- like the new

1    agreement process was going.

2    Q.  Why were you making these comments to Mr. Kovacs and

3    Mr. Sullivan?

4    A.  Just so that they knew where I was in the process.

5    Obviously, it's not ideal to have one company paying expenses

6    on behalf of another company; so we were trying to wind that

7    whole process down.

8    Q.  Was this viewed as a temporary arrangement?

9    A.  Yes.

10              MR. LICKER:  Move admission of JX244.

11              MR. ABRAMS:  No objection.

12              THE COURT:  JX244 is received in evidence.

13              (Joint Exhibit 244 received in evidence)

14   BY MR. LICKER:

15   Q.  Now, we just talked about LiquidX payments to TRE.  In

16   2016, did TRE make any payments to LiquidX?

17   A.  Yes, just one.

18   Q.  Can you turn to Exhibit 78.  Again, we've got this on the

19   screen, whichever is easier for you.

20   A.  Okay.  Yes.

21   Q.  Do you recognize this document?

22   A.  Yes.  This is a recharge schedule of the service charge

23   that TRE owed LiquidX, and then the expenses that LiquidX owed

24   back to TRE.

25   Q.  So how much was the service charge?

1   A.  $107,244 so that represented 80 percent of the transaction

2   fees for January for TRE, plus $5,000.

3   Q.  And the 80 percent transaction fees, does that come from

4   the TSA?

5   A.  Yes.

6   Q.  Do you see where it says:  Less 34,258?

7   A.  Yes.

8   Q.  What does that represent?

9   A.  The expenses that were owed back to Receivables Exchange

10  from LiquidX.

11  Q.  Down at the bottom 72,986.15?

12  A.  That's the net of the 107 and the 34.

13  Q.  So is that the payment that was actually made to LiquidX?

14  A.  Yes.

15          MR. LICKER:  Move admission of JX78.

16          THE COURT:  Any objection.

17          MR. ABRAMS:  No objection.

18          THE COURT:  JX78 received in evidence.

19          (Joint Exhibit 78 received in evidence)

20  BY MR. LICKER:

21  Q.  Can you turn to JX79 now.

22  A.  Yes.

23  Q.  Do you recognize this document?

24  A.  Yes.  This is a LiquidX bank account, and it shows the

25  payment for $72,000.9 -- 72,986, which is the net of the

GBGPLIQ4                          Gielewski - Direct

1    numbers that we looked at before.

2    Q.  That's the same number that we looked at in JX78?

3    A.  Yes.

4    Q.  Is this incoming into LiquidX's bank account?

5    A.  Yes.

6               MR. LICKER:  Move admission of JX79.

7               MR. ABRAMS:  No objection.

8               THE COURT:  JX79 is received in evidence.

9               (Joint Exhibit 79 received in evidence)

10   BY MR. LICKER:

11   Q.  Turn now to Exhibit 240, please.  Do you recognize this

12   document?

13   A.  Yes, this is an e-mail with an attachment to James.

14   Q.  Why were you sending this particular e-mail to James?

15   A.  I was putting -- I was putting together the LiquidX

16   accounts, sort of like the opening balances, and I wanted to

17   get clarification on how we were going to structure the capital

18   injection from the investors for the prior year.

19        There was like a debt component and an equity

20   component, and I wanted to make sure that I captured this

21   correctly on the books.  So I reached out to a friend at PWC;

22   so that we could have a conversation with Jim and James and, I

23   believe, Gary, to discuss this and some other matters so that

24   they had comfort over what I was doing and that we had

25   structured the transaction the best way.

1   Q.  What's the subject of this e-mail, the actual subject line?

2   A.  PWC questions.

3   Q.  So how was PWC involved in this?

4   A.  As an accountant, I have a lot of accountant friends.  Some

5   of them work at the Big Four accounting firms.  One of my

6   friends worked at PWC.  As a favor, I just reached out to her

7   to see if she could put me in touch with someone with on a

8   short notice.

9   Q.  Had LiquidX actually engaged PWC to do anything at this

10  point?

11  A.  No.

12  Q.  Do you see there's an attachment to this e-mail?

13  A.  Yes.

14  Q.  Can you turn to that, please?

15  A.  Yes.

16  Q.  I don't know if you're able to read under question two,

17  there's some -- some what looks like highlighted text.  On the

18  screen, at least, it looks -- sorry, next line down, Jim.  Are

19  you able to read it at all, Ms. Gielewski?

20  A.  No, but I remember what --

21  Q.  We've got a -- Mr. Abrams has provided me with a clean

22  copy.

23          MR. LICKER:  So may I approach, your Honor?

24          THE COURT:  Sure.

25  Q.  Are you able to see that any better?

1   A.  Yes.

2   Q.  Just for the record, we've marked that as Exhibit 240-A.

3   Okay.  What does the question 2, what does that day?

4   A.  Confirm our understanding over overall transactions, i.e.

5   why are they moving assets out of old co into new co?

6   Q.  What is written underneath that?

7   A.  I write to James:  I know why, but I don't know how much

8   you want to put in writing.

9   Q.  What did you mean by that?

10  A.  It was a complicated transaction.  I had already explained

11  it to my friend once, and it was clear from that question that

12  she was oversimplifying what the transaction was.  I wanted to

13  let James know that I knew what the situation was, but I just

14  didn't know whether he wanted to put -- wanted to write out a

15  lot, like, put it down or whether it would be just easier to

16  talk about it in realtime and then answer any of their

17  questions.

18              (Continued on next page)

19

20

21

22

23

24

25

1   BY MR. LICKER:

2   Q.  Did you have further conversations with Mr. Kovacs about

3   this?

4   A.  Yes.

5   Q.  Were there further conversations with PWC about this?

6   A.  Yes.

7   Q.  In those conversations, did you describe or you somewhat

8   describe the transaction?

9   A.  Yes.

10  Q.  The person at PWC you were dealing with, this was a friend

11  of yours, you said?

12  A.  She was on the call and then the person -- a colleague of

13  hers who advised us on what we wanted to do was also on the

14  call.

15          MR. LICKER:  OK.  Move admission of JX 240A?

16          MR. ABRAMS:  No objection.

17          THE COURT:  240A is received.

18  BY MR. LICKER:

19  Q.  OK.  Are you familiar with something called NetSuite?

20  A.  Yes.

21  Q.  What is that?

22  A.  It is -- it is a cloud program for general ledger, for the

23  general ledgers for companies.

24  Q.  OK.  Does LiquidX use NetSuite?

25  A.  Yes.

1   Q.  Did TRE use NetSuite?

2   A.  Yes.

3   Q.  Are LiquidX and TRE separated in that suite somehow?

4   A.  Yes.  They have separate accounts, separate licenses.

5   Q.  What does that mean to have a separate license?

6   A.  LiquidX is a completely different company, so, therefore,

7   has a separate agreement with NetSuite for their license.

8   Q.  And are there any LiquidX financial information in TRE's

9   general ledger?

10  A.  No.

11  Q.  What about the other way around, is there any TRE financial

12  information in LiquidX's general ledger?

13  A.  No.

14  Q.  Does LiquidX pay its vendors for using TRE's accounts at

15  all?

16  A.  No.

17  Q.  Does TRE pay its vendors using LiquidX's accounts?

18  A.  There is one example with the New York rent, but that was

19  agreed with the landlord that LiquidX could pay the landlord

20  directly instead of paying TRE and then TRE paying the landlord

21  just, like, for efficiency.

22  Q.  So with respect to that lease, what is the arrangement

23  between LiquidX and TRE?

24  A.  LiquidX has leased space in the New York office from TRE,

25  but TRE is still leasing that space from the landlord.

1   Q.  OK.  So LiquidX just pays the landlord directly rather than

2   paying TRE to pay the landlord?

3   A.  Correct.

4   Q.  Are you generally familiar with LiquidX's employee

5   contracts?

6   A.  Yes.

7   Q.  Have you seen many of the LiquidX employee contracts?

8   A.  Yes.

9   Q.  Are you familiar with the old TRE employee contracts?

10  A.  Less so, but yes.

11  Q.  Are you aware of what happened to TRE employee contracts at

12  the end of 2015?

13  A.  They were terminated, the majority of them were terminated.

14  Q.  And those employees who had their agreements terminated, if

15  they got an offer to LiquidX, what happened?

16  A.  They had new -- they had agreements with LiquidX.

17  Q.  Are you aware of any employees that left TRE and came to

18  LiquidX negotiating new contracts?

19  A.  Well, everyone negotiated new contracts, yes.

20  Q.  Are you aware of any new employees negotiating different

21  terms of their contracts?

22  A.  Yes.

23  Q.  Who do you know that did that?

24  A.  Jesse Bornstein had a raise, and Beth Carcich, on my

25  report, got a raise -- yeah -- was paid more and had a title

GBGsLIQ5                         Gielewski - direct

1    change.

2    Q.  She actually had a title change?

3    A.  Yes.

4    Q.  Can you turn to JX 41, please.

5            Do you recognize this document?

6    A.  Yes.  This is an invoice report from Insparity for LiquidX.

7    Q.  What are the names down the left side of the page?

8    A.  At that time, the employees of LiquidX.

9    Q.  OK.  Are you able to tell from looking at this document the

10   date of the document?

11   A.  It was -- it was the beginning of June 2016.

12   Q.  OK.  Does LiquidX have any other employees presently that

13   are not listed here?

14   A.  Yes.

15   Q.  How many?

16   A.  Two.

17   Q.  Are you generally familiar with who the employees of TRE

18   were at the end of 2015?

19   A.  Yes.

20   Q.  Are there any employees on this list that never worked for

21   TRE?

22   A.  Yes.

23   Q.  Are you able to identify how many?

24   A.  Four.

25   Q.  Four?

GBGsLIQ5                         Gielewski - direct

1              OK.  So there is six employees in the company now that

2    never worked for TRE?

3    A.  Yes.

4              MR. LICKER:  Move admission of JX 41.

5              MR. ABRAMS:  No objection.

6              THE COURT:  JX 41 is received in evidence.

7    BY MR. LICKER:

8    Q.  Can you turn to JX 45.

9              Do you recognize this document?

10   A.  Yes.  This is a list of creditors at the end of 2015 for

11   TRE.

12   Q.  Can you now turn to Exhibit 80, but just keep a finger in

13   JX 45 so you don't lose your place.

14   A.  Yes.

15   Q.  Do you recognize this document?

16   A.  Yes.  This is a list of LiquidX vendors or outstanding

17   amounts to vendors as of October 12, 2016.

18   Q.  OK.  I know this is difficult to do because they are spaced

19   a little ways apart, I apologize.  Maybe could we put

20   Exhibit 80 on the screen and then you can look at Exhibit 45 in

21   the book so you can have them --

22   A.  Yep.

23   Q.  Does that work?

24   A.  Yep.

25   Q.  We have them both on the screen.  Thank you.

1          If you look at JX 45, which you identified as the TRE

2     list of creditors, are there any TRE creditors listed that did

3     not become LiquidX creditors?

4     A.  Yes.

5     Q.  Can you identify just a couple of them?

6     A.  Green Key, Hudson River Moving Company, McGlinchey

7     Stafford, Sandler ONeill, TW Telecom, the law firms all

8     Zeichner Ellman & Krause.

9     Q.  What about William Roche, I think you said he was a TRE

10    employee?

11    A.  Yes.

12    Q.  Was he ever a LiquidX employee?

13    A.  No.

14    Q.  If you look at Exhibit 80, which you identified as the

15    LiquidX list of creditors, are there any creditors there that

16    were never creditors of TRE?

17    A.  Yes.

18    Q.  You don't have to -- I can see it is a longer list.  You

19    don't have to identify all of them.  Just a couple, please.

20    A.  Sure.  Andrew Chu, Lighttower, RIMES Technology,

21    CNA Insurance, A&A Signs, AdEdge.

22          Do you want me to keep going?

23    Q.  Are there others?  You don't have to name them, but are

24    there?

25    A.  Yeah, there are a couple of others.

1   Q.  That's fine.  Thank you.

2            You have talked a little bit today about work that you

3   and one other LiquidX employee did under the TSA, right?

4   A.  Yes.

5   Q.  Other than the work you've described under the TSA, are you

6   aware of any LiquidX employees working on other TRE matters or

7   performing work on behalf of TRE?

8   A.  The operations team, as part of the maintaining of the

9   platform, the operating of the platform, which was what LiquidX

10  was charging TRE the service fees for.

11  Q.  I know that wasn't your responsibility, right?

12  A.  No.

13  Q.  Was that also under the TSA?

14  A.  Yes.

15  Q.  So other than that, the operations piece and the back

16  office piece, are you aware of anything else that LiquidX has

17  done for TRE in 2016?

18  A.  No.

19  Q.  Do you know how much longer LiquidX's services will be

20  required under the TSA?

21  A.  I don't know, no.

22  Q.  Are you doing the same amount of work now under the TSA

23  that you did in January of 2016?

24  A.  No.

25  Q.  Has it changed?

1    A.  Yes.  He was able to exchange last payments to be made, so

2    we have not been processing payments every week, and we are not

3    processing payroll every couple -- like on a regular basis

4    either.

5    Q.  About the last just, say, October, November, December 2016,

6    are you able to estimate how much time each week you have spent

7    on work under the TSA?

8    A.  Not a lot of time.  Maybe an hour a week.  We, at the end

9    of September, the NetSuite license for TRE lapsed, so we don't

10   have access to the financials anymore.  So the work was

11   significantly reduced after that, because we didn't have to

12   maintain vendor lists or create financial statements.

13   Q.  OK.  As part of your role as finance director for LiquidX,

14   are you familiar with LiquidX's financial books and records?

15   A.  Yes.

16   Q.  Let's look at JX 36, please.

17           Do you recognize this document?

18   A.  Yes.  These are the financial statements for LiquidX as of

19   the end of February 2016.

20   Q.  OK.  If you turn to page 2841.

21   A.  Yes.

22   Q.  Do you see a line net change in cash for a period?

23   A.  Yes.

24   Q.  What does that represent?

25   A.  It represents the amount of money received or paid out in

1   that period.

2   Q.  So if you look at the number $597,558, what does that

3   number represent?

4   A.  The cash paid out by LiquidX over January and February in

5   2016.

6   Q.  So this is year to date as of February 2016?

7   A.  Correct.

8   Q.  Is that comparable to the amount of money that LiquidX lost

9   in that period?

10  A.  Yes.

11  Q.  Is LiquidX still losing money in the present?

12  A.  Yes.

13  Q.  Do you know how much money each month LiquidX is losing?

14  A.  It is roughly 600,000.

15  Q.  Per month?

16  A.  650.  Yeah.

17  Q.  So it is actually losing more money per month than it was

18  in February of 2016?

19  A.  Yes.

20  Q.  Actually, I am told I missed a couple exhibits into

21  evidence.  Let me clean that up right now.

22          MR. LICKER:  This one is JX 36.  I would move JX 36

23  into evidence.

24          MR. ABRAMS:  No objection.

25          THE COURT:  JX 36 is received.

1                (Joint Exhibit 36 received in evidence)

2                MR. LICKER:  I also neglected move JX 85 and JX 80

3     into evidence.

4                MR. ABRAMS:  No objection.

5                THE COURT:  JX 85 and 80 are received.

6                (Joint Exhibits 80 and 85 received in evidence)

7     BY MR. LICKER:

8     Q.  Can you turn to JX 37, please.

9     A.  Yes.

10    Q.  Do you recognize this document?

11    A.  I recognize the table as forecasts that I prepared.

12    Q.  What does this document show?

13    A.  This shows the forecasted financials for LiquidX for 2016,

14    2017, 2018.

15    Q.  By looking at this document, are you able to tell

16    approximately when it was created?

17    A.  Yeah.  Roughly the end of Q1 in 2016.

18    Q.  How were you able to tell that?

19    A.  The servicing revenue line isn't forecasted out further and

20    it looks like there is roughly, maybe, two periods -- two

21    months of servicing revenue.  So that would put me -- that

22    would put this document being made at the end of, like,

23    sometime in March, which is the end of Q1.

24    Q.  If I go down toward the bottom to EBIDTA --

25    A.  Yes.

1    Q.   -- does it show a positive EBIDTA beginning in Q3 2016?

2    A.   Yes.

3    Q.   Has that forecast proven to play out that way?

4    A.   No.

5    Q.   Do you know why that is?

6    A.   Revenue -- so new revenue has been over-projected or

7    over-estimated.

8    Q.   Do you know why new revenue was over-projected?

9    A.   There were -- it wasn't like foreseen that the on-boarding

10   of new clients would take as long as it has, so revenue --

11   well, like new revenue has been pushed back.

12   Q.   Just to step back for a minute, the numbers that went into

13   this document, where did you get them from?

14   A.   These numbers came from the salespeople, the sales team.

15   Q.   Did you have meetings with the sales team?  How did that

16   process work?

17   A.   They would -- at this point in time, they filled out

18   templates which listed their projected new clients and,

19   essentially, how much revenue they thought that these clients

20   would be bringing in on a monthly basis.  Then we would

21   aggregate them, put them into our financial model, and present

22   them in this format.

23   Q.   Who would they be presented to?

24   A.   It could be anyone.  I would send these to Jim and whoever

25   he sent them to, like, I couldn't tell you.

1   Q.  I think you mentioned that the projections have fallen

2   behind because of the on-boarding process.  What do you mean by

3   on-boarding process?

4   A.  So, just the length of time it would take to get to take a

5   lead and take them all through the sales pipeline and get them

6   to sign a document -- execute documents in trade on our

7   platform.  There are a number of reasons why some of them, we

8   didn't have sales agreements for a few months.  So that really

9   pushed back the process.

10          Being a small unknown company that's quite new, a lot

11  of, like, the clients that we are targeting are big banks and

12  multi-national companies, so they are less likely to -- they

13  are somewhat riskier.  They might not want to engage with such

14  a small company about -- about, like, their sort of, like,

15  financial assets.  So that process took a lot longer, I think,

16  than the salespeople anticipated originally.

17  Q.  OK.  During your career, you've prepared financial

18  projections throughout your career?

19  A.  Yes.

20  Q.  How accurate are projections typically?

21  A.  You try to make them as accurate as possible.  But, once

22  again, it's like future predictions, like, you can only be so

23  accurate with them, and I think everyone that reads them knows

24  that they are subject to change.

25  Q.  How frequently do they change?

1   A.  I change -- I change -- well, we update our projections on

2   a monthly basis, but it is really dependent on what I get asked

3   to run the models.  It could be on a daily basis because the

4   numbers are changing that frequently.

5   Q.  Has LiquidX added any sellers to its platform?

6   A.  Sellers, no.

7   Q.  Has LiquidX added any buyers to its platform?

8   A.  Yes.

9   Q.  How many?

10  A.  Three.

11  Q.  Do you know why those buyers signed on?

12  A.  The first one was in September and then we've had a couple

13  more in November.

14  Q.  We talked a few minutes ago about how these projections

15  have changed.

16          Is LiquidX currently projecting to break even in 2016?

17  A.  No.

18  Q.  When is LiquidX expecting to break even?

19  A.  Currently, we expect that to happen late 2017.

20          MR. LICKER:  OK.  Just one moment, your Honor.

21          THE COURT:  Yes.  Take your time.

22  BY MR. LICKER:

23  Q.  Just to go back to the work you did under the TSA, have you

24  made any decisions on behalf of TRE related to that work?

25  A.  No.

GBGsLIQ5                          Gielewski − cross

1    Q.  Are you aware of anyone else at LiquidX making any

2    decisions on behalf of TRE?

3    A.  No.

4              MR. LICKER:  Nothing further.

5              THE COURT:  All right.  Cross-examination, Mr. Abrams?

6              MR. ABRAMS:  Thank you, your Honor.

7              MR. LICKER:  Your Honor, once again, I think I

8    neglected to move an exhibit.

9              I would move to admit JX 37.

10             MR. ABRAMS:  No objection.

11             THE COURT:  JX 37 is received.

12             (Joint Exhibit 37 received in evidence)

13   CROSS−EXAMINATION

14   BY MR. ABRAMS:

15   Q.  Good afternoon, Ms. Gielewski.

16   A.  Hi.

17   Q.  You say you performed bookkeeping roles for TRE since

18   January 2016, is that correct?

19   A.  Myself and my report, yes.

20   Q.  And your report is Ms. Carcich?

21   A.  Yes.

22   Q.  And financial you prepare financial statements is that

23   correct for TRE?

24   A.  Yes.

25   Q.  That's since January 2016, correct?

1    A.  Yes.

2    Q.  You handle the accounts payable, is that correct?

3    A.  Myself and my report, we did up until the end of September,

4    yes.

5    Q.  And so you and Ms. Carcich, correct?

6    A.  Yes.

7    Q.  And up until September, you handled the accounts receivable

8    for TRE?

9    A.  TRE doesn't really have accounts receivable.

10   Q.  OK.  Did you do any other accounting work for TRE during

11   that period?

12   A.  Just journal entries, preparing the financial statements,

13   that type of thing, yes.

14   Q.  OK.  TRE has no finance department, correct?

15   A.  Correct.

16   Q.  So you and Ms. Carcich act as TRE's finance department, is

17   that correct?

18   A.  Well, we don't make any decisions, but we do like the day

19   to day tasks, yes.

20   Q.  Has TRE ever run a payroll without the involvement of you

21   or Ms. Carcich since January 2016?

22   A.  No.

23   Q.  Has TRE ever paid a bill without you or Ms. Carcich since

24   January 2016?

25   A.  No.

1   Q.  Has TRE ever prepared any financial statements since

2   January 2016 without the involvement of you or Ms. Carcich?

3   A.  I don't know what Peter did for October.

4   Q.  OK.  But just in October it changed?

5   A.  Up until September, yes.

6   Q.  You talked about your familiarity with a document called

7   the transition services agreement?

8   A.  Yes.

9   Q.  That's Exhibit 21, correct?  Can you turn to that?

10          Do you have it in front of you?

11  A.  Yes.

12  Q.  Do you see a Section 1.1 on the first page marked 123?

13  A.  Yes.

14  Q.  All right.  You say buyer agrees to provide the services

15  set forth on Exhibit A.  Do you see that?

16  A.  Yes.

17  Q.  All right.  Can you turn to the last page of that document?

18  A.  Yes.

19  Q.  Actually, the page marked 134, page before last.

20          Do you see that, it says Exhibit A on the top?

21  A.  Yes.

22  Q.  There is a description of services here, correct?

23  A.  Yes.

24  Q.  You described the back office functions you performed for

25  TRE and you mentioned payroll, financial statement preparation,

GBGsLIQ5                        Gielewski – cross

1    bookkeeping, accounts payable.

2              Do you see those services listed in Exhibit A here?

3    A.  Not specifically, no.

4    Q.  OK.  Do you have an understanding of why they were left out

5    of the transition services agreement?

6    A.  I was under the impression that the line that providing

7    such services are necessary for the trades to close pursuant,

8    etc., encompassed those back office functions.

9    Q.  OK.  So let me break that down.

10             Which sentence are you looking at, you're talking

11   about existing trade services?

12   A.  So buyer will service those trades for sellers including

13   providing such services after February 28, 2016, as are

14   necessary for the trades to close pursuant to the relevant open

15   contract.

16   Q.  OK.  But this is describing the trading going on for the

17   Small and Medium Buyer exchange, correct?

18   A.  I don't know.

19   Q.  Do you and Ms. Carcich get involved in settlement or

20   clearing operations, do you have an understanding of that term?

21   A.  No, we do not.

22   Q.  OK.  And that's handled by Mr. Walker's team out of

23   New Orleans, is that correct?

24   A.  I believe so, yes.

25   Q.  OK.  Is this not referring to trades and settlement and

1    clearing for the SMB exchange?

2    A.  I -- I couldn't tell you.  That's how I interpreted the

3    document along those lines.

4    Q.  Do you see the word payroll appearing in there?

5    A.  No.

6    Q.  Accounting?

7    A.  No.

8    Q.  Bookkeeping?

9    A.  No.

10   Q.  OK.  Is it your understanding, though, the work you're

11   doing for TRE is pursuant to this agreement, is that correct?

12   A.  Yes.

13   Q.  Have you performed work for TRE since June 1st, 2016?

14   A.  Yes.

15   Q.  Are you aware that the transition services agreement

16   expired as of June 1, 2016?

17   A.  I -- I didn't -- I don't believe that was the case.

18   Q.  Did you see any amendments to the transitions services

19   agreement?

20   A.  Here or just generally?

21   Q.  In general.

22   A.  Just within these -- these, like, proceedings I have seen

23   amendments, yes.

24   Q.  Are you aware there are two amendments to the transitions

25   services agreement?

GBGsLIQ5                    Gielewski - cross

1    A.   Yes.

2    Q.   One signed in February and one signed in April, are you

3    aware of that?

4    A.   Yes.

5    Q.   OK.  And you haven't seen one signed since April, correct?

6    A.   No.

7    Q.   And you're still running payroll for TRE at this time?

8    A.   We haven't run payroll for a couple pay periods now, but if

9    we needed to, then yes.

10   Q.   I'd like to go back to Exhibit 21.

11             Do you still have that in front of you?

12   A.   Yes.

13   Q.   Do you see a sentence that says here, buyer agrees to

14   respond in good faith to any reasonable request by sellers to

15   access to any additional services that are necessary to fulfill

16   their obligations to remaining customers which are not

17   currently contemplated by the services exhibit.

18             Do you see that?

19   A.   Yes.

20   Q.   Those are called additional services.

21             Do you see that?

22   A.   Yes.

23   Q.   And then it goes on to the back and it says, at a price

24   to be agreed upon after a good faith negotiations between the

25   parties.

GBGsLIQ5                          Gielewski - cross

1        Do you see that?

2   A.   Yes.

3   Q.   Are you aware of any negotiation of payment to LiquidX from

4   TRE for the services that you and Ms. Carcich have been

5   providing since January 2016, including the bookkeeping, the

6   financial account statements, the payroll operations?

7   A.   I thought they were all wrapped up in the servicing charge

8   in attachment A, so yes.

9   Q.   So, that's no, you're not aware?

10  A.   Well, I believed that it was part of the servicing charge,

11  so then we were being paid for those services.

12  Q.   And that's the servicing charge that relates to the Small

13  and Medium Business exchange trades?

14  A.   The trades on the platform, yes.

15  Q.   OK.  Does the New Orleans office of LiquidX still handle

16  those trades?

17  A.   I couldn't tell you.  I am not involved in the trading

18  side.

19  Q.   OK.  Do you have an awareness that recently LiquidX stopped

20  performing all trades for the SMB program for TRE?

21        Do you have any awareness of that fact?

22  A.   I know that we have stopped charging them any service fees,

23  so that would make sense.

24  Q.   OK.  So that piece of what you did for TRE is done, there

25  is no service fees being charged.

1          But you and Ms. Carcich are still handling the

2    separate services, the bookkeeping, the financial accounting,

3    correct?

4    A.  Not the bookkeeping anymore, not the financial accounting

5    anymore.

6    Q.  Payroll?

7    A.  When payroll needs to be run, when we are directed to, yes.

8    Q.  OK.  Mr. Sullivan is achieve restructuring officer of TRE,

9    is that correct?

10   A.  I believe so, yes.

11   Q.  And he just recently got access to the TRE bank accounts,

12   is that correct?

13   A.  Define recently.

14   Q.  Do you know when he got access to the TRE bank accounts?

15   A.  I think it was early 2016.

16   Q.  But he didn't always have access to the TRE bank accounts,

17   is that correct?

18   A.  No.  It takes a while to set that up.

19   Q.  You mentioned you get Toggle to access those bank accounts,

20   is that correct?

21   A.  Yes.

22   Q.  Explain what that is.

23   A.  It is a security key that no one -- so you have to have

24   that present.  It has, I think, six or seven numbers on it that

25   change every minute so that it makes it harder for someone else

1   to impersonate you and get, like, use your account to transfer

2   money.

3   Q.  That's a physical key?

4   A.  Yes.

5   Q.  Do you know if Mr. Sullivan has one?

6   A.  Yes.

7   Q.  He does?

8   A.  Yes.

9   Q.  Do you know if Mr. Sullivan accesses TRE's bank accounts?

10  A.  I don't know.

11  Q.  Do you know if he ever accessed TRE's bank accounts?

12  A.  I don't know.

13  Q.  You heard the term signature authority today, correct?

14  A.  Yes.

15  Q.  What is signature authority over a bank account?

16  A.  He can sign -- a person can sign checks.

17  Q.  OK.  And you have signature authority over TRE's bank

18  accounts, correct?

19  A.  I don't know if I do.

20  Q.  OK.  I believe you testified on direct that you and

21  Mr. Sullivan have signature authority?

22  A.  I would have meant that in terms of approval -- like,

23  approving transactions in the banking system.

24  Q.  OK.  But if you don't have signature authority, how could

25  you process those payments so that Mr. Sullivan or any

1    consultant gets paid?

2    A.  I'm sorry.  Can you repeat the question?

3    Q.  Yeah.  Don't you need signature authority in order to

4    process these payments to be the financial step before they get

5    paid, is that correct?

6    A.  I don't know how the banking system operates.

7    Q.  OK.  But if Mr. Sullivan says this is approved for payment,

8    you can click something on the bank and you can make that

9    payment happen, is that correct?

10   A.  Yes.

11   Q.  OK.  Do you recall the exact date of when you joined TRE?

12   A.  Approximately, the 13th of October, 2015.

13   Q.  And you reviewed TRE's books, November, December, mid

14   October 2015, correct?

15   A.  Correct.

16   Q.  Do you have an understanding that was after you were hired

17   after a funding round closed in September 2015?

18            MR. LICKER:  Objection.

19   BY MR. ABRAMS:

20   Q.  I'm sorry.  It didn't close.

21            A funding round didn't close in 2015.

22   A.  Was I aware?

23   Q.  Yes.

24   A.  Yes.

25   Q.  OK.  Was the company in financial distress at that time?

1   A.  If -- it looked like that it is where they were heading.

2   Q.  Do you have an understanding of why you were hired as

3   finance director in mid October if the cash projection and the

4   cash situation was so precarious?

5   A.  I was filling a role that had been made -- left vacant.

6   And at that time, the senior management of the board thought

7   that the round would close so that there wouldn't be any

8   financial difficulty.

9   Q.  They thought it would close by October 15?

10  A.  Well, at some point, maybe not October 15, but in the not

11  too distant future.

12  Q.  OK.  Who hired you?

13  A.  Jim Toffey and James Kovacs.

14  Q.  You said there was a vacancy and that is why you were

15  hired, correct?

16  A.  Yes.

17  Q.  Is that because Mr. Kovacs resigned from TRE so he could

18  work full-time on this LiquidX transition?

19  A.  I don't know what Mr. Kovacs did.  I wasn't replacing -- I

20  wasn't replacing James.

21  Q.  OK.  But when you say vacancy, you're referring to James

22  Kovacs, correct?

23  A.  No.

24  Q.  What was the vacancy?

25  A.  There was a controller based in New Orleans, and he left

1    earlier in 2015.

2    Q.  OK.  Was James filling in for him during that period from

3    when you were hired and when he left in early 2015?

4    A.  I think the responsibilities were split between Beth and

5    James.

6    Q.  OK.  Did you report to James when you started at TRE?

7    A.  I reported to James and Jim, but mostly James, yes.

8    Q.  Is there a time when you stopped reporting to James?

9    A.  Yes.

10   Q.  OK.  When was that?

11   A.  When he ceased to be an employee and became a consultant.

12   Q.  For LiquidX?

13   A.  For TRE, as well.

14   Q.  For TRE and LiquidX?

15   A.  Yes.

16   Q.  Do you know when that was?

17   A.  Mid November, late November.

18   Q.  OK.  Do you recall discussing today the amount of cash in

19   TRE's bank accounts at the end of December 2015?

20   A.  Yes.

21   Q.  Do you recall being around in excess of $800,000?

22   A.  Approximately, yes.

23   Q.  You're aware of the foreclosure that occurred on

24   December 31 2015, between LiquidX and TRE, correct?

25   A.  Yes.

1    Q.  Is it your understanding that that cash was subject to the

2    foreclosure and it was LiquidX's cash to sweep from the

3    accounts?

4              Did you have that understanding?

5    A.  Yes.

6    Q.  LiquidX never did that, correct?

7    A.  LiquidX came in control of the Comerica Bank accounts which

8    had previously had the money in them, but the money had been

9    swept out.  So they weren't able to sweep out that money,

10   correct.

11   Q.  What do you mean they weren't able to sweep out that money?

12   A.  The money was transferred between a Comerica account and a

13   JPMorgan Chase account.  So when LiquidX took control of the

14   Comerica Bank accounts, there was -- there was probably, like,

15   $10.  There wasn't a lot of money in there.

16   Q.  Just so I am clear, it was TRE's cash still.  LiquidX is

17   not touching that cash, is that correct?

18   A.  LiquidX -- yes, LiquidX has not touched the cash.

19   Q.  OK.  And if it swept out that cash, are you aware of any

20   other capital that TRE would have had starting January 2016 in

21   order to pay down the wind-down consultant and in order to pay

22   Mr. Kovacs, Mr. Gonik, any of those?

23   A.  It was timing issues.  There was still cash coming in.

24   They had -- TRE had a number of assets that would convert into

25   cash, but had the money been swept out as of the first of

1    January, they probably wouldn't have had any cash to pay out

2    any vendors.

3    Q.  Do you know why LiquidX didn't seize that cash?

4    A.  No.

5    Q.  Are you aware of any TRE vendors getting paid following

6    January 1st, 2016, with that cash that wasn't swept out by

7    LiquidX?

8    A.  Yes.

9    Q.  OK.  Can you tell me who those vendors were?

10   A.  It was probably like a long list, like legal fees.  What

11   else?  Like banking fees, some expenses that they paid on

12   behalf of LiquidX, so, like, Internet, phone bills, that type

13   of thing.

14   Q.  OK.  Is LiquidX still doing business with majority of those

15   vendors who were paid out with this cash by TRE following

16   January 2016?

17   A.  I'm sorry.  Can you repeat the question?

18   Q.  Yes.  So cash was left in the TRE's accounts and there were

19   vendors who were paid from that cash, is that correct?

20   A.  Yes.

21   Q.  And you would have processed those payments, correct?

22   A.  Yes.

23   Q.  And I believe you said you and Ms. Carcich are weekly

24   sending reports to Mr. Sullivan up until September 2016, about

25   what is owed to what vendors, correct?

1    A.  Yes.

2    Q.  Are any of those vendors currently LiquidX vendors,

3    as well?

4    A.  Yes.

5    Q.  Is it the majority of those vendors?

6    A.  No.

7    Q.  It's not?

8            But there is some overlap in the vendors?

9    A.  Yes.

10           THE COURT:  Is this an appropriate place to take a

11   mid-afternoon recess?

12           MR. ABRAMS:  Yes, your Honor.

13           THE COURT:  All right.  We are going to take a short

14   recess.

15           Ms. Gielewski, you can step down for a few minutes.

16   We will reconvene shortly.

17           (Recess)

18           THE COURT:  You may proceed, Mr. Abrams.

19           MR. ABRAMS:  Thank you, your Honor.

20   BY MR. ABRAMS:

21   Q.  Ms. Gielewski, I believe before we left you testified that

22   TRE money, around the time of the foreclosure, got moved from a

23   Comerica account to a Chase account, is that correct?

24   A.  Yes.

25   Q.  What did you mean by that?  Can you explain that?

1    A.   Peter Sullivan approved Beth and myself to transfer the

2    money that was sitting in the Comerica account to a Chase -- to

3    the TRE Chase account.

4    Q.   So this was after the foreclosure?

5    A.   I couldn't -- I couldn't be sure when the date was.

6    Q.   OK.  Just so I understand, LiquidX forecloses as a senior

7    creditor on December 31?

8    A.   Yes.

9    Q.   The money that was foreclosed upon was the Comerica

10   account, correct?

11   A.   Yes.

12   Q.   And that was subject to the bank's lien, correct?

13   A.   Yes.

14   Q.   Then, at some point, either before or after that, all that

15   money was moved to a Chase account, correct?

16   A.   Yes.

17   Q.   Was that a new account for TRE?

18   A.   No.

19   Q.   OK.  But this is LiquidX's money that's getting moved to a

20   TRE Chase account, correct?

21   A.   If it was after the foreclosure, then yes.

22   Q.   You said that's not a new account?

23   A.   No.

24   Q.   Do you know how long that Chase account was used by TRE?

25   A.   It's before my time.  There was a lot of transferring

1   between the Comerica and Chase accounts.

2   Q.  OK.  Did you actually have to move the LiquidX money from

3   Comerica to Chase?  You processed that?

4   A.  Beth set it up, and then I clicked a button and Peter

5   approved it.

6   Q.  Were you involved in the decision of who should be paid of

7   TRE's creditors from this LiquidX money?

8   A.  Involved just in terms of providing information to Peter,

9   who would make the final decision.

10  Q.  OK.  You looked at Exhibit 45.  Do you recall that?

11  A.  It's a bit blurry.

12  Q.  It will come back into focus.  There we go.

13  A.  Yes.

14  Q.  Do you recall this document?

15  A.  Yes.

16  Q.  It's been admitted into evidence.

17  A.  Yes.

18  Q.  These were TRE's creditors as of December 31, 2015?

19  A.  Yes.

20  Q.  OK.  And you're making this list, correct?

21  A.  Yes, I believe so.

22  Q.  OK.  Who is directing you to make this list?

23  A.  I don't know.  From this document, I can't tell you.

24  Q.  Do you recall around December, in December 2015, someone

25  asking you who are TRE's creditors, we need to make a list of

1    all of them?

2    A.  Yes.

3    Q.  And who asked you that?

4    A.  Honestly, I can't remember.

5    Q.  Mr. Toffey?

6    A.  I -- I can't remember.

7    Q.  Do you remember Mr. Toffey making any requests to you in

8    December 2015 regarding TRE's outstanding creditor balances?

9    A.  I can't remember.

10   Q.  What about Mr. Kovacs?

11   A.  I -- I honestly can't remember.

12   Q.  OK.  Some of these vendors are LiquidX vendors after the

13   foreclosure, correct?

14   A.  Some of them are also LiquidX vendors, yes.

15   Q.  And some of them are law firms and things that TRE were

16   using, Zeichner Ellman & Krause, William Roche.  LiquidX won't

17   have those vendors.

18          NetSuite, Office Depot, IPFS, those are LiquidX

19   vendors today?

20   A.  Yes.

21   Q.  When you joined in October 15 until January 1, 2016, isn't

22   it accurate that you spent a huge bulk of your time switching

23   over TRE vendors to become LiquidX vendors, such that the

24   platform could operate smoothly, there being no operations down

25   coming January 1, 2016?

1    A.  I don't know if I would use the words, a huge bulk of my

2    time.

3    Q.  OK.

4    A.  But I did spend time doing that, yes.

5    Q.  That was certainly a task of yours, correct?

6    A.  Yes.

7    Q.  Let me show you a document marked Exhibit 157.  This has

8    already been admitted into evidence.

9         Do you recognize this document?

10   A.  Yes.

11   Q.  What is it?

12   A.  It is a list of vendors that was used to track the progress

13   of being set up for LiquidX.

14   Q.  OK.  Now, it says updated December 29, 2015.

15        Do you recall receiving this before that time or a

16   version of this document?

17   A.  I believe so, yes.

18   Q.  OK.  And your name appears as the owner of a lot of items

19   on here, is that correct?

20   A.  Yes.

21   Q.  LexisNexis?

22   A.  Yes.

23   Q.  Did you switch LexisNexis over from TRE to LiquidX?

24   A.  No, we created a new account.  There --

25   Q.  Let me ask it a different way.

GBGsLIQ5                          Gielewski - cross

1              LexisNexis was a TRE vendor?

2    A.   Yes.

3    Q.   Are they a LiquidX vendor?

4    A.   Yes.

5    Q.   What about Thomson Reuters?

6    A.   Yes.

7    Q.   CT Lien?

8    A.   Yes.

9    Q.   Let's go up to the top.

10             Do you know if NaviSite is a vendor?

11   A.   Yes.

12   Q.   IGate?

13   A.   Under a different name, yes.

14   Q.   TurnKey?

15   A.   Yes.

16   Q.   Venyu?

17   A.   No.

18   Q.   What about Sonic.net?

19   A.   No.

20   Q.   OK.  We talked about NetSuite, PricewaterhouseCoopers.

21             They are TRE vendors and now they are LiquidX vendors,

22   is that correct?

23   A.   Yes.

24   Q.   And you would have been involved in that process of

25   switching them over, or however they became TRE vendors, and

1    then went to LiquidX between October and December 2015,

2    correct?

3    A.   Well, obviously switching -- only assigning where

4    necessary, but creating new accounts.  And then, yes, into

5    January, February, because it did take a while.

6    Q.   OK.  So think about what you're saying, the process of how

7    they became LiquidX vendors from TRE vendors might vary on the

8    account.  There was contractual obligations and things like

9    that, is that correct?

10   A.   Yeah.  And only some of them you could say went from TRE to

11   LiquidX.

12   Q.   OK.  There is some accounts that are still in TRE's name,

13   is that accurate, some vendors used by LiquidX and on the

14   contracts says TRE?

15   A.   As of today, I don't think that that's accurate.

16   Q.   OK.  You discussed chargebacks earlier, correct?

17   A.   Yes.

18   Q.   What are chargebacks?

19   A.   Where the contract hadn't been created for LiquidX or

20   hadn't been assigned to LiquidX, and the Receivables Exchange

21   contract was still in place and, therefore, we were paying the

22   services on behalf of LiquidX.

23   Q.   So, if I get this right, that is after January 1, 2016,

24   correct?

25   A.   Yes.

1    Q.  OK.  So LiquidX forecloses on TRE December 31, 2016.

2            After that time, there is still some contracts in

3    TRE's name.  TRE is not using these services at all, but

4    LiquidX is taking money out of the TRE accounts to pay those

5    services, is that correct?

6    A.  TRE is paying those vendors on behalf of LiquidX and

7    LiquidX is reimbursing TRE.

8    Q.  OK.  But you handle that procedure, so the money comes from

9    the TRE accounts to pay those vendors, correct?

10   A.  But the approval comes from Peter Sullivan.

11   Q.  Putting aside the approval, the processing of the payment,

12   you pay the vendors that LiquidX uses from the TRE account,

13   correct?

14   A.  I'm sorry.  Can you repeat the question?

15   Q.  Yeah.

16           So we are talking about those contracts that couldn't

17   be assigned to LiquidX and are still in TRE's name.

18   A.  OK.

19   Q.  And LiquidX uses those services and has used them after

20   January 1st, 2016?

21   A.  Yes.

22   Q.  You or Ms. Carcich go into the TRE account, pay those

23   contracts, correct?

24   A.  With Peter's approval, yes.

25   Q.  OK.  And then you go to the LiquidX account and pay TRE

1   right back and that's the chargeback fees you discussed

2   earlier?

3   A.  Yes, with Jim's approval.

4   Q.  OK.  Putting aside Jim's approval, Peter's approval, those

5   two steps occur, those couple steps, LiquidX uses the services,

6   TRE pays for them, take money from TRE accounts and then pay

7   them back using LiquidX money, correct?

8   A.  Mechanics, yes.

9   Q.  OK.  Was your understanding of why TRE would agree to have

10  money withdrawn from its accounts for services it doesn't use

11  at all even if you're paying them back at a later date?

12          MR. LICKER:  Objection, speculation.

13          THE COURT:  Sustained.

14  BY MR. ABRAMS:

15  Q.  You discussed a meeting in mid November with Mr. Toffey and

16  Mr. Kovacs, correct?

17  A.  Yes.

18  Q.  And that was a meeting where you found out about LiquidX?

19  A.  About the company that is now known as LiquidX, yes.

20  Q.  OK.  And you were told that was a new company, is that

21  correct?

22  A.  Yes.

23  Q.  OK.  Did you have an understanding of how the foreclosure

24  process would have worked at that meeting?

25  A.  Not in detail, no.

GBGsLIQ5                          Gielewski - cross

1    Q.  OK.  Did you have an understanding that LiquidX was going

2    to be taking TRE's assets?

3    A.  Foreclosing on them, yes.

4    Q.  OK.  Was there an instruction at that meeting to use your

5    Gmail account in order to discuss any business of LiquidX?

6    A.  I don't know if it was at that meeting, but there was an

7    instruction to use my Gmail account.

8                   (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  And that's mid-November 2015, correct?

2    A.  Roughly around then.

3    Q.  Okay.  And you joined TRE October 2015?

4    A.  Correct.

5    Q.  Okay.  And prior to that time, you had been communicating

6    with Mr. Toffey, Mr. Kovacs via your RECX e-mail address?

7    A.  Sorry, prior to?

8    Q.  So prior to that November 15th, 2015, meeting, or around

9    there, whenever it was, did you communicate with Mr. Toffey and

10   Mr. Kovacs via these RECX e-mail addresses?

11   A.  Yes.

12   Q.  Okay.  And then a month in your employment, there's an

13   instruction that you're going to have to work on a project, and

14   all of it has to be kept off the RECX e-mail addresses,

15   correct?

16   A.  I wouldn't say all.

17   Q.  Okay.

18   A.  But they wanted us to use our Gmail accounts in relation to

19   that project.

20   Q.  Okay.  Do you raise any concern about that at that time?

21   A.  No.

22   Q.  I'm going to put up here what's marked JX238.  Do you

23   recognize this document?

24   A.  Yes.

25   Q.  And this is your separation agreement -- separation

1   agreement and release from TRE; is that correct?

2   A.  Yes.

3   Q.  Okay.  Is your signature on the back?

4   A.  Yes.

5   Q.  Okay.  And Jim Toffey signed that as CEO --

6   A.  Yes.

7   Q.  -- of Receivables Exchange?

8   A.  Yes.

9           MR. ABRAMS:  Your Honor, I'd like to move 238 into

10  evidence.

11          THE COURT:  Any objection?

12          MR. LICKER:  No objection.

13          THE COURT:  All right.  JX238 is received in evidence.

14          (Joint Exhibit 238 received in evidence)

15  BY MR. ABRAMS:

16  Q.  Did you receive an offer letter from LiquidX prior to that

17  time?

18  A.  I believe it happened at the same time.

19  Q.  I show you JX239, which has already been admitted into

20  evidence.  Do you see the date of December 24th, 2015?

21  A.  Yes.

22  Q.  And we don't have an executed copy for you.  Do you recall

23  seeing this document?

24  A.  Yes, and I have signed it.

25  Q.  Okay.  This is already moved into evidence.  The date,

1    December 24th, precedes when you separated from TRE, correct?

2    A.  Yes.

3    Q.  Okay.  Did you raise a question about that?

4    A.  No.

5    Q.  Okay.  Mr. Licker went through with you some employees who

6    have come to LiquidX recently, correct?

7    A.  Yes.

8    Q.  When you left in December 2015 and came back to your

9    office, did every employee stay on who was in the office at

10   that time, in New York?

11   A.  No.  I believe one employee from TRE did not become an

12   employee of LiquidX.

13   Q.  Is that Mr. Gonik?

14   A.  Yes.

15   Q.  Okay.  But you said you have a small office at TRE,

16   correct?

17   A.  Yes.

18   Q.  And when you were working at TRE, you were in that same

19   Park Avenue office that you reported to as LiquidX?

20   A.  Yes.

21   Q.  Okay.  And when you walked out December 2015 and came back

22   January 2016, as LiquidX, everyone but one person was still

23   there, correct?

24   A.  Yes.

25   Q.  And LiquidX just recently added a few employees; is that

1    right?

2    A.   They've been adding employees over the entire year.  It

3    hasn't just been recently.

4    Q.   Okay.  In January 2016, were they adding employees at that

5    time, or did they add employees at that time?

6    A.   Yes.

7    Q.   Okay.  And who did they add?

8    A.   RT Rowe.

9    Q.   RT Rowe?

10   A.   Yes.

11   Q.   Salesperson?

12   A.   Yes.

13   Q.   She started January 1st, 2016?

14   A.   She didn't start January 1st, no.

15   Q.   Okay.  Was she the only one in January?

16   A.   Yes.

17   Q.   You mentioned Mark Brazier, as the CFO?

18   A.   Yes.

19   Q.   He came on later, correct?

20   A.   In April.

21   Q.   In April?

22   A.   Yes.

23   Q.   And Mr. Gonik, even though he was a TRE consultant, he

24   still worked in that office, correct, the 100 Park Avenue

25   office?

1   A.  You mean a TRE employee?

2   Q.  Yes.

3   A.  I don't believe so, no.

4   Q.  You never saw him in that office after January 1st, 2016?

5   A.  I don't recall.  I don't remember seeing him.

6   Q.  Do you remember seeing Mr. Roche after January 1st, 2016?

7   A.  Maybe in a capacity as just to stop by and say hello, but

8   that's about it.

9   Q.  Did Mr. Roche have office space at LiquidX following

10  January 1st, 2016?

11  A.  No.

12  Q.  Okay.  Do you recall Mr. Roche having an area with a

13  Receivables Exchange sign following January 1st, 2016?

14  A.  No.

15  Q.  Okay.  Did you see Mr. Kovacs this the office following

16  January 1st, 2016?

17  A.  Yes.

18  Q.  Okay.  Was he there regularly?

19  A.  No.

20  Q.  Okay.  Did you have an understanding that Mr. Kovacs was

21  working for both TRE and LiquidX at the same time?

22  A.  He was being paid as a consultant, yes.

23  Q.  Okay.  And you processed his consulting invoices, correct?

24  A.  Yes.

25  Q.  Do you recall if he was being paid approximately 10,000 a

1   month for LiquidX?  Does that sound accurate?

2   A.   Roughly.

3   Q.   Okay.  And about 1,000 a month for TRE; is that correct?

4   A.   Yes.  Roughly, yeah.

5   Q.   He was being paid ten times more at LiquidX per month,

6   correct?

7   A.   Essentially, yes.

8   Q.   You looked at a document on direct that's 240A.  Do you

9   have that in front of you?  Can you see it?

10  A.   Yes, I can see it.

11  Q.   Okay.  This is from you to James Kovacs, correct?

12  A.   Yes.

13  Q.   January 14th, 2016?

14  A.   Yes.

15  Q.   Two weeks after the foreclosure, right?

16  A.   Yes.

17  Q.   James -- you say:  James, PWC wants some clarification on

18  the transaction before we have a call with them.

19  A.   Yes.

20  Q.   And you were writing to James at his TRE address, right?

21  A.   Yes.

22  Q.   So he was doing TRE work in this e-mail?

23  A.   No, but it probably just auto populated when I started

24  typing his name.

25  Q.   Okay.  I believe you testified on direct that you were

1  consulting with an accounting friend of yours; is that correct?

2  A.  Yes.

3  Q.  Why are you consulting about the accounting treatment of a

4  LiquidX transaction with a friend?

5  A.  That's -- that's -- it was a favor.  She worked at PWC.  It

6  was also including some PWC experts, as well.  This type of

7  work is quite common.  We wanted some clarification on the

8  transaction.  They have the knowledge.

9  Q.  Who directed you to contact PWC?

10  A.  I reached out to them on my own because that's where my

11  friend worked.

12  Q.  Okay.  And so no one directed you, but you had some

13  questions about the tax treatment of the foreclosure; is that

14  correct?

15  A.  Tax treatment of the cap injection in 2015, and then I

16  think there were like some other questions that we were asking

17  which related to the foreclosure.

18  Q.  And you say:  Jim wants the call to take place this week;

19  do you see that?

20  A.  Yes.

21  Q.  So Jim also wanted to talk to PWC; is that correct?

22  A.  Yes.  This PWC call came out of a conversation that Jim,

23  James and I had, and I volunteered the fact that I had a friend

24  that worked at PWC that could help us, and that's how the call

25  came about.

GBGPLIQ6                    Gielewski - Cross

1   Q.  Okay.  So you, Jim, James are having a meeting, there were

2   some questions that arose about the financing of LiquidX and

3   the tax treatment of that, and you said, I have a friend and I

4   will call PWC?

5   A.  Yes.

6   Q.  And your friend had some questions; is that correct?

7   A.  Yes.

8   Q.  Okay.  And this relates -- this is not just the financing

9   of LiquidX, this also relates to the foreclosure transaction;

10  is that correct?

11  A.  Correct.

12  Q.  Okay.  And she says:  Confirm our understanding of the

13  overall transaction, i.e. why they're moving assets out of old

14  co into new co?

15  A.  Yes, I see that.

16  Q.  And you discuss -- SG are your initials -- I know why, but

17  I don't know how much you want to put in writing?

18  A.  Yes.

19  Q.  Do you see that?

20  A.  Yes.

21  Q.  And I believe you said on direct that's because it was

22  complicated, and you didn't want to write out the whole thing

23  there; is that correct?

24  A.  Yes.

25  Q.  Aren't you talking to accounting experts, people from PWC

1    that they're going to know -- you say it's about the

2    foreclosure.  They're going to understand.  That's what they do

3    for a living.  Why did you think it would be over their heads;

4    it would be too complicated?

5                MR. LICKER:  Objection.

6                THE COURT:  Overruled.

7    A.  I didn't necessarily think that it was over their heads.  I

8    had already had a conversation with my friend, and based on how

9    she's worded question 2, it seems like there was some

10   misunderstanding.  So based on that, I didn't know whether it

11   was worth writing out paragraphs explaining the situation

12   again, or whether it would just be more time efficient to get

13   on a call and go through it in realtime and have them answer --

14   ask any questions that they need to, instead of like going back

15   and forth over e-mail.

16   Q.  Okay.  But that's not what it says here.  It says:  I know

17   why, but I don't know how much you want to put in writing.

18   You're talking to Mr. Kovacs, right?

19   A.  Yes.

20   Q.  Okay.  Was there a reason that you'd be concerned or you

21   would -- let me withdraw that.

22               Do you recall earlier we talked about the Gmail

23   communications and how everything had to go to Gmail if it was

24   LiquidX business?

25   A.  Well, not everything went to Gmail.

1    Q.  But that was the intention, to speak on Gmails if it was

2    about LiquidX.  And you were working at TRE for a month, and

3    there was an instruction to try to use your Gmail to talk about

4    LiquidX?

5    A.  That's fair to say.

6    Q.  Isn't this more of the same thing, that you're trying to

7    keep things out of writing?  It's just like using the Gmail

8    communications; isn't that right?

9               MR. LICKER:  Objection.

10              THE COURT:  Sustained.

11   Q.  Just to clarify what we were discussing earlier, the money

12   that moved from the Comerica accounts to the Chase account,

13   that was LiquidX money at the time it was moved, correct?

14   A.  If it happened after the foreclosure, then that would have

15   been assets that LiquidX was foreclosing on, yes.

16   Q.  And they let TRE keep it; is that correct?

17   A.  For the time being.

18   Q.  Okay.  Was it your understanding that that was to be used

19   to pay TRE's bills; is that correct?

20   A.  I believe so, yes.

21              MR. ABRAMS:  All right.  Thank you, Ms. Gielewski.

22   Pass the witness.

23              THE COURT:  Redirect?

24              MR. LICKER:  No redirect, your Honor.

25              THE COURT:  All right.  Ms. Gielewski, you're excused.

1    You may step down.

2              (Witness excused)

3              THE COURT:  Mr. Sullivan, would LiquidX call its next

4    witness.

5              MR. SULLIVAN:  We will.  We'll be doing a witness by

6    videotape, your Honor.

7              THE COURT:  All right.

8              MR. SULLIVAN:  We're just trying to figure out the

9    timing to make it work for the rest of the remainder.  We have

10   47 minutes, and I want to make sure that we have the tape that

11   doesn't go longer than that.

12             MR. LICKER:  We have a tape that's about 47 minutes;

13   so that would work perfect.

14             THE COURT:  Let's go.

15             MR. LICKER:  We're going to play the videotaped

16   deposition of Kimberly Russell, who is the representative of

17   Alvarez and Marsal, corporate representative.

18             THE COURT:  And just for the record, would you say

19   where the deposition was conducted and who were the examiner

20   and the defender.

21             MR. LICKER:  I'm sorry, I missed the second part.

22             THE COURT:  Who examined and defended the deponent.

23             MR. LICKER:  The deposition took place at Foley Hoag's

24   New York offices and myself, Michael Licker, took the

25   deposition, and the deposition was defended by Nicholas Cutaia

712

GBGPLIQ6                        "Russell"

1   for the witness and --

2           MR. ABRAMS:  Yes, I defended Kimberly Russell's

3   deposition.

4           THE COURT:  I presume the parties may already be aware

5   of this.  If not, I'm disclosing now that Nicholas Cutaia was a

6   former law clerk of mine some years back.  It will in no way

7   affect my ability to be impartial in this case.

8           MR. ABRAMS:  And, your Honor, just to clarify.  I

9   didn't defend.  I was cross-examining.  Mr. Licker called her.

10          THE COURT:  All right.  Fine.  Let's go.

11          MR. LICKER:  As you asked for the other day, I have a

12  cue of exhibits.

13          THE COURT:  Give that to the court reporter.

14          MR. LICKER:  Do you need one?

15          THE COURT:  And, Madam Court Reporter, you'll take

16  down the questions and answers, and they're going to give you a

17  key for the exhibits because the exhibits are some of the

18  numbering is different.  So you'll just substitute the exhibit

19  that you hear for the exhibits that's on the chart when you

20  draw it up.  Okay.

21          MR. LICKER:  We also have a video report printout.

22  Would that be helpful for you to follow?

23          THE COURT:  Sure, yes.  Roll the tape.  Let's get

24  started.  I have a 5:00 meeting.

25  EXAMINATION OF KIMBERLY RUSSELL:

GBGPLIQ6                      "Russell"

1   "Q.  What is your background?

2   "A.  I graduated from DePaul University with a Bachelor of

3   Science, specialty and focus, my major was in finance.  I also

4   have an MBA from New York University with a specialty focus in

5   finance and marketing, finance and marketing.

6   "Q.  What was your job title when you first arrived at Alvarez

7   and Marsal?

8   "A.  Managing director.

9   "Q.  Is that still your job title today?

10  "A.  That is still my job title today.

11  "Q.  What were your roles and responsibilities when you first

12  arrived at Alvarez Marsal?

13  "A.  I'm responsible for not only managing projects, overseeing

14  the work that's being done, but I'm also responsible for

15  generating business.

16  "Q.  Just to make this a little easier, I'm going to hand you

17  what we'll mark as Exhibit JX2, which is your -- a printout of

18  your biography from Alvarez and Marsal's website.  Can you

19  describe some of your experience related to the valuation of

20  intangible assets?

21  "A.  I valued intangible assets for -- over the years, for a

22  variety of purposes by financial reporting.  So when a company

23  acquires another company in a business combination, you need to

24  allocate the purchase price to the assets acquired.  In many

25  cases, it involves the identification and valuation of a

714

1     variety of intangible assets.

2              I've also valued intangible assets for tax reporting

3     purposes.  So if there is, you know, a transfer of a particular

4     basket of intellectual property, for -- again, for a variety of

5     reasons, I valued that.

6              There have also been instances where intellectual

7     property has been the source of a dispute, perhaps, between two

8     parties, and we have come in to provide an independent

9     valuation, you know, of those assets.

10    "Q.  Okay.  If you look at Page 2 of this printout, the second

11    paragraph that starts 'Ms. Russell has in-depth experience.'

12    If you go to the last line of that paragraph, it goes on to

13    describe that you have experience with valuing internally

14    developed software.  Can you describe some of that experience

15    specifically?

16    "A.  It would be in the same context that I had just shared.

17    So I have valued software, that it would -- either sold as a

18    service.  We have valued software that was packaged as a

19    product and sold.  I have also valued internally developed

20    software that was served as sort of a backbone for operations

21    of a company.

22    "Q.  Do you have experience with valuing the assets of

23    distressed companies, financially distressed companies?

24    "A.  Yes.

25    "Q.  Can you describe some of that experience?

1    "A.  Companies that were either going through a restructuring,

2    I have valued their assets.  Sometimes it was the crux of what

3    was being restructured.  Other times, there has been situations

4    where a company has been in bankruptcy and there was a

5    disagreement amongst the parties about what the value of the

6    assets of the company were, including its intangible assets,

7    and I have assisted in the valuation in that context.

8    "Q.  Okay.  Now, Alvarez and Marsal -- if I refer to Alvarez

9    and Marsal as A&M, is that okay?

10   "A.  Yes.

11   "Q.  A&M is a valuation firm, correct?  That's one of the

12   things it does?

13   "A.  It is one of the things it does.

14   "Q.  What are some of the other things that Alvarez and Marsal

15   does?

16   "A.  It's a global and professional services firm.  We have

17   over 2500 employees.  The firm's -- one of the firm's, I would

18   say, main focus is restructuring.  So the structuring practice

19   has a very long heritage.  Tony Alvarez and Bryan Marsal are

20   the two co-CEOs and founders of the business.  Both of them

21   have background in restructuring.

22          We also have a fairly large business consulting group.

23   We also provide services to private equity, including

24   performance improvement, transactional advisory, operational

25   due diligence.

GBGPLIQ6                          "Russell"

1                We also have a -- well, no, they changed their name.

2     We had, it was called global forensics and disputes.  I think

3     the group has changed its name to disputes and investigations,

4     but a group that assisted like forensic accounting and look at

5     economic analysis, where parties may have a disagreement about

6     a particular matter.

7     "Q.  Okay.  So its valuation work, is that a majority of your

8     work at Alvarez and Marsal?

9     "A.  It's all of my work.

10    "Q.  All of your work.  Okay.  So valuation work, is that a

11    majority of your work at Alvarez and Marsal?

12    "A.  It's all of my work.

13    "Q.  Do you recall when you first learned of the Receivables

14    Exchange or of the Receivable Exchange?

15    "A.  Yes.

16    "Q.  When was that?

17    "A.  That was in, I want to say, late October or early November

18    of 2015.

19    "Q.  Okay.  And how did the Receivables Exchange come to your

20    attention?

21    "A.  It came to my attention because I received a call from my

22    colleague, Keith Kushin at Alvarez and Marsal, and he had

23    spoken to me about this company.

24    "Q.  Okay.  Did TRE ultimately engage Alvarez and Marsal to

25    perform some kind of valuation?

GBGPLIQ6                          "Russell"

1    "A.  Yes.

2    "Q.  Were you involved in that project, in the valuation

3    project?

4    "A.  Yes.

5    "Q.  What was your involvement?

6    "A.  I was the managing director in charge of the project.

7    "Q.  Did you have an understanding of why TRE sought this

8    opinion from Alvarez and Marsal, sought the valuation?

9    "A.  I think that there was -- after we were engaged, I

10   understood that there was some concern because of the distress

11   the company was in, that they needed to have some documentation

12   that the buyer was at least paying -- at least paying fair

13   market value for the assets.

14   "Q.  Did everyone working on the project report to you,

15   ultimately?

16   "A.  Ultimately, yes.

17   "Q.  Okay.  And what was your role on the project?

18   "A.  Specifically, I was leading a lot of the calls that we had

19   with the -- with company management and its financial advisor.

20   I also was responsible for reviewing the analysis that Matt put

21   together, provided commentary, focusing on, you know, different

22   assumptions, maybe additional support that we needed, and then

23   ultimately helping to prepare, you know, the report.

24   "Q.  I hand you now what we have marked as Exhibit JX4, and

25   I'll warn you that the document is paper clipped together

1    because, as you'll see, there's an e-mail and an attachment to

2    the e-mail.  Just keep them together.

3              After you're done looking at it, if you can just let

4    me know if you recognize both the e-mail and the attachment to

5    the e-mail?

6    "A.  The e-mail generally looks familiar.  I would say I'm most

7    familiar with the preliminary information request list.

8    "Q.  Okay.  And that's the document that at the bottom right

9    corner, has the number TRE foreclosure 03916?

10   "A.  Yes.

11   "Q.  The next section is proprietary developed

12   technology/software; do you see that?

13   "A.  Yes.

14   "Q.  At this time, did you have an understanding that TRE had a

15   software platform that it used?

16   "A.  At that time -- at the outset of the engagement, I was

17   told that they had some proprietary software, yes.

18   "Q.  Okay.  And I think you had said earlier that valuing

19   software is something that you had experience with?

20   "A.  Yes.

21   "Q.  Are you able to give a rough estimate of how many times

22   you've had to do a valuation that involved software?  Rough?

23   "A.  I think it's probably hundreds.

24   "Q.  Hundreds?  Okay.  That's fair.  The -- under proprietary

25   developed technology/software, again, there is a whole host of

GBGPLIQ6                          "Russell"

1    questions, like more than ten questions here.  The --

2    generally, the information that you were trying to obtain here,

3    why was -- how would this be used in your valuation?

4    "A.  This information would help form some of the assumptions

5    that we used in order to value essentially the technology or,

6    in this case, it was in the form of software.

7    "Q.  Okay.  If you look at question 39 at the bottom of Page 3,

8    it says:  Provide the age of the existing technology/software

9    and discuss the product life cycle.

10             Why is that question -- why did you need to know the

11   answer to that question to perform the valuation?

12   "A.  We need to understand how current the technology is.  It

13   will make a difference in terms of the value, if the technology

14   is brand new, using current resources, current coding, current,

15   you know, base platforms, forms, or if it is old and outdated

16   and needs a fair amount of rework or rebuild.

17   "Q.  Okay.  During the valuation process, did you obtain

18   information about the age of TRE's software platform?

19   "A.  Yes.

20   "Q.  What did you learn about it?

21   "A.  We learned that it had a fairly long history.  It started

22   out -- the initial development started out in 2008.  The

23   development was really of a couple of different platforms, and

24   one was a corporate platform, another was -- they called it an

25   SME platform.  My understanding was that the -- a skeleton was

1    really formed.  They called it a skeleton operational platform

2    was developed for -- on the corporate side in about 2010.

3    "Q.  So you said that the software was initially developed in

4    2008?

5    "A.  Correct.

6    "Q.  Okay.  And this -- the work you were doing was in late

7    2015?

8    "A.  Correct.

9    "Q.  And we'll get to the specifics of this when we look at

10   some of the workpapers, but as a general matter, is the -- when

11   a software platform has aged or is not current, is that

12   something you have to take into account when valuing it?

13   "A.  Yes.

14   "Q.  How would you take the age of software into account?

15   "A.  It could be taken into consideration in a variety of ways.

16   I would say most often it is taken into consideration in the

17   form of a potential obsolescence adjustment to the software.

18   "Q.  Did you learn whether TRE had taken any steps toward

19   obtaining a new software platform?

20   "A.  Yes.

21   "Q.  Okay.  What did you learn about any steps that TRE had

22   taken?

23   "A.  I learned that they went out to two, I guess, independent

24   firms to actually receive some fee quotes on potentially

25   rebuilding, you know, the platform.

GBGPLIQ6                       "Russell"

1    "Q.  Okay.  Did you learn anything about those quotes?

2    "A.  There were two different providers, one was -- and again,

3    apologies if I'm mispronouncing the names but Synechron,

4    Synechron and iGATE were the two companies that had provided

5    some fee estimates to the management team about rebuilding the

6    platform.

7    "Q.  Okay.  During the course of this engagement, did you

8    review either of those quotes?

9    "A.  We did, yes.  Reviewed both.

10   "Q.  Did you review both of them?

11   "A.  Both.

12   "Q.  For purposes of this valuation, did Alvarez and Marsal

13   value TRE's current software?

14   "A.  We valued the current software.

15   "Q.  Okay.  So in order to do that, why was it necessary for

16   Alvarez and Marsal to look at estimates for rebuilding the

17   software?

18   "A.  Typically when we are valuing, again, software technology

19   that's used for business operations and not necessarily sold as

20   a product, we wanted to take into consideration not only what

21   the company's historical experience was, but if we learn that

22   perhaps the company was reviewing a rebuild or potentially

23   looking at upgrading its software, we want to understand what

24   potentially other parties, who are more entrenched in sort of

25   technology development, would have to say about the cost of

GBGPLIQ6                         "Russell"

1   rebuilding the software platform.

2   "Q.  Okay.

3   "A.  Or the technology, whatever the subject is.

4   "Q.  Did you have conversations with Mr. Walker regarding the

5   software?

6   "A.  Yes.

7   "Q.  What did you learn from those conversations?

8   "A.  I learned from Mr. Walker that -- and he was not -- he

9   told us initially he was not at the company at the time of the

10  very first initial build in 2008, but he came in, you know, a

11  few years later.  He was -- expressed concerns that the

12  technology that was being used was a little antiquated, that it

13  was not object oriented.  It required a lot of downtime and

14  manual intervention and that, from his perspective, having had

15  experience in the industry, that the software -- let me

16  clarify -- that the corporate platform and settlement engine

17  needed to work together and, unfortunately, because they were

18  built at totally different points in time, they did not work

19  together very well.  That's my layman's terms.

20  "Q.  Okay.  Mark this as Exhibit JX200.

21         Have you had a chance to review Exhibit JX200?

22  "A.  Yes.

23  "Q.  Do you recognize it?

24  "A.  Generally speaking, yes.

25  "Q.  Okay.  Now, I think you said that you recognize this as

1   the loan security agreement between the Receivables Exchange

2   and Comerica Bank?

3   "A.   Yes.

4   "Q.   Okay.  I think you said you saw it during the engagement.

5   Did you actually review it or read it?

6   "A.   During the engagement?

7   "Q.   During the engagement.

8   "A.   Yes.

9   "Q.   Ms. Russell, before we took a break you had testified, I

10  believe, that there was some initial confusion regarding what

11  assets of TRE were secured by the Comerica loan; is that

12  correct?

13  "A.   Yes.

14  "Q.   Okay.  Do you recall what that confusion was, or what

15  there was confusion about?

16  "A.   There was confusion in the definition of the collateral.

17  "Q.   Okay.  Was that confusion eventually resolved?

18  "A.   The confusion was eventually resolved in that I went back

19  to the company and requested clarification, what was their

20  understanding of the collateral.

21  "Q.   Who did you speak to at TRE about that?

22  "A.   James Kovacs.

23  "Q.   What did you learn regarding the collateral from

24  Mr. Kovacs?

25  "A.   I think that he was also -- he understood my question and

1    also understood the confusion and said that his interpretation

2    of, you know, intellectual property, you know, might be more

3    narrow.  I had a suggestion for him, a recommendation and --

4    that we proceeded on that basis.

5    "Q.  So was the -- you mentioned intellectual property.  Was

6    the intellectual property, was that the primary source of the

7    confusion regarding what was collateral under the loan?

8    "A.  That was the basket of intellectual property, was the

9    primary source of confusion, yes.

10   "Q.  Okay.  And how did you ultimately proceed for purposes of

11   valuation with the intellectual property?

12   "A.  We ultimately proceeded by valuing all of the intangible

13   assets that I thought were present in the business.  There was

14   confusion as to whether or not the scope of what was perhaps

15   collateralized by Comerica might be more narrow.  My

16   recommendation to the company was that we proceed and value all

17   of the intangible assets that would be subject to this

18   transaction.

19   "Q.  Is it possible that some of the assets that A&M valued for

20   purposes of this valuation were not collateral under the

21   Comerica loan?

22   "A.  Yes.

23   "Q.  Okay.  I'm going to hand you two documents marked

24   Exhibits JX11 and JX12.  Here's JX11.  Here's JX12.  Thank you.

25   "A.  Printing on the back.

GBGPLIQ6                         "Russell"

1    "Q.  What's that?  Yes, they're double sided, yes.  Start with

2    what's been marked as Exhibit JX11.  Do you recognize

3    Exhibit JX11?

4    "A.  Yes.

5    "Q.  What is it?

6    "A.  It is our opinion letter.

7    "Q.  Okay.  Is this the final draft of the opinion letter?

8    "A.  This is the final.

9    "Q.  Who wrote this letter?

10   "A.  I believe Keith Kushin, and Matt Combs drafted the letter,

11   and then I reviewed the letter, provided commentary, and I was

12   the one who actually issued the letter to Peter Sullivan.

13   "Q.  So you, as the team leader, were you ultimately

14   responsible for the content of the letter?

15   "A.  Yes.

16   "Q.  If you look -- actually, before we do that, let's just go

17   to Exhibit JX12 for a second.  Do you recognize this document?

18   "A.  Yes.

19   "Q.  What is this?

20   "A.  These are our workpapers that essentially support the

21   value conclusions that are included in Exhibit JX11.

22   "Q.  Okay.  And do you see in the -- I think this appears on

23   every page, the top right corner, it says:  Final?

24   "A.  Yes.

25   "Q.  What does that indicate?

GBGPLIQ6                          "Russell"

1   "A.   That these were our final opinions.

2   "Q.   Okay.  Let's turn back to Exhibit JX11.  Do you see that

3   the valuation date is a defined term in the first paragraph?

4   "A.   Correct.

5   "Q.   And what is the valuation date?

6   "A.   As of November 30th of 2015.

7   "Q.   Why is November 30th, 2015, the valuation date?

8   "A.   The company had requested that the value be performed as

9   of November 30th, 2015.

10  "Q.   Okay.  When you are performing a valuation of this type,

11  do you typically use whatever date the company wants the

12  value -- wants to use?

13  "A.   Typically there is a reason why they want the valuation as

14  of a particular date, but it is usually up to the client to

15  specify.  In order for us to perform our analysis, we need an

16  'as of' date.

17  "Q.   Okay.  Do you know why the company chose November 30th,

18  2015?

19  "A.   I believe that that's when they anticipated that the

20  transaction would occur between, you -- you know, with the

21  buyers, essentially.

22  "Q.   Sure.  Okay.  If you go to the paragraph right under the

23  proposed transaction:  It is our understanding that the

24  proposed transaction will involve the buyer paying

25  $3.25 million to Comerica for the credit facility payable, and

GBGPLIQ6                              "Russell"

1    as a result, the buyer will foreclose on certain assets of the

2    company.

3            Did you have any contact with the buyer during this

4    process?

5    "A.  We had no contact with the buyer.

6    "Q.  The buyer was LiquidX?

7    "A.  That's what I was told by Peter Sullivan, that the buyer

8    would be LiquidX, yes.

9    "Q.  Okay.  Do you know -- do you know, sitting here today,

10   what assets of the Receivables Exchange the buyer ultimately

11   foreclosed on?

12   "A.  I do not.

13   "Q.  So the buyer could have foreclosed on fewer or different

14   assets than what Alvarez and Marsal actually valued; you

15   wouldn't know that one way or the other?

16   "A.  I would not know.

17   "Q.  Okay.  If you go to the chart that's on the first page,

18   the very bottom, value of net assets, that's $1.988 million; is

19   that correct?

20   "A.  Yes.

21   "Q.  Let's look.  Turn back to Exhibit JX12, which I think you

22   said were the workpapers.  Were these -- do these papers

23   contain the information that underlies that final value of the

24   net assets number that you came up with?

25   "A.  Yes.

GBGPLIQ6                    "Russell"

1  "Q.  Okay.  Let's start on schedule I, cash held in custody,

2  the second item under assets.  What does that refer to?

3  "A.  I think that was cash that was essentially in transit, if

4  I recall correctly.  So essentially that was money that was due

5  to, you know, sellers.  It was just being held for a very short

6  period of time by the company.

7  "Q.  So customer money?

8  "A.  That's correct.

9  "Q.  That was owed back to the customers?

10 "A.  Which is why it was actually recorded separately from

11 their own cash.

12 "Q.  Okay.  What about prepaid expenses and other, what is

13 that?

14 "A.  You know, that would be like rent expense, insurance,

15 things of that nature.

16 "Q.  Okay.  Then, if you go to other assets, and then there's

17 just an item, other?

18 "A.  Mmm, hmm.

19 "Q.  It's valued at 615,000; is that correct?

20 "A.  Yes.

21 "Q.  Do you know what the 'other' refers to offhand?

22 "A.  No.  I recall that the -- the two largest amounts that

23 make up that 615,000, one was a deferred tax asset, and I think

24 the other was a deposit with a bill -- you know, deposit for

25 their lease.

GBGPLIQ6                         "Russell"

1    "Q.  If we turn now to the next page or the back of that page,

2    schedule II, what is shown on this schedule?

3    "A.  This is the replacement cost associated with the

4    proprietary software platform.

5    "Q.  Okay.  So at the very bottom of this page, there is a

6    number $290,000.  I know it's small.

7    "A.  You know, my copy has got a line right through it.  Is

8    that the number you are referring to?  See, I mean, I think we

9    can gather it's 290 --

10   "Q.  I might be able to help you anyway.  If you turn back to

11   the first page of this, schedule I, do you see under

12   technology --

13   "A.  Yes --

14   "Q.  -- 290,000?

15   "A.  The 290, which would have been linked to schedule II.

16   "Q.  Okay.  So that's -- the number that you came up with on

17   schedule II would have gone onto schedule I under technology?

18   "A.  Yes.

19   "Q.  Okay.  And you said that this is the replacement cost,

20   right?

21   "A.  Mmm, hmm.

22   "Q.  And at the top of this, do you see it says, on the top

23   left, it's the white writing in the black box, it says

24   technology valuation cost approach replacement cost, new

25   method?

1    "A.   Mmm, hmm.

2    "Q.   What does replacement cost mean?

3    "A.   Essentially, it's the cost to replace an asset of like

4    utility.

5    "Q.   Is that a valuation method?

6    "A.   Yes.

7    "Q.   Okay.  And is that the valuation method you used for

8    purposes of valuing the technology?

9    "A.   TRE's technology, yes.

10   "Q.   TRE's.  Okay.  Now, down the left side of the schedule, it

11   says RecX, which I'm assuming that refers to Receivables

12   Exchange?

13   "A.   Yes.

14   "Q.   REB analysis/TRE platform, what does that refer to?

15   "A.   That refers to management's analysis associated with

16   the -- what it would take to replace the technology new,

17   essentially.

18   "Q.   Okay.  And then if you go down to the next set of numbers,

19   it says:  Synechron analysis-TRE platform?

20   "A.   Mmm, hmm.

21   "Q.   What does that refer to?

22   "A.   That refers to one of the third-party developers that they

23   had, where they sought a quote concerning the efforts that it

24   would take and what the fee estimate would be associated with a

25   rebuild, you know, of the platform.  Okay.  Then, yes, that's

GBGPLIQ6                              "Russell"

1   correct.

2   "Q.   Okay.   And the number to the left of 1732, that's -- is

3   that 1,000 -- 1059?

4   "A.   Yes, it is.

5   "Q.   And what does that number refer to?

6   "A.   That was their low estimate.   So Synechron provided a high

7   and a low, a range, essentially.

8   "Q.   And is the 1731 their high estimate?

9   "A.   That was their high estimate, correct.

10  "Q.   And then the next line down Synechron estimated rebuilding

11  cost-TRE platform, and then there's a parens five, the number

12  is 1395; do you see that?

13  "A.   Mmm, hmm.

14  "Q.   What does that refer to?

15  "A.   Well, in footnote 5 we indicate estimated rebuilding cost

16  assumed to be the median of the high and low estimates for

17  Synechron.

18  "Q.   Okay.   And if you go down to -- there's iGATE estimate low

19  and iGATE estimate high; do you see that?

20  "A.   Yes.

21  "Q.   Then the next line down it says, average rebuilding

22  cost-TRE platform.   What does that number refer to?

23  "A.   That number would be the -- and I'm sorry, what -- again,

24  I have a line through it.

25  "Q.   Yeah, I apologize.

1    "A.   What number do you have?

2    "Q.   It's 1043.

3    "A.   43, okay.  So that would have represent -- represented

4    sort of a midpoint between our three estimates of costs to

5    rebuild.  So it would have been the management of TRE, their

6    estimate of rebuild, together with Synechron and iGATE.  So it

7    would have been an average.

8    "Q.   Okay.  And then continuing down, opportunity cost, and you

9    have here, time to replace the asset in weeks, 52; do you see

10   that?

11   "A.   Yes.

12   "Q.   What does that number refer to, 52 weeks?

13   "A.   The 52 weeks assumes the average time to rebuild the

14   platform.  Mike Walker -- sorry, Mike Walker had shared with us

15   that it would be, on average, about a year it would take to

16   rebuild the platform.

17   "Q.   And generally the category opportunity cost, what does

18   that -- what does that value refer to?

19   "A.   That value refers to, and we do have a footnote 6 on that.

20   So I will read it:  Opportunity cost assumes a one-year

21   development period over which an investor could invest capital

22   in another entity with similar risk profile.

23        So, in other words, what it means, in layman's terms,

24   is that as opposed to taking your time and capital and spending

25   a year to rebuild this platform, if I'm an investor in a

GBGPLIQ6                    "Russell"

1   similar -- and interested in a similar type asset, I could

2   deploy that capital elsewhere for a year and earn a return.

3            So there's an incremental amount of what I'm losing as

4   an investor by focusing on the rebuild of this technology.  It

5   would be all of the information I would take into consideration

6   as an investor.

7   "Q.  Okay.  And then you've got opportunity, and there may be a

8   line through this, but I can tell you the number is 313.

9   "A.  Yes.

10  "Q.  So what does that number actually represent?

11  "A.  So that represents the return over a 52-week period that

12  you're forego in order to focus on the rebuild of this

13  technology.

14  "Q.  Okay.  Then going down to the next line, total replacement

15  cost new prior to obsolescence, and you've got a number there,

16  which I can represent is 1356.

17  "A.  Mmm, hmm.

18  "Q.  Where is that number derived from?

19  "A.  That number is derived from the average rebuilding cost,

20  TRE platform, and plus the opportunity cost.

21  "Q.  Okay.  And then the next thing down is obsolescence

22  factor, what does that refer to?

23  "A.  We have a footnote on that, and it refers to -- I'll read

24  the footnote:  Obsolescence factor assumes a useful life of

25  seven years for the technology, of which only one and a half

GBGPLIQ6                          "Russell"

1   years remain, based on discussions with management.

2   "Q.   Okay.  So the -- you had conversations with TRE's

3   management about how much longer the software could be used

4   for?

5   "A.   Yes.  We had conversations with them concerning these

6   rebuild estimates, which were very clearly estimates, cost

7   estimates, associated with building a new platform --

8   "Q.   Yup.

9   "A.   -- utilizing current technology.  The difference is that

10  TRE's platform did not utilize current technology.  Therefore,

11  a buyer of this asset would not pay, you know, $1.3 million.

12  They would pay something less because what they were receiving

13  was an obsolete -- semi-obsolete piece of software.

14  "Q.   Okay.  And obsolescence factor is how you discounted the

15  value to take account of that?

16  "A.   To take into consideration, yes.

17  "Q.   Okay.  And then total cost to replace asset says 291?

18  "A.   Yes.

19  "Q.   Is that the total replacement cost new, less the

20  obsolescence factor; is that how that figure is derived?

21  "A.   Yes.

22  "Q.   And then indicated value technology rounded, it says 290;

23  so that's just a rounding?

24  "A.   Correct.

25  "Q.   Let me ask you.  Did Alvarez and Marsal form an opinion

735

1   and conclusion at the end of this engagement?

2   "A.  We did.

3   "Q.  What was that conclusion?

4   "A.  The conclusion, as it states on Page 5 of Exhibit JX11,

5   was that, based upon our analysis, it is our opinion, as of the

6   valuation date, that the amount paid by the buyer of 3.25

7   million for the credit facility payable constitutes at least

8   reasonably equivalent value for the net assets.

9   "Q.  Okay.  And I know this is not signed by -- individually,

10  correct?

11  "A.  No.

12  "Q.  The opinion?  It's signed by Alvarez and Marsal?

13  "A.  We issue opinions as a firm.

14  "Q.  But did you have to sign off or approve on this before

15  Alvarez Marsal's name would go on it?

16  "A.  I had to approve it, yes.

17  "Q.  Were you the final approval?

18  "A.  I was the final approval.

19  "Q.  Okay.  Before you signed this, did you believe that the --

20  that TRE and its management had provided you all the

21  information that you needed to perform this engagement?

22  "A.  I believe that they did, yes.

23  "Q.  And do you still hold that belief today?

24  "A.  Yes, I do.

25  "Q.  Okay.  And do you still stand behind this opinion, sitting

GBGPLIQ6                         "Russell"

1    here today?

2    "A.   Yes.

3    "Q.   The reasonable equivalent value opinion, is it typical for

4    the seller of the assets to get a reasonable equivalent

5    opinion?

6    "A.   I wouldn't say that.  It's not -- not that it's not

7    typical.  It's -- in most cases, a buyer typically gets -- in

8    most cases, the buyer gets the opinion, but opinions have been

9    provided to sellers before.

10   "Q.   But it's somewhat unusual for a seller to get a reasonable

11   equivalent value opinion?

12   "A.   I wouldn't say it's unusual.

13   "Q.   Based on your work on that opinion, did you have any

14   hesitation around the seller engaging A&M versus -- instead of

15   the buyer?

16   "A.   I consulted with outside counsel, and based on that

17   conversation, I did not have any hesitation moving forward.

18   "Q.   Did TRE engage a fairness opinion here?

19   "A.   No.

20   "Q.   And is there information that would only be in the custody

21   of management that's provided to you?

22   "A.   Yes, there is proprietary information that is provided and

23   only with -- in their custody.

24   "Q.   Okay.  So you need -- in a sense, for many aspects of your

25   opinion, you need to rely on what management represents to you;

GBGPLIQ6                         "Russell"

1   is that correct?

2   "A.  For several aspects of it, yes.

3   "Q.  Okay.  If I were to tell you that Mr. Toffey was also

4   working for LiquidX at the time he was providing information to

5   you, would that affect your opinion in any way if you found

6   that information out?

7   "A.  It does not factor into my conclusion of the fair market

8   value of the assets.

9   "Q.  If an employee was working on both sides of the

10  transaction, the seller and buyer, couldn't that affect what

11  representations they are making to you?

12  "A.  Potentially.

13  "Q.  Okay.  Have you ever had a valuation where you knew of

14  employees working for the seller and the buyer?

15  "A.  I don't recall.

16  "Q.  Okay.  Would that be unusual to you?

17  "A.  It's not unheard of.  I just -- I just can't recall, to be

18  honest with you.

19  "Q.  Okay.  Did you ever see an agreement between LiquidX and

20  Comerica for the purchase of this loan?

21  "A.  No.  I don't recall seeing one.

22  "Q.  Do you recall asking for that agreement?

23  "A.  I don't recall.

24  "Q.  Have you ever dealt with a foreclosure like this, private

25  foreclosure?

1    "A.  A private foreclosure, no.

2    "Q.  Okay.  So this is your first private foreclosure

3    valuation -- sorry.  Let me rephrase.  That's a bad question.

4    This is your first valuation associated with a private

5    foreclosure?

6    "A.  It's my first, yes.

7    "Q.  Do you recall any discussions with management about what

8    would occur with the company post-foreclosure?

9    "A.  You know, maybe one comment about that the -- after the

10   assets were transferred, that the buyer would then attempt to

11   operate, use those assets in a business going forward.

12   "Q.  Okay.  And did that factor into your analysis at all, that

13   understanding that the business would be resumed -- be resumed

14   by the buyer?

15   "A.  I wouldn't use the word 'resume.'  My understanding was

16   they were basically going to buy some assets that were

17   non-operational at the time and attempt to improve -- put into

18   the business some additional capital in order to be able to

19   operate it going forward.

20   "Q.  Did that understanding impact your analysis in any way?

21   "A.  It was general information I considered.

22   "Q.  Do you remember any assumptions here that you couldn't

23   verify, other than what management represented to you?  Does

24   anything come to mind?

25   "A.  For example, two examples.  Probabilities associated with

GBGPLIQ6                              "Russell"

1   the likelihood of continuity of work force.

2   "Q.  Yeah.

3   "A.  Probabilities associated with the likelihood of continuity

4   of customers.

5   "Q.  Yes.

6   "A.  We did not talk to every customer, nor did we talk to

7   every employee to be ability to verify what those probabilities

8   were that were provided by management.

9   "Q.  Did anyone -- did you or anyone in your team actually test

10  the software yourself?

11  "A.  No, we're not technology experts.

12  "Q.  Okay.  Did anyone look at the source codes?

13  "A.  No.

14  "Q.  Did anyone -- did you go to any third-party software

15  expert regarding this technology?

16  "A.  Did we engage --

17  "Q.  Engage?

18  "A.  -- a third party?  No.

19  "Q.  Okay.  Did anyone at TRE ever convey to you that they

20  internally valued the company at 18 million?  Was that

21  something that was ever discussed with you?

22  "A.  It was never discussed with me, no.

23  "Q.  Okay.  Were you aware of that?

24  "A.  I became aware of that, based on materials that they had

25  provided us.

GBGPLIQ6                         "Russell"

1   "Q.  Okay.  And can you explain that, what materials made you

2   aware of that fact?

3   "A.  There was a valuation done, and I apologize, I know I'm

4   probably going to misstate the name, White Hawk, I want to say.

5   There was a valuation firm that did an analysis of the --

6   provided a value conclusion of the company's equity,

7   essentially for stock compensation purposes.

8   "Q.  Mmm, hmm.  Okay.

9   "A.  And I believe there was an $18 million value in one of the

10  valuations.  They did a few.

11  "Q.  Okay.  You say you saw White Hawk paper that discussed an

12  $18 million valuation?

13  "A.  Correct.

14  "Q.  How did that factor into your analysis, or why was their

15  valuation higher than what you guys arrived at?

16  "A.  Well, it was done as of a completely different date in

17  2014.

18  "Q.  Okay.

19  "A.  So the value can absolutely change over a period of time,

20  and in this company's case, it did.

21  "Q.  And do you have an understanding of what caused the value

22  to decrease in this company?

23  "A.  That's a little hard to answer because --

24  "Q.  Okay.

25  "A.  -- I don't know exactly what information was provided to

GBGPLIQ6                         "Russell"

1    White Hawk at the time.  I also, in looking at the report,

2    disagreed with some of their assumptions; so I didn't view it

3    as a very relevant report.

4    "Q.  What about here, when you saw that White Hawk; do you

5    think it was unusual that you guys came in at 2 million?

6    "A.  Again, I didn't agree with the premise of the 18 million;

7    so I don't have a comment about that.  You can put any number

8    up you want.  It doesn't matter in terms of, you know, value

9    degradation.  It matters on the facts and circumstances that

10   are specific at the time of the valuation.

11   "Q.  You say you didn't agree with the premise of the White

12   Hawk valuation.  Do you recall specifically what you disagreed

13   with?

14   "A.  I recall that they used a couple different methods to come

15   up with the value, and in particular, one that stood out in my

16   mind is that they used a multiples of companies that I thought

17   were extremely dissimilar to the Receivables Exchange.  They

18   used multiples from like the NASDAQ and Chicago Board of Trade,

19   and without applying any adjustments, took those multiples and

20   applied it to the company's revenue with no thought about the

21   profitability of the company at the time.

22   "Q.  Did Mr. Toffey ever represent to you in any way that he

23   was hoping for a, quote, low valuation?

24   "A.  He had -- yes, he had expressed interest -- he expressed

25   interest in having a low value, yes.

```
 1   "Q.  And did he explain why he was looking for a low value?
 2   "A.  Yes.
 3   "Q.  And what did he state?
 4   "A.  He stated that if the value were too high, then the buyer
 5   wouldn't be interested in buying these assets and that he was
 6   trying to save jobs, and people would lose their jobs if we
 7   didn't come up with a -- if our value wasn't low enough for the
 8   buyer.
 9   "Q.  Did that statement by him affect your analysis in any way?
10   "A.  It made me dig harder for more assets is what it did.  It
11   had the opposite effect, I think, of what he was intending.
12   "Q.  Okay.  So what about that would cause you to dig -- well,
13   let me step back.  What does dig harder for more assets mean?
14   "A.  I had become concerned when a client is trying to exert
15   that kind of influence at the beginning of an engagement; so I
16   want to make sure that I follow the appropriate course, and I
17   value all the assets that I feel that need to be, you know,
18   included.
19   "Q.  Okay.  Would a statement like that make you sort of divert
20   your questions from Mr. Toffey, that you would rely on other
21   TRE employees for relevant information?  Is that fair?
22   "A.  I wouldn't say divert, no.
23   "Q.  Okay.
24   "A.  I would say we needed to get on the same page and clarify
25   what the purpose of our assignment was.
```

743

1   "Q.  Have you ever had a seller before convey to you that they

2   were looking for a low valuation?

3   "A.  Sure.

4   "Q.  Sure?  And what are some reasons that occurs?

5   "A.  There's a variety of reasons that can occur.

6   "Q.  Anything similar to what Mr. Toffey conveyed to you?

7   "A.  I think there has been instances of it.  It is not unusual

8   for a client to share, you know, concerns and perspectives.

9   "Q.  Okay.

10  "A.  It is our job to make sure that we do the valuation

11  properly and appropriately.

12  "Q.  Did Mr. Kovacs ever express something similar, that he was

13  looking for a low valuation?

14  "A.  Mr. Kovacs expressed the opposite.

15  "Q.  He did?  Okay.  And do you recall exactly the substance of

16  the conversation or --

17  "A.  Mr. Kovacs communicated to us that Jim was nervous about

18  the transaction, but that he understood our line of questioning

19  and our rationale behind looking at all of the assets, and it

20  was his job to make sure that we got the information we needed

21  to value all of the assets that we felt were appropriate.

22  "Q.  Okay.  So if I understand you correctly, Mr. Kovacs was

23  sort of saying we need to let A&M do their job?

24  "A.  Correct.

25  "Q.  We want to ensure they're doing it independently?

GBGPLIQ6                        "Russell"

1   "A.   Correct.

2   "Q.   But you had the sense that Mr. Toffey was not doing that;

3   is that fair?

4   "A.   No, no.

5   "Q.   Okay.

6   "A.   That's not fair.

7   "Q.   Okay.  Was there ever a time that you felt that Mr. Toffey

8   wasn't being -- wasn't disclosing something relevant to you or

9   material to you?

10  "A.   No.

11  "Q.   All right.  Mr. Abrams asked you about whether you have

12  private foreclosure experience; do you recall that?

13  "A.   Yes.

14  "Q.   Other than knowing that a foreclosure was involved here,

15  do you know any other details about how that foreclosure was

16  consummated?

17  "A.   No.

18  "Q.   Do you recall being asked some questions about whether

19  Alvarez and Marsal independently tested the technology, TRE's

20  technology, or looked at the source code or consulted with an

21  expert?

22  "A.   Yes.

23  "Q.   And you said that Alvarez and Marsal didn't test the

24  technology or look at the source code; is that right?  Okay.

25  And in an engagement like this, is that -- are those steps that

GBGPLIQ6                              "Russell"

1   Alvarez and Marsal would typically take?

2   "A.  No.

3   "Q.  You were asked some questions about assumptions that the

4   Alvarez and Marsal team made based on information provided by

5   management, right?

6   "A.  Yes.

7   "Q.  If management told you something that didn't make sense,

8   would you ask a follow-up question about it?

9   "A.  Yes.

10  "Q.  Would you accept what they told you at face value if it

11  didn't make sense?

12  "A.  No.

13  "Q.  Are you familiar with the concept or the phrase pre-money

14  valuation?

15  "A.  I'm familiar with the concept, yes.

16  "Q.  Do you have an understanding of what that means?

17  "A.  Yes.

18  "Q.  What's your understanding?

19  "A.  In general, that's -- it's typically the value of a

20  company prior to, let's say, a capital raise.

21  "Q.  Okay.  Is that a different type of valuation than the type

22  of valuation that Alvarez and Marsal performed here?

23  "A.  Yes.

24  "Q.  And would you expect a -- from those two different types

25  of valuations, would it surprise you if there were two

GBGPLIQ6                         "Russell"

1   different numbers at the end of the process?

2   "A.  It wouldn't surprise me, no.  They oftentimes are not

3   exactly the same.

4   "Q.  Okay.  You said that -- after Mr. Toffey made the comment

5   to you about valuing the assets, that it was important to get

6   on the same page with him; do you recall that?

7   "A.  Mmm, hmm.

8   "Q.  Did you -- did you get on the same page with him at some

9   point after he made those comments?

10  "A.  I -- at that point, after he said that to us on a call, I

11  did have pause.  I was uncomfortable, and I actually called

12  Keith Kushin, who at that time -- because this was very early

13  on, this is one of the first conversations that we had; so it

14  was one of my first interactions with Jim Toffey.  I became

15  uncomfortable.  I contacted Keith Kushin, who was our main

16  contact up to that point in the engagement, told him I was

17  uncomfortable, and that he needed to go back to -- I believe

18  his -- most of his communications was with James Kovacs, and

19  let him know that we were going to do our job the way -- in a

20  proper and appropriate way, and if the company was concerned

21  about that at all, at this point in time, that we could step

22  away from the engagement.

23  "Q.  Okay.  And so that was at the beginning of the engagement

24  that all happened?

25  "A.  It was at the very beginning, yes.

1   "Q.  And after that happened, did you have -- did it seem that

2   TRE had gotten the message that you had conveyed?

3   "A.  It seemed that TRE had gotten the message, and I know that

4   because James Kovacs communicated the information that I had

5   previously shared.

6   "Q.  Okay.  And after that point, did you have any concerns

7   about the accuracy or completeness of information that was

8   provided to you by anyone at the company?

9   "A.  No.

10  "Q.  And did whatever comments Mr. Toffey made, did they have

11  any effect on the work that Alvarez and Marsal performed, other

12  than what you've already described?

13  "A.  Other than what I've already described?  No.

14  "Q.  So you -- are you -- even in light of those comments, are

15  you fully comfortable with Alvarez and Marsal's final report?

16  "A.  Yes.

17  "Q.  Would you change anything about Alvarez and Marsal's final

18  report?

19  "A.  No.

20  "Q.  Okay."

21         MR. LICKER:  May I just move a couple of exhibits into

22  evidence --

23         THE COURT:  Yes.

24         MR. LICKER:  -- based on that video?

25         THE COURT:  Thank you.

GBGPLIQ6                         "Russell"

1              MR. LICKER:  I'd like to move JX2, 4, 200, 11 and 12

2    into evidence.

3              THE COURT:  Any objection?

4              MR. ABRAMS:  No objection.

5              THE COURT:  All right.  JX2, 4, 11, 12 and 200 are

6    received in evidence.

7              (Joint Exhibits 2, 4, 11, 12 and 200 received in

8    evidence).

9              THE COURT:  All right.  We're going to suspend for

10   this evening.  I'm concerned about the pace of the case.  I

11   don't think we're going to be finishing tomorrow, and I want to

12   conclude the matter; so I think you should be prepared to

13   finish up on Friday.  I'm trying to clear my schedule.

14   Tomorrow I have a couple of conferences, and I have two

15   sentencings that will be relatively brief at 2:30 and 3:30.  So

16   they're going to be some interruptions in the trial.

17             Once again, I'll do my best to start at 9:45 tomorrow

18   and we can take an abbreviated lunch tomorrow.  For the first

19   day of the week, there are no meetings that I have to attend;

20   so plan on a shorter lunch.  Yes

21             MR. RHYNHART:  Your Honor, is it not a possibility

22   that we might stipulate to allow the viewing of videos in

23   chambers at an hour that's easier for you, or anything like

24   that?

25             THE COURT:  I don't -- I don't take homework

GBGPLIQ6                         "Russell"

1    assignments.

2              MR. RHYNHART:  Okay.

3              THE COURT:  Okay?  For a trial.  And we can work later

4    tomorrow.  I'll speak to the court reporters.  We'll see what

5    we can do.  I certainly try to do my best this week, and

6    it's -- on Monday you were telling me you could do this in

7    three days.  More than three days have now passed because I've

8    added time on each day to the trial day to accommodate you, and

9    I don't want to bring you back at another time.  You're all

10   here, your gear is here, we're going to get this case finished.

11   All right?  Anything else?

12             MR. RHYNHART:  Thank you, your Honor.

13             MR. LICKER:  Can we -- there's nothing in the morning?

14             THE COURT:  You can leave all your stuff here.  All

15   right?

16             MR. LICKER:  Thank you.

17             THE COURT:  We'll start at 9:45, maybe even try to

18   start a little bit earlier, but I've got other things going.

19             MR. SULLIVAN:  Your Honor, one thing.  In connection

20   with the examination of Mr. VandenBol, I plan to use JX325

21   through JX336 as part of that examination, and we saw in the

22   pretrial order there's an objection to our using that on the

23   basis of the attorney-client privilege and on the basis, I

24   think, of relevance.  Can we be heard on that tomorrow morning

25   before we start.

GBGPLIQ6                          "Russell"

1          THE COURT:  Sure.  And you could send me, if you'd

2  like -- why don't you send me a very short letter overnight.

3  Okay?  So that I can look at it when I get in tomorrow or

4  tonight before we take the issues up.

5          MR. SULLIVAN:  Thank you.

6          THE COURT:  All right.

7          MR. RHYNHART:  Actually file the letter, your Honor?

8          THE COURT:  Yes, file.

9          MR. SULLIVAN:  I think I'd like to just deliver it to

10  chambers first thing in the morning because it's going to have

11  attorney-client privileged documents, or there may be

12  references to them and I don't want to file them on ECF.

13          THE COURT:  All right.  You'll send them by e-mail to

14  my clerk.  You'll get the appropriate e-mail address, and he'll

15  circulate them without putting it on the docket, and then we'll

16  take it up.

17          MR. RHYNHART:  Your Honor, I think, for our position,

18  I don't know if we need to file any privileged documents.  We'd

19  be just as happy to file it online, if that was better.

20  Whatever works.

21          THE COURT:  It's fine.  Why don't you just send yours

22  by e-mail as well, and then we'll docket them in order so that

23  there won't be a response to something before the docket sees

24  what is being responded to.  All right?  Have a good evening.

25          MR. RHYNHART:  Thank you, your Honor.

GBGPLIQ6                          "Russell"

1            MR. SULLIVAN:  Thank you.

2            (Adjourned to November 17, 2016, at 9:45 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION
 2     Examination of:                        Page
 3     JAMES D. KOVACS
 4     Direct By Mr. Sullivan . . . . . . . . . . . 505
 5     Cross By Mr. Rhynhart  . . . . . . . . . . . 538
 6     Redirect By Mr. Sullivan . . . . . . . . . . 625
 7     SOPHIA GIELEWSKI
 8     Direct By Mr. Licker . . . . . . . . . . . . 627
 9     Cross By Mr. Abrams  . . . . . . . . . . . . 677
10                       JOINT EXHIBITS
11     Exhibit No.                          Received
12      87                                  508
13      88                                  509
14      54                                  511
15      24                                  511
16      61                                  514
17      58                                  514
18      53                                  523
19      49                                  524
20      50                                  525
21      51                                  525
22      52                                  527
23      35                                  528
24      267                                 558
25      236                                 562
```

```
 1                          JOINT EXHIBITS

 2     Exhibit No.                              Received

 3      189                                      569

 4      273                                      575

 5      224                                      578

 6      290                                      584

 7      157                                      586

 8      284                                      591

 9      278                                      607

10      193                                      607

11      282                                      611

12      306                                      612

13      220                                      614

14      285                                      616

15      286                                      617

16      283                                      618

17      273                                      623

18      110                                      625

19      47                                       631

20      48                                       632

21      58                                       632

22      91                                       633

23      227                                      639

24      235                                      641

25      13                                       643
```

754

```
 1                        JOINT EXHIBITS

 2    Exhibit No.                              Received

 3     27                                      648

 4     28                                      649

 5     77                                      652

 6     26                                      653

 7     32                                      658

 8     244                                     659

 9     78                                      660

10     79                                      661

11     36                                      673

12   s 80 and 85                               673

13     37                                      677

14     238                                     702

15     2, 4, 11, 12 and 200                    748

16

17

18

19

20

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300