UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LIQUIDX, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )        Civil Action No. 16-cv-5528-WHP |
| | ) |
| BROOKLAWN CAPITAL, LLC, | ) |
| BROOKLAWN CAPITAL FUND, LLC, and | ) |
| BROOKLAWN CAPITAL FUND II, LP | ) |
| | ) |
| Defendants. | ) |
| | ) |

**LIQUIDX, INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## <u>TABLE OF CONTENTS</u>

I. FINDINGS OF FACT ...................................................................................................4

    A. The Parties .........................................................................................................4

    B. TRE's Financial Condition and Need to Raise Financing ...................................5

        1. John Connolly Joins TRE's Board in 2013 ...............................................6

        2. TRE's Board Releases Management and Obtains New Financing ............6

        3. TRE Solicits, But Fails to Find, Additional Needed Capital .....................7

    C. Gary Mueller Expresses Interest in Investing in TRE ..........................................8

        1. Mueller Provides a Term Sheet .................................................................9

        2. Mueller Conducts Initial Diligence on TRE ..............................................9

    D. The Solaia Arbitration Award .............................................................................11

    E. Mueller Proposes an Alternative Transaction with Comerica, and TRE's Board Explores Alternatives to Avoid a Foreclosure ....................................................13

        1. Mueller Remains Interested in Components of TRE's Exchange Business .................................................................................................................13

        2. TRE's Board Considers Alternatives to Avoid a Default.........................13

        3. TRE's Board and Management Remained in Contact with Comerica......15

        4. Comerica Warns of a Default ..................................................................17

        5. Mueller Moves Toward a Transaction with Comerica.............................17

        6. Mueller Forms LiquidX ...........................................................................19

        7. Mueller Obtains TRE Board Approval.....................................................21

    F. LiquidX Paid More Than Equivalent Value for TRE's Assets ............................23

    G. LiquidX Begins Preparations to Acquire TRE's Assets .....................................26

    H. LiquidX Forecloses on Substantially All of TRE's Assets .................................28

    I. LiquidX Provides Back Office Support to TRE Under the Transition Services Agreement .........................................................................................................31

i

J.    LiquidX's Business in 2016 is Different Than TRE's ..........................................34

II.    CONCLUSIONS OF LAW .....................................................................................36

A.    LiquidX Is Not the Alter Ego of TRE..............................................................36

1.    LiquidX Did Not Use the Corporate Form to Perpetrate any Fraud or Injustice Against Brooklawn..................................................................38

2.    LiquidX Does Not Dominate or Control TRE .........................................42

B.    LiquidX and TRE Are Not a Single Business Enterprise ....................................47

<u>TABLE OF AUTHORITIES</u>

**Case Law**

*Aker Sols., Inc. v. Shamrock Energy Sols.,*
2016 U.S. Dist. LEXIS 116342 (E.D. La. Aug. 30, 2016)........................................................37

*Albert v. Alex. Brown Mgmt. Servs.,* 2005 Del. Ch. LEXIS 133 (Del. Ch. Aug. 26, 2005)....42, 47

*Amaysing Techs. Corp. v. CyberAir Communs.,*
2005 Del. Ch. LEXIS 35 (Del. Ch. Mar. 3, 2005).....................................................................36

*Andrus v. Scully's Metal Fabrication, Inc.*, 352 B.R. 783, 786 (Bankr. W.D. La. 2006) ............48

*Base Optics Inc. v. Yaping Liu,*
No. 9803-VCG, 2015 Del. Ch. LEXIS 155 (Del. Ch. May 29, 2015).........................................36

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan ("Bridas II),* 447 F.3d 411 (5th Cir. 2011)........41, 42

*Brown v. Automotive Casualty Ins. Co.*, 644 So.2d 723 (La. App. 1 Cir. 1994) .........................48

*Capmark Fin. Group Inc. v. Goldman Sachs Credit L.P.,*
491 B.R. 335 (S.D.N.Y 2013) ........................................................................ 36, 38, 47

*C. R. Bard Inc. v. Guidant Corp.,* 997 F. Supp. 556 (D. Del. 1998) ...........................................46

*D. Klein & Son, Inc. v. Good Decision, Inc.,* 147 F. Appx. 195 (2d Cir. 2005)...........................43

*Dickson Marine Inc. v. Panalpina, Inc.,* 179 F3d 331 (5th Cir. 1999) ........................................43

*EBG Holdings LLC v. Vredezicht's Gravehage,*
109 B.V., 2008 Del. Ch. LEXIS 127 (Del. Ch. Sep. 2, 2008)....................................................44

*eCOMMERCE Indus. v. MWA Intelligence, Inc.,*
No. 7471-VCP, 2013 Del. Ch. LEXIS 245 (Del. Ch. Sep. 30, 2013) ...................................37, 38

*Edgewater Growth Capital Partners LP v. H.I.G. Capital, Inc.,* 68 A.3d 197 (Del. Ch. 2013)...45

*Gartner v. Snyder,* 607 F.2d 582 (2d Cir. 1979)........................................................................43

*Grayson v. R.B. Ammon & Assocs.*, 778 So. 2d 1 (La. App. 1 Cir. 2000) ..................................46

*Green v. Champion Ins. Co.,* 577 So. 2d 249 (La. Ct. App. 1991)..............................................48

*Harco Nal'l Ins. Co., v. Green Farms, Inc.,*
Civil Action No. 1131, 1989 Del. Ch.  LEXIS 114 (Del. Ch. Sep. 19, 1989) ............................36

*Hart Holding Co. v. Drexel Burnham Lambert, Inc.,*
1992 Del. Ch. LEXIS 112 (Del. Ch. May 28, 1992) .................................................................42

*Lee v. Clinical Research Ctr. Of Fla., L.C.,* 889 So. 2d 317 (La. App. 4 Cir. 2004) ............ 48, 50

*Mason v. Network of Wilmington, Inc.*, 2005 Del. Ch. LEXIS 99 (Del. Ch. July 1, 2005) ......... 47

*Midland Interiors, Inc. v. Burleigh*, 2006 Del. Ch. LEXIS 220 (Del. Ch. Dec. 19, 2006)..........38

*Mobil Oil Corp. v. Linear Films, Inc.,* 718 F. Supp. 260 (D. Del. 1989)............................... 36, 37

*NetJets Aviation, Inc. v. LHC Communs., LLC*, 537 F.3d 168, 173-74 (2d Cir. 2008) ..............38

*Ogea v. Merritt,* 130 So. 3d 888 (La. 2013) ...........................................................................36

*Outokumpu Eng'g Enters., Inc. v. Kvaerner Enviropwer, Inc.,* 685 A.2d 724 (Del. 1996)..........38

*Pauley Petroleum, Inc., v. Cont'l Oil Co.,* 239 A.2d 629 (Del. 1968).........................................44

*Peoples State Bank v. GE Capital Corp.*, 482 F.3d 319 (5th Cir. 2007) ....................................49

*Phoenix Canada Oil Co. v. Texaco, Inc.,* 842 F.2d 1466 (3d Cir. 1988)....................................42

*Riggins v. Dixie Shoring Co.,* 590 So. 2d 1164 (La. 1991)................................................... 37, 44

*Sapic v. Gov't of Turkmenistan ("Bridas I"),* 345 F.3d 347 (5th Cir. Tex. 2003) ......................38

*Sun Forest Corp. v. Shvili,* 152 F. Supp. 2d 367 (S.D.N.Y. 2001)..............................................40

*Trevino v. Merscrop, Inc.,* 583 F. Supp. 2d 521 (D. Del. 2008)..................................................42

*Wallace v. Wood,* 752 A.2d 1175 (Del. Ch. 1999) ......................................................... 37, 38, 42

**Statutes and Rules**

Cal. Com. Code § 1301 ............................................................................................................40

Cal. Com. Code § 9620-22 .......................................................................................................40

N.Y. U.C.C. Law § 1-301..........................................................................................................40

N.Y. U.C.C. Law § 9-620-23 ....................................................................................................40

**Other**

1 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations,
§ 41.33 (2002)...........................................................................................................................45

The only issue for determination by the Court at this time is whether LiquidX, Inc. ("LiquidX") is the alter ego of The Receivables Exchange, LLC ("TRE"). It is not. To obtain this extraordinary remedy, Brooklawn must prove two essential elements: (1) LiquidX exercised "complete domination and control" of TRE; and (2) that the control was used to perpetrate a fraud or injustice that injured Brooklawn. It proved neither. In fact, none of the hallmarks of alter ego is present:

- LiquidX and TRE do not share common owners or a common parent, nor are they controlled by the same entity;

- there has been no improper transfer of assets from TRE to LiquidX, or any attempt by LiquidX to bleed TRE to avoid a judgment;

- there has been no fraud or injustice, particularly as to Brooklawn; and

- there has been no disregard of corporate form.

The absence of common ownership should end the inquiry. This is the *sine qua non* of alter ego. Nearly every reported case, including Brooklawn's "flagship" alter ego case, requires it. In fact, no court in a reported case has ever pierced the corporate veil in a situation like this, where there is no showing of fraud, an acquirer paid fair value for another entity's assets, and there is no common ownership or control of the entities. Courts require such a showing because the corporate form is to be respected except in the most extraordinary circumstances. Applying alter ego to these facts would stretch the doctrine beyond recognition.

The evidence showed that TRE and LiquidX have no ownership overlap; none of the shareholders of TRE is or has ever been an investor in LiquidX. It also showed that there was no fraud and Brooklawn suffered no harm. The complained-of transactions — LiquidX's purchase of Comerica Bank's ("Comerica") fully-secured loan and subsequent partial strict foreclosure —

were initiated by a third party, Gary Mueller, in exchange for fair value as established by an independent valuation consultant and confirmed by LiquidX's expert witness on valuation. Brooklawn asserted in the parties' pre-trial filing that the valuation was "irrelevant," and then offered no evidence of the value of the collateral to contradict the valuations in the record. It is also undisputed that the foreclosure was unanimously approved by TRE's Board of Directors, who Brooklawn concedes were independent and disinterested, and by TRE's four largest shareholders after they concluded that there was no practical alternative available to TRE.

Remarkably, Brooklawn complains about a transaction that did not impair its status as a potential creditor of TRE. If anything, the transaction improved Brooklawn's position. The evidence confirmed that Brooklawn stands in the same, if not better, place than it would have if Comerica foreclosed on the loan or if TRE declared bankruptcy. Brooklawn's fanciful claim that some yet-unnamed white knight would swoop in to save TRE after news of the Solaia award was flatly disproved. To the contrary, the evidence showed that TRE had no viable path forward other than through Mueller. Mueller's proposed transaction provided TRE the opportunity to engage in an orderly wind-down, including the ability to maintain the insurance policies that were specifically left in place to address Brooklawn's claims. To this day, Brooklawn has not proven that the available insurance would not cover its claim, or that there would be insufficient resources available to satisfy any award it might obtain – yet another reason why application of the alter ego doctrine would be inappropriate.

The hearings also confirmed that TRE and LiquidX have always been separate companies, with separate management structures and owners, and that LiquidX does not "dominate" or "control" TRE. While there were interactions between the two companies, those can be attributed to two circumstances. First, LiquidX sought, and obtained, TRE's permission

to offer employment to TRE employees while TRE wound down its business.  Those soon-to-be LiquidX employees performed preparatory work for LiquidX in late 2015 while also assisting TRE in wind-down activities.  Second, LiquidX and TRE entered a Transition Services Agreement, by which LiquidX employees would provide services to the independent TRE Chief Restructuring Officer, Peter Sullivan, in "back office" activities to enable him to wind down TRE in an orderly fashion.  None of the employees' activities in preparing for the creation of LiquidX, or providing back office services on behalf of TRE, demonstrates a disregard of corporate form.  Indeed, entry into a transition services agreement is a regular feature of corporate merger and acquisition activities when the seller is winding down, precisely to preserve as much value as possible for creditors.

The issue before the Court is whether to permit Brooklawn to drag LiquidX into an arbitration concerning issues in which it had no role when LiquidX never signed an agreement with Brooklawn to arbitrate.  The only way Brooklawn can achieve this novel and extreme action is to establish that LiquidX is TRE's alter ego.  Yet, Brooklawn's presentation at trial was devoted to issues that are irrelevant to its alter ego claim.  For example, it focused on clerical mistakes made by TRE and its attorneys, and spent most of its examination time fabricating an alleged breach of fiduciary duty by John Connolly and Jim Toffey, a baseless allegation that in any case is part of Brooklawn's stayed counterclaim.  These alleged facts have absolutely nothing to do with LiquidX's activities or with establishing an alter ego claim.  In any event, as with its prior allegations, Brooklawn failed to provide any evidence of fraud or injustice, or any harm to Brooklawn.  There was nothing fraudulent or unjust in the TRE board members' dealings with each other, or in LiquidX's dealings with TRE.  At the end of the day, these

negotiations led to a benefit to both parties — a disposition of assets in an orderly form for TRE, and a quicker entry into the market for LiquidX.

The trial was more notable for all of the allegations that Brooklawn made, but utterly failed to support.  For example, Brooklawn alleged that TRE forced a default of its own loan. This was shown to be false.  It alleged that TRE canceled its own investment round, also false.  It alleged that Mueller was a "straw man" for TRE to establish LiquidX, equally false.  Finally, it alleged that TRE transferred to LiquidX a software platform worth "millions more" than the asset valuation indicated, which was shown to be pure fiction.

The only issue before the Court is alter ego.  Brooklawn seeks to invoke equitable principles to have LiquidX stand in the shoes of TRE and answer for TRE's alleged liability in an arbitration concerning events that occurred in 2012 and 2013, and in which LiquidX, its employees and investors played no part.  Brooklawn's other (equally meritless) claims are stayed and reserved for another day if it prevails in the arbitration and there are not sufficient assets (including the insurance policies) to satisfy its claim.  On the single question now before the Court, Brooklawn has failed to meet the high burden for invoking such a drastic remedy.

I.      FINDINGS OF FACT

     A.      The Parties

     1.      LiquidX is a Delaware corporation with a principal place of business in New York and another office in New Orleans. (JX 8, Trial Transcript ("Tr.") at 484:17-19 (M. Walker).)

     2.      Defendants Brooklawn Capital, LLC, Brooklawn Capital Fund, LLC and Brooklawn Capital Fund II, LP ("Brooklawn") are organized under Cayman Islands law and have a principal place of business there.  (D.E. 1 at ¶ 9, D.E. 36 at ¶ 7.)

3.      Non-party TRE is a Louisiana limited liability company.  It is wholly owned by The Receivables Exchange, Inc., which is a Delaware corporation.  All investments were made in TRE, Inc., the board members served for, and made all decisions on behalf of, TRE, Inc., financial statements were prepared for TRE, Inc., and TRE, Inc. is TRE's sole member and manager. (JX 1, JX 48, JX 63, JX 84, JX 338.)

**B.      TRE's Financial Condition and Need to Raise Financing**

4.      TRE is an online trading exchange for accounts receivable.  (Tr. at 11:8-19, 104:12-17 (G. Mueller).)  An account receivable is an asset consisting of a debt of a third party that is held on a company's books.  TRE's exchange allowed accounts receivable holders to sell them to buyers on the exchange.  From TRE's inception through 2013, it focused on small-and-medium-size business buyers and sellers of receivables (the "SMB Business").  Beginning in 2014, TRE shut down the SMB Business and changed its business model to focus on the trading of large corporate receivables.  (Tr. at 11:8-19 (G. Mueller); 301:9-302:5 (J. Toffey).)

5.      By the fall of 2013, TRE had spent close to $60 million that had been invested by preferred shareholders during five investment rounds.  (Tr. at 12:13-13:22 (G. Mueller); 176:17-177:2 (J. Connolly); JX 84.)  Four preferred shareholders that held board seats, Bain Capital Ventures, StarVest Partners, Prism Venture Partners and Redpoint Ventures, invested a substantial majority of these funds.  (JX 84.)  None of them invested in LiquidX.  (Tr. at 217:6-15 (J. Connolly).)  All of the investors ultimately wrote off their entire investments, an acknowledgment that they valued TRE at zero.  (Tr. at 245:15-19 (J. Connolly); 827:14-24 (J. Counihan).)  Bain wrote off 80 percent of its $14.2 million investment in late 2013 or early 2014, and wrote off the rest approximately 90 days later. (Tr. at 168:13-169:6 (J. Connolly).)

### 1.   John Connolly Joins TRE's Board in 2013

6.       In Fall 2013, John Connolly, a Bain partner with substantial experience as a CEO and board member, took over Bain's TRE board seat.  (Tr. at 160:5-13, 158:19-159:1 (J. Connolly).)  Connolly joined the board in his role as head of Bain's operating group.  (Tr. at 160:14-16 (J. Connolly).)  In that role, he worked with those Bain investments that had leadership or operational challenges.  (Tr. at 158:7-14 (J. Connolly).)

7.       TRE's other board members from the fall of 2013 through the fall of 2015 were Jim Counihan of Prism, Deborah Farrington of StarVest and Jeff Brody of Redpoint.  (Tr. at 162:5-11 (J. Connolly); JX 63.)

8.       Prior to Connolly's joining TRE's board, Bain participated in three TRE preferred funding rounds, and invested $14.2 million.  (Tr. at 164:10-12 (J. Connolly).)  Connolly did not make the decisions to invest in TRE, and never personally invested in TRE.  (Tr. at 160:1-4, 162:15-16, 168:10-12 (J. Connolly).)  Brooklawn provided no evidence that Connolly directed any Bain investment, or invested personally, in TRE.  (Tr. at 162:17-25, 163:6-12, 163:21-164:9, 164:13-16 (J. Connolly).)  Bain is not, and never has been, an investor in LiquidX.  (Tr. at 217:6-7 (J. Connolly).).

### 2.   TRE's Board Releases Management and Obtains New Financing

9.       When Connolly joined the board, he reviewed TRE's financials and determined that TRE was "in trouble."  (Tr. 171:14-18 (J. Connolly).)  The board released TRE's then-CEO, CFO and CRO, and reduced the company's high cash burn rate by laying off most of TRE's employee workforce.  (Tr. at 161:12-23, 171:19-172:5; 206:4-207:3 (J. Connolly).)

10.      TRE obtained a $3.25 million loan from Comerica in December 2014, secured by substantially all of TRE's assets.  (JX 1).  The Comerica loan required TRE to provide monthly compliance certificates and financial statements, and required TRE to open a bank account with

Comerica that held a balance of at least $2 million at all times.  (JX 1, 10, 251; Tr. at 175:4-15 (J. Connolly); 520:19-521:1 (J. Kovacs); 859:1-18, 860:1-12, 860:25-861:5 (B. Cohen).)

11.     TRE hired Jim Toffey as CEO in March 2015 after searching for more than a year.  (Tr. 172:14-23, 173:1-3 (J. Connolly).)  As TRE's senior secured lender, Comerica monitored the CEO search.  (Tr. at 520:19-24, 522:2-17 (J. Kovacs).)  As part of his employment agreement, Toffey received unvested common shares in TRE.  (Tr. at 340:17-19 (J. Toffey).)  These shares never vested, and Toffey has never held vested stock in TRE.  (Tr. at 425:7-10 (J. Toffey).)  Brooklawn provided no evidence that Toffey was an investor in TRE.

12.     TRE continued to struggle with a high cash burn rate, losing between $89,000 and $313,000 per month between January and June 2015, with no change in sight.  (JX 82 at 2; Tr. at 179:19-180:2 (J. Connolly).)  Its trading volume of $687 million in the second quarter of 2015 was just a fraction of the $8-12 billion in trading volume that was needed for TRE to break even.  (Tr. at 181:8-21(J. Connolly).)  In order to finance these monthly operating losses, TRE was forced to use the loan proceeds from Comerica.  (Tr. at 293:16-21 (J. Toffey).)

### 3.     TRE Solicits, But Fails to Find, Additional Needed Capital

13.     As a result of operating losses and cash expenditures, TRE needed to raise additional funds in the spring and summer of 2015.  (Tr. at 173:24-174:8 (J. Connolly); 293:16-294:5 (J. Toffey).)  But none of the current investors was willing to provide additional capital without a new lead investor.  (Tr. at 834:7-11 (J. Counihan).)  TRE's board cast a wide net to find one, targeting private equity firms, strategic investors and venture capitalists.  (Tr. at 176:8-16 (J. Connolly).)

14.     Fundraising proved nearly impossible.  The board spoke with approximately 30 potential investors between March and August 2015.  (Tr. at 177:3-10 (J. Connolly); 295:8-10, 295:19-24 (J. Toffey); JX 14, JX 82 at 3.)  All of them declined to invest for various reasons,

including that TRE had already expended $62 million without proof that the business model could succeed, continued to lose money every month, had no sales pipeline and few sales people, and already had four investors with preferred stock and board seats who were senior to any new investor in the capital structure. (Tr. at 177:11-178:1 (J. Connolly); 295:25-296:21 (J. Toffey); 517:16-24 (J. Kovacs); 850:1-21 (J. Counihan).) Some investors had been approached by TRE previously, as many as three or four times. (JX 82 at 3.) One potential investor, Pivot, provided a draft term sheet that TRE's board rejected because it proposed to shrink TRE's board and it only offered $2 million, which was half of what TRE needed from a lead investor. (Tr. at 182:13-20 (J. Connolly); 298:19-25, 306:2-9, 425:15-426:7 (J. Toffey); JX 124.) Connolly also approached the chairman and CEO of Broadridge Financial Solutions ("Broadridge"), which declined to invest for many of the same reasons that other potential investors identified. (Tr. at 183:5-12 (J. Connolly).) Broadridge indicated that it might take another look at the opportunity if a successful funding round closed. (Tr. at 341:25-342:7, 347:14-18, 426:14-24 (J. Toffey).)

### C.   Gary Mueller Expresses Interest in Investing in TRE

15.   Gary Mueller is an entrepreneur and investor; he has invested in approximately 20-25 companies since 1994. (Tr. at 3:17-20, 5:16-19 (G. Mueller).) A majority of these companies are in the financial technology space, known as FinTech. These companies typically involve financial services and technology, such as data companies, marketplaces and exchanges. (Tr. at 5:20-6:6 (G. Mueller).)

16.   Mueller learned of TRE in the summer of 2015 from Connolly. (Tr. at 7:14-18 (G. Mueller).) Mueller and Connolly served together on the board of directors of Ecosense Lighting and they had known each other for about three years. (Tr. at 7:25-8:9 (G. Mueller); 184:3-8 (J. Connolly).) They also serve together on the board of 7Park Data, which is an information services company. (Tr. at 184:9-14 (J. Connolly).)

17.     Connolly introduced Mueller to Toffey in July 2015, and Toffey supplied a pitch deck to Mueller that provided an overview of TRE, its historic buyers and sellers, and its financial projections.  (JX 14-15, 17; Tr. at 7:19-22 (G. Mueller) 185:6-8 (J. Connolly).)

### 1.   Mueller Provides a Term Sheet

18.     After these initial discussions and his review of the pitch deck materials, Mueller was sufficiently interested in TRE's business model and potential to provide a term sheet and engage in further due diligence.  (Tr. at 13:23-14:6 (G. Mueller); JX 34.)  Mueller's August 25, 2015 term sheet proposed an investment of $4.5-to-5 million at a "pre-money" valuation of $18.21 million.  (JX 34.)  A pre-money valuation is a venture capital construct that is based on what an investor thinks the business opportunity may be worth in the future.  (Tr. at 23:12-22 (G. Mueller).)  It is not a formal valuation process or an actual asset valuation – Counihan described the comparison of the two as an "apple and an orange."  (Tr. at 23:23-25 (G. Mueller); 187:4-13; 187:23-188:2 (J. Connolly); 846:12-21, 848:19-849:15 (J. Counihan).)  A pre-money valuation results from negotiations between a potential investor and the company based on what the parties think the company could be worth in the future if their assumptions come true.  (Tr. at 24:5-9 (G. Mueller); 186:17-24 (J. Connolly); 800:5-17, 817:22-818:12 (W. Haegele); 846:12-21, 848:19-849:15 (J. Counihan).)

19.     Mueller proposed a $16 million pre-money valuation, but TRE counter-offered $18.2 million.  (Tr. at 187:14-24 (J. Connolly).)  TRE's board accepted the term sheet, and the firms they represented planned to collectively invest approximately $5 million, contingent on Mueller leading the round.  (Tr. at 189:12-24, 190:7-191:2 (J. Connolly).)

### 2.   Mueller Conducts Initial Diligence on TRE

20.     Mueller then began due diligence in earnest.  He learned that while TRE was currently operating a marketplace for accounts receivables for large corporate entities, it initially

started as an exchange for trading small-and-medium-sized business receivables.  He viewed the new model as more attractive than the old business, and envisioned an exchange for other classes of trade assets besides receivables.  (Tr. at 11:8-19 (G. Mueller).)

21.     Mueller saw certain impediments to TRE's long-term success.  TRE's corporate receivables program was struggling to get off the ground, and consisted almost entirely of one seller and two or three main buyers, a somewhat different picture than had been presented in the pitch deck.  (Tr. at 12:13-24 (G. Mueller).)  TRE had spent more than $60 million in investor funds, most of which he believed had been squandered.  (Tr. at 12:13-13:22 (G. Mueller).)  He also had concerns about TRE's capital structure.  (Tr. at 13:18-22 (G. Mueller).)  Finally, as Mueller got to know TRE's board members, he liked Toffey and Connolly, but had concerns about TRE's other directors, whom he viewed as at least partially responsible for TRE's losses. (Tr. at 13:9-17 (G. Mueller).)

22.     Mueller also reviewed TRE's financial performance to date and its projections. (JX 14, 288.)  He viewed these projections with a "grain of salt" because, in his experience, the projections in investor presentations and business plans are extremely difficult to verify and are rarely accurate.  (Tr. at 17:4-19, 60:9-11 (G. Mueller).)  TRE also provided Mueller with various contracts, the Comerica loan agreement, incorporation documents and legal due diligence materials.  (Tr. at 519:12-17 (J. Kovacs).)

23.     Throughout the financing process, TRE's management communicated frequently with Comerica, which requested regular updates on the potential financing.  (Tr. at 194:9-24 (J. Connolly); 861:6-11 (B. Cohen); JX 53.)  Toffey had maintained regular contact with the bank since he was hired.  (Tr. at 350:17-19 (J. Toffey); 522:11-24 (J. Kovacs).)  TRE had only $2.32 million in the Comerica account as of August 31, and was weeks away from violating the

$2 million covenant as it continued to incur monthly operating losses of $400,000-to-$600,000 per month and to eat up the Comerica loan proceeds to fund those losses.  (JX 48, 50.)

24.    In September 2015, Mueller learned that TRE was a defendant in two arbitration proceedings and one court case, including the Brooklawn arbitration and a pending arbitration brought by Solaia.  (Tr. at 18:14-21 (G. Mueller); 302:13-18 (J. Toffey).)  On August 14, 2015, Brooklawn had filed an $8.4 million arbitration demand against TRE for gross negligence, breach of contract, and unfair and deceptive trade practices related to the SMB Business.  (JX 323.)  Brooklawn alleged it was one among a number of "victims" of TRE's alleged misdeeds. (JX 323; Tr. at 929:7-22 (E. Van den Bol).)  Mueller's attorneys requested additional documentation regarding these cases from TRE.  (Tr. at 18:22-25 (G. Mueller); JX 271.)  As of September 23, Mueller had not decided whether to invest and still had several concerns about TRE, including the pending litigations.  (Tr. at 20:1-7 (G. Mueller).)

25.    In the last week of September, Mueller learned more about the pending litigations against TRE.  The claims all related to duties that TRE allegedly undertook in its agreements. (Tr. at 153:2-23, 155:16-156:13 (G. Mueller).)  He also spoke to Counihan about representations and warranties in TRE's customer contracts.  (Tr. at 155:16-156:13 (G. Mueller); 555:20-25 (J. Kovacs).)  These discussions and other due diligence discoveries further heightened Mueller's concerns about the business.  (Tr. at 154:23-155:15 (G. Mueller).)

### D.    The Solaia Arbitration Award

26.    On September 26, 2015, TRE's board learned that an arbitrator had awarded Solaia approximately $177,000 against TRE.  (Tr. at 192:16-21 (J. Connolly); 302:22-303:1 (J. Toffey).)  The Solaia allegations related to those made in the Brooklawn arbitration —TRE's supposed fraud and/or gross negligence in carrying out duties in its representations and warranties in the agreements with buyers on the exchange prior to 2013.  (JX 323; Tr. at 924:20-

22 (E. Van den Bol).)  The board held an emergency telephone call that weekend to discuss the unexpected result and its options, and immediately realized that the award would affect the planned financing.  It discussed how to communicate the award to Mueller and Comerica.  (Tr. at 192:16-193:11 (J. Connolly); 305:11-17 (J. Toffey).)

27.    Soon after this call, Connolly notified Kevin Urban at Comerica of the award. (Tr. at 195:8-196:4 (J. Connolly).)  He emphasized to Urban that TRE's board understood its responsibilities to Comerica as TRE's senior secured lender.  (Tr. at 195:11-196:11 (J. Connolly).)  Having worked extensively with other companies that went into bankruptcy, Connolly understood that when a company is facing potential insolvency, its board becomes obligated to protect the interests of its creditors, including secured creditors such as Comerica. (Tr. at 208:18-209:5 (J. Connolly).)

28.    On September 28, 2015, Toffey informed Mueller of the arbitration award.  (Tr. at 303:13-21 (J. Toffey).)  Mueller responded that this "does not bode well for the other arbitration, correct?"  (JX 16.)  Later that day, Mueller asked TRE to send a copy of the award.  (JX 29.) Prior to receiving Toffey's email, Mueller still had not decided whether or not to invest in TRE. (Tr. at 26:9-15 (G. Mueller).)  Ultimately, the Solaia award was one important reason among several that informed Mueller's decision not to invest.  But as soon as Mueller read the award, he was "done."  (Tr. at 27:15-20, 64:9-13 (G. Mueller); 192:5-10 (J. Connolly).)

29.    Brooklawn provided no evidence to support its assertion that TRE canceled its own financing round with Mueller.  To the contrary, the evidence established that Mueller walked away from this investment.  (Tr. at 27:15-20 (G. Mueller); 191:17-192:12 (J. Connolly); 823:13-824:2 (J. Counihan).)  Without Mueller, TRE had no viable path forward.

E. **Mueller Proposes an Alternative Transaction with Comerica, and TRE's Board Explores Alternatives to Avoid a Foreclosure**

1. **Mueller Remains Interested in Components of TRE's Exchange Business**

30.     Mueller remained interested in developing an exchange for trade assets. Within days of the arbitration award, he began considering other alternative strategies with respect to TRE. (Tr. at 27:21-23 (G. Mueller).) He understood that TRE's business had three central components: (1) the exchange platform; (2) its employees; and (3) its (relatively few) corporate customers. (Tr. at 30:1-10 (G. Mueller).) He knew from due diligence that substantially all of TRE's assets, including the software for the trading platform, secured the Comerica loan. (Tr. at 28:15-24 (G. Mueller).) With his attorneys, he developed a proposal to buy the loan from Comerica, form a new company and foreclose on TRE's assets to obtain the platform. (Tr. at 30:1-10 (G. Mueller).) He then hoped to negotiate with TRE's employees to join his new company and to negotiate new agreements with TRE's current customers and new customers. (*Id.*) Mueller expected that he would only move forward with this potential opportunity if TRE could not locate an alternative equity investor or buyer. (Tr. at 29:20-25 (G. Mueller).)

31.     Mueller discussed this concept with his attorneys and Toffey within days of learning about the Solaia award. (Tr. at 67:19-21, 68:18-25 (G. Mueller); 306:10-15 (J. Toffey).) This idea came from Mueller alone, not from anyone associated with TRE. (Tr. at 28:7-24, 30:1-10, 32:3-5, 39:17-24, 41:18-23 (G. Mueller); 306:10-15, 334:4-6 (J. Toffey).)

2. **TRE's Board Considers Alternatives to Avoid a Default**

32.     TRE's board held its first formal meeting after the Solaia award on Sunday, October 4, 2015. (JX 63 at Oct. 4.) The board discussed whether it had any viable alternatives in light of its cash burn, continuing monthly operating losses and imminent default on the Comerica loan, including additional investments by the existing investors. (*Id.*) The directors

and their funds had previously agreed to invest only if there was a new investor; they had no

interest in doing so without one.  (Tr. at 305:18-306:1 (J. Toffey); 834:7-11 (J. Counihan).)

33.    The board also explored the possibility of obtaining bridge financing while the

board sought new investors to lead an equity round.  However, the existing investors concluded

that such a bridge financing would be a "bridge to nowhere" without any realistic opportunity to

obtain a lead investor and turn the business cash positive.  (Tr. at 204:17-205:25 (J. Connolly);

305:18-306:1 (J. Toffey); 536:9-17 (J. Kovacs).)  The board also explored cutting TRE's

expenditures even further, but could not do so without disrupting TRE's client base.  (Tr. at

206:4-18 (J. Connolly).)  The board considered whether it could find an alternative investor, but

the company had just finished a lengthy solicitation process without any success, and the board

had run out of potential investors.  (JX 63 at October 30; Tr. at 306:2-9, 314:21-315:7 (J.

Toffey).)  As Counihan testified, "[w]e must have shown this to every venture capital firm in

America, and I mean that literally."  (Tr. at 850:16-23 (J. Counihan).)  In light of the Solaia

award, the board concluded that there was no way that any of its previous targets would change

their minds.  (Tr. at 207:18-208:2 (J. Connolly); 804:12-805:3, 819:15-820:5 (W. Haegele).)

LiquidX's expert witness, William Haegele, clearly explained why there was no likelihood of an

equity investment:

> [I]n 2014, revenue declined 43 percent and then it continued to decline in 2015.
> So when you look at that, you have an entity that had an unproven business model
> over -- after seven years of trying and was projected to be in default on its loan,
> that -- coupled with the recent adverse ruling in an arbitration related primarily, I
> think, exclusively to its small and medium business line -- gave a lot of pause to
> and would cause you to look at all the other arbitrations that existed out there.  All
> those events coupled together makes it extremely unlikely that they would be able
> to raise any additional equity at all.  (Tr. at 763:23-764:8 (W. Haegele).)

34.    Haegele also would not have expected TRE to approach investors that had already

turned it down because "[t]hings were materially worse than when they were approached.  The

company was in near default on its loan and now had an adverse ruling in an arbitration matter."
(Tr. at 819:23-820:5 (W. Haegele.). There was thus only one reasonable conclusion at this time –
TRE had no chance of finding an investor, and without Mueller had no viable option to continue
as a going concern. (Tr. at 763:6-764:7, 764:12-24, 801:16-802:24, 803:4-804:11, 825:19-826:4
(W. Haegele).)

35.     Brooklawn speculated that there were investors who were interested in investing
in TRE after the Solaia award. It produced no evidence to support this whatsoever, instead
asking questions on hypothetical alternatives. It adduced no facts showing that any of these
alternatives were viable or even possible.

36.     During the October 4 meeting, the board instructed Toffey to begin working with
Mueller on a new transaction. (JX 63 at October 4; Tr. at 313:19-23 (J. Toffey).) Toffey told the
board that he would help wind the company down, but that he did not see a path forward if the
existing investors would not invest or if TRE could not find an outside investor. (Tr. at 322:2-15
(J. Toffey).) He also told the board that he might work with Mueller if there was a new
transaction. (Tr. at 364:10-14 (J. Toffey).)

### 3. TRE's Board and Management Remained in Contact with Comerica

37.     TRE's management remained in frequent contact with Comerica during October
and November 2015. (Tr. at 557:3-24 (J. Kovacs).) On October 1, Connolly and Toffey relayed
to Comerica that Mueller was potentially interested in purchasing the loan, and by mid-October,
Toffey told Comerica that Mueller was ready to make an offer. (Tr. at 232:8-18 (J. Connolly);
311:11-19, 344:6-15 (J. Toffey); JX 104, JX 106, JX 128.)

38.     As of September 30, $2.21 million remained in the Comerica account. (JX 51; Tr.
at 196:20-197:14 (J. Connolly).) Comerica requested that TRE provide weekly cash summaries
and remain in frequent contact in addition to TRE's other reporting requirements. (Tr. at 233:3-

10; 235:12-22 (J. Connolly); 522:2-24, 525:16-22 (J. Kovacs); 835:17-23, 836:5-9 (J. Counihan); JX 35, 52.)

39.     The board also considered TRE's obligations to other constituencies, including clients, employees and general unsecured creditors.  (Tr. at 208:18-209:5, 209:10-24, 237:12-14, 278:10-19 (J. Connolly); 350:12-16, 351:1-9 (J. Toffey); 837:13-19 (J. Counihan).)  The board took into consideration TRE's insurance policy with AIG, which covered costs associated with the pending legal disputes.  (Tr. at 210:1-8 (J. Connolly); 574:16-21 (J. Kovacs).)

40.     TRE's board met again on October 11, 2015.  The board considered several alternatives, but decided that the best option was for Connolly, Toffey and James Kovacs to discuss with Comerica the option of Mueller purchasing the loan.  (JX 63 at October 11; Tr. at 324:3-24 (J. Toffey).)  The board was "absolutely" concerned about Comerica sweeping TRE's cash, and wanted to take steps to avoid that outcome.  (Tr. at 324:18-24 (J. Toffey); 850:22-851:5 (J. Counihan).)  TRE's management was in regular contact with board members, including Counihan, about these efforts.  (Tr. at 559:15-19, 560:1-5 (J. Kovacs); JX 267.)

41.     The board considered the possibility of selling the company to another third-party, but it was unable to identify any purchasers.  (Tr. at 280:2-12 (J. Connolly); 347: 9-13 (J. Toffey); 839:7-22 (J. Counihan); JX 63 at October 30.)  Counihan also testified that after talking to counsel, the board decided not to shop TRE's assets:

> [I]n our experience, it was a low likelihood you would get somebody interested based after that wide of shopping.  And again, people -- it's a small industry. People know when a company gets a term sheet.  They know when to expect those financings to close.  Typically, it's 30 days later.  So when they don't, they know something has gone wrong.  Again, I think I used the word hamper before. You are hampered if you go to market.  (Tr. at 839:7-22 (J. Counihan).)

42.     There is no evidence that Connolly and Toffey "steered" the other TRE directors toward Mueller's proposed transaction, as Brooklawn alleges.  Mueller's proposed transaction

- 16 -

was the board's only viable option at the time. (Tr. at 264:21-265:8 (J. Connolly).) If the board did not find an alternative, TRE would default on the $2 million covenant and Comerica would likely foreclose on TRE's assets. (Tr. at 345:10-18 (J. Toffey).) The board was fully aware that Mueller had asked Toffey to be involved in any new company he formed for the transaction. (Tr. at 537:9-16 (J. Kovacs).)

### 4. Comerica Warns of a Default

43.     On October 15, 2015, Comerica sent TRE a letter warning of an impending loan default, and reserved the "right to foreclose upon and liquidate TRE's assets." (JX 46; Tr. at 863:6-10, 16-19 (B. Cohen).) Among other concerns, the letter cited the Solaia award, the Brooklawn arbitration, the failed equity round and the imminent breach of the $2 million covenant. (JX 46.) The letter did not specifically name Mueller, but described a potential sale of the loan to a third-party. (*Id.*) Toffey understood the letter to mean that Comerica was open to Mueller's proposed transaction, and the bank confirmed this the following day. (JX 46; Tr. at 863:6-10, 16-19 (B. Cohen).) Toffey communicated Comerica's willingness to sell the loan to Mueller. (Tr. at 312:9-14 (J. Toffey); JX 132.)

### 5. Mueller Moves Toward a Transaction with Comerica

44.     On October 21, 2015, TRE formally consented to Mueller's engaging in discussions with Comerica. (JX 33.) That same day, Mueller sent a letter of intent to Comerica, proposing to purchase the loan at 100 percent of the outstanding amount of the secured debt. (JX 57.) If Mueller was willing to pay the full loan amount, Toffey was confident that Mueller would strike a deal with Comerica. (Tr. at 325:3-15 (J. Toffey).) On October 23, Comerica told Toffey that it was prepared to sell the loan to Mueller at the full amount of the unpaid loan balance. (JX 107.) On October 28, Comerica responded to Mueller's letter of intent and agreed to sell the loan to Mueller on that same condition. (JX 20.) Aside from encouraging Mueller to

pay the full face value, Toffey did not discuss the deal terms with Mueller, nor did he engage in negotiations with Comerica.  (Tr. at 313:24-314:7, 394:16-22 (J. Toffey).)

45.     By October 26, TRE was in default with only $1.94 million left in the Comerica bank account.  (JX 256.)  TRE had no other cash available to cure this breach other than money held in customer custodial accounts, which belonged to its customers, and approximately $50,000 in a Chase bank account.  (*Id.*)  TRE included information on the small Chase bank account in its reporting to Comerica.  (*Id.*)  But moving this money to the Comerica account would not have changed anything — at best it would have staved off default by a few days.  (Tr. at 428:25-429:2 (J. Toffey).)

46.     In late October, Barry Cohen, a Comerica senior vice-president, determined, in consultation with counsel, that it would be beneficial for Comerica to sell the loan to Mueller. (Tr. at 853:11-12, 856:6-13 (B. Cohen).)  TRE had previously spent all of the equity investments, and was surviving on proceeds of the Comerica loan so Mueller's transaction presented the only opportunity for Comerica to get its money back.  (Tr. at 176:17-177:2 (J. Connolly); 293:16-21, 363:14-17 (J. Toffey).)  Cohen did not speak to anyone at TRE or LiquidX regarding the sale of the loan.  (Tr. at 856:14-22 (B. Cohen).)  Cohen's testimony was clear:  TRE did not force Comerica to sell the loan.  (Tr. at 862:22-24 (B. Cohen).)  Rather, Mueller's proposal presented the best outcome for Comerica.  (Tr. at 363:14-17 (J. Toffey).)

47.     Brooklawn's allegations that TRE engineered a default are not supported by any evidence.  At times, Brooklawn pointed to Connolly's and Toffey's investments in LiquidX, suggesting that these funds should have been used to pay off the loan.  Neither Connolly nor Toffey was obligated to use their personal funds to pay the debts of TRE.

48.     On October 29, 2016, TRE received a formal default notice from Comerica. (JX 59).  The bank mentioned sweeping TRE's cash as a possibility.  (Tr. at 316:7-12, 16-22 (J. Toffey).)

49.     On October 30, 2015, James Kovacs, TRE's chief strategy officer, and TRE agreed to a mutual separation because TRE no longer needed a strategy officer in a wind-down. (Tr. at 513:15-16, 581:22-582:5 (J. Kovacs).)  Toffey signed the Comerica compliance certificates as of October 30, where Kovacs had signed previous certificates.  (Tr. at 541:4-8, 545:2-12 (J. Kovacs); JX 10.)  Kovacs sent board members a goodbye email on October 30 thanking them for their support.  (JX 110; Tr. at 545:2-12, 623:16-624:16 (J. Kovacs).)  Kovacs' termination was formally memorialized on November 13, 2015, though the letter does not refer to the October 30 date.  (Tr. at 544:1-545:12 (J. Kovacs); JX 115.)   Kovacs became a consultant to TRE in November 2015.  (Tr. at 530:6-14 (J. Kovacs).)

### 6.   Mueller Forms LiquidX

50.     Starting in October and throughout November 2015, Mueller had more detailed discussions with Toffey regarding the formation of his new company.  (Tr. at 77:13-18 (G. Mueller).)  Mueller also spoke to Toffey about becoming LiquidX's CEO.  (Tr. at 77:19-21 (G. Mueller).)  On October 6, Toffey told Mueller that he would be interested in working with him if Comerica agreed to the loan purchase.  (JX 129.)  By the middle of October, Toffey understood that Comerica was interested in selling the loan to Mueller and began taking additional steps toward setting up a new company, such as researching a new name and discussing the formation of a new company.  (JX 135, 136.)

51.     Mueller also approached Connolly about a role in the new company, and Connolly expressed interest.  He informed the TRE board and Bain of this interest sometime during the middle of October 2015.  (Tr. at 211:9-23, 244:23-245:4; 260:25-261:3 (J. Connolly).)

After this time, Connolly began having more detailed discussions with Mueller.  (JX 109.)

Connolly resigned from the TRE board on November 6, 2015.  (Tr. at 212:10-16 (J. Connolly);

JX 62A.)  Following his resignation, he had no further involvement with TRE other than to

attend the beginning of a November 11 board meeting as an observer (*i.e.*, not as a board

member) to thank the board.  (Tr. at 213:4-19 (J. Connolly); JX 63 at Nov. 11.)

     52.     Mueller's counsel incorporated LiquidX in Delaware on November 6, 2015, and

Mueller signed an amended certificate of incorporation on November 23, 2015.  (JX 8, 9.)

Mueller alone controlled the process of how LiquidX was formed.  (Tr. at 56:24-57:1

(G. Mueller).)

     53.     When LiquidX was incorporated, Mueller, Toffey, Connolly and Kovacs

purchased a small amount of common stock for approximately $1,000 that would vest pursuant

to a vesting schedule.  (Tr. at 41:24-42:18 (G. Mueller).)  The approximately $100 of restricted

stock that Kovacs purchased, after separating from TRE, never vested because he did not provide

services to LiquidX for a year, which is required for the first portion of the stock to vest.  (Tr. at

123:11-15 (G. Mueller); 535:3-12, 563:4-10 (J. Kovacs).)

     54.     Later in November 2015, LiquidX was capitalized through a combination of

preferred stock purchases and loans to the company.  (JX 70, 73.)  LX Investment Vehicle LLC,

which was split evenly between Mueller and his investment partner, Walter McCormack,

purchased $249,999.96 worth of preferred shares and loaned LiquidX $2.25 million.  Connolly

purchased $124,999.98 worth of preferred shares and loaned LiquidX $1.125 million, and Toffey

purchased $75,000 worth of preferred shares and loaned LiquidX $675,000.  (JX 71-73.)  None

of these individuals were investors in TRE.  (Tr. at 56:7-10 (G. Mueller).)  Mueller alone

determined how these funds would be used.  (Tr. at 272:7-10 (J. Connolly).)

55.    Brooklawn's allegation that Mueller was a "straw man" for TRE's owners lacks any factual support in the record whatsoever.  Mueller conceived of the transaction to purchase the loan from Comerica, came up with the idea of forming LiquidX, invested his own personal funds, filled its leadership positions and decided who would invest in LiquidX.  (Tr. at 44:16-17 (G. Mueller).)  None of TRE's owners benefitted from Mueller's purchase of the loan; Mueller even declined the requests of TRE board members Counihan and Farrington to invest in LiquidX.  (Tr. at 45:21-46:8 (G. Mueller); 537:17-20 (J. Kovacs); 832:6-9 (J. Counihan).)

### 7.    Mueller Obtains TRE Board Approval

56.    TRE's board minutes make clear that from at least the middle of October 2015, the board viewed a transaction with Mueller as the company's only feasible option.  (JX 63.)  Mueller and his counsel participated in a November 11 board meeting to describe the proposed transaction.  (JX 63 at Nov. 11; Tr. at 851:14-21 (J. Counihan).)  Mueller and his counsel explained that: (1) Mueller would make an offer of strict foreclosure to be negotiated with TRE's board; (2) he would make employment offers to substantially all of the company's employees; (3) he had offered to purchase the loan from Comerica at par; (4) the new company would agree to a transition services agreement with TRE; and (5) TRE would commission an appraisal of the collateral.  (JX 63 at Nov. 11; Transcript at 851:14-21 (J. Counihan).)  The board favored Mueller's proposal and requested a more formal term sheet.  (Tr. at 331:5-10 (J. Toffey); JX 63 at Nov. 11.)

57.    The board knew before this time that Toffey was working on the transaction with Mueller; at the meeting, Farrington asked Toffey when he would resign from TRE's board.  (Tr. at 330:11-21, 332:12-15 (J. Toffey); JX 63 at Nov. 11.)  Toffey resigned from the board on or around November 11.  (Tr. at 367:9-11 (J. Toffey).)  While Counihan testified that he did not recall learning that Connolly and Toffey were working with Mueller, the evidence from the

board minutes, as well as the testimony of Connolly, Toffey and Kovacs, establishes that he was present when such discussions were taking place, including the November 11 meeting where Mueller proposed to make offers of employment to substantially all TRE employees.  (JX 63; Transcript at 211:9-212:5, 244:23-245:4; 260:6-261:9; 280:13-25 (J. Connolly); 330:1-25; 332:12-15 (J. Toffey); 536:23-537:20 (J. Kovacs).)  Indeed, Counihan and Farrington both asked Mueller to allow them to invest in LiquidX, indicating that individual board members also saw an opportunity to be a part of LiquidX.  (Tr. at 45:21-46:6 (G. Mueller); 832:6-9 (J. Counihan).)

58.    The board began consulting with wind-down specialists and preparing to wind-down the business.  (JX 63 at Oct. 30, Nov. 11; JX 148.)  TRE engaged Argus Management, and its managing director, Peter Sullivan, to assist with the wind-down.  (JX 18; Tr. at 878:18-879:3 (P. Sullivan).)

59.    TRE engaged Alvarez & Marsal Valuation Services ("A&M") to value TRE's assets to ensure that LiquidX was paying at least reasonably equivalent value for the Comerica loan.  (Tr. at 37:21-38:7 (G. Mueller).)  Prior to closing, Mueller learned from either Toffey or Kovacs that the A&M valuation was likely to come in between $2-3 million.  (Tr. at 38:17-21 (G. Mueller).)  This provided Mueller with the comfort he needed to proceed with the purchase.  (Tr. at 38:22-39:1, 116:15-20 (G. Mueller).)  If the value of the assets greatly exceeded the loan amount, Mueller would not have moved forward.  (Tr. at 116:21-23 (G. Mueller).)

60.    Mueller agreed to pay Comerica the full value of the loan because it saved money and time in the long run.  (Tr. at 35:11-25 (G. Mueller).)  If he started a new company without acquiring TRE's platform, Mueller believed that it would have taken up to 12 months to build a new platform at a cost of approximately $400,000 per month before being in a position to obtain customers and generate revenue.  (Tr. at 31:11-32:2, 35:11-25, 117:21-118:12 (G. Mueller).)

Although the existing platform needed to be replaced to grow the business properly, Mueller viewed paying Comerica $3.25 million and immediately building the business in 2016 as a better deal than spending $5 million to build the platform and waiting until 2017 to start generating business.  (Tr. at 147:12-148:7 (G. Mueller).)  Mueller also did not want to wait for Comerica to foreclose or for TRE to declare bankruptcy because he worried about losing the opportunity to attract TRE's customers and employees to a new company as the legal process dragged on.  (Tr. at 118:16-25, 119:11-120:3 (G. Mueller).)  The most important consideration for Mueller was getting all of the pieces he needed – the exchange, employees and customers – in place quickly. (Tr. at 117:21-118:12, 119:22-120:3 (G. Mueller).)

61.     On November 20, 2016, Mueller sent a proposed term sheet to TRE on behalf of LiquidX with an offer to acquire TRE's assets through a partial strict foreclosure.  (JX 147.)

62.     On November 30, 2016, LiquidX entered into a Loan Purchase Agreement with Comerica, whereby it purchased the loan for 100 percent of the outstanding loan balance, which was $3.25 million plus interest.  (JX 67.)

**F.     LiquidX Paid More Than Equivalent Value for TRE's Assets**

63.     A&M valued TRE's assets (including assets that were not subject to foreclosure by a creditor, such as customer cash held in custody and deferred tax assets), with a valuation date of November 30, 2015.  (JX 11-12; Tr. at 724:10-22, 726:5-6, 727:13-16 (K. Russell).) Kimberly Russell, an A&M managing director, led A&M's valuation team and was responsible for the final work product.  (Tr. at 717:5-6, 725:13-15 (K. Russell).)  Russell has extensive experience valuing intangible assets, including hundreds of software valuations, for purposes of different business combinations, and also has experience valuing the assets of financially distressed companies.  (Tr. at 713:16-715:7, 718:21-23 (K. Russell).)

64.     At the outset of the valuation process, Toffey told Russell that he believed TRE's assets were worth between $2-3 million.  (Tr. at 395:2-23 (J. Toffey).)  He does not recall telling her that the valuation needed to be low or attempting to influence her in any way, but regardless, nothing Toffey said to Russell affected her work and she never had concerns that Toffey, or anyone else at TRE, failed to disclose or withheld information.  (Tr. at 395:2-23 (J. Toffey); 742:9-18, 743:22-744:10, 747:6-13 (K. Russell).)  Russell also explained that sellers of assets have made similar comments to her before, and that it is not unusual for a client to provide its perspective.  (Tr. at 743:1-11 (K. Russell).)  The exchange with Toffey resulted in Russell working even harder to ensure that she considered and fairly valued all of TRE's assets.  (Tr. at 742:9-18 (K. Russell).)  Kovacs made very clear to Russell that TRE wanted the "fairest valuation possible," and Russell testified that Kovacs told her that "it was his job to make sure that we got the information we needed to value all of the assets that we felt were appropriate."  (Tr. at 583:15-584:3 (J. Kovacs); 743:12-21 (K. Russell).)

65.     One of A&M's primary areas of focus was TRE's software platform.  In particular, A&M needed to understand the age of the software and whether it needed to be updated or replaced.  (Tr. at 719:10-16 (K. Russell).)  There were numerous problems with TRE's trading platform (which was one component of the software): it was built originally as a prototype; TRE did not possess the software source code for important parts of the platform, leaving TRE unable to fix any functions provided by that part of the platform; the code generally lacked proper documentation; and it was built over 30 years ago with a language that universities no longer teach.  (Tr. at 431:11-24, 432:13-433:12. (M. Walker).)  It required a wholesale replacement to be robust enough to handle numerous simultaneous instructions, as would be expected of a functioning exchange.  (Tr. at 433:13-14, 492:16-23 (M. Walker).)  Mike Walker

provided A&M with the internal and external re-build proposals and cost estimates.  (Tr. at 439:5-14 (M. Walker); 719:17-19 (K. Russell).)

    66.    In valuing TRE's technology, A&M used the replacement cost valuation approach, which values the cost to replace an asset of like utility.  (Tr. at 730:2-9 (K. Russell).) It treated the assets as an assemblage of assets and valued each asset as if it were going to be transferred and put to use without interruption.  (Tr. at 774:5-12 (W. Haegele).)  This resulted in the assets being valued at their highest and best use.  (*Id.*)  It applied this approach understanding that the buyer intended to utilize the assets going forward, but did not value TRE as a going concern because as of November 30, 2015, it was not one.  (Tr. at 738:7-21 (K. Russell); 809:21-811:21, 812:20-813:8 (W. Haegele).)  A&M used the rebuild cost estimates that TRE had obtained from two outside vendors, in addition to TRE's internal rebuild estimate, to come up with the average cost for replacing TRE's software platform.  (Tr. at 731:21-732:7 (K. Russell); JX 12.)  It then added the investment return that would have been lost by spending a year rebuilding the platform.  Finally, A&M applied an obsolescence factor to take into account the software's age and condition.  (Tr. at 733:21-734:16 (K. Russell); JX 12.)  A&M arrived at a final platform value of $290,000.  (JX 11-12.)  While A&M relied on certain information provided by TRE, it asked follow-up questions as needed and verified the information it received.  (Tr. at 745:3-12 (K. Russell).)

    67.    As of November 30, 2015, A&M determined that the net value of TRE's assets was approximately $1.9 million, and thus concluded that the amount paid by the buyer for the Comerica loan constituted "at least reasonably equivalent value for the net assets."  (JX 11; Tr. at 734:25-735:8 (K. Russell).)  At the time Russell approved A&M's opinion letter, she believed that TRE and its management had provided her all of the information she needed to perform the

engagement, and she testified that she would not change anything about the final report.  (Tr. at 735:19-736:2, 747:14-19 (K. Russell).)

68.     Brooklawn provided no evidence that the software platform (valued by A&M at $290,000) or any other TRE assets were worth more than the valuation amount, let alone "millions more," as it had alleged.  Brooklawn did not introduce any testimony from a valuation expert or otherwise provide a competing valuation to the one prepared by A&M and endorsed by LiquidX's valuation expert, William Haegele, who has substantial experience working with and valuing distressed entities.  (Tr. at 757:9-758:6, 758:24-759:24 (W. Haegele).)  Underscoring its failure of proof, Brooklawn shifted its position and claimed that valuation was "irrelevant" to the issues in the case.  *See* D.E. 46 at 10.

69.     Mr. Haegele's testimony confirmed A&M's work.  (Tr. at 765:20-766:1 (W. Haegele).)  While A&M valued all of TRE's assets, regardless of whether an asset was collateral for the loan or had tangible value, Haegele reviewed the assets that LiquidX actually obtained in the foreclosure transaction with TRE.  (Tr. at 724:10-22, 727:13-16 (K. Russell); 767:5-773:13 (W. Haegele).)   Haegele determined that the value of these foreclosed assets was $1.72 million.  (Tr. at 772:16-24 (W. Haegele).)  In doing so, he valued the assets at their replacement costs, which valued them at their highest and best use.  (Tr. at 773:9-13 (W. Haegele).)

### G.     LiquidX Begins Preparations to Acquire TRE's Assets

70.     Once Toffey knew that Comerica was open to a transaction with Mueller, he began working with Mueller on the pieces that needed to be in place to start a new company. (Tr. at 333:1-3, 357:6-12, 358: 7-12 (J. Toffey).)  This included choosing a name, creating a logo and marketing materials, updating the software platform and obtaining a website domain name. (JX 135, 149, 173, 181.)  Much of this work commenced after LiquidX had already purchased

the Comerica loan. (Tr. at 380:17-21 (J. Toffey).) At the time of these efforts, many TRE employees did not yet know the details of the transaction and incorrectly described it as a "re-branding," or a name change. (JX 149, Tr. at 378:23-379:1, 379:8-15, 382:11-13 (J. Toffey); Tr. at 639:7-18 (S. Gielewski).)

71.     Toffey did not disclose the transaction details to most TRE employees until the transaction was closer to being finalized. (Tr. at 357:22-358:3 (J. Toffey).) For example, TRE's finance director, Sophia Gielewski, first learned of the company that would become LiquidX in the middle of November 2015 in a meeting with Toffey and Kovacs. (Tr. at 633:19-634:2 (S. Gielewski).) Gielewski first heard the name LiquidX around the same time, when Toffey came into an open area of TRE's offices and asked employees, including Gielewski, what they thought of the name. (Tr. at 635:12-636:21 (S. Gielewski).)

72.     After separating from TRE as an employee, Kovacs joined LiquidX as a consultant to assist Mueller with preparation work. (Tr. at 547:18-24 (J. Kovacs).) He assisted with the formation of LiquidX, helped establish vendor contracts, and assisted with LiquidX's fundraising efforts. (Tr. at 533:16-23, 534:8-24 (J. Kovacs).) He never joined LiquidX as an officer or employee. (Tr. at 560:21-561:13 (J. Kovacs).) Kovacs sent bills for his LiquidX consulting to the new LiquidX CFO, Mark Brazier. (Tr. at 552:2-5 (J. Kovacs).) His consulting relationship with LiquidX ended in the fall of 2016. (Tr. at 533:25-534:3 (J. Kovacs).)

73.     Walker and Kovacs also circulated action item lists in November and December 2015 concerning the formation of LiquidX and wind-down of TRE. (JX 144, 157, 172, 189.) These lists included such tasks as entering into new contracts with former TRE vendors and customers and terminating the employment of TRE employees and hiring them as LiquidX employees. (JX 189, Tr. at 572:7-18 (J. Kovacs).) Walker and Gielewski were responsible for

canceling TRE vendor contracts and entering into new contracts with vendors to the extent that LiquidX still needed them.  (Tr. at 452:14-24 (M. Walker).)  While many former TRE vendors entered into contracts with LiquidX, others did not.  (Tr. at 586:21-25, 587:7-12 (J. Kovacs); 669:1-13, 696:16-19, 697:6-11 (S. Gielewski); JX 45, 80.)  Walker also created a new computer directory or file share system for LiquidX, and LiquidX maintains a separate electronic document infrastructure from TRE.  (Tr. at 457:12-24, 458:11-13 (M. Walker).)

74.     During the formation of LiquidX, Mueller suggested to Toffey and Connolly that they use a non-TRE email account to communicate regarding LiquidX business.  (Tr. at 72:23-73:5, 83:14-16 (G. Mueller); 349:13-17 (J. Toffey).)  Mueller did so because LiquidX business was separate from TRE, not for any improper purpose.  (Tr. at 97:17-18 (G. Mueller); 243:22-244:5 (J. Connolly); 565:1-17 (J. Kovacs).)  Mueller has distinct email accounts for many of the businesses that he is involved with, and he keeps those accounts segregated by business.  (Tr. at 148:13-149:6 (G. Mueller).)

### H.    LiquidX Forecloses on Substantially All of TRE's Assets

75.     TRE's board accepted Mueller's proposal and LiquidX and TRE entered into a Partial Strict Foreclosure Agreement on December 31, 2015.  (Tr. at 146:24-147:2 (G. Mueller); JX 68.) TRE's remaining board members, Counihan and Farrington, and its preferred shareholders holding board seats, Prism, Bain (signed by a current managing director, since Connolly had resigned), StarVest and Redpoint, all signed consents approving the transaction and terminating their voting rights.  (JX 338.)  In doing so, Counihan and Farrington affirmed that the foreclosure and associated transactions "are in the best interests of the Companies and their stakeholders."  (JX 338 at LQX-SDNY002882.)  Under the agreement, LiquidX credited TRE $2.25 million toward the outstanding loan balance.

76.     The Partial Strict Foreclosure was fully consistent with the Comerica loan agreement.  While the Comerica loan agreement included a list of possible remedies, it did not preclude LiquidX, as the successor lender to Comerica, from pursuing other remedies and in fact specifically provides that the lender shall "have all other rights and remedies" under the Uniform Commercial Code.  (JX 1 at LIQUX000013-15.)  Brooklawn repeatedly attributed some ulterior motive to the parties changing the loan agreement's governing law from California to New York, but adduced no evidence of any such motive.  This change in governing law is not untoward nor even surprising given that neither party has any connection to California (where Comerica is located) and both conducted business in New York.  (Tr. at 484:17-25 (M. Walker); JX 67 at LQX000049.)

77.     LiquidX and TRE also entered into an Intellectual Property Purchase Agreement, whereby LiquidX acquired TRE's intellectual property that was not collateral under the Comerica loan for an additional $250,000.  (JX 69.)  These assets largely consisted of trademarks and domain names.  (JX 12, 69.)  None of the assets that LiquidX purchased separately related to the software platform.  (Tr. at 442:1-443:3 (M. Walker).)  LiquidX instead obtained the platform as collateral for the loan via the foreclosure.  (Tr. at 644:19-645:15 (S. Gielewski); JX 1 at LIQUX000026 (listing software as collateral); JX 68 at LIQUX000100-102, JX 13.)

78.     In December 2015, Mueller offered Toffey the job as LiquidX's CEO.  (Tr. at 45:8-12 (G. Mueller).)  Mueller became chairman of LiquidX's board.  (Tr. at 47:24-25 (G. Mueller).)

79.     After obtaining permission from TRE's board, LiquidX negotiated directly with TRE's employees to join LiquidX.  (Tr. at 54:9-14 (G. Mueller).)  Ultimately, all of TRE's employees, with the exception of Mike Gonik, joined LiquidX.  (Tr. at 703:8-14 (S. Gielewski).)

These employees signed termination agreements with TRE and new employment agreements with LiquidX.  (Tr. at 54:9-14 (G. Mueller).)  Toffey and the other former TRE employees joined LiquidX effective January 1, 2016.  (Tr. at 288:5-6 (J. Toffey); JX 239.)  Certain LiquidX employment agreements were dated December 24, 2015 and signed by Jim Toffey as LiquidX's CEO because the partial strict foreclosure that was originally expected to close on December 15 was first pushed back to December 24, before being pushed back to December 31.  (Tr. at 51:10-20, 135:8-15 (G. Mueller).)  The agreement dates conformed to the first of the pushed-back closing dates.  (Tr. at 135:2-15 (G. Mueller); JX 239.)

80.     LiquidX and TRE negotiated to make funds available to satisfy the claims of TRE's unsecured creditors – both contingent and non-contingent – during a wind-down.  (Tr. at 848:2-6 (J. Counihan); 890:21-891:19 (P. Sullivan).)  While LiquidX had the right to foreclose on all of TRE's cash, TRE negotiated for LiquidX to leave funds in TRE's bank account for purposes of paying TRE's creditor claims.  (Tr. at 421:4-21 (J. Toffey); 644:6-14. 651:19-21 (S. Gielewski); 790:23-791:3 (W. Haegele); 890:21-891:19 (P. Sullivan); JX 26.)  These funds were moved from TRE's Comerica account to TRE's Chase account, upon approval by Peter Sullivan, around the time of the foreclosure.  LiquidX never controlled those funds.  (Tr. at 689:11-18, 691:21-692:3 (S. Gielewski).)  In addition to these funds, TRE also generated other revenue from trades that was available to pay creditors.  (Tr. at 689:19-690:2 (S. Gielewski).)  Many of the TRE vendors paid with the funds left in TRE's bank account did not subsequently become LiquidX vendors.  (Tr. at 691:2-9 (S. Gielewski).)

81.     TRE also had a total of $10 million in insurance available to satisfy any litigation claims.  (Tr. at 245:20-246:10, 277:6-8 (J. Connolly).)  AIG has not taken any position suggesting that its policy does not cover the Brooklawn claims, and has not denied coverage.

(Tr. at 920:7-11 (P. Sullivan.)  To the contrary, AIG is paying defense costs pursuant to this same policy under a reservation of rights and has authorized TRE to make a settlement offer to Brooklawn.  (Tr. at 531:18-532:4 (J. Kovacs); 905:25-906:5, 917:18-21, 922:16-21 (P. Sullivan).)  AIG also paid defense costs and funded a settlement in litigation brought by Cargill and ICICI against TRE that involved similar claims as those asserted by Brooklawn.  (Tr. at 530:20-531:17 (J. Kovacs); 905:10-24 (P. Sullivan).)

82.     In reaching an agreement with LiquidX, TRE preserved value for its unsecured creditors.  Absent the foreclosure, Comerica likely would have foreclosed on its loan and swept TRE's cash rather than wait and allow the cash in the TRE accounts to be used up.  (Tr. at 775:1-21 (W. Haegele).)  Haegele determined that a liquidation would have followed, resulting in a deficiency of nearly $2.9 million – *i.e.*, liquidated creditor claims (not even including the Brooklawn contingent litigation claim) would have exceeded the proceeds generated in any sale.  (Tr. at 778:24-779:9 (W. Haegele).)  If this deficiency existed and Comerica foreclosed, TRE's unsecured creditors would have received nothing.  (Tr. at 779:3-4 (W. Haegele); 886:12-21 (P. Sullivan).)

I.     **LiquidX Provides Back Office Support to TRE Under the Transition Services Agreement**

83.     During discussions with TRE's board regarding the loan purchase and foreclosure, the board informed Mueller that it wanted a transition services agreement in place to ensure that existing TRE clients were serviced.  (Tr. at 54:18-25, 55:1-6 (G. Mueller).)

84.     Effective January 1, 2016, TRE appointed Peter Sullivan as its Chief Restructuring Officer to wind down TRE.  As a consultant, Kovacs assisted Sullivan and TRE's legal counsel with litigation against TRE, terminating TRE contracts and other wind-down work.

(Tr. at 531:5-8, 532:19-533:5, 554:13-555:3 (J. Kovacs); 902:8-25 (P. Sullivan).)  Kovacs sent

bills for his TRE consulting to Sullivan.  (Tr. at 552:2-5 (J. Kovacs).)

85.     LiquidX and TRE entered into a Transition Services Agreement on December 31,

2015 (the "TSA").  (JX 21.)  It had two main components.  First, LiquidX agreed to service the

existing trades of TRE customers.  (Tr. at 880:21-881:22 (P. Sullivan).)  Second, LiquidX agreed

to provide certain back office functions, including bookkeeping, accounts payable payments,

payroll services and financial statement preparation, to assist Sullivan with the wind-down.  (Tr.

at 646:4-15, 680:4-15 (S. Gielewski); 880:21-881:5, 883:2-16 (P. Sullivan).)

86.     The back office services provided by LiquidX were subject to the direct oversight

and approval of Sullivan, who is TRE's sole decision-maker.  (Tr. at 831:3-8 (J. Counihan).)

LiquidX's finance department, composed of Gielewski and Beth Carcich, ran a summary of

payables and sent that list to Sullivan for his approval.  (Tr. at 646:22-647:6 (S. Gielewski);

888:10-18, 889:1-3, 895:2-896:3 (P. Sullivan).)  Sullivan sometimes asked questions about bills

or declined to authorize payment.  (Tr. at 648:7-19 (S. Gielewski); JX 27.)  Sullivan alone

decided whether or not to pay a bill.  (Tr. at 650:14-24 (S. Gielewski).)  Once Sullivan approved

payment, Gielewski would process the payments out of TRE's bank account.  (Tr. at 646:22-

647:6, 651:4-6, 19-21 (S. Gielewski).)  Payments were never made without Sullivan's approval.

(Tr. at 647:10-15 (S. Gielewski); 848:7-9 (J. Counihan).)  TRE's payroll was disbursed in a

similar fashion.  Carcich sent a payroll report to Sullivan, and would only process the payment

after Sullivan approved.  (Tr. at 648:25-649:14 (S. Gielewski); 898:3-8 (P. Sullivan).)  TRE has

its own bank account and LiquidX funds are not commingled in that account.  (Tr. at 894:2-18

(P. Sullivan).)  Argus also prepares TRE's tax returns, which only reflect TRE's tax reporting

information.  (Tr. at 893:12-19 (P. Sullivan.)  The testimony was unrebutted that before any

money leaves TRE's bank account, Sullivan must approve the disbursement and that LiquidX employees never make those, or any other, decisions on behalf of TRE. (Tr. at 654:22-655:1, 676:23-677:3 (S. Gielewski); 906:6-8 (P. Sullivan).) No one from LiquidX has ever attempted to influence any of Sullivan's decisions. (Tr. at 906:9-11, 920:12-16 (P. Sullivan).)

87. Sullivan requested that LiquidX continue to perform these functions because Gielewski and Carcich were more familiar with TRE's books and records than he was, and he believed it was "without a doubt" more efficient and thus benefited TRE's creditors. (Tr. at 647:21-648:1 (S. Gielewski); 882:20-883:1, 883:17-884:6 (P. Sullivan).) This is a standard arrangement. Sullivan, an experienced insolvency professional, testified that he had previously used ex-employees who moved on to an acquirer to assist in a wind-down. (Tr. at 884:22-885:17, 903:17-904:1, 906:24-908:19 (P. Sullivan).) In this case, he requested that back office support be part of the TSA, in part so that he would have access to former TRE employees to help him. (*Id.*) LiquidX's work for TRE under the TSA significantly decreased by the fall of 2016. (Tr. at 670:22-671:12 (S. Gielewski); 916:10-17 (P. Sullivan).)

88. LiquidX has also reimbursed TRE for contractual expenses that TRE incurred for services used by LiquidX, such as when it could not quickly enter into new contracts with vendors, and instead requested that it be allowed to obtain services under TRE's contracts and reimburse TRE for the cost. (Tr. at 655:6-13, 698:2-7 (S. Gielewski); JX 32.) Sullivan signed all TRE contract cancellations. (Tr. at 656:17-657:9, 659:8-9 (S. Gielewski); 889:4-15 (P. Sullivan).) TRE never transferred funds to LiquidX, other than for payment of services authorized by Sullivan. (Tr. at 899:6-9 (P. Sullivan).)

89. LiquidX also provided technology services to TRE pursuant to the TSA. (Tr. at 460:7-23 (M. Walker).) The foreclosed assets included TRE's computer server. (JX 68 at

LIQUX000100-102; Tr. at 458:14-22 (M. Walker); 654:10-21 (S. Gielewski).)  Turnkey

Solutions is the administrator for that server, but sometimes Walker's assistance is required.  (Tr.

at 458:25-459:10 (M. Walker).)  Walker has also provided TRE employees with access to data

from the old TRE trading platform if needed.  (Tr. at 460:7-18 (M. Walker).)  As with other TRE

bills, Sullivan must approve all payments to Turnkey; on a few occasions he has questioned

Walker about Turnkey's bills.  (Tr. at 465:13-21, 466:17-24 (M. Walker).)

      90.    Walker also provided limited assistance to TRE pursuant to the TSA with respect

to accessing documents needed for TRE's arbitrations.  (Tr. at 606:2-10, 608:10-14

(M. Walker).)  Because LiquidX acquired TRE's server, TRE could not have responded to

discovery requests without some assistance from him.  (Tr. at 555:6-10 (J. Kovacs).)  Walker

provided TRE, or TRE's e-discovery vendor, with access to the server, and he answered general

questions about the landscape of available documents and how to access them.  (Tr. at 467:22-

468:10 (M. Walker).)  No one from LiquidX has been involved with, or attempted to influence,

TRE's strategy in the Brooklawn arbitration.  (Tr. at 906:15-23 (P. Sullivan).)  All such decisions

were made by Sullivan in conjunction with TRE's counsel.  (Tr. at 903:1-9 (P. Sullivan).)

     **J.**    **LiquidX's Business in 2016 is Different Than TRE's**

      91.    LiquidX and TRE both offered large corporate customers an online trading

exchange for accounts receivable, but the similarities end there.  (Tr. at 273:8-14 (J. Connolly).)

LiquidX has been working on adding new asset classes since its inception, and it introduced one

new asset class in the third quarter of 2016, with plans to add others.  (Tr. at 102:11-20

(G. Mueller).)  LiquidX also introduced new customer agreements and hired several new

employees in 2016.  (Tr. at 53:23-54:2, 102:21-103:10 (G. Mueller); 668:1-3, 703:25-704:3

(S. Gielewski); JX 41.)  TRE never could have made these changes because it did not have the

capital or resources available.  (Tr. at 346:12-22 (J. Toffey).)  Unlike TRE's board, LiquidX's

board is filled with individuals with FinTech experience who understand the industry.  (Tr. at
102:21-103:10 (G. Mueller).)  LiquidX's board consists of Connolly, Mueller, Toffey,
McCormack and a Broadridge representative.  (Tr. at 216:23-217:5 (J. Connolly).)

92.     LiquidX maintains separate financial books and records and accounting systems
from TRE.  (Tr. at 889:16-18, 893:4-9 (P. Sullivan).)  It has its own bank accounts, which do not
hold any TRE funds.  (Tr. at 652:19-22 (S. Gielewski); JX 77.)  LiquidX also has a separate
account and its own license for the general ledger software, NetSuite.  (Tr. at 665:3-7
(S. Gielewski).)  TRE's general ledger does not include LiquidX financial information and
LiquidX's general ledger does not include TRE financial information.  (Tr. at 665:8-13
(S. Gielewski).)  Several TRE vendors were not engaged by LiquidX, and LiquidX hired many
new vendors that never worked for TRE.  (Tr. at 669:14-25 (S. Gielewski); JX 80.)  LiquidX has
never paid TRE's employees, nor has TRE paid LiquidX's employees.  (Tr. at 887:16-888:1
(P. Sullivan).)  Only a few of TRE's customers ultimately became LiquidX customers.  (Tr. at
54:3-5 (G. Mueller); 337:2-10 (J. Toffey).)  TRE employees do not have offices at LiquidX.  (Tr.
at 704:23-705:11 (S. Gielewski).); 901:10-19 (P. Sullivan).)

93.     After several months of negotiations, Broadridge invested in LiquidX in March
2016.  (JX 74.)  While Broadridge passed on investing in TRE, it agreed to invest in LiquidX
because it wanted to help LiquidX move into the fixed income market, and TRE did not offer an
exchange for fixed income assets.  (Tr. at 335:3-13, 337:11-14 (J. Toffey).)  As part of that
financing round, Broadridge purchased approximately $2.5 million worth of preferred shares.
Additionally, Mueller's LX Investment Vehicle purchased $999,996.90 worth of shares and
Connolly and Toffey each purchased $249,998 worth of shares.  (JX 74.)  Four individuals – Bill
Sahlman, Brian Brille, Andrew Balson and Ted Ashford (none of whom had invested in TRE) –

also invested.  (Tr. at 47:2-19 (G. Mueller).)  Brooklawn has repeatedly alleged common

ownership between TRE and LiquidX, but the evidence shows there was none.  (Tr. at 46:15-

47:19 (G. Mueller); 217:6-15 (J. Connolly); JX 84.)

94.     Despite LiquidX's initial financial projections, the company is not yet profitable.

(Tr. at 675:20-676:4, 676:16-17 (S. Gielewski).)  It lost approximately $600,000 in the first two

months of 2016 and is currently losing $650,000 per month.  (Tr. at 672:2-16 (S. Gielewski);

JX 36.)  LiquidX is currently forecasting that it will take another nine-to-12 months to break

even on a monthly basis.  (Tr. at 672:2-16 (S. Gielewski); JX 36.)

## II.   CONCLUSIONS OF LAW

### A.   LiquidX Is Not the Alter Ego of TRE

95.     The alter ego doctrine is a form of piercing the corporate veil.  *See Mobil Oil*

*Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 266 (D. Del. 1989).  It is an extraordinary remedy

that is only appropriate in "exceptional circumstances." *Id*. at 270; *see Base Optics Inc. v. Yaping*

*Liu*, No. 9803-VCG, 2015 Del. Ch. LEXIS 155, at *86–87 (Del. Ch. May 29, 2015) (describing

piercing the corporate veil as an "extraordinary equitable remedy"); *Harco Nat'l Ins. Co. v.*

*Green Farms, Inc.*, Civil Action No. 1131, 1989 Del. Ch. LEXIS 114, at *10 (Del. Ch. Sep. 19,

1989) (same); *Ogea v. Merritt*, 130 So. 3d 888, 895 n.4 (La. 2013).  The party seeking to pierce

the veil bears the burden of proof. *See Amaysing Techs. Corp. v. CyberAir Communs.*, 2005 Del.

Ch. LEXIS 35, at *22 n.31 (Del. Ch. Mar. 3, 2005).

96.     Courts in this circuit apply the law of the entity's state of incorporation.  *See*

*Capmark Fin. Group Inc. v. Goldman Sachs Credit L. P.*, 491 B.R. 335, 346 (S.D.N.Y. 2013)

(applying Delaware law).  TRE, Inc. and LiquidX are both Delaware corporations, and Delaware

law applies here.  Finding of Fact ("FOF") ¶¶ 1, 3.  All investments were made in TRE, Inc., the

board members served for, and made all decisions on behalf of, TRE, Inc., financial statements

were prepared for TRE, Inc., and TRE, Inc. is TRE's sole member and manager.  FOF ¶ 3.  In short, TRE, Inc. is the operative entity and by ignoring it, Brooklawn skips an important step in its alter ego analysis.  While Delaware law applies, Brooklawn has failed to carry its burden under either Delaware or Louisiana law.

97.     Under Delaware law, piercing the corporate veil requires proof of two elements: that the officers or parent exercise "complete domination and control" of the relevant entity and that the corporate structure was used to perpetrate fraud or injustice.  *Wallace v. Wood*, 752 A.2d 1175, 1183–84 (Del. Ch. 1999).

98.     Under Louisiana law, the alter ego doctrine may only be used to reach officers, directors or shareholders of a corporation.  *Aker Solutions, Inc. v. Shamrock Energy Solutions,* 2016 U.S. Dist. LEXIS 116342, at *8 (E.D. La. Aug. 30, 2016); *see Riggins v. Dixie Shoring Co.*, 590 So. 2d 1164, 1168 (La. 1991) ("Louisiana courts are reluctant to hold a shareholder, officer, or director of a corporation personally liable for corporate obligations, in the absence of fraud, malfeasance, or criminal wrongdoing.").  LiquidX is none of these, and the claim fails under Louisiana law on this basis alone.

99.     Brooklawn likewise failed to prove either element under Delaware law.  Courts have declined to make an alter ego finding in cases that come closer to meeting the elements than those presented here.  *See Mobil Oil Corp.*, 718 F. Supp. 260 (no alter ego despite (1) the parent company's control of the subsidiary with respect to decisions on hiring, salary, major expenditures and policy, (2) the parent's guarantee of debts of the subsidiary, (3) the use of the subsidiary's bank account to pay obligations of the parent, (4) common officers and directors, and (5) the lack of separate minutes and agendas for the subsidiary's board meetings); *eCOMMERCE Indus. v. MWA Intelligence, Inc.*, No. 7471-VCP, 2013 Del. Ch. LEXIS 245 (Del.

Ch. Sep. 30, 2013) (no alter ego finding where entities had overlapping management, common ownership and coordinated marketing efforts).  The facts of this case bear no resemblance to the few cases in which courts have found alter ego.  *See, e.g.*, *NetJets Aviation, Inc. v. LHC Communs., LLC*, 537 F.3d 168, 173-74 (2d Cir. 2008) (sole owner of undercapitalized LLC used company funds for personal expenses, mischaracterized a loan and siphoned funds when the company was unable to pay creditors); *Midland Interiors, Inc. v. Burleigh*, 2006 Del. Ch. LEXIS 220, *15-19 (Del. Ch. Dec. 19, 2006) (business had a single owner and employee, never owned assets, never held corporate meetings, was consistently undercapitalized and insolvent, and was ultimately declared inoperative and void by the state for non-payment of franchise taxes).

### 1. LiquidX Did Not Use the Corporate Form to Perpetrate any Fraud or Injustice Against Brooklawn

100.    The party seeking to pierce the corporate veil must show that the corporate form was abused to perpetrate fraud or injustice to the party seeking to disregard the separation between the two companies.  *Wallace*, 752 A.2d at 1184 (citing *Outokumpu Eng'g Enters. v. Kvaerner Enviropower*, 685 A.2d 724, 729 (Del. 1996)); *Sapic v. Gov't of Turkmenistan* (*"Bridas I"*), 345 F.3d 347, 359 & n.11 (the control must be "used to commit a fraud or wrong that injured the party").  "Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud."  *Wallace*, 752 A.2d at 1184; *Capmark Fin. Group*, 491 B.R. at 350 (corporate form must be used as a "sham" to perpetrate a "fraud or injustice").  Brooklawn has failed to carry this burden.

101.    There has been no showing of any fraud or injustice on the part of LiquidX.  The only assets that LiquidX obtained under the transactions were collateral under the Comerica loan and intellectual property under a separate intellectual property agreement.  FOF ¶¶ 75, 77.  The purchase of the Comerica loan was the idea of an independent third party, Gary Mueller, and it

was for more than adequate value, as determined in the first instance by A&M and confirmed by LiquidX's valuation expert witness.  FOF ¶¶ 31, 55, 67-69.  The consideration paid under the intellectual property agreement, $250,000, was at the high end of the value for that asset as reflected in the A&M valuation.  FOF ¶ 77, JX 11-12.  Brooklawn introduced no affirmative evidence of valuation to rebut this, or indeed any evidence on valuation whatsoever.  FOF ¶ 68.

102.    LiquidX also negotiated with TRE to leave cash behind to permit TRE to pay its outstanding liabilities, and TRE left $10 million in insurance in place to cover outstanding litigation claims, including the Brooklawn arbitration.  FOF ¶¶ 80-82.  The insurer for one of these policies, AIG, has not disclaimed coverage of Brooklawn's claims.  FOF ¶ 81.  To the contrary, the evidence shows that AIG funded out of this same policy the settlement of a related claim, is paying the costs of defending the Brooklawn arbitration, and authorized TRE to make a settlement offer to Brooklawn.  *Id.*  There is absolutely no evidence to suggest that AIG would decline to cover a judgment or settlement for Brooklawn.  There was thus no fraud, particularly with respect to Brooklawn.

103.    Brooklawn alleges that Connolly and Toffey misled TRE's other directors into believing that the LiquidX foreclosure was the only viable path forward, and failed to disclose that they were working with Mueller.  The record is to the contrary on all of these points.  TRE's board considered numerous alternatives, including a bridge financing, other investors or buyers, and cutting costs, but none of these options was viable.  FOF ¶¶ 32-34, 40-41.  There is no evidence that Toffey or Connolly misled the remaining board members about any of this.  FOF ¶ 42.  The record also demonstrates that Connolly and Toffey disclosed to TRE's board that they planned to work with Mueller on his new venture.  FOF ¶¶ 36, 42, 51, 57.  Moreover, even if these allegations were true (they are not), any alleged failure on the part of Toffey or Connolly to

disclose that they planned to work with Mueller was not a misuse of LiquidX's corporate form as to Brooklawn, nor does it demonstrate that LiquidX was a "sham."

104.    Brooklawn has also alleged that LiquidX used the Partial Strict Foreclosure Agreement to change the applicable law in the underlying Comerica loan agreement from California to New York, *see* D.E. 53 at 13-14, but has never identified why this is relevant or how it was harmed.  As an initial matter, the application of New York law did not materially affect the parties' rights under the Comerica loan agreement.  New York and California each have Uniform Commercial Code provisions allowing for partial strict foreclosure.  Those provisions are substantively identical in all material respects.  *Compare* N.Y. U.C.C. Law § 9-620–23 *with* Cal. Com. Code § 9620-22.  There was no unfairness to anyone, least of all Brooklawn, based on the parties' selection of New York law.

105.    The change of law was also entirely reasonable and proper.  Comerica had a nexus to California, but TRE and LiquidX had no relationship with that state, and both conducted substantial business from New York.  FOF ¶ 76.  A reasonable inference can be drawn that the parties were more familiar with New York commercial law and adopted it.  Both the New York and California UCC allow the parties to choose the law governing an agreement.  *See* N.Y. U.C.C. Law § 1-301; Cal. Com. Code § 1301; *see also Sun Forest Corp. v. Shvili*, 152 F. Supp. 2d 367, 388 (S.D.N.Y. 2001) ("Under N.Y. Gen. Oblig. § 5-1401, parties to a contractual agreement worth more than $ 250,000 may freely agree to stipulate that New York law shall govern any disputes arising out of the transaction.").

106.    Furthermore, nothing in the loan agreement precluded LiquidX from proposing, and TRE accepting, a partial strict foreclosure.  Section 9.1 of the loan agreement provided a list of remedies, but did not bar other remedies.  Section 9.7 then specifically reserved for the lender

"all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity." (JX 1 at § 9.7.) LiquidX appropriately exercised rights available to it under the UCC.

107.    Brooklawn also cannot show the requisite fraud or injustice because it cannot demonstrate that it was harmed by LiquidX's actions. Brooklawn is in at least the same, if not better, position vis-à-vis TRE's assets as it would have been if LiquidX had never purchased and foreclosed on the Comerica loan. FOF ¶¶ 80-82. The evidence is clear that TRE needed additional investment, could not obtain any such investment and as a result was on the verge of a foreclosure or liquidation. FOF ¶ 32-35, 38, 40-41, 43, 45, 48. If LiquidX had not entered the picture, Comerica would have foreclosed on all of the assets and TRE's unsecured creditors, including Brooklawn, would have received nothing. FOF ¶ 38, 40, 43, 45, 48, 82.

108.    Brooklawn points the Court to *Bridas S.A.P.I.C. v. Gov't of Turkmenistan ("Bridas II")*, 447 F.3d 411 (5th Cir. 2011), in support of its alter ego theory. In that case, the government of Turkmenistan was the common owner of two entities, Turkmenian and Turkmenneft. Turkmenian was originally a party to an agreement with Bridas, but Turkmenistan dissolved it after Bridas filed an arbitration demand against it and replaced it with Turkmenneft. *Bridas II*, 447 F.3d at 414-15. This new company was capitalized with $17,000 and was funded by a fund that was rendered immune from seizure under a new law. *Id*. at 417. The Fifth Circuit found that the manipulation of this new entity satisfied the "fraud or injustice" element. *Id*. The court also found that "[i]ntentionally bleeding a subsidiary to thwart creditors is a classic ground for piercing the corporate veil." *Id*. at 420. The two key elements that guided the Court's reasoning are absent here. Unlike these two government-controlled entities, TRE and LiquidX do not share common ownership or a common parent. FOF ¶¶ 5, 8, 11, 53, 93; JX 84. Nor did LiquidX intentionally bleed TRE to avoid a judgment. TRE was already in severe distress when

Mueller and LiquidX entered the picture, and the transaction was solely the idea of a third party (Mueller).  FOF ¶¶ 5, 9, 12-14, 31, 55.  The only fact *Bridas II* has in common with this case is the presence of an arbitration.

109.  In essence, the "injustice" that Brooklawn complains of is that the company against which it may obtain a judgment is insolvent.  This is a fact that existed even before Brooklawn sued TRE – the company was burning through cash and faced a looming default on its secured debt.  FOF ¶¶ 5, 9, 12-14.  Moreover, difficulty enforcing a judgment against an insolvent entity does not justify piercing the corporate veil, particularly where an insurance policy is available to satisfy a potential judgment and the insolvency was not caused by LiquidX or its owners.  *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 530 (D. Del. 2008) ("[T]he possibility that a plaintiff may have difficulty enforcing a judgment is not an injustice warranting piercing the corporate veil.").

### 2.  LiquidX Does Not Dominate or Control TRE

110.  With respect to the second element, there must be a level of domination and control so severe that the dominated entity effectively "no longer has legal or independent significance of its own." *Wallace*, 752 A.2d at 1184 (quoting *Hart Holding Co. v. Drexel Burnham Lambert, Inc.*, 1992 Del. Ch. LEXIS 112, at *35 (Del. Ch. May 28, 1992)).  This is typically established by showing common ownership so as to allow for such domination.  *See Albert v. Alex. Brown Mgmt. Servs.*, 2005 Del. Ch. LEXIS 133, at *29 (Del. Ch. Aug. 26, 2005) ("While many factors are considered in deciding whether to pierce the corporate veil, 'the concept of complete domination by the parent is decisive.'" (quoting *Phoenix Canada Oil Co. v. Texaco, Inc.*, 842 F.2d 1466, 1477 (3d Cir. 1988))).  TRE and LiquidX do not have common ownership.  FOF ¶¶ 5, 8, 11, 53, 93; JX 84.  None of the individuals who Brooklawn points to as part of the "LiquidX Management Team" has, or has ever had, shareholdings in both TRE and

LiquidX.  Toffey never had vested shares of TRE, Connolly never held shares of TRE, and Kovacs never held shares in TRE or vested shares in LiquidX. FOF ¶¶ 5, 8, 11, 53, 93; JX 84. There is no ownership overlap at all.

111.  The lack of common ownership is fatal to Brooklawn's theory, and its argument that LiquidX and TRE are "sister" corporations, so "lateral" or "horizontal" veil piercing applies, is meritless.  While courts sometimes pierce the veil of two "sister" companies, a necessary element is common ownership or a common parent, which is absent here. *See Gartner v. Snyder*, 607 F.2d 582, 587-88 (2d Cir. 1979) (veil piercing available where corporations are being operated by their individual owner as a single "corporate combine"); *D. Klein & Son, Inc. v. Good Decision, Inc.*, 147 Fed. Appx. 195, 197 (2d Cir. 2005) (affirming alter ego finding where common owner controlled two related corporations); *Dickson Marine Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338-39 (5th Cir. 1999) (court evaluated sister companies that shared common parent under alter ego doctrine for purposes of personal jurisdiction).  TRE and LiquidX are not "sister" or "lateral" companies because they do not have a common parent.  They are simply different companies.

112.  Not only is common ownership a necessary prerequisite, but the other factors courts consider also demonstrate the absence of domination and control.  These factors include whether:  (1) the relevant entities adhered to legal formalities when contracting with one another; (2) dividends were paid; (3) corporate records were kept, and whether officers and directors functioned properly, (4) corporate and shareholder funds were intermingled; (5) the relevant entity failed to follow statutory formalities for incorporating and transacting corporate affairs; (6) the relevant entity was undercapitalized; (7) the relevant entity lacked a separate bank account and bookkeeping records; (8) the relevant entity failed to hold regular shareholder and director

meetings; (9) the company is solvent; (10 the company and its owners observe corporate formalities; (11) the dominant shareholder siphons funds from the company; and (12) the company functions as a mere façade for the dominant shareholder.  *See EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*, 2008 Del. Ch. LEXIS 127, at *46 (Del. Ch. Sep. 2, 2008) (quoting *Pauley Petroleum, Inc. v. Cont'l Oil Co.*, 239 A.2d 629, 633 (Del. 1968)); *Riggins*, 590 So. 2d at 1169.

113.    TRE and LiquidX adhered to legal formalities when contracting with one another. The Partial Strict Foreclosure Agreement and Intellectual Property Purchase Agreement were formal agreements signed by each entity's duly appointed corporate representative, and LiquidX paid fair consideration under each agreement.  FOF ¶¶ 67-69, 75, 77.  TRE and LiquidX also entered into the TSA whereby LiquidX supplied back office services and support for existing trades for TRE during TRE's wind down.  FOF ¶¶ 83-90.  Toffey signed these documents for TRE only after TRE's board approved them in November and December 2015.  FOF ¶ 75; JX 68, 69, 338.

114.    Whether dividends were paid is not relevant to this analysis.  The evidence suggests that TRE was financially distressed and unlikely to be able to pay a dividend for many years before LiquidX entered the picture.  FOF ¶¶ 5, 9, 12-14.

115.    TRE maintained corporate books and records, and its officers and directors functioned properly.  TRE maintained board minutes for board meetings, including for the seven meetings held between October and December 2015.  JX 63.  Those meetings were attended by TRE's outside counsel.  *Id*.  When corporate decisions needed to be made, TRE's duly-appointed directors voted on them at meetings or signed consents to approve them.  FOF ¶ 36, 40, 56, 75;

JX 63, 338.  While in some cases, the corporate documents contained errors or were incomplete, that does not take away from the point that TRE actively maintained them.

116.    Brooklawn presented no evidence of any intermingling of corporate and shareholder funds.

117.    TRE and LiquidX both adhered to statutory formalities.  There was no evidence offered to the contrary.

118.    TRE could not be considered undercapitalized.  The proper inquiry is whether TRE was capitalized at the time it was formed.  *See* 1 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations, § 41.33 (2002) ("A corporation that was adequately capitalized when formed, but which subsequently suffers financial reverses is not undercapitalized.").  TRE was capitalized by virtue of $60 million in equity investments over a period of years.  FOF ¶ 5; JX 84.  Companies that are initially capitalized sometimes become insolvent, which is not the same as being undercapitalized.  As for its subsequent insolvency, the events the led to it occurred prior to Mueller's interest in TRE.  FOF ¶¶ 5, 9, 12-14.  Neither LiquidX nor its owners caused any alleged undercapitalization or insolvency.

119.    LiquidX and TRE each maintained separate bank accounts and bookkeeping records.  FOF ¶¶ 86, 92.  While LiquidX employees provided back office services to assist Sullivan under the TSA, such an arrangement is a common feature of an asset sale.  *See Edgewater Growth Capital Partners LP v. H.I.G. Capital, Inc.*, 68 A.3d 197 (Del. Ch. 2013) (transition services agreement not "uncommon in distressed scenarios" and was commercially reasonable in a foreclosure sale agreement).  LiquidX employees do not make any transfers of TRE money without Sullivan's approval.  FOF ¶ 86.  There is no evidence that they exercised any decision-making authority, made any payments on behalf of TRE, or that they paid TRE's

bills or employees using LiquidX funds.  FOF ¶ 86; *C.R. Bard. Inc. v. Guidant Corp.*, 997 F.

Supp. 556, 558 & 560 (D. Del. 1998) (no basis to disregard corporate form where entities share a

centralized payroll system, but employees are hired and fired by separate entities, wages are

accounted for separately and entities submit separate tax returns).  The use of LiquidX personnel

to perform accounting, payables and payroll functions was more economical than TRE retaining

staff to undertake these tasks.  FOF ¶ 87.  This increased efficiency benefitted TRE's creditors.

*Id.*

   120. TRE regularly held shareholder and director meetings.  JX 63.

   121. There has been no "siphoning" of funds from TRE.  At the time Mueller learned

of TRE, the company was on the verge of default and virtually all of its cash belonged to

Comerica.  FOF ¶¶ 5, 9, 12-14.  Mueller bargained with Comerica to obtain the loan and thereby

the power to foreclose on TRE's assets in the event of default.  FOF ¶¶ 30, 44, 46, 60, 62.  It paid

more than fair value for all of the assets it obtained.  FOF ¶¶ 67-69.

   122. Brooklawn has made other allegations, none of which support a finding of

domination and control.  For example, it has pointed to LiquidX's hiring of TRE's employees

and moving into TRE's former office space.  First, the two companies were not actively engaged

in business at the same time.  By the time LiquidX began conducting business on January 1, TRE

had already begun winding down, so any overlap in the operating space or in employees was

temporary.  FOF ¶¶ 58, 84, 87, 91.  LiquidX acquired substantially all of TRE's assets so it is not

surprising that it moved into TRE's office space.  After seeking TRE's permission, it negotiated

with most of TRE's employees to join LiquidX.  FOF ¶ 79.  At the LiquidX board level, Mueller

serves as the chair and McCormack and Broadridge also have board seats.  FOF ¶¶ 78, 91.  None

of them served on TRE's board.  FOF ¶¶ 7, 91.  Toffey is LiquidX's CEO, but it also hired a new

CFO and General Counsel who were never affiliated with TRE.  FOF ¶¶ 79, 91.  *See Mason v. Network of Wilmington, Inc.*, 2005 Del. Ch. LEXIS 99, at *12 (Del. Ch. July 1, 2005) (rejecting alter ego claim where two companies had the same sole shareholder, used the same office building and phone number); *Albert*, 2005 Del. Ch. LEXIS 133, at *31 (allegations of shared offices, employees and executives do not "alone or together" support disregarding the corporate form); *Capmark Fin. Group*, 491 B.R. at 350 (shared employees, officers and directors insufficient to disregard corporate form)

123.  LiquidX's and TRE's businesses also differ.  LiquidX operates a different, broader exchange than TRE did.  TRE was a trading place for accounts receivable only, but LiquidX has expanded into additional trade assets and plans to expand into others.  FOF ¶ 91. Many of TRE's customers have not signed on with LiquidX, and LiquidX has begun attracting new customers.  FOF ¶ 92.  While Mueller originally envisioned steering TRE to expand into other trade assets, the company did not have the wherewithal to do so because it could not attract additional investment and had substantial debt.  FOF ¶ 21, 25, 91.

124.  Brooklawn points to LiquidX's possession of TRE's servers and other property. LiquidX paid fair consideration for these assets.  FOF ¶¶ 67-69, 75, 89-90.  Brooklawn unsurprisingly has failed to cite a single case where one company paid adequate consideration for another company's assets and then was found to be its alter ego upon using them.

**B.      LiquidX and TRE Are Not a Single Business Enterprise**

125.  Brooklawn also seeks to apply Louisiana's "single business enterprise" theory to join LiquidX to the arbitration.  As an initial matter, Delaware law applies here and Brooklawn has no claim under this Louisiana theory.  Even if Brooklawn could make a claim, because the single business enterprise doctrine also should be applied only in exceptional circumstances, the party seeking to apply it bears the burden of proof by clear and convincing evidence.  *See*

- 47 -

*Grayson v. R.B. Ammon & Assocs.*, 778 So. 2d 1, 14 (La. App. 1 Cir. 2000); *Lee v. Clinical Research Ctr. of Fla., L.C.*, 889 So. 2d 317, 328 (La. App. 4 Cir. 2004).

126.     As Brooklawn has acknowledged, the single business enterprise doctrine is a variation of alter ego and requires a similar showing.  It is inapplicable here for a number of reasons.  First, the single business enterprise theory applies only to entities that are operating concurrently.  *See Lee*, 889 So. 2d at 327 (two entities do not constitute a single business enterprise where one entity did not begin operations until after the other entity had ceased accepting new business); *Andrus v. Scully's Metal Fabrication, Inc.*, 352 B.R. 783, 786 (Bankr. W.D. La. 2006) (single business enterprise inapplicable where the parties never did business together or operated at the same time).  LiquidX and TRE have never done so; TRE is winding down and has never conducted joint operations with LiquidX.  FOF ¶¶ 58, 84, 87, 91.

127.     Second, similarly to the alter ego doctrine, a key factor is common ownership or control of affiliated entities.  *See Green v. Champion Ins. Co.*, 577 So.2d 249, 259 (La. App. 1 Cir. 1991) (applying single business enterprise theory where same family members were controlling shareholders of a series of corporations; single business enterprise "may take the form of a traditional parent-subsidiary relationship or that of a single individual or group of individuals owning directly the stock of various corporations which go make up the single business enterprise"); *Brown v. Automotive Casualty Ins. Co.*, 644 So.2d 723, 730 (La. App. 1 Cir. 1994) ("Most importantly, the Court finds absolute control of all corporations by a single individual…who wrote checks at will with no documentation or authorization and for undisclosed purposes.").  As described above, this ingredient is indisputably absent here.  FOF ¶¶ 5, 8, 11, 53, 93; JX 84.

128.    Finally, the single business theory also requires a showing of fraud or inequity. *Peoples State Bank v. GE Capital Corp.*, 482 F.3d 319, 335 (5th Cir. 2007) (single business enterprise does not apply where no allegation that plaintiffs were "damaged, disadvantaged, or delayed in the enforcement of [their] rights").  Brooklawn cannot make this showing because it is no worse position today than if LiquidX had not entered the picture and Comerica foreclosed. FOF ¶¶ 38, 40, 43, 45, 48, 80-82.

129.    The 18 factors considered by Louisiana courts to determine if the doctrine applies further demonstrate that TRE and LiquidX are not a single business enterprise: (1) the two companies do not have any overlap in ownership, FOF ¶¶ 5, 8, 11, 53, 93; JX 84; (2) only two of five LiquidX directors served as TRE directors, FOF ¶ 7, 91;  (3) there is no unified administrative control: Toffey and the board make decision for LiquidX and Sullivan makes decisions for TRE, FOF ¶ 86, 90; (4) TRE's and LiquidX's officers and directors function independently, FOF ¶¶ 91-92; (5) LiquidX does not finance TRE, FOF ¶¶ 80, 88, 92; (6) to the extent TRE is now undercapitalized, it was not originally and its current financial distress predates LiquidX's involvement, FOF ¶¶ 5, 9, 12-14; (7) TRE did not incorporate LiquidX; Gary Mueller did, FOF ¶ 31, 52, 55; (8) LiquidX and TRE pay the salaries of their own employees and their own expenses, FOF ¶¶ 86, 88, 92; (9) LiquidX did not enter into agreements with a majority of TRE customers, and TRE is winding down and no longer conducts business, FOF ¶¶ 58, 84, 87, 91-92; (10) LiquidX acquired the assets of TRE via a Partial Strict Foreclosure and paid more-than adequate consideration for those assets, FOF ¶¶ 67-69, 75, 77; (11) both TRE and LiquidX comply with corporate formalities, FOF ¶¶ 86, 91-92; JX 8, 9, 63, 338; (12) LiquidX employees and TRE employees were never "in common," FOF ¶ 79; (13) the only services provided by LiquidX on behalf of TRE are pursuant to the TSA, FOF ¶¶ 83-90; (14)

following the foreclosure, LiquidX moved into TRE's offices in New York and New Orleans, but TRE employees do not have officers there, FOF ¶ 92; (15) the companies maintain separate bank accounts, books and records, pay their own bills and file separate tax returns, FOF ¶¶ 86, 92; (16) any transfers of funds between TRE and LiquidX were for reimbursement of expenses and were documented, FOF ¶ 88; (17) the companies maintain separate records and allocate profits and losses to each respective entity, FOF ¶¶ 86, 92; and (18) LiquidX and TRE are two separate companies with different owners and are appropriately incorporated as such, FOF ¶ 5, 8, 11, 52, 53, 93; JX 84. *See Lee*, 889 So.2d at 326 (no single business enterprise finding where companies conducted accounting from a central office, but maintained separate books and bank accounts, earned their own income, paid their own bills and filed separate tax returns).

130.   The totality of the circumstances thus does not justify treating LiquidX and TRE as two halves of a single business enterprise.

Dated: December 14, 2016                  Respectfully submitted,

                                          LIQUIDX, INC.,

                                          By its attorneys

                                          /s/ Michael J. Licker
                                          Peter A. Sullivan, Esq. (PS-4704)
                                          FOLEY HOAG LLP
                                          1540 Broadway, 23rd Floor
                                          New York, NY 10036
                                          psullivan@foleyhoag.com
                                          Telephone: (646) 927-5500
                                          Facsimile: (646) 927-5599

                                          Michael Licker, Esq., (*pro hac vice*)
                                          FOLEY HOAG LLP
                                          155 Seaport Boulevard
                                          Boston, MA  02110
                                          mlicker@foleyhoag.com
                                          Telephone: (617) 832-1000
                                          Facsimile: (617) 832-7000

### <u>Certificate of Service</u>

I, Michael J. Licker, certify that on December 14, 2016, I caused a copy of the foregoing document to be served on counsel for defendants via the Court's CM/ECF system.


/s/ Michael J. Licker
Michael J. Licker