UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LIQUIDX, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 16-cv-5528-WHP |
| ) | |
| BROOKLAWN CAPITAL, LLC, ) | |
| BROOKLAWN CAPITAL FUND, LLC, and ) | |
| BROOKLAWN CAPITAL FUND II, LP ) | |
| ) | |
| Defendants. ) | |

**<u>LIQUIDX, INC.'S REPLY TO BROOKLAWN'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

## **TABLE OF CONTENTS**

I.    BROOKLAWN FAILED TO EVEN ADDRESS, LET ALONE ESTABLISH, COMMON OWNERSHIP AND INJURY ..................................................................................2

II.    BROOKLAWN'S SUPPOSED "FACTS" ARE FICTION .............................................4

    A.    Fiction: TRE's "Rosy" Financial Projections........................................................5

    B.    Fiction:  The Cavalcade of Suitors for TRE.........................................................5

    C.    Fiction:  The Board Failed to Consider Alternatives to Mueller's Transaction ......6

    D.    Fiction: TRE Pressured Comerica to Sell the Loan and Engineered a Default.......7

    E.    Fiction:  Secret Meetings and Secret Communications .........................................8

    F.    Fiction:  The Partial Strict Foreclosure and Intellectual Property Purchase Transactions Were Improper and Harmed Brooklawn ..........................................8

    G.    Fiction:  Common Employees and TRE/LiquidX Interactions in 2016................10

## TABLE OF AUTHORITIES

### Case Law

*Am. Federated Title Corp. v. GFI Mgmt. Servs.*, 39 F. Supp. 3d 516 (S.D.N.Y. 2014) .................. 3

*Capmark Fin. Group Inc. v. Goldman Sachs Credit L.P.*, 491 B.R. 335 (S.D.N.Y. 2013) ............. 2

*Holme v. Global Mins. & Metals Corp.*, 63 A.D.3d 417, 879 N.Y.S.2d 453 (1st Dep't 2009) ...... 3

*Rebh v. Rotterdam Ventures*, 252 A.D.2d 609, 675 N.Y.S.2d 234 (3d Dep't 1998) ...................... 3

*Wm. Passalacqua Builders v. Resnick Developers S.*, 933 F.2d 131 (2d Cir. 1991) ……………..2

Brooklawn's Proposed Findings of Fact and Conclusions of Law are further proof that Brooklawn is not going to let the facts get in the way of its story. Brooklawn distorts the factual record, and makes a claim that is unmoored from the two key legal requirements to satisfy alter ego: (1) complete domination and control and (2) a fraud or wrong that injured it. In doing so, Brooklawn makes unwarranted attacks on the professional integrity of LiquidX's witnesses, recklessly disregarding the substantial reputational damage such accusations can inflict.

Brooklawn repeats the same meritless claims — Comerica was coerced to sell its loan, TRE "engineered" its own default, the collateral was worth "millions more" than the valuation — despite citing no evidence to support these conspiracy theories, and in the face of evidence flatly contradicting them. Brooklawn also ignores other inconvenient facts. One case in point — excising the obligation of co-ownership from its "test" for alter ego. Every case that Brooklawn cites concerns entities with a near complete overlap in ownership, but there is no mention of this requirement in Brooklawn's submission. Without a proper focus on domination and control, its elastic, multi-factor test would just as easily apply to a spin-off of a corporate division as it applies here. Applying the test as Brooklawn proposes is not only contradicted by the case law, but it would open a Pandora's Box for corporate transactions.

Brooklawn also conveniently ignores the valuation work of Alvarez & Marsal and William Haegele, which conclusively established that Brooklawn was not harmed by the foreclosure. Similarly absent is any mention of insurance that TRE maintained for precisely this type of claim. Brooklawn likewise neglects that the work performed by LiquidX for TRE was pursuant to a Transition Services Agreement. The intentional omission completely changes the complexion of these exchanges.

Moreover, the idea that TRE decided to shut down and make its assets subject to foreclosure just to avoid a potential judgment of Brooklawn is ludicrous. TRE was losing money at an unsustainable rate – it had net monthly losses ranging from $200,000-to-$700,000 in 2015, and by Spring 2015 it was living off the Comerica loan proceeds just to survive. The four institutional investors who controlled TRE lost their entire investments when TRE failed. TRE's collapse was multi-faceted, resulting from a history of mismanagement, a failed business model, and the related litigation exposure.

There are two inescapable truths that came out of the trial: 1) TRE had no choice other than to wind down after the Solaia award, given the massive monthly cash burn, imminent loan default, and lack of viable alternatives; and 2) the LiquidX transaction was fair for TRE. Brooklawn had no basis to invoke the alter ego doctrine. For Brooklawn to continue pressing it in the face of no legal support and undisputed evidence of fairness in the underlying transaction is bad enough. To mislead the Court on the law and bury critical facts is egregious.

## I. BROOKLAWN FAILED TO EVEN ADDRESS, LET ALONE ESTABLISH, COMMON OWNERSHIP AND INJURY

Brooklawn omits from its proposed findings any discussion of two key elements of alter ego: (1) common ownership and (2) a fraud or inequity as to Brooklawn.

LiquidX already established that common ownership is the essential element of alter ego, and the cases cited by Brooklawn confirm this. Every single case it cited involved common ownership.[1] *See Wm. Passalacqua Builders v. Resnick Developers S.*, 933 F.2d 131, 139-40 (2d Cir. 1991) (corporate entities controlled entirely by family members or family-owned businesses

---

1 Contrary to Brooklawn's claim, LiquidX asserts that the law of the relevant entity's state of incorporation controls. *See Capmark Fin. Group Inc. v. Goldman Sachs Credit L.P.*, 491 B.R. 335, 346 (S.D.N.Y. 2013). As such, Delaware law applies here.

were undercapitalized, used company funds for personal expenses, and comingled funds); *Am. Federated Title Corp. v. GFI Mgmt. Servs.*, 39 F. Supp. 3d 516, 525-26 (S.D.N.Y. 2014) (defendants created new inadequately capitalized entities and transferred funds to other companies they owned and controlled); *Holme v. Global Mins. & Metals Corp.*, 63 A.D.3d 417, 417-18, 879 N.Y.S.2d 453 (N.Y. App. Div. 1st Dep't 2009) (dominant shareholders stripped company of assets, then transferred business to new entities within their ownership and control); *Rebh v. Rotterdam Ventures*, 252 A.D.2d 609, 610-11, 675 N.Y.S.2d 234 (N.Y. App. Div. 3d Dep't 1998) (parent inadequately capitalized subsidiary and had it transfer all assets to parent for less than fair consideration).

No matter how Brooklawn defines veil piercing – "lateral," "horizontal," or "sister companies" – the conclusion remains the same:  LiquidX and TRE are separate companies, with completely separate ownership.[2]  Plaintiff Finding of Fact ("P. FOF") ¶¶ 5, 8, 11, 53, 93, JX 84. No matter how "flexible" Brooklawn claims the doctrine may be, it does not apply here.

Brooklawn also disregards its burden to prove that it suffered injury as a result of the transaction.  The evidence proved that the transaction was entirely fair to all parties, including Brooklawn.  P. FOF ¶¶ 66-69, 80-82.  The evidence shows that TRE had no option but to wind down after the Solaia award.  P. FOF ¶¶ 32-43.  Brooklawn does not even mention the testimony of Alvarez & Marsal's lead valuation professional, Kimberly Russell, or LiquidX's valuation expert, William Haegele, which indisputably established that LiquidX paid fair value for TRE's

---

2  To prop up its ownership argument, Brooklawn calls Connolly an investor in TRE, knowing full well that the evidence proves he was not.  P. FOF ¶ 8.  He invested in a $660 million Bain fund that acquired TRE as one of 34 portfolio companies <u>after</u> Connolly made his investment decision.  (Trial Transcript ("Tr.") at 162:19-164:9 (J. Connolly).)  It calls Toffey a "stockholder" of TRE, even though the evidence is undisputed that he held restricted shares that never vested.  P. FOF ¶ 11.

assets.  P. FOF ¶¶ 66-69.  Brooklawn likewise ignores the unrebutted testimony of Haegele that TRE's unsecured creditors, including contingent ones like Brooklawn, would have done worse if TRE dismissed Mueller's proposed transaction and Comerica foreclosed.  P. FOF ¶ 82.

Brooklawn offers no evidence to substantiate its allegation that A&M undervalued TRE's assets by millions.  Its only "proposed finding" on valuation is a chart comparing the "pre-money valuation" for Mueller's proposed investment in TRE with the A&M valuation and a proposed "pre-money valuation" for a LiquidX investment.  Brooklawn Proposed Finding of Fact ("B. FOF") ¶ 82.  Four different witnesses explained how a pre-money valuation is entirely different than an asset valuation (or as Counihan described it, like comparing " an apple to an orange").[3]  No one testified that the two metrics are in any way related.

Brooklawn also ignores other evidence that no fraud or injustice was suffered by it, particularly the $10 million in insurance that was left in place to address its claim.  It makes no attempt to rebut the fact that AIG (1) is paying defense costs in the arbitration, (2) authorized TRE to make a settlement offer to Brooklawn, and (3) paid defense costs and funded a settlement in a related matter.  P. FOF ¶ 81.

## II.     BROOKLAWN'S SUPPOSED "FACTS" ARE FICTION

While Brooklawn spins a tale of alleged fraud and deception, and repeatedly and unjustifiably impugns the integrity of the people who work for and invested in LiquidX, it utterly failed to support its allegations at trial.  Brooklawn nonetheless repeats these allegations, resorting to mischaracterizations, factual distortions, falsehoods, and, in some cases, offering as

---

3  Tr. at 23:23-25 (G. Mueller); 187:4-13, 187:23-188:2 (J. Connolly); 846:12-21, 848:19-849:15 (J. Counihan); 817:22-818:12 (W. Haegele); P. FOF ¶ 18.

"fact" attorney argument without citation to the record. While the page limit precludes a deconstruction of all these distortions, LiquidX addresses the more egregious ones here.

### A. Fiction: TRE's "Rosy" Financial Projections

Before Mueller entered the picture, TRE was approaching financial desperation. It was rapidly burning through cash in 2015 and dipping into the Comerica loan to operate. P. FOF ¶ 12. TRE suffered net monthly losses of $206,000 in February 2015, $382,983 in April, $368,009 in May and $239,205 in June. JX 48. TRE's losses worsened on the eve of Mueller's planned investment, with a net loss of $766,115 in September. *Id.* For the year, it lost $4.55 million. JX 91. Even its "record" trading volume of $687 million in the second quarter of 2015 was just a fraction of the $8-12 billion that TRE needed to break even. P. FOF ¶ 12. These steep losses made it impossible for TRE to continue operating without an immediate injection of capital. (Tr. at 762:18-763:5 (W. Haegele).)

### B. Fiction: The Cavalcade of Suitors for TRE

Despite this financial distress, Brooklawn contends that "eight separate investors were courting TRE." B. FOF ¶¶ 6, 13. This suggestion is a complete fabrication. The evidence showed that it was TRE that courted — unsuccessfully — 30 investors before the Solaia award. P. FOF ¶ 13-14. Four of the eight entities Brooklawn refers to are the institutional investors that held TRE board seats, but it is undisputed that they would only invest with a new lead investor. *Id.* at ¶ 5, 19. Once Mueller cancelled his investment, these investors followed suit. *Id.* at ¶¶ 28-29, 32-33. The fifth is Connolly, who agreed to a small investment only as "a gesture of support." (Tr. at 225:25-226:3.) The sixth, Broadridge, also passed, but indicated it might take another look if Mueller's round closed. P. FOF ¶ 8. As for Pivot, TRE needed a larger investment than it offered. *Id.* at ¶ 8. No potential investors came forward after the Solaia award. *Id.* at ¶¶ 33-34.

The evidence also establishes that Mueller alone cancelled the funding round. *Id*. at ¶¶ 28-29.  TRE's financial reality at this point could not have been more apparent: without a new investor, it had no future as a going concern.  (Tr. at 763:7-13 (W. Haegele).)

### C. Fiction:  The Board Failed to Consider Alternatives to Mueller's Transaction

Brooklawn contends, again without citation, that Mueller and "TRE's Management Team" "came up with a plan" for TRE to default under the loan and to convince Comerica to sell the loan so LiquidX could foreclose on it.  B. FOF ¶¶ 26-27.  There was no plan or conspiracy.  Mueller and his attorneys conceived of, and carried out, the alternative transaction, and Mueller formed LiquidX.  P. FOF ¶¶ 30-31, 52, 54-55.

TRE pursued Mueller's proposal because there were no alternatives.  Brooklawn's suggestion that TRE did not consider "any other options because they were excited to invest in 'New Co'" (once again without citation) is contrary to the record, and ignores that the investors who controlled TRE had no opportunity to invest.  B. FOF ¶ 30.  TRE's board acted under enormous financial pressure:  TRE faced an October net loss of nearly $600,000 after losing more than $700,000 in September, and on September 30 it was just $210,000 from breaking the Comerica loan covenant.  JX 50-51.  If the board did not act quickly, Comerica soon would.  But before turning to Mueller's alternative transaction, TRE considered finding a new investor, obtaining bridge financing by existing investors or cutting its burn rate.  P. FOF ¶¶ 32-35.  None was feasible.  *Id*.  It also considered a third-party sale.[4]  *Id*. at ¶ 41.  Every witness at trial testified that TRE had no other alternatives.  *Id*. at ¶¶ 32-35, 40-41.

---

4 Brooklawn points to Farrington at the October 30 board meeting questioning whether TRE should conduct a search for other potential purchasers of the Comerica loan or new investors, and attributes a sinister motive to the privilege redactions that follow her question.  B. FOF ¶ 38.  This is pure speculation, and it disregards other comments in meeting minutes, including the

### D.     Fiction: TRE Pressured Comerica to Sell the Loan and Engineered a Default

Brooklawn continues to insist that TRE's Management Team "pressured" Comerica to sell the loan (B. FOF ¶ 41), and Comerica "had no reason to believe that TRE was distressed or that the loan was under-secured." B. FOF ¶ 46. This too is fanciful. As to the allegation of coercion, Comerica's Barry Cohen was unequivocal: no one at TRE pressured Comerica to sell the loan. P. FOF ¶ 46. As to the allegation that Comerica was unaware of TRE's dire financial condition, the extensive communications between Comerica and TRE, including an October 15 letter expressing "concern about [TRE's] ability to perform their obligations under the Loan Documents and repay the outstanding Loan balance," prove otherwise. JX 46.[5] Comerica also received monthly financial updates, which demonstrated that TRE was rapidly burning cash and a default was imminent. Comerica was closely monitoring the status of the financing and requested increased reporting when the financing fell apart. P. FOF ¶¶ 10, 23, 37-38, 43. Brooklawn ignores all of this. In light of these undisputed facts, TRE's board acted more than reasonably in quickly taking steps to avoid the inevitable foreclosure, and instead choosing an option that allowed for an orderly wind-down.

Brooklawn likewise asserts that TRE "engineer[ed] a default on the Comerica loan" without a shred of evidence. B. FOF ¶ 56. It instead speculates that TRE could have prevented the default by moving $30,000 from another bank account. This pointless activity would have

---

entry in the October 11 meeting where she expressed that "Mueller should be told that the Company wants to enter into a transaction with him." JX 63 at TRE Foreclosure 04839.
5 Brooklawn's argument that Comerica acted as though its loan was fully secured by demanding the full loan price from Mueller fares no better. B. FOF ¶ 74. Comerica had the opportunity in late October to sweep $2 million and force a liquidation of TRE's remaining assets to recoup the remaining $1.25 million. *Id.* at ¶ 43-45. It is not surprising, then, that Comerica would seek to be made whole by a purchaser of the note.

"avoided" a default by a couple of days. P. FOF ¶ 45. Brooklawn's other assertion that the loan was not in default in early October is misleading because TRE was losing hundreds of thousands of dollars a month. A default was imminent and unavoidable. P. FOF ¶¶ 5, 12, 32, 34, 38.

### E.  Fiction: Secret Meetings and Secret Communications

It was no secret that Connolly and Toffey planned to work with Mueller on his new company. They all disclosed their plans to the board.[6] P. FOF ¶¶ 36, 42, 51, 57. Counihan's testimony, to the extent that it can be read as inconsistent, is contradicted by the board minutes. They reflect that Mueller was making offers to all TRE employees – surely such an offer would include the person who managed them all, Toffey. *Id*. at ¶¶ 56-57. They also demonstrate that the existing investors expressed an interest in investing in Mueller's new company. *See* JX 63 at TRE Foreclosure 04840, 46. Mueller further confirmed this when he testified that he rejected Counihan's and Farrington's requests to invest in LiquidX, and that the board approved his request to make employment offers. P. FOF at ¶ 55. Finally, none of this has any bearing on alter ego, and Brooklawn has not cited a case demonstrating otherwise.

### F.  Fiction: The Partial Strict Foreclosure and Intellectual Property Purchase Transactions Were Improper and Harmed Brooklawn

Brooklawn, again without citation, accuses Toffey of "conspir[ing] with LiquidX to achieve a foreclosure," B. FOF ¶ 101, but still has not explained how engaging in a partial strict

---

[6] Brooklawn also misrepresents the record concerning the resignations of Connolly and Kovacs and their subsequent involvement with LiquidX. Connolly did not "claim[ ]" to have resigned on November 6. B. FOF ¶ 70. His November 6 resignation letter was entered into evidence. JX 62A. A subsequent resignation letter does not undo the effectiveness of his prior one. As for Kovacs, Brooklawn points to "the initial filings for LiquidX" in an attempt to demonstrate Kovacs served as LiquidX's treasurer. B. FOF ¶ 71. It fails to inform the Court, however, that the "initial filings" were unsigned, draft consents. (Tr. at 89:12-90:15 (G. Mueller).) Witnesses uniformly testified that Kovacs was never the treasurer (or any other officer) of LiquidX. Tr. at 90:1-9 (G. Mueller); 270:12-21 (J. Connolly); 560:21-561:13 (J. Kovacs).)

foreclosure, as opposed to a public auction, constitutes fraud. The remedy is available under both California and New York law and was not precluded by the Comerica loan agreement. P. FOF ¶ 76. In addition, TRE's software platform was "designed for a unique purpose," would only have had value to a similar exchange business, and a public auction may well have resulted in a lower price.[7] (Tr. at 318:15-319:1 (J. Toffey).)

Brooklawn also falsely claims that LiquidX swept $800,000 from TRE's Comerica account as part of the partial strict foreclosure and then gave it back to TRE. B. FOF ¶¶ 162-64. The testimony that it cites establishes exactly the opposite: "LiquidX has not touched the cash." (Tr. at 689:11-18.) Pursuant to the Transition Services Agreement, Peter Sullivan, acting for TRE, instructed Gielewski to move those funds from one TRE bank account to a different one because LiquidX and TRE had negotiated for TRE to keep the funds to pay creditor claims. P. FOF ¶ 80. LiquidX never possessed them. *Id*. The allegation that LiquidX "gave" TRE this money because LiquidX needed TRE's vendors to provide it services also has no support in the record. B. FOF ¶ 164. TRE paid vendors after the foreclosure that never became LiquidX vendors, discrediting Brooklawn's claim of motivation. P. FOF ¶ 80.

Finally, these transactions were all approved by TRE's directors at the time, Counihan and Farrington, both of whom even Brooklawn concedes were disinterested. P. FOF ¶ 75. They affirmed that the board had "evaluated the Companies' alternatives in connection with a possible

---

[7] Brooklawn's allegation regarding the "no litigation" representation in the Intellectual Property Purchase Agreement (B. FOF ¶¶ 111-12) also provides no evidence of fraud. Both parties to the agreement obviously knew that litigation was pending. This was a representation and warranty between the two signatories. JX 69. There is no evidence that either party intended to defraud anyone, or that any third party relied on the representation. It also incorrectly asserts that LiquidX acquired "all" of TRE's intellectual property via that agreement; LiquidX acquired TRE's software platform via the foreclosure. P. FOF ¶ 77.

- 9 -

restructuring" and that the "transactions … are in the best interests of the Companies and their stakeholders." JX 338. There is no contrary evidence.

### G. Fiction: Common Employees and TRE/LiquidX Interactions in 2016

Brooklawn's entire attempt to show "complete control" is based on interactions between LiquidX and TRE in 2016. As with the rest of its submission, it shields the Court from the key fact: the Transition Services Agreement, which is not referenced once. The TSA was negotiated by TRE and LiquidX to provide for servicing existing trades and back office support, and all interactions between the two companies in 2016 (and compensation for such services) was pursuant to the TSA. P. FOF ¶¶ 83-90. Brooklawn also fails to mention that all such assistance required approval by Sullivan. *Id*. at ¶¶ 86-90. For example, it asserts that Gielewski "does not need Sullivan's approval to remit any money from [TRE's bank] accounts," B. FOF ¶ 151, but then cites testimony from Gielewski that Sullivan approved everything. (Tr. at 647:10-13.)

Finally, Brooklawn mischaracterizes Sullivan's testimony that TRE would already be wound down if not for the Brooklawn arbitration into a supposed "admission" that "TRE exists solely to absorb LiquidX's liabilities." B. FOF ¶ 175. Sullivan made no such admission. He testified in November, ten months after the wind down began, and explained his responsibilities over that period in detail, including deciding which bills to pay, overseeing TRE's employees, executing contracts, and preparing tax returns. P. FOF ¶¶ 86-88.

\*   \*   \*

This case never should have been brought. The evidence all points to a badly distressed entity with no prospects to continue as a going concern, a transaction that was fair to all parties, and that there has been no abuse of the corporate form. Moreover, LiquidX and TRE share no common ownership and Brooklawn was not injured by the transaction. Brooklawn has failed to prove alter ego, the only claim presently before the Court.

Dated: December 21, 2016 　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　LIQUIDX, INC.,

　　　　　　　　　　　　　　　　　　　　By its attorneys

　　　　　　　　　　　　　　　　　　　　/s/ Michael J. Licker
　　　　　　　　　　　　　　　　　　　　Peter A. Sullivan, Esq. (PS-4704)
　　　　　　　　　　　　　　　　　　　　FOLEY HOAG LLP
　　　　　　　　　　　　　　　　　　　　1540 Broadway, 23rd Floor
　　　　　　　　　　　　　　　　　　　　New York, NY 10036
　　　　　　　　　　　　　　　　　　　　psullivan@foleyhoag.com
　　　　　　　　　　　　　　　　　　　　Telephone: (646) 927-5500
　　　　　　　　　　　　　　　　　　　　Facsimile: (646) 927-5599

　　　　　　　　　　　　　　　　　　　　Michael Licker, Esq., (*pro hac vice*)
　　　　　　　　　　　　　　　　　　　　FOLEY HOAG LLP
　　　　　　　　　　　　　　　　　　　　155 Seaport Boulevard
　　　　　　　　　　　　　　　　　　　　Boston, MA  02110
　　　　　　　　　　　　　　　　　　　　mlicker@foleyhoag.com
　　　　　　　　　　　　　　　　　　　　Telephone: (617) 832-1000
　　　　　　　　　　　　　　　　　　　　Facsimile: (617) 832-7000

**Certificate of Service**

　　　I, Michael J. Licker, certify that on December 21, 2016, I caused a copy of the foregoing document to be served on counsel for defendants via the Court's CM/ECF system.

　　　　　　　　　　　　　　　　　　　　/s/ Michael J. Licker
　　　　　　　　　　　　　　　　　　　　　　　Michael J. Licker