```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- :
                                         :
     LIQUIDX INC.,                       :
                                         :        16cv5528
                Plaintiff,               :
                                         :        OPINION & ORDER
          -against-                      :
                                         :
     BROOKLAWN CAPITAL, LLC, et. al,     :
                                         :
                Defendants.              :
                                         :
---------------------------------------- :
```

WILLIAM H. PAULEY III, District Judge:

  Plaintiff LiquidX Inc. brings this declaratory judgment action against Defendants Brooklawn Capital LLC, Brooklawn Capital Fund LLC, and Brooklawn Capital Fund II, LP (collectively, "Brooklawn"), seeking a declaration that LiquidX is not the alter ego of non-party The Receivables Exchange ("TRE") and that Brooklawn cannot compel LiquidX to join a Louisiana arbitration proceeding between Brooklawn and TRE.

  In September 2016, this Court entered an order enjoining the arbitrator from deciding the question of whether LiquidX is the alter ego of TRE. Thereafter, this Court conducted a four-day bench trial and now makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. Specifically, this Court holds that LiquidX is the alter ego of TRE and may be joined to the Louisiana arbitration.

## FINDINGS OF FACT

  This dispute arises out of the demise of TRE, an electronic exchange for accounts receivable founded in 2007. Brooklawn, a Grand-Cayman-based investment vehicle and onetime trader on the TRE platform, brought an arbitration proceeding against TRE in August 2015 pursuant to a binding arbitration agreement. Shortly thereafter, LiquidX purchased TRE's

debt and foreclosed on its assets, leaving Brooklawn (and other contingent creditors) with little more than a name to litigate against. When Brooklawn sought to join LiquidX to the arbitration, LiquidX filed this action seeking a declaration that joinder would be improper.

The essence of the parties' dispute revolves around what happened in the months leading up to January 1, 2016, when TRE ceased operations and LiquidX began running the same business under its own name. Brooklawn alleges that LiquidX, with the help of TRE's management, engineered a default on TRE's debt so that LiquidX could buy the business for pennies on the dollar and shed the exposure to Brooklawn's arbitration claims. LiquidX paints the picture of a standard foreclosure on a distressed borrower, with the concomitant unfortunate outcomes for junior, unsecured creditors like Brooklawn. As discussed below, this Court finds that the evidence supports Brooklawn's version of events.

A. **The Receivables Exchange and the Final Funding Round**

TRE was a financial technology company that operated an online exchange for accounts receivable—i.e. debts held on a company's books, such as scheduled payments for goods shipped on credit. The platform allowed companies to access short-term liquidity by selling these accounts at a discount to buyers on the exchange, who would then become the creditors on these accounts and would profit if and when the debtor paid the account in full.

By the fall of 2013, TRE had raised nearly $60 million from a variety of venture capital entities over five rounds of funding. (See Joint Set of Admitted Exhibits ("JX"), ECF No. 66, Ex. 84.) Four of these shareholders—including Bain Capital Ventures ("Bain")—contributed the majority of this capital and held board seats. (JX 63, 84.) Bain invested in July 2010. (Trial Transcript at 159:19.)

Nevertheless, TRE found itself in dire financial straits, having tapped nearly all of its funding while still suffering substantial quarterly losses. (Tr. at 171:18–24.) Bain asked John Connolly, a managing director of the partnership and experienced corporate manager, to step into Bain's board seat and try to salvage Bain's investment. (Tr. at 160:13.) After reviewing TRE's financials, Connolly and the board decided to dramatically reduce the company's headcount in order to slow TRE's "burn rate" while the board sought additional funding. The board also replaced TRE's management and, in March 2015, brought in a new CEO, James Toffey, another veteran executive and entrepreneur. (See JX 14 at 3.) Finally, the board secured a $3.25 million loan from Comerica Bank in December 2014 to extend TRE's financial runway during the search for new funding. (JX 1.) The loan included a covenant that TRE would open an account with Comerica and maintain a balance of at least $2 million. (JX 1.)

Having staunched the financial bleeding, the TRE board embarked on an extensive campaign for a sixth round of funding during the summer of 2015. None of the existing investors were willing to contribute additional capital, so the board pitched the investment to a wide variety of venture capital and private equity firms. (Tr. at 176:8–16.) Most of these targets passed on the investment, citing the complicated capital structure and problems with TRE's sales pipeline. (Tr. at 295:23–296:21.) TRE was, in short, old news; a large group of investors had contributed substantial capital over five funding rounds but the company was still operating at a loss, and the financiers who had passed on the earlier rounds saw no reason to get involved at this stage. One potential investor, Pivot, offered a term sheet that the board rejected because the investment was too small. (Tr. at 182:13–20.) Broadridge, another prospect, entered into negotiations but ultimately declined to invest, indicating that it would take a second look if TRE managed to close a successful funding round. (Tr. at 341:25–342:7.)

Then, in TRE's darkest hour, dawn broke in the form of Gary Mueller, a successful investor and entrepreneur who had been approached by Connolly in the summer of 2015. (Tr. at 7:14–18.) Connolly and Mueller were business acquaintances who had served together on multiple corporate boards. (Tr. at 7:25–8:9.) Notwithstanding TRE's struggles, Mueller was enticed; he liked the new management team, considered the market opportunity "compelling," and envisioned an "upside . . . in the $300-500 [million] range." (JX 99.) In August 2015, Mueller provided the TRE board with a term sheet that offered an investment of up to $5 million at a "pre-money" valuation of $18.21 million. (JX 34.) The board accepted these terms and agreed, on behalf of the firms that the board members represented, to contribute an additional $5 million if Mueller would "lead" the financing round. (Tr. at 189:12–24, 190:7—191:2.) With the terms in place, Mueller began his diligence in earnest and set a closing date of September 28, 2015.

In late September, Mueller and the TRE board were optimistic that the funding round would close as scheduled. Board members expressed excitement about such an experienced executive as Mueller joining the team and offered "congrats all around" in the week before the closing date. (JX 103.) On September 25, however, disaster struck. An arbitrator awarded Solaia Capital, another aggrieved TRE customer, with $186,000 in damages on claims very similar to those asserted in the Brooklawn arbitration. (JX 16.) Although the award was relatively small, the board immediately realized the implications; TRE was now significantly more exposed to Brooklawn, which was seeking more than $8 million in its arbitration. (Tr. at 343:20–23.) The TRE board held an emergency weekend meeting and informed Mueller of the Solaia award on September 28. (JX 16.) Mueller, the veteran financier, was similarly quick on the uptake. He reviewed the award and, after discussing it with TRE's management, canceled

4

the funding round on the very day it was set to close. (Tr. at 27:15–20; 64:9–13.) As quickly as it had been rescued, TRE once again faced financial ruin.

B.  **The "NewCo" Plan**

Although Mueller was "done" with TRE as soon as he finished reading the arbitrator's award, he was not ready to walk away from the opportunity entirely. (Tr. 27:18.) By October 1, two days after he canceled the funding round, Mueller was working with Toffey (the president and CEO of TRE) on an alternative plan—instead of investing directly, Mueller would form a "NewCo" to purchase TRE's loan from Comerica and foreclose on TRE's assets as the first-priority secured creditor. (JX 128, 136.) Comerica, aware of the failed funding round, sent a letter on October 15 outlining several different options for TRE to avoid default, including a "going-concern" sale or an outright sale of TRE's assets. (JX 46.) Toffey declined to consider these alternatives and instead pursued Mueller's proposal, which he considered a "global opportunity." (JX 134.) Three TRE insiders—Toffey, Connolly, and finance chief James Kovacs—planned to invest in "NewCo" and join Mueller there after the foreclosure.

An integral part of this plan was keeping it from the other members of TRE's board, whom Connolly and Mueller did not intend to include in "NewCo." Starting in October 2015, the three TRE insiders stopped using their TRE email accounts to communicate with Mueller and switched to their personal Gmail accounts. (Tr. 148:8–16, 349:13–19.) When Toffey inadvertently sent an email about "NewCo" from his TRE account, Mueller reminded everyone on the list to "use [their] G-mail addresses" for "NewCo" business. (JX 140.) The only TRE board member besides Connolly who testified at trial stated that he did not know that Connolly, Kovacs, and Toffey were working with Mueller during October 2015, but that he would have "certainly . . . looked into" it if he had been informed. (Tr.: 840:22–841:9, 843: 20–

5

25.) Toffey, still the CEO and chair of each TRE board meeting, testified that he never told the board about his planned investment because "[t]hey never asked." (Tr. 364: 15–20.)

Mueller and the "NewCo" investors then set about the task of convincing Comerica to sell TRE's loan to Mueller's new company. Toffey and Kovacs held multiple calls with Comerica executives, "[p]ounding them every day" to consent to a sale. (JX 267, Tr. 344:6–9.) On October 15 Comerica consented, but only if the sale was to a "disinterested buyer" who would offer the loan's entire principal and interest. (JX 46.) Because TRE was not yet in default, Comerica would only agree to a sale at par—i.e. at a price that "pays the bank back in full." (JX 46.)

With the plan settling into place, Toffey began reaching out to investors whom he had previously approached about TRE and offering them an opportunity to invest in Mueller's "NewCo." (JX 109.) The day after Comerica consented to the sale, Toffey emailed Mueller an update on his discussions with Broadridge, the investor that had expressed interest in TRE's failed funding round: "Talked to Broadridge. They get what we are doing and why. They are very bullish on us. I feel confident that they will invest at the prior terms when we are ready :)." (JX 133.) This process also involved lining up customers for the "NewCo" platform. (Tr. 354:13–355:2.) On October 19, Toffey informed Mueller of his "great meeting with China Merchant [B]ank," a new customer that wanted "to buy and sell all trade assets on the [NewCo] platform." Throughout October 2015, Toffey remained the president and CEO of TRE.

On November 6, 2015, "NewCo" came into being as LiquidX, Inc, with Gary Mueller as president and James Kovacs as Treasurer. (JX 117 at 1.) Toffey, Connolly, Kovacs, and Mueller capitalized the new company with $1,000, receiving approximately 80% of the shares at incorporation. (JX 117 at 2.) By the end of November, the four investors had

purchased additional LiquidX stock and loaned the company $4.05 million. (JX 73.) Thus incorporated and capitalized, LiquidX was ready to purchase the Comerica loan.

Toffey formally resigned from TRE's board on November 11, five days after purchasing nearly 500,000 shares of LiquidX, although the TRE board minutes noted his presence at board meetings throughout November and December 2015. (JX 63.) He continued to serve as TRE's president and CEO until January 1, 2016. Connolly resigned from the TRE board by letter dated November 16, 2015, ten days after he acquired 193,000 shares of LiquidX common stock. (JX 112.) Kovacs, who was listed on LiquidX's November 6 incorporation documents as Treasurer, signed a separation agreement with TRE on November 13, 2015. He continued to attend TRE board meetings and stayed on with TRE as a consultant. (Tr. 546:3–7, ("[I]n November 2015, I started consulting with both TRE and LiquidX."))

C. **The Loan Purchase and Foreclosure**

On November 20, Mueller sent a term sheet to the TRE board outlining his plan to purchase the loan and effect a strict partial foreclosure on TRE's assets. (JX 147.) These assets, which Mueller believed were worth "$2 to $3 million," would constitute partial satisfaction of the $3.25 million loan—thus, LiquidX would remain TRE's senior secured creditor. (JX 147.) In effect, TRE would cease to be and LiquidX would acquire its remaining cash and assets, including the exchange platform.

One final obstacle stood between LiquidX and TRE's valuable trading platform: TRE needed to obtain an independent appraisal of its assets before the foreclosure could proceed. Mueller acknowledged at trial that he needed this valuation to be low—i.e. below the $3.25 million loan amount—for the transaction to work. (Tr. 38:17–39:1, 116:21–117:3.) If TRE's assets were appraised above $3.25 million, the junior TRE creditors (like Brooklawn) would still

7

have claims on those assets after LiquidX foreclosed. Mueller needed a valuation between $2 and $3 million in order to "leave unsecured creditors behind." (JX 146.) Toffey, who as CEO would have been a primary source of valuation information for the appraiser, understood this. On December 4, 2015 he learned that the appraisal expert had valued TRE at $2.05 million and told Mueller "we look very good from that standpoint." (JX 155.) With the appraisal in place, LiquidX was in position to acquire for a mere $4.05 million (the cost of the loan plus interest) all the assets of a company that Mueller had recently valued at $18.2 million, with considerable upside potential.

D. **TRE becomes LiquidX**

The LiquidX team, knowing that any interruption in the exchange would be detrimental to the business, worked in parallel to transition TRE's business into the new company. On November 12, Kovacs—by then "consulting" for both TRE and LiquidX and invested in LiquidX—sent Mueller and Toffey a workstream document for "Project Caerus,"[1] which outlined the steps necessary to transfer TRE's business to the new company. (JX 144, 189.) Over the following two months, TRE's management worked on the "rebranding" into LiquidX. (JX 149.) Toffey and other executives moved vendor contracts, bank accounts, and customer agreements to LiquidX. (See JX 157, 172, 227.)

By December 4, Toffey reported to Connolly that the LiquidX project was "lining up nicely," with "[g]ood new customer interest . . . . Everyone is ready to officially become LiquidX." (JX 300.) In mid-December, Toffey traveled to TRE's New Orleans headquarters to explain the transition to employees and collect signed termination/re-hiring letters from them, effective January 1, 2016. (JX 161.) Although Toffey was technically still TRE's president and

---

[1] This Court takes judicial notice, without comment, of the fact that Caerus is the Greek god of opportunity, luck, and favorable moments.

CEO at this time, he signed these employee offer letters as "CEO of LiquidX." (JX 165.) In the final week of December, all existing TRE customers received a form letter informing them that TRE "has sold its trading platform to LiquidX" and assuring them of a "seamless continuation of business" because LiquidX was "hiring the TRE team effective Jan[uary] 1." (JX 160, Tr. 407:11–12.)

The final transaction occurred on December 31, when Toffey executed a "Letter Agreement re: Partial Strict Foreclosure" on behalf of TRE. It was his final act as TRE's president and CEO, and the board authorized him to sign the document without knowing that he was also an investor in LiquidX, the counterparty to the foreclosure. (Tr. 410: 23–411:7.) Significantly, this letter agreement expanded LiquidX's available remedies to include the right to conduct a private foreclosure under UCC § 9-620. (JX 68) The previous loan agreement between TRE and Comerica did not permit this transaction, and only allowed the lender to acquire TRE's assets through a public auction under UCC § 9-610. (JX 1.)

Although TRE had informed its vendors and customers of the impending "rebranding," TRE's common stockholders and contingent creditors (including Brooklawn) were left in the dark. (JX 283.) Former TRE employees who were compensated with TRE stock were surprised to learn, months after the fact, that their shares were "officially worth $0." (JX 283.) LiquidX's accountants were similarly confused, and asked Sophia Gielewski—LiquidX's finance director who had transitioned from the same role with TRE—why LiquidX was "moving assets out of Oldco into Newco." (JX 240A.) In an internal email to Kovacs with draft responses to the accountants' questions, Gielewski noted "I know why, but don't know how much you want to put in writing." (JX 240A.)

With LiquidX operating TRE's business free and clear of TRE's creditors and with a clean cap table, investors were comfortable buying into the business that they had passed on just months earlier. Connolly, Toffey, and Mueller participated in a new funding round in March 2016 that raised $4.5 million. (JX 74.) Broadridge, the investor that Connolly and Toffey had approached in November 2015, invested approximately $2.5 million in this round. (JX 74.) LiquidX commenced operations seamlessly on January 1, 2016, using, inter alia, the same offices, employees, vendors, and finance department that had served TRE the day before. (See Brooklawn's Proposed Findings of Fact and Conclusions of Law, ECF No. 68, ¶¶ 122–71.)

## CONCLUSIONS OF LAW

A.  **Choice of Law**

The parties disagree on which state's "alter ego" doctrine should apply to this dispute, arguing variously for Louisiana (the mandatory forum for arbitration with TRE), Delaware (the state of incorporation of both TRE and LiquidX), and New York (the location of TRE and LiquidX's principal place of business and, of course, this Court's forum state). In a diversity case, district courts apply the choice of law rules of the forum state. Krauss v. Manhattan Life Ins. Co., 643 F.2d 98, 100 (2d Cir. 1981). New York choice of law rules "require a court to apply the law of the state with the most significant relationship with the particular issue in conflict." Indosuez Int'l Finance B.V. v. Nat'l Reserve Bank, 98 N.Y.2d 238, 245 (N.Y. 2002). When there is "no 'actual conflict between the laws of the jurisdictions involved,'" however, "there need not be a determination of which law to apply because the application of either jurisdiction's law would provide the same result. Asesores y Consejeros Aconsec CIA v. Global Emerging Mkts. N. Am., Inc., 841 F. Supp. 2d 762, 766 (S.D.N.Y. 2012).

In this case there is no actual conflict among the law of the states at issue, because each employs substantially the same analysis to determine whether a corporation is the alter ego of an owner or of another corporation.[2] Each state requires a showing that one corporation is wholly under the domination and control of another. See, e.g. Wm. Passalacqua Builders Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 138 (2d Cir. 1991); Trevino v. Mescorp, Inc., 583 F. Supp. 2d 521, 528 (D. Del. 2008); Holly & Smith Architects, Inc. v. St. Helena Congregate Facility, 872 So.2d 1147, 1155 (La. App. 1 Cir. 2004). The three states also employ similar non-exclusive lists of factors to consider with respect to domination and control. See Wm. Passalacqua, 933 F.2d at 139; Trevino, 583 F. Supp. 2d at 528–29; Holly & Smith, 872 So.2d at 1155–56. Finally each state's law demands proof that this control was used to perpetrate a fraud or injustice, as the purpose of the alter-ego doctrine is to pierce the corporate veil "whenever justice requires protection of the rights of third persons." Green v. Champion Ins. Co., 577 So.2d 249, 257 (La. App. 1 Cir. 1991); see also Wm. Passalacqua, 933, F.2d at 138; Trevino, 583 F. Supp. 2d at 528.

Because there is no actual conflict between the alter-ego rules of these three states, this Court will apply New York alter-ego doctrine.

B. **Alter Ego and Veil-Piercing under New York Law**

Under New York law, courts may pierce the corporate veil "whenever necessary to prevent fraud or achieve equity." Walkovszky v. Carlton, 18 N.Y.2d 414, 417 (N.Y. 1966). "Generally, however, piercing the corporate veil requires a showing that: (1) the owners

---

[2] The fact that Louisiana has a complementary doctrine of "single business enterprise" veil piercing—for situations where a party seeks to pierce a corporate veil to reach another corporation rather than an owner—is immaterial, because New York courts use the New York alter-ego rule to the same effect. See, e.g. Wm. Passalacqua, 933 F.2d at 140 (using the alter-ego doctrine "to reach the assets of either the individual [owners] or the other [owner]-controlled corporate entities").

exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." Morris v. N.Y. State Dep't of Taxation and Fin., 623 N.E.2d 1157, 1160–61 (N.Y. 1993). This analysis eschews mechanical interpretation, as every veil-piercing inquiry "will necessarily depend on the attendant facts and equities." Morris, 623 N.E.2d at 1160.

   1. Complete Domination and Control

The first inquiry—whether the alleged alter-ego entity "exercised complete domination"— is highly case-specific and must be made in view of "the totality of the facts." United States v. Funds Held in the Name or for the Benefit of Wetterer, 210 F.3d 96, 106 (2d Cir. 2000). The Second Circuit has articulated a series of factors to guide district courts in this determination, including

> (1) The absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arm's length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

Wm. Passalacqua, 933 F.2d at 139. "No one factor is dispositive, and courts have considered additional factors as well." Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC, 851 F. Supp. 2d 504, 510 (S.D.N.Y. 2012). The factfinder must consider the totality of the evidence as well as the public policy of "protect[ing] those who deal with the corporation." Wm. Passalacqua, 933 F.2d at 139. Generally, courts will pierce the veil and hold a corporation's alter

ego liable "when doing so would achieve an equitable result." Williamson v. Recovery Ltd. P'ship, 542 F.3d 43, 53 (2d Cir. 2008).

In this case, the evidence adduced at trial compels a finding that LiquidX is the alter ego of TRE. As discussed above, the two entities are virtually indistinguishable; LiquidX is a new company in name only. Beginning on January 1, 2016, LiquidX continued to operate TRE's business in a seamless transition. TRE's offices and employees became LiquidX's offices and employees, the exchange was simply rebranded, and LiquidX took over responsibility for financing and defending TRE's outstanding legal disputes (including the Brooklawn arbitration.) (Tr. 611:5–23.) Although TRE hired a "wind-down" consultant to oversee the transition and retains a single employee in LiquidX's offices, all relevant business functions—e.g. IT maintenance, payment of bills and salaries—are conducted by LiquidX personnel. There is simply no meaningful distinction between the company that TRE was and the company that LiquidX is today.

LiquidX makes much of the fact that there is no literal overlap in ownership because Toffey, Connolly, Kovacs, and Mueller never owned shares of both TRE and LiquidX. This argument is not compelling, as it rests on an overly formalistic conception of "domination and control." Ownership, in the corporate context, is a proxy for control. It is certainly possible, however, to exercise control over corporate functions without owning the corporation itself; in this case, Toffey, Connolly, and Kovacs—at the direction of Mueller—did just that. The TRE insiders ensured that Mueller's transaction would be successful by declining to consider other options after the funding round fell apart. Connolly and Toffey, both former TRE board members, became directors of LiquidX on the company's first day in business. Kovacs worked for both companies simultaneously in November 2015 as he endeavored to ensure a smooth

13

transition after the foreclosure. Mueller was never a part of TRE but nonetheless exercised considerable influence on the board, as he was the only viable source of funding at the end of 2015. Taken together, these facts reveal a substantial overlap in directors, officers, and control between TRE and LiquidX.

The most significant factor in this case, however, is that the corporations did not deal with one another "at arm's length." The substantial involvement of TRE's management team, and Toffey in particular, in engineering the foreclosure from both sides suggests that this was anything but a disinterested negotiation between sophisticated parties. Toffey's influence over the independent appraisal is particularly glaring. The valuation agent testified that Toffey "expressed an interest in having a low value" because "if the value were too high, then the buyer wouldn't be interested in buying [TRE's] assets." (Tr. 741:22–742:8.) This was unusual, as LiquidX's own valuation expert noted, because the typical seller of distressed assets would want a <u>high</u> valuation. (Tr. 817:9–12.) So unusual, in fact, that the independent appraiser was "uncomfortable" with Toffey's requests and discussed with her supervisor the possibility of terminating the engagement. (Tr. 746:4–22.) Indeed, there would be no reason for Toffey to push for a low valuation if he were a disinterested TRE executive.

Testimony at trial revealed that Toffey and his associates did more than just ask the appraiser to come back with a low valuation. Mike Walker, TRE's head of technology who also used his Gmail account to communicate with Toffey and Mueller about LiquidX business, told the appraiser that TRE's technology was "non-operational" and that the business was "non-functioning." (Tr. 722:4–19.) The appraiser acknowledged that this changed her approach, as she believed that she was merely valuing TRE as a collection of assets rather than as a going concern. (Tr. 738:9–21.) The information provided to the appraiser stands in stark contrast to

14

Mueller's private assessment; he was excited about the opportunity to acquire a "functioning platform" that was a "moving bus" rather than a collection of parts. (Tr. 107:16–18, 126:5.) Mueller and his fellow investors placed significant value on TRE's platform, which they envisioned as a functional business that simply required financial restructuring; apparently, however, it was important that the independent appraiser not come to the same conclusion.

Toffey claimed at trial that he wanted to see the deal close so that TRE would avoid bankruptcy and retain the remaining employees. This justification might have been compelling if he had disclosed his interest in LiquidX—the counterparty to the foreclosure—to the TRE board and explained why the low valuation was necessary. As discussed above, however, he did the opposite; the board was not aware of his investment in LiquidX at the time of the foreclosure agreement, and consequently his negotiation of that transaction on terms favorable to LiquidX cannot be considered "arm's length."

In light of the totality of the facts, this Court concludes that LiquidX exercised the requisite domination and control of TRE at all relevant times.

2. Use of Control to Commit Fraud or Wrongdoing

The second factor allows courts to pierce the corporate structure where an entity's control of the other corporation was "used . . . to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights." Lowendahl v. Baltimore & Ohio R.R. Co., 287 N.Y.S. 62, 76 (1st Dep't 1936) (aff'd 6 N.E. 2d 56 (1936)). It is not strictly necessary to find that the transaction "constituted 'fraud'" on the aggrieved party. Gorrill v. Icelandair/Flugleidir, 761 F.2d 847, 853 (2d Cir. 1985). Rather, it is sufficient for the factfinder to conclude that the controlling entities, "through their domination of the corporation, 'abused the privilege of doing business in the

15

corporate form to perpetrate a wrong or injustice against [the aggrieved party] such that a court in equity will intervene.'" JSC Foreign Econ. Assoc. Technostroyexport v. Int'l Dev. And Trade Servs., Inc., 386 F. Supp. 2d 461, 465 (S.D.N.Y. 2005) (quoting Morris, 623 N.E.2d at 1161).

There is ample evidence in the record to support the conclusion that LiquidX, through the actions of TRE's management, structured and executed this transaction to perpetrate a wrong—namely, a foreclosure that would allow LiquidX to acquire TRE's business free and clear of its creditors, leaving Brooklawn with nothing but a shell company to litigate against. See Carte Blanche (Singapore) PTE, LTD v. Diners Club Int'l, Inc., 758 F. Supp. 908, 917 (S.D.N.Y. 1991) (finding that "stripping of the assets by the parent, motivated by a desire to render the subsidiary judgment proof" constitutes "fraud or wrong").

The sequence of events leading to the foreclosure renders this conclusion inescapable. TRE's final funding round cratered immediately upon Mueller learning of the Solaia arbitration award—not because the award was large, but because it amplified the litigation risk of Brooklawn's more substantial claim. (See JX 16 (September 28, 2015 email from Mueller to Toffey and Kovacs asking "[The Solaia award] does not bode well for the other arbitration, right?")) Instead of walking away from the transaction, Mueller and Connolly came up with an approach that would allow them to acquire TRE's functioning platform while "leav[ing] unsecured creditors behind." (JX 146.) Brooklawn would find itself arbitrating against a "ShellCo," (JX 189) and LiquidX, with TRE's contingent creditors safely in the rearview mirror, would be a functioning business worthy of a multi-million dollar investment in a matter of months. To achieve this outcome Mueller relied on insiders like Toffey to stack the deck in LiquidX's favor—for example, by agreeing on behalf of TRE (without disclosing his interest in LiquidX to the board) to amend the loan agreement and allow LiquidX to conduct a

16

private foreclosure. Ultimately, the foreclosure turned Brooklawn's otherwise-viable arbitration into an exercise in futility. This result would not have been possible without the high degree of control that Mueller, Toffey, Connolly, and Kovacs exercised over TRE's operations.

## CONCLUSION

Because LiquidX used its domination and influence over TRE to structure the foreclosure specifically to evade liability to Brooklawn, this Court concludes that LiquidX exercised its control to perpetrate a wrong against Brooklawn. Accordingly, LiquidX is liable to Brooklawn as TRE's alter ego and may be joined to the Louisiana arbitration. LiquidX's claims for declaratory relief on these issues are dismissed.

Dated: May 23, 2017
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.